Exhibit C

Last updated  August 23, 2020   04:54:11 pm GMT

## *Nelligan v. Zaio Corp.*

United States District Court for the District of New Jersey

March 21, 2011, Decided; March 21, 2011, Filed

Civil Action No.: 10-cv-1408 (FLW)

**Reporter**
2011 U.S. Dist. LEXIS 28628 *; 2011 WL 1085525

DIANE NELLIGAN, Plaintiff, v. ZAIO CORP.; ZAIO INC.; JAMES KIRCHMEYER, individually and in his representative capacity; REAL INFO, INC.; DOUGLAS VINCENT, individually and in his representative capacity; MARK CHAPIN, individually and in his representative capacity; STEVEN OLIVER, individually and in his representative capacity; JOHN DOE (1-10) (being fictitious names for unknown persons); ABC CORP. (1-20) (being fictitious names for unknown entities), Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

purposefully, promissory, unilateral, targeting, estoppel, tortious, senior, hired, team

**Counsel:** **[\*1]** For **DIANE NELLIGAN**, **Plaintiff**: **RICHARD D. DEL MONACO**, LAW OFFICES OF WILLIAM J. COURTNEY LLC, FLEMINGTON, NJ.

For **JAMES KIRCHMEYER**, *individually and in his representative capacity*, **Defendant**: **BRIAN MICHAEL SHER**, *LEAD ATTORNEY*, KAUFMAN BORGEEST & RYAN LLP, PARSIPPANY, NJ; **CARA A. O'SULLIVAN**, *LEAD ATTORNEY*, KAUFMAN BORGEEST & RYAN LLP, NEW YORK, NY; **MARK W. CATANZARO**, *LEAD ATTORNEY*, MOORESTOWN, NJ.

For **REAL INFO, INC., KIRCHMEYER &**

ASSOCIATES, INC.**, **Defendants**: **MARK W. CATANZARO**, *LEAD ATTORNEY*, MOORESTOWN, NJ.

For **DOUGLAS VINCENT**, *individually and in his representative capacity*, **MARK CHAPIN**, *individually and in his representative capacity*, **STEVEN OLIVER**, *individually and in his representative capacity*, **Defendants**: **BRIAN MICHAEL SHER**, *LEAD ATTORNEY*, KAUFMAN BORGEEST & RYAN LLP, PARSIPPANY, NJ; **CARA A. O'SULLIVAN**, *LEAD ATTORNEY*, KAUFMAN BORGEEST & RYAN LLP, NEW YORK, NY.

**Judges:** Honorable Freda L. Wolfson.

**Opinion by:** Freda L. Wolfson

## Opinion

**WOLFSON, United States District Judge:**

Presently before this Court is Defendants' motion to dismiss the Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, and in the alternative, pursuant to *Rule 12(b)(6)*. Plaintiff Diane Nelligan ("Plaintiff") alleges in her Complaint **[\*2]** that individual defendants James Kirchmeyer, Stephen Oliver, [1] Douglas Vincent and

---

[1] Defendant Stephen Oliver was incorrectly sued as "Steven Oliver." The Court will use the correct spelling of "Stephen Oliver."

Mark Chapin (hereinafter "Defendants") engaged in actions that violate: (1) the Equal Pay Act, *29 U.S.C. §206(d)*; (2) the retaliation provisions of the Fair Labor Standards Act, *29 U.S.C. §215(a)(3)*; (3) the New Jersey Wage and Hour Law, *N.J.S.A. 34:11-56.8*; and (4) the New Jersey Law Against Discrimination, *N.J.S.A. 10:5-1 et. seq.* She further alleges that these individual defendants aided and abetted their former, now-defunct employer, Zaoi, Inc., in discriminating against her. Lastly, Plaintiff brings a "breach of contract/promissory estoppel" claim. For the reasons that follow, the Court grants Defendants' motion to dismiss due to lack of personal jurisdiction over the Defendants.

## I. Factual Background and Procedural History

Plaintiff is, and was at all relevant times, a resident of the State of New Jersey. (Compl. ¶ 1). Plaintiff was hired by Zaio Inc. [2] in April 2007 as a consultant on a trial basis, and was offered a permanent position as Director in or around June 2007. **[*3]** Id. at ¶ 16-18. As Director, Plaintiff received an annual salary of $80,000, plus 4% sales commission. Id. at ¶ 18. Defendants are all former employees of Zaio Inc., and reside in different states: James Kirchmeyer ("Kirchmeyer") is a resident of the State of New York; Douglas Vincent ("Vincent") is a resident of the State of Texas; Mark Chapin ("Chapin") is a resident of the State of California; and Stephen Oliver ("Oliver") is a resident of the State of Florida. Id. at ¶ 4-9. Plaintiff claims that all four Defendants exercised supervisory authority over her during her employment with Zaio. [3] Id. at ¶ 4-9.

The Court notes that Plaintiff's Complaint speaks in generalities by claiming **[*4]** throughout that "Defendants," rather than individual defendants, engaged in certain conduct. However, Plaintiff's Complaint does allege that during her time with Zaio, she was: (1) not a member of the executive or senior management team, and was excluded from senior level team building meetings despite her title of Director; (2) compensated less than her male subordinate; (3)

---

[2] Zaio Inc. is presently a dissolved business entity. It was a wholly owned subsidiary of Zaio Corp., and was incorporated and had its principal offices located in Scottsdale, Arizona.

[3] Defendants Kirchmeyer, Chapin, and Oliver deny having any direct supervisory authority over Plaintiff. (Kirchmeyer Aff. at ¶ 8; Chapin Aff. at ¶ 8; Oliver Aff. at ¶ 8). Vincent claims that, contrary to Plaintiff's allegations, he was only her direct supervisor for several weeks during the summer of 2007. (Vincent Aff. at ¶ 8).

promised an annual bonus of $20,000 that she never received; (4) "harassed, discriminated, and retaliated against" when she was removed from her position as Director and demoted to an inferior position; and (5) "harassed, discriminated, and retaliated against" when she was terminated in or around September 2008. Id. at ¶ 33-35.

After Plaintiff filed her initial Complaint, Defendants filed a motion to dismiss for lack of jurisdiction pursuant to *F.R.C.P. 12(b)(2)*, or in the alternative, pursuant to *F.R.C.P. 12(b)(6)*. Subsequently, Defendants filed a declaration accompanied by Defendants' individual affidavits in support of the present motion. Plaintiff then filed Opposition, accompanied by a Certification of Diane Nelligan on July 6, 2010. The Court now rules upon Defendants' motion to dismiss for lack of jurisdiction **[*5]** and, accordingly, does not reach Defendants' *Rule 12(b)(6)* motion.

## II. Discussion

## A. Personal Jurisdiction

The present motion challenges whether this Court has personal jurisdiction over Defendants. Once challenged, a plaintiff bears the burden of establishing personal jurisdiction. *General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001)* (finding the plaintiff must demonstrate "[a] nexus between the defendant, the forum and the litigation."). This Court is not required to hold an evidentiary hearing; however, without such hearing, Plaintiff has the burden to establish a prima facie case of personal jurisdiction. *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)*. For a prima facie case, Plaintiff must "establish[] with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)* (citing *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc., 819 F.2d 434 (3d Cir. 1987))*. Although Plaintiff bears this burden, in considering Defendants' Motion, this Court must take Plaintiff's allegations as true and resolves all factual disputes in Plaintiff's favor. *Miller, 384 F.3d at 97*.

*Federal Rule of Civil Procedure 4(k)* **[*6]** requires a district court to exercise personal jurisdiction according to the law of the state where it sits. In this instance, the New Jersey long-arm statute establishes New Jersey's

jurisdictional reach conterminous to that allowed for under the U.S. Constitution, subject only to due process of law. Thus, the central inquiry is whether Defendants have "certain minimum contacts with. . . .[New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." See *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (internal quotation omitted). The Plaintiff only asserts specific jurisdiction, and therefore, the Court will not apply a general jurisdiction analysis. [4]

## B. Specific Jurisdiction

The inquiry as to whether specific jurisdiction exists has three parts. First, Defendants must have "purposefully directed [their] activities" at the forum state. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (quotation marks omitted). Second, the litigation must "arise out of or relate to" at least one of those activities. *Helicopteros, 466 U.S. at 414*; *Grimes v. Vitalink Commc'ns Corp., 17 F.3d 1553, 1559 (3d Cir. 1994)*. Finally, if the prior two requirements are met, the Court may consider whether the exercise of jurisdiction would offend "notions of fair play and substantial justice." *Int'l Shoe, 326 U.S. at 316*.

At the threshold level, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)*. Physical entrance is not required. See *Burger King Corp., 471 U.S. at 476*. But what is necessary is a deliberate targeting of the forum. *O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312 (3d Cir. 2007)*. Thus, the "unilateral activity [*8] of those who claim some relationship with a nonresident defendant" is insufficient. See *Hanson, 357 U.S. at 253*. Further, contacts with a state's citizens that take place outside the state are not purposeful contacts with the

state itself. See *Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 542-43 (3d Cir. 1985)*. Moreover, the jurisdictional nexus must also be the result of intentional conduct by the defendant and not merely "random, fortuitous, or attenuated contacts." *Amberson Holdings v. Westside Story Newspaper, 110 F.Supp. 2d 332, 334 (D.N.J. 2000)* (internal quotation omitted).

Importantly, the Supreme Court has recognized that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n. 13, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)*. *Sathianathan v. Pacific Exchange, Inc., 248 Fed.Appx. 345 (3d Cir. 2007)* ("Jurisdiction over employees of a corporation does not arise automatically from jurisdiction over the corporation."). "As [*9] a general rule, an individual whose contacts with the forum state are in his corporate capacity does not thereby become subject to jurisdiction in his individual capacity." *Nicholas v. Saul Stone & Co. LLC, No. 97-860, 1998 U.S. Dist. LEXIS 22977, at *10 (D.N.J. June 30, 1998)*, aff'd, *224 F.3d 179 (3d Cir. 2000)*; see *Shapiro v. Sun Life Assurance Co. of Can., 117 F.R.D. 550 (1987)* (holding that defendants' only contacts with the forum state were a result of following company procedures, and therefore, the exercise of jurisdiction over the defendants was unreasonable). Therefore, "each defendant's contacts with the forum State must be assessed individually." *Keeton, 465 U.S. at 781 n. 13* (citing *Rush v. Savchuk, 444 U.S. 320, 332, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980))*.

## C. Analysis

Plaintiff's allegations against the individual defendants are based upon contacts that were primarily through mail, email, and by phone. As an initial matter, then, the Court addresses Plaintiff's reliance on *Grand Entert. Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476 (3d Cir. 1993)*, for the general proposition that mail and telephone communications sent by a defendant into the forum state may demonstrate sufficient minimum contacts. [*10] *Grand* was a suit involving a contract dispute, where allegations relating to the negotiation of the agreement are paramount. Thus, the Third Circuit looked to mail and telephone communications evincing the formation of the agreement at issue in that case. *Id. at 482*. Here, by contrast, Plaintiff's claims sound in discrimination. So, while the Court agrees that mail and telephone communication may support specific jurisdiction in some instances, it is only where the

---

[4] The assertion of general jurisdiction over non-forum related activities is proper when the defendant has engaged in "systematic and continuous" activities in the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404*. Here, Plaintiff never asserts that the Defendants have "systematic and continuous" contacts with New Jersey; rather, Plaintiff alleges that: "In the case at bar, the Plaintiff's cause of action is related to or arises out [*7] of the Defendants' contacts with the forum, thereby giving the Court 'specific jurisdiction' over Defendants." (Pl. Opp. at 8).

plaintiff's claims arise out of those communications. Accord *Asanov v. Gholson, Hicks & Nichols, P.A., 209 Fed.Appx. 139, 142 (3rd Cir. 2006)* (distinguishing Grand where plaintiff brought legal malpractice claim against attorneys who represented plaintiff in a suit in a foreign forum); see also *O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 n.3 (3d Cir. 2007)* (noting that specific jurisdiction is usually assessed on a "claim-by-claim basis"). With this principle in mind, the Court will separately assess each individual defendant's contacts with New Jersey for the purpose of analyzing Defendants' 12(b)(2) motion to dismiss for lack of in personam jurisdiction.

## 1. Defendant Kirchmeyer

Kirchmeyer is a resident [*11] of the State of New York. Plaintiff asserts that she first met Kirchmeyer at a trade conference, [5] through a mutual business friend, while Kirchmeyer was in the process of negotiating his own employment with Zaoi, and that she maintained a friendly relationship with him. [6] (Nelligan Cert. ¶¶ 4-6). Once Plaintiff began working for Zaoi on a trial basis in April of 2007, she avers, she engaged in discussions with Kirchmeyer in which she expressed her reluctance to accept a permanent position with Zaio on account of the below-market compensation and job title. Id. She, further, avers that Kirchmeyer encouraging her to accept the permanent position with Zaoi and promised her that he would "take care of things" once he joined the company. Id. In regards to these conversations, Plaintiff alleges that she conversed with Kirchmeyer from her home in New Jersey, and Plaintiff, thereafter, accepted Zaoi's offer of employment.

Plaintiff states that, while employed at Zaio in a permanent position, Kirchmeyer was her direct supervisor. Id. at ¶¶ 12-16. She asserts that he knew she worked out of her home office in New Jersey and conducted business on behalf of Zaio in New Jersey. Id. at ¶ 10. Plaintiff alleges that Kirchmeyer directed her to conduct business in New Jersey and the surrounding area. Id. at ¶ 22. Plaintiff further claims that after

complaining about being compensated less than her male subordinate, Kirchmeyer stated that Plaintiff was "all set with a guarantee of 20k bonus." (Compl. ¶ 31; Nelligan Cert. Exh. E). Lastly, Plaintiff claims that when she questioned Kirchmeyer about senior level team building meetings that she had not been invited to attend, Kirchmeyer stated that she would not like the meetings because they were comprised of "a bunch of guys drinking and playing poker," and that the male managers did not like Plaintiff because she was too assertive. (Compl. ¶ 33).

Plaintiff's strongest argument for personal jurisdiction over Kirchmeyer relates [*13] to his conversation with Plaintiff about her employment at Zaio. When Kirchmeyer told Plaintiff that he would "take care of things," Plaintiff arguably relied on this statement and, therefore, such contact could potentially be related to Plaintiff's promissory estoppel claim. Id. at ¶ 72-74. However, this alleged statement is not only ambiguous, [7] but the Complaint's promissory estoppel allegations do not reference the Kirchmeyer statement. Plaintiff's promissory estoppel allegations are: "Plaintiff and Defendants agreed that Plaintiff would perform certain job functions, and that Plaintiff would be compensated for her labor, including a promise for an annual bonus of at least $20,000. Plaintiff provided services in a satisfactory manner and rendered demand for payment in connection therewith." Id. at ¶ 72-73. As such, Kirchmeyer's comment that he would "take care of things" is not related to the promissory estoppel claim, since the claim includes only allegations made during Plaintiff's employment with Zaio. When Kirchmeyer made this statement, he was not employed at Zaio, and had no influence over the terms of Plaintiff's contract or compensation. Thus, Kirchmeyer's statement is [*14] not related to any claim asserted, and is irrelevant for a specific jurisdiction analysis. See *Helicopteros, 466 U.S. at 414* (holding that contact unrelated to the litigation at hand cannot be used to support personal jurisdiction over a defendant).

---

[5] Plaintiff does not state where this trade conference was held.

[6] At the trade conference, Plaintiff alleges that she discussed with Kirchmeyer that she resided and worked out of her home office in New Jersey. The Court notes that this contact is unrelated [*12] to the litigation at hand, and as such, cannot be used to support personal jurisdiction over this defendant. See *Helicopteros, 466 U.S. at 414*.

[7] This court questions whether Kirchmeyer could ultimately be held liable under a theory of promissory estoppel for the statement that he would "take care of things". See *Trianco, LLC v. IBM, 271 Fed. Appx. 198 (3d Cir. 2008)* (stating that "a promise obliging only one party to a contract to do something, without receiving any benefit in return, is illusory and creates no enforceable obligation"). In addition, for a claim of promissory estoppel in New Jersey, the plaintiff must allege that the promise was "clear and definite." *Del Sontro v. Cendant Corp., 223 F. Supp. 2d 563 (D.N.J. 2002)*.

2011 U.S. Dist. LEXIS 28628, *14

Regarding Kirchmeyer's contacts with Plaintiff made during their employment at Zaio, the Court is similarly convinced that these contacts do not warrant personal jurisdiction over Kirchmeyer in New Jersey. Specifically, Kirchmeyer's contacts with Plaintiff as her supervisor are not sufficient to warrant jurisdiction over this defendant in New Jersey. [8] In **[*15]** *MoneyGram Payment Systems, Inc. v. Consorcio Oriental, S.A., 65 Fed. Appx. 844 (3d Cir. 2003)*, the Court held that two individual defendants who travelled to the forum state of New Jersey "specifically for the purpose of doing business in New Jersey with a business then located in the state" could not be haled into a New Jersey court due to lack of personal jurisdiction. Citing *Nicholas, 224 F.3d at 184*, and *Keeton, 465 U.S at 781*, the court noted that it was "not the business of the individual officers . . . with no identified contact with New Jersey other than in their capacity as corporate agents," that occasioned the few contacts the individual defendants had with the forum state. *MoneyGram, 65 Fed. Appx. at 850*. Rather, it was the business of the corporation, for whom the individuals worked, that led them to make the contacts with New Jersey. Hence the court held that the Plaintiff's attempt to "ensnare" the two individual defendants in a "jurisdictional web" ignores the defendants' separate legal identity from their employer, another defendant in that case. [9] *Id*. While Moneygram

---

[8] While this fact is disputed, for a 12(b)(2) motion without an evidentiary hearing, the Court will accept as true Plaintiff's allegations that Kirchmeyer was her supervisor for a period of time at Zaio Inc. *Miller, 384 F.3d at 97*. This analysis holds true for all four defendants, who claim that Plaintiff's characterization of their supervisory authority is false or misleading. The Court notes that this analysis also applies to this Court's assertion of personal jurisdiction over each individual defendant who Plaintiff contends had supervisory authority over her. Therefore, each defendant's contacts with Plaintiff in a supervisory capacity are insufficient to warrant jurisdiction over any of the Defendants in this case. See *Bangura v. Pennrose Mgmt. Co., No. 1:09-04017, 2010 U.S. Dist. LEXIS 59450, at *10* ("The necessity of communicating with an employee who happens to work in New Jersey cannot be said to show that **[*18]** the supervisors purposefully directed their activities at New Jersey.").

[9] In cases that have criticized this analysis, such as *Schley v. Microsoft Corporation, No. 08-3589, 2008 U.S. Dist. LEXIS 96059 (D.N.J. 2008)*, jurisdiction seems to exist over an individual defendant who is acting in a "corporate capacity" if the defendant is personally involved in committing a tort (or something analogous to a tort in the forum state), or where a defendant could be held statutorily liable as an individual. Here, Plaintiff has failed to assert that a tort or something

---

is nonprecedential, this Court finds its analysis persuasive, and it has been relied upon by many **[*16]** other courts for this same proposition. See *Oorah, Inc. v. Schick, No. 08-2202, 2009 U.S. Dist. LEXIS 5475 (D.N.J. Jan. 26, 2009)* ("To exercise jurisdiction over Schick, Plaintiff must make a prima facie showing that Schick has contacts with New Jersey, aside from his capacity as an officer . . ."); *Bangura, 2010 U.S. Dist. LEXIS 59450, at *9-10* ("Both Holden and Jones supervised employees in New Jersey, and, as such, were required to have contact with New Jersey for the purposes of fulfilling their professional responsibilities. However, these contacts do not demonstrate purposeful availment on their part."); *Goodman v. Goodman, No. 04-03869, 2010 U.S. Dist. LEXIS 20518, at *18 (D.N.J. Mar. 5, 2010)* ("Unidentified 'family visits' and limited business conducted on behalf of an employer does not establish this Court's personal jurisdiction over these defendants."); *Knierim v. Siemens Corporation, No. 06-4935, 2008 U.S. Dist. LEXIS 26571, at *22 (D.N.J. 2008)* ("In their declarations, plaintiffs point exclusively to contacts between plaintiffs and [their employer] in New Jersey, regarding the formation and alleged breach of the employment contracts. However, those contacts are not sufficiently **[*17]** independent of [their employer] to establish specific jurisdiction."). Indeed, it is "the general rule in federal courts [] that personal jurisdiction will not be exercised over an individual defendant for acts done in a corporate capacity." 3A Fletcher Cyc. Corp. § 1296.10.

In this case, Kirchmeyer, in his corporate capacity, had less substantial contacts with New Jersey than the defendants in Moneygram. Indeed, in Moneygram, the individual defendants were physically present in New Jersey for the purpose of doing business on behalf of their employer. Here, Kirchmeyer simply instructed

---

analogous to a tort was committed by Kirchmeyer and aimed at the forum state. In addition, as explained herein, the facts put forth by the Plaintiff simply do not support individual liability under any of the alleged causes of action over Kirchmeyer. See *Acteon, Inc. v. Vista Dental Prods., No. 05-3847, 2006 U.S. Dist. LEXIS 27584, at * 3 (D.N.J. 2006)* (citing *Educational Testing Service v. Katzman, 631 F. Supp. 550, 555-559 (D.N.J. 1986))* (stating that the law of New Jersey permits a court to consider contacts with a forum made in a corporate capacity if the facts in the complaint support individual liability); see also 3A Fletcher **[*19]** Cyc. Corp. § 1296.10 (noting that "personal jurisdiction may be exercised over the officer as an individual defendant where the officer's acts are sufficient to subject the officer to personal liability, notwithstanding the fact that those acts were done in a corporate capacity.").

Plaintiff to conduct business in New Jersey and the surrounding area. In addition, Kirchmeyer's "guarantee" of a $20,000 bonus cannot be construed as a personal guarantee, and Plaintiff does not suggest otherwise. Such minimal contacts will not serve to justify personal jurisdiction in this case. See _Knierim, 2008 U.S. Dist. LEXIS 26571_ (holding that personal jurisdiction did not exist over two defendants who did not have any contacts with the forum state separate and apart from their relationship with their employer; such contacts with the forum state included soliciting business from the forum **[*20]** state, engaging in recruiting activities in the forum state, advising the plaintiff to recruit solely from the forum state, and communicating with Plaintiff several times a week while the plaintiff was located in the forum state); compare _Norben Imp. Corp. v. Metro. Plant & Flower Corp., No. 05-54, 2005 U.S. Dist. LEXIS 34386, at *24 (D.N.J. July 15, 2005)_ (holding that because the individual defendants offered personal guarantees of their employer's checks, they were subjecting themselves to personal liability as guarantors, which made it reasonable that they should anticipate being haled into the forum state).

Even Kirchmeyer's comment about the senior level team building meetings would not justify personal jurisdiction over Kirchmeyer in New Jersey. Plaintiff has not asserted when or where this comment was made, and therefore, she cannot prove that the defendant purposefully directed this activity at New Jersey. See _Burger King Corp., 471 U.S. at 472_. Simply because Plaintiff unilaterally decided to live and work in New Jersey is insufficient to show that Kirchmeyer directed this comment at the forum state. See _Hanson, 357 U.S. at 253_ ("The unilateral activity of those who claim **[*21]** some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

An analysis under the "effects test", generally used for tortious conduct, or conduct analogous to a tort, substantiates the notion that Plaintiff's unilateral activity will not serve to establish jurisdiction in this case. In order to prevail on a claim of personal jurisdiction under the "effects test," Plaintiff must show that

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

_Walburn v. Rovema Packaging Machs., L.P., No. 07-3692, 2008 U.S. Dist. LEXIS 25369, 2008 WL 852443, at *7 (D.N.J. 2008)_ (citing _Imo Industries, Inc. v. Kiekert AG, 155 F.3d 254, 265-66 (1998))_. In Walburn, the court explained that "[a] court cannot automatically infer that a defendant expressly aimed its tortious conduct at the forum from the fact that the defendant knew the plaintiff resided in the forum." Id. In fact, "[p]ermitting jurisdiction [] would mean **[*22]** that jurisdiction in intentional tort cases would always be appropriate in the plaintiff's home state since the plaintiff would always feel the impact of the tort there." Id. In Walburn, the plaintiff asserted that she was present in New Jersey when the defendants made sexually derogatory remarks to her; however, this was insufficient to support deliberate targeting under the effects test. _2008 U.S. Dist. LEXIS 25369, [WL] at *7_ (stating that "the Plaintiff's contention that jurisdiction is proper because the Defendants committed an intentional tort against her in New Jersey with the knowledge that she was an New Jersey resident does not comport with the holding of _Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)_); see also _Imo Industries, 155 F.3d at 266_ ("[T]he plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."). Here, Plaintiff never even asserts that she was in New Jersey when Kirchmeyer made the alleged comment regarding the senior level team building meeting, and never provides any further evidence of deliberate targeting **[*23]** of New Jersey besides her residence and home office in the State. Hence this Court will not exercise jurisdiction over Kirchmeyer.

### 2. Defendant Vincent

Plaintiff's argument regarding jurisdiction over Vincent, a resident of Texas, is similarly unconvincing. In addition to the claim that Vincent was her direct supervisor, which this Court already concluded is insufficient on its own to warrant personal jurisdiction over an individual defendant, Plaintiff asserts that Vincent communicated with Plaintiff about the terms of her contract. Specifically, Plaintiff alleges that "Vincent reassured Plaintiff that while her salary of $80,000 was well below market rate, everyone was being hired at lower salaries because Zaio Inc. was a start-up company, and [] it would offer greater financial rewards to Plaintiff once it became fully operational." (Compl. ¶ 20).

As with Plaintiff's allegations relating to Kirchmeyer, these are insufficient to warrant jurisdiction over Vincent in New Jersey because Plaintiff does not allege that Vincent "purposefully directed [his] activities" at New Jersey. *Burger King Corp., 471 U.S. at 472*. In fact, Plaintiff never asserts that she was in New Jersey during any **[*24]** of the alleged communications. Even if she was, however, Plaintiff has not demonstrated any deliberate targeting. In <u>Walburn</u>, the court held that even though the plaintiff was present in the forum state of New Jersey, this did not

> by itself establish that the[] Defendants were targeting New Jersey through their communications. Plaintiff's residence in New Jersey was a unilateral act in the sense that the contacts with the forum occurred as a result of Plaintiff's unilateral choice of residence. Such arbitrary contacts are insufficient to establish personal jurisdiction."

*2008 U.S. Dist. LEXIS 25369, 2008 WL 852443, at *7* (citing *Helicopteros, 466 U.S. at 416*). Indeed, Plaintiff's certification supports the notion that she initiated the contact between Vincent and New Jersey, since it was her decision to work out of her home office in New Jersey. (Nelligan Cert. ¶ 3) (stating that she informed Kirchmeyer in 2004 that she worked out of her home office in New Jersey). Indeed, Plaintiff continued to work from that same address when Zaio hired her in 2007. (Compl. ¶ 1; Nelligan Cert. ¶ 3-5). Plaintiff's allegations demonstrate <u>her</u> availment of the forum, but fall short of proving that Vincent targeted New Jersey. [10]

Plaintiff suggests that Vincent's statement that Zaio Inc. would offer greater financial rewards to Plaintiff once it became fully operational was directed at the forum state, and is therefore sufficient to establish jurisdiction over this defendant. However, Vincent was not making any personal promise or individual claim, but rather, was asserting that <u>Zaio</u> would offer greater financial rewards once it became fully operational. See *Norben, 2005 U.S. Dist. LEXIS 34386, at *24 (D.N.J. July 15, 2005)* (finding jurisdiction over individual defendants who offered *personal* guarantees of their employer's checks). This statement may implicate Zaio Inc. in a promissory estoppel claim, but Plaintiff fails to show that Vincent made any promises or arguments on his own behalf that

would induce her to take the job with Zaio. Therefore, this statement falls short of the activities necessary to prove that Vincent purposefully availed himself of New Jersey. Compare *Schley, 2008 U.S. Dist. LEXIS 96059, at *30* **[*26]** (holding that there was personal jurisdiction over an individual defendant acting in a corporate capacity where defendant (1) conducted extensive employment negotiations with the plaintiff while the plaintiff was in the forum state of New Jersey, (2) encouraged plaintiff to quit his job, and (3) induced the plaintiff to take actions that would affect him and his family in New Jersey)). This Court holds that that there are insufficient contacts to assert jurisdiction over Vincent in New Jersey.

### 3. Defendant Chapin

Defendant Chapin is a resident of California. Plaintiff claims that Chapin "had involvement with the conditions of my employment and compensation," and was responsible for approving Plaintiff's reimbursed expenses. [11] (Nelligan Cert at ¶ 18-19). [12] However, Plaintiff does not show that these acts are sufficiently independent from his activity as a corporate officer of Zaio. See *Knierim, 2008 U.S. Dist. LEXIS 26571*. While case law suggests that actions taken by an individual defendant in his "corporate capacity" may be considered in a personal jurisdiction analysis if the facts alleged support individual liability, this Court holds that the Plaintiff does not sufficiently allege **[*27]** that Chapin would be personally liable for his actions. See *Acteon, 2006 U.S. Dist. LEXIS 27584, at *11* (citing *Educational Testing, 631 F. Supp. at 555-559*) (stating that <u>Educational Testing</u> held "that the law of New Jersey allowed it to consider contacts with the forum made in a corporate capacity if the facts alleged supported

---

[10] Plaintiff **[*25]** provides an email where Vincent states that Plaintiff is "based out of New Jersey." (Nelligan Cert. Exhibit B). This evidence, however, does not negate that it was Plaintiff's unilateral decision to live and work in New Jersey.

[11] Plaintiff alleges that defendant had "involvement" with the conditions of Plaintiffs employment, including compensation. She provides Exhibit G and Exhibit H of her certification as evidence of such "involvement." The Court notes that the allegations provided shows that the "involvement" Plaintiff alleges solely consists of *informing* Plaintiff of her demotion and new compensation, and calculating her commission. The Plaintiffs Complaint does not state or otherwise show that Chapin was the officer in charge of *deciding* Plaintiff's compensation.

[12] Plaintiff also claims that Chapin supervised her work out of New Jersey. (Nelligan Cert. at ¶ 21-22). As aforementioned, this is insufficient to establish jurisdiction over the Defendants in this case.

individual liability").

Indeed, it seems that **[*28]** Plaintiff seeks to impute liability to Chapin under the Equal Pay Act, *29 U.S.C. § 206(d)*, the Fair Labor Standards Act, *29 U.S.C. § 215(a)(3)*, the New Jersey Wage and Hour Law, *N.J.S.A. 34:11-56.8*, and aiding and abetting in violation of the New Jersey Law Against Discrimination, *N.J.S.A. 10:5-1*. However, the allegations that Chapin was "involved" in Plaintiff's compensation because he informed her of her demotion and associated compensation, and calculated her commission, are insufficient to impute personal liability against Chapin under any of the aforementioned causes of action. See *Wildi v. Alle-Kiski Med. Ctr. Part of the West Penn Allegheny Health Sys., 659 F. Supp. 2d 640, 657-58 (W.D. Pa. 2009)* (citing *Dubowsky v. Stern, 922 F. Supp. 985, 990 (D.N.J. 1996)* ("To establish a prima facie case under the Equal Pay Act, a plaintiff must show that defendant paid different wages to employees of the opposite sex for equal work on jobs which required equal skill, effort, and responsibility, and all of which are performed under similar working conditions."); *Byrne v. Commissioner, 883 F.2d 211, 215 (3d Cir. 1989)* (citing *29 U.S.C. § 215(a)(3)*) (stating that *29 U.S.C. § 215(a)(3)* of the **[*29]** FLSA pertains to retaliation through discharge of an employee); *Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110, 922 A.2d 710 (N.J. 2007)* (stating that the NJ Wage and Hour Law "directs employers to compensate employees who work in excess of forty hours a week with an overtime rate of '1 1/2 times' the employees' regular hourly wage."); *Lehmann v. Toys 'R' Us, 132 N.J. 587, 626 A.2d 445 (N.J. 1993)* (citing *N.J.S.A. 10:5-12*) (stating that the LAD makes it unlawful for an employer to discriminate against an individual in compensation or in "terms, conditions, or privileges of employment" based on sex). Moreover, Plaintiff has not cited to any additional contacts Chapin had with Plaintiff that could support personal liability. As such, this Court holds that there is no jurisdiction over Chapin in New Jersey.

## 4. Defendant Oliver

Defendant Oliver is a resident of Florida. Plaintiff alleges that in or around September 2007, Oliver suggested that Plaintiff hire a male friend of the CEO's as a regional salesperson. (Compl. ¶ 27). Since the CEO's friend was to work in Arizona, Plaintiff claims that Oliver stated that he would handle the negotiations of his compensation. Id. at ¶ 29. Soon after, Plaintiff discovered that **[*30]** the male friend was given a higher compensation package

than Plaintiff, despite Plaintiff having better qualifications and Plaintiff being his supervisor. Id. at ¶ 30. Plaintiff also claims that, during her time at Zaio, Mr. Oliver played an active role in all Human Resources matters. (Nelligan Cert. ¶ 11). Plaintiff does not give a specific date, but claims that, at some point during her employment, the company sent out an announcement that all Human Resources matters, including the hiring of employees, changes in compensation, changes in job descriptions, and other matters required the approval of Mr. Oliver. Id.

Plaintiff's allegations regarding Oliver are insufficient to establish personal jurisdiction over him in New Jersey. Specifically, Plaintiff fails to establish (1) that Oliver purposefully directed his activities at the forum state, or (2) that Oliver could be individually liable for his actions. See *Burger King Corp., 471 U.S. at 472*; see also *Acteon, 2006 U.S. Dist. LEXIS 27584*. Importantly, Plaintiff never alleges that she was located in New Jersey during any of their alleged conversations. Indeed, even if all of the communications between Oliver and Plaintiff occurred **[*31]** when Plaintiff was located in New Jersey, those would be insufficient to establish personal jurisdiction. Such communications are a necessary part of any supervisory job, and as aforementioned, "communicating with an employee who happens to work in New Jersey cannot be said to show that the supervisors purposefully directed their activities at New Jersey." *Bangura, 2010 U.S. Dist. LEXIS 59450, at *10*.

Plaintiff wants this Court to consider Oliver's contacts with New Jersey made in his corporate capacity. As aforementioned, New Jersey case law suggests that actions made in a corporate capacity can be considered in a personal jurisdiction analysis "if the facts alleged support[] individual liability." *Acteon, 2006 U.S. Dist. LEXIS 27584, at *11*. However, the evidence and allegations presented are insufficient to hold Oliver personally liable for the relevant causes of action in this case. Specifically, the Plaintiff states that Oliver was at some point responsible for changes in compensation at Zaio, but fails to allege that he was involved in determining *her* compensation, or that he was even aware of her compensation as compared to other employees at the company. Compare *2006 U.S. Dist. LEXIS 27584, at *12* (stating **[*32]** that because the plaintiff alleged that the individual defendants were "directly involved in directing [the defendant corporation] to take such actions complained of, and themselves contributed to the infringement by taking an active part and providing the plans and decisions which effected

2011 U.S. Dist. LEXIS 28628, *32

the defendant corporation's actions," the plaintiff has sufficiently pled facts supporting claims of individual liability against the individual defendants). As such, this defendant's individual actions taken in his corporate capacity will not be sufficient to establish jurisdiction in New Jersey.

Accordingly, for the foregoing reasons, the Court concludes that Plaintiff has not alleged sufficient minimum contacts with the State of New Jersey by any of the individual defendants. The Court, therefore, need not engage in a fair play and substantial justice analysis, and concludes that there is insufficient basis for exercising personal jurisdiction over these defendants.

### III. Conclusion

Defendants' motion to dismiss is granted and an appropriate Order shall follow.

/s/ Freda L. Wolfson

Honorable Freda L. Wolfson

Dated: March 21, 2011

**End of Document**

⚠ Last updated  August 23, 2020   04:23:36 pm GMT

# *McCourt v. A.O. Smith Water Prods. Co.*

United States District Court for the District of New Jersey

August 20, 2015, Filed

Civil Action No. 14-221

**Reporter**
2015 U.S. Dist. LEXIS 110111 *

JAMES McCOURT and MABEL McCOURT, Plaintiffs, v.
A.O. SMITH WATER PRODUCTS CO., et al.,
Defendants.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *McCourt v. A.O. Smith Water Prods. Co.,*
*2014 U.S. Dist. LEXIS 127999 (D.N.J., Aug. 5, 2014)*

# Core Terms

registered, systematic

# Case Summary

**Overview**
HOLDINGS: [1]-Plaintiffs, who asserted only general
jurisdiction over defendant, failed to demonstrate that
defendant's activities in New Jersey were so continuous
and systematic as to render it at home in that forum; [2]-
Defendant was a Delaware corporation with its principal
place of business in Massachusetts; [3]-Defendant's
operations in New Jersey were not so substantial that
they rendered it at home in New Jersey; [4]-Defendant
did not maintain any bank accounts in New Jersey, and
it did not own any real property there; [5]-Out of 63,000
total employees, only 30 or 31 worked in two New
Jersey locations; [6]-The contract that defendant had to
provide airport security systems at airports in both New

York and New Jersey did not even evidence a
significant portion of its revenue; [7]-The reasoning of
the Kubin decision was persuasive.

**Outcome**
Motion granted.

# LexisNexis® Headnotes

Civil Procedure > Preliminary
Considerations > Jurisdiction > In Rem & Personal
Jurisdiction

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of
Evidence

Civil Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to Dismiss

Evidence > Burdens of Proof > Burden Shifting

*HN1*[⬇]   **Jurisdiction, In Rem & Personal**
**Jurisdiction**

On a motion to dismiss for lack of personal jurisdiction
under *Fed. R. Civ. P. 12(b)(2)*, a plaintiff bears the
burden of establishing the court's jurisdiction over the
defendant. Although a plaintiff must ultimately prove

personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the early stages of litigation. Rather, a plaintiff must present a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state. Once the plaintiff meets that burden, the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Due Process

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm Jurisdiction

*HN2*[⬇]  **In Personam Actions, Due Process**

In general, a federal court sitting in diversity must engage in a two-step inquiry to determine whether it may properly exercise personal jurisdiction: (1) the court must determine whether the relevant state long-arm statute permits the exercise of jurisdiction; and (2) if it does, the court must satisfy itself that the exercise of jurisdiction comports with the Due Process Clause of the Constitution. When a state's long-arm statute extends the state's jurisdictional reach as far as the Constitution permits, a court need only consider the propriety of exercising personal jurisdiction under the federal constitutional standard.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Substantial Contacts

*HN3*[⬇]  **In Personam Actions, Substantial Contacts**

General jurisdiction may be invoked even when a plaintiff's claim does not arise out of or is unrelated to the defendant's contacts with the forum. General jurisdiction is satisfied when the defendant's affiliations with the forum state are so continuous and systematic as to render them at home in the forum state.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Substantial Contacts

*HN4*[⬇]  **In Personam Actions, Substantial Contacts**

In the Daimler decision, the United States Supreme Court emphasized that the general jurisdiction inquiry is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic, but whether that corporation's affiliations with the state are so continuous and systematic as to render it essentially at home in the forum state. The Supreme Court explained that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. For a corporate defendant, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Substantial Contacts

*HN5*[⬇]  **In Personam Actions, Substantial Contacts**

In the Daimler decision, the United States Supreme Court did recognize the possibility that, in an exceptional case, a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that state. However, an approach that approves the exercise of general jurisdiction in every state in which a corporation engages in a substantial, continuous, and systematic course of business is unacceptably grasping.

Civil Procedure > ... > Jurisdiction > In Rem & Personal Jurisdiction > In Personam Actions

*HN6*[⬇]  **In Rem & Personal Jurisdiction, In Personam Actions**

In the Bane decision, the United States Court of Appeals for the Third Circuit held that a foreign corporation that registered to do business in Pennsylvania had consented to Pennsylvania's exercise of general personal jurisdiction over it.  Central to its analysis was its finding that a Pennsylvania statute explicitly empowered courts to exercise general jurisdiction over corporations that registered to do business in Pennsylvania. Following the Bane decision. the United States District Court for the District of New Jersey analyzed whether business registration alone

was sufficient to confer general jurisdiction under New Jersey law. First, in the Sadler decision, it concluded that notwithstanding New Jersey's lack of an express provision authorizing general jurisdiction over foreign companies that register to do business in the state, business registration in New Jersey nonetheless constituted consent to general jurisdiction. That conclusion was based on New Jersey's statutory requirement that foreign corporations designate an in-state agent to accept service of process.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Doing Business

_HN7_[🔽] **In Personam Actions, Doing Business**

In the Kubin decision, the United States District Court for the District of New Jersey concluded that business registration alone did not constitute consent to general jurisdiction. The court distinguished the Bane decision based upon New Jersey's lack of an explicit statutory authorization for courts to exercise general jurisdiction over foreign corporations registering to do business in the state. Instead, jurisdiction could only be exercised over a corporation that registered to do business in New Jersey if it was actually doing business in New Jersey.

**Counsel:** **[\*1]** For JAMES MCCOURT, Plaintiff: JASON T. SCHEETS, LEAD ATTORNEY, KELLEY JASONS, PHILADELPHIA, PA; ROBERT MICHAEL SILVERMAN, LEAD ATTORNEY, WEITZ & LUXENBERG, CHERRY HILL, NJ.

For MABEL MCCOURT, H/W, Plaintiff: ROBERT MICHAEL SILVERMAN, LEAD ATTORNEY, WEITZ & LUXENBERG, CHERRY HILL, NJ.

For A.O. SMITH WATER PRODUCTS CO., Defendant, Cross Defendant: JOSEPH D. RASNEK, LEAD ATTORNEY, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ.

For ALCATEL-LUCENT USA, Individually and as successor in interest to WESTER ELECTRIC, Defendant, Cross Defendant: GEORGE R. TALARICO, LEAD ATTORNEY, EDWARDS WILDMAN PALMER

LLP, Morristown, NJ; AILEEN E. MCTIERNAN, Edwards Wildman Palmer LLP, Morristown, NJ.

For BALTIMORE ENNIS LAND COMPANY, Defendant, Cross Defendant, Cross Claimant: ERIC JOHN KADISH, LEAD ATTORNEY, MARON MARVEL BRADLEY & ANDERSON LLC THREE LOGAN SQUARE, PHILADELPHIA, PA; LINA MARIA CARRERAS, MARON MARVEL BRADLEY & ANDERSON PA, PHILADELPHIA, PA.

For GENERAL ELECTRIC COMPANY, Defendant: MICHAEL A. TANENBAUM, SEDGWICK LLP, NEWARK, NJ.

For PUBLIC SERVICE ENTERPRISE GROUP, Defendant: ANGELA A. IUSO, LEAD ATTORNEY, CONNELL FOLEY, LLP, ROSELAND, NJ; GEORGE W. KEEFER, LEAD ATTORNEY, WILLIAM E. FRESE, **[\*2]** ESQ., NEWARK, NJ.

For RAYTHEON, Defendant, Cross Defendant: JOHN C. GARDE, LEAD ATTORNEY, MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For UNION CARBIDE CORPORATION, Defendant, Cross Defendant: RICHARD DOMINICK PICINI, LEAD ATTORNEY, CARUSO SMITH EDELL PICINI, PC, FAIRFIELD, NJ.

For ROCKWELL AUTOMATION, INC., Individually, and as successor to ROCKWELL INTERNATIONAL CORP., and ROCKWELL MANUFACTURING COMPANY, Defendant: BRIAN JONATHAN SORENSEN, LEAD ATTORNEY, MCELROY DEUTSCH MULVANEY & CARPENTER LLP, MORRISTOWN, NJ; JOSEPH P. LASALA, DONNA DUBETH GARDINER, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ.

For SEARS, ROEBUCK AND CO., Defendant, Cross Claimant, Cross Defendant: JOHN S. MCGOWAN, CHATHAM, NJ.

For WESTERN AUTO SUPPLY COMPANY INC., Defendant: MICHAEL JOSEPH BLOCK, LEAD ATTORNEY, WILBRAHAM, LAWLER & BUBA, HADDONFIELD, NJ.

For PFIZER, INC., Defendant, Cross Claimant, Cross Defendant: DONNA DUBETH GARDINER, LEAD ATTORNEY, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ.

For METROPOLITAN LIFE INSURANCE COMPANY, CERTAINTEED CORPORATION, Defendants: RICHARD V. JONES, LEAD ATTORNEY, LAW OFFICES OF ROGER V. JONES, LLP, RIDGEWOOD, NJ.

For CRANE CO., Cross Defendants: ANGELA DIGIGLIO, LEAD ATTORNEY, [*3] K&L GATES, NEW YORK, NY; TARA LYNNE PEHUSH, LEAD ATTORNEY, K&L GATES LLP, NEW YORK, NY.

For ALCATEL-LUCENT USA, Individually and as successor in interest to WESTER ELECTRIC, Cross Defendant: GEORGE R. TALARICO, LEAD ATTORNEY, EDWARDS WILDMAN PALMER LLP, Morristown, NJ.

For CERTAINTEED CORPORATION, UNION CARBIDE CORPORATION, Cross Defendants: RICHARD DOMINICK PICINI, LEAD ATTORNEY, CARUSO SMITH EDELL PICINI, PC, FAIRFIELD, NJ..

For PUBLIC SERVICE ENTERPRISE GROUP, Cross Defendant: ANGELA A. IUSO, LEAD ATTORNEY, CONNELL FOLEY, LLP, ROSELAND, NJ.

For A.O. SMITH WATER PRODUCTS CO., Cross Defendant: JOHN S. MCGOWAN, CHATHAM, NJ.

For BALTIMORE ENNIS LAND COMPANY, Cross Defendant, Cross Defendant, Cross Claimant: ERIC JOHN KADISH, LEAD ATTORNEY, MARON MARVEL BRADLEY & ANDERSON LLC, PHILADELPHIA, PA; LINA MARIA CARRERAS, MARON MARVEL BRADLEY & ANDERSON PA, PHILADELPHIA, PA.

For CERTAINTEED CORPORATION, UNION CARBIDE CORPORATION, Cross Defendants: RICHARD DOMINICK PICINI, LEAD ATTORNEY, CARUSO SMITH EDELL PICINI, PC, FAIRFIELD, NJ.

For SEARS, ROEBUCK AND CO., Cross Claimant, Cross Defendant: JOHN S. MCGOWAN, CHATHAM, NJ.

For ALCATEL-LUCENT USA, Individually and as successor in interest to WESTER ELECTRIC, [*4] Cross Defendant: GEORGE R. TALARICO, LEAD ATTORNEY, EDWARDS WILDMAN PALMER LLP, Morristown, NJ; MAYLING C. BLANCO, Blank Rome LLP, Princeton, NJ.

For BRYANT HEATING & COOLING SYSTEMS, Cross Defendant: LINTON W. TURNER, JR., LEAD ATTORNEY, MAYFIELD, TURNER, O'MARA & DONNELLY, CHERRY HILL, NJ.

For PEERLESS INDUSTRIES, INC., Cross Defendant: GARY D. VAN LIEU, LEAD ATTORNEY, MORRISTOWN, NJ.

For ROCKWELL AUTOMATION, INC., Individually, and as successor to ROCKWELL INTERNATIONAL CORP., and ROCKWELL MANUFACTURING COMPANY, Cross Defendant: BRIAN JONATHAN SORENSEN, LEAD ATTORNEY, MCELROY DEUTSCH MULVANEY & CARPENTER LLP, MORRISTOWN, NJ.

For CRANE CO., INDIVIDUALLY, AND AS SUCCESSOR-IN-INTEREST TO TERRY STEAM TURBINE COMPANY, Cross Defendant: ANGELA DIGIGLIO, LEAD ATTORNEY, K&L GATES, NEW YORK, NY; TARA LYNNE PEHUSH, LEAD ATTORNEY, K&L GATES LLP, NEW YORK, NY; DONNA DUBETH GARDINER, LEAD ATTORNEY, MORRISTOWN, NJ.

For GUARD-LINE, INC., INDIVIDUALLY, AND AS SUCCESSOR-IN-INTEREST TO TERRY STEAM TURBINE COMPANY, Cross Defendant, Cross Claimant: JASON T. SCHEETS, KELLEY JASONS, PHILADELPHIA, PA.

For JAMES MCCOURT, MABEL MCCOURT, H/W, Cross Defendants: ROBERT MICHAEL SILVERMAN, LEAD ATTORNEY, WEITZ & LUXENBERG, [*5] CHERRY HILL, NJ.

For PEERLESS INDUSTRIES, INC., Cross Defendant:

GARY D. VAN LIEU, LEAD ATTORNEY, DONNA DUBETH GARDINER, LEAD ATTORNEY, MORRISTOWN, NJ.

For CRANE CO., Cross Defendant: ANGELA DIGIGLIO, LEAD ATTORNEY, K&L GATES, NEW YORK, NY; TARA LYNNE PEHUSH, LEAD ATTORNEY, K&L GATES LLP, NEW YORK, NY; MARK J. SKINNER, SWARTZ CAMPBELL LLC, PHILADELPHIA, PA.

For GENERAL ELECTRIC COMPANY, Cross Defendant: MICHAEL A. TANENBAUM, LEAD ATTORNEY, SEDGWICK LLP, MORRISTOWN, NJ.

For GENERAL ELECTRIC COMPANY, Cross Defendant: MICHAEL A. TANENBAUM, SEDGWICK LLP, NEWARK, NJ; DONNA DUBETH GARDINER, LEAD ATTORNEY, MORRISTOWN, NJ.

**Judges:** MADELINE COX ARLEO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MADELINE COX ARLEO

# Opinion

**ARLEO, UNITED STATES DISTRICT JUDGE.**

Before this Court is the motion of Defendant Raytheon Company ("Defendant") to dismiss Plaintiffs James McCourt and Mabel McCourt's ("Plaintiffs") complaint for lack of personal jurisdiction and failure to state a claim [Dkt. No. 116]. For the reasons set forth herein, the Court grants Defendant's motion to dismiss for lack of personal jurisdiction.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Mr. McCourt's alleged exposure to asbestos. Sec. Am. Compl., **[*6]** Dkt. No. 113. Mr. Court, who was a Florida resident, does not allege he was exposed to any of Defendant's asbestos-containing products in New Jersey. See id. Rather, the Second Amended Complaint asserts the Court may exercise jurisdiction over Defendant because it is "doing business in New Jersey." Id. ¶ 3.

Defendant is a Delaware Corporation with its principal place of business in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 60. Defendant has registered with the State to transact business in New Jersey and has designated the Corporation Trust Company of West Trenton, NJ as its registered agent. Pl. Opp'n Br., Ex. I. The Complaint in this case was not served on this agent, but instead on Defendant by way of certified mail in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 134-1.

Defendant does not maintain any bank accounts in the State and does not own any real property in the State, but leases two office spaces in New Jersey.[1] Abbott Aff. ¶ 3, Dkt. No. 60. A total of thirty employees, out of the company's approximately 63,000 employees, work in these locations.[2] Id. Defendant's employees neither enter into contracts nor make any sales at either facility. Id. Instead, at one facility that employs **[*7]** 28 individuals, Defendant performs software development and testing for a limited number of customers. Id. Two persons are employed at the other facility, which performs limited support functions for certain customers. Id. In the past five years, Defendant has not initiated any legal proceedings in New Jersey. Id.

According to a 2006 news article, in or around 2006, Defendant entered into a two-year, $100,000,000 contract with PATH to provide airport security systems at airports in both New York and **[*8]** New Jersey. See Pl. Opp'n Br., Ex. M. It is unclear what the contract involved in New Jersey and what percentage of the contract's revenues were attributable to the New Jersey locations Defendant was to service. In any event, Plaintiff has offered no evidence suggested the contract

---

[1] Defendant had, until 2011, also leased a third office space in the State.

[2] Plaintiff asserts that Defendant had recently posted a job advertisement for a position in New Jersey. Assuming the position was filled, Defendant's total employees in the State would increase to 31 out of 63,000.

Additionally, Plaintiff has provided the Court with a news article from 1998, which represents that Defendant had stated, in 1996, it would relocate 1,000 workers from Pennsylvania to New Jersey. This article's subject, however, was Defendant's need to reduce its workforce and Plaintiff has presented no evidence that any of these 1,000 employees worked for Defendant in New Jersey during the relevant period.

was extended past 2008. This contract represented a small percentage of Defendant's income during that time. See Pl. Opp'n Br., Ex. L (stating Defendant's 2005 sales totaled $21,900,000,000); see also Def. Reply Br. at 3, n.3 (listing Defendant's 2013 total sales at $23,700,000,000).

## II. DISCUSSION

### A. Applicable Law

HN1[↑] On a motion to dismiss for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)*, the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)*. Although the plaintiff must ultimately prove personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the early stages of litigation. *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)*. Rather, the plaintiff must "present[] a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Id. at 1223* (internal quotations and citations omitted). Once the plaintiff **[*9]** meets this burden, the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable. *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)* (citation omitted).

HN2[↑] In general, a federal court sitting in diversity must engage in a two-step inquiry to determine whether it may properly exercise personal jurisdiction: (1) the court must determine whether the relevant state long-arm statute permits the exercise of jurisdiction; and (2) if it does, the court must satisfy itself that the exercise of jurisdiction comports with the *Due Process Clause of the Constitution*. *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 258-59 (3d Cir. 1998)*. Because New Jersey's long-arm statute extends the state's jurisdictional reach as far as the Constitution permits, this Court need only consider the propriety of exercising personal jurisdiction under the federal constitutional standard. *Id. at 259*; see also *Mesalic v. Fiberfloat Corp., 897 F.2d 696, 698 n.5 (3d Cir. 1990)* (stating that "New Jersey courts look to federal law for interpretation of the limits on in personam jurisdiction").

Here, Plaintiff asserts only general jurisdiction over Defendant. HN3[↑] General jurisdiction may be invoked even when the Plaintiff's claim does not "arise out of or is unrelated to the defendant's contacts with the forum." *Carteret Sav. Bank, FA, 954 F.2d at 149* (quoting *Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984))*. General jurisdiction is satisfied when **[*10]** the defendant's affiliations with the forum state are so "continuous and systematic" as to render them "at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)*.

HN4[↑] In *Daimler AG v. Bauman*, the Supreme Court emphasized that the general jurisdiction inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' [but] whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'" *134 S.Ct. 746, 761, 187 L. Ed. 2d 624 (2014)* (quoting *Goodyear, 131 S.Ct. at 2851*). The Supreme Court explained that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id. at 760*. For a corporate defendant, "the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." Id. (internal citation and quotation omitted).

HN5[↑] The *Daimler* Court did recognize the possibility that, in an "exceptional" case, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id. at 761 n.19*. However, an approach that "approve[s] the exercise of general jurisdiction **[*11]** in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Id. at 761* (internal citation and quotation omitted).

## III. ANALYSIS

In this case, Plaintiffs fail to demonstrate that Defendant's activities in New Jersey are so continuous and systematic as to render it "at home" in this forum.[3]

---

[3] Plaintiffs object to Defendant's decision to limit its interrogatory responses to the five-year period prior to this litigation. The Court, in analyzing general jurisdiction, must

Defendant is a Delaware Corporation with its principal place of business in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 60. Therefore, neither of the two typical scenarios in which a corporation is "at home" are present here, and the Court must consider whether this is an "exceptional" case in which Defendant's operations are so substantial that they render it "at home" in New Jersey.

As set forth above, Defendant does [*12] not maintain any bank accounts in the State and does own any real property in the State, but leases two small office spaces in New Jersey with minimal employees. Id. ¶ 3. Out of 63,000 total employees, only 30 or 31 work in these two New Jersey locations. Id. Furthermore, in the past five years, Defendant has not initiated any legal proceedings in New Jersey. Id.

In support of their argument that the Court may exercise general personal jurisdiction over Defendant, Plaintiffs rely upon: (1) the fact that Defendant has defended itself in another litigation in this forum; (2) Defendant leasing two office locations and employing 30/31 workers in the State; (3) a 1998 news article in which it was reported that Defendant was transferring 1,000 workers from Philadelphia to Princeton; (4) a 2006 news article reporting a two-year $100,000,000 contract between Defendant and PATH for services to be provided in New York and New Jersey; (5) the fact that one of Defendant's subsidiary's website lists an employee as its "East Coast USA Regional Sales Manager" and his territory includes New Jersey; (6) that two of Defendant's New Jersey employees are listed as "Rapid Response Contacts;" and (7) a current [*13] job posting for a position in New Jersey. See Pl. Opp'n Br. at 6-8.

The foregoing contacts do not come close to evidencing that Defendant is "at home" in New Jersey. Even if the Court were to assume that the "current" job posting was filled and Defendant thus has 31 employees in this State, these employees would constitute only .0492% of Defendant's workforce. Furthermore, while Plaintiffs put much weight on the fact that Defendant entered into a $100,000,000 contract with PATH, this two-year contract was entered into eight years before the Complaint was filed, there is no evidence its term was

---

examine a defendant's contacts over a "reasonable period" of time. _Leja v. Schmidt Mfg., Inc., No. 01-5042, 2005 U.S. Dist. LEXIS 49017, 2005 WL 1366533, at *4 (D.N.J. June 7, 2005)_. Here, the Court concludes five years is a reasonable period of inquiry, _id._; see also _Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569 (2d Cir. 1996)_, and has even considered contacts pre-dating this period for purposes of this motion.

extended. Plaintiff has also failed to demonstrate the nature of the contacts with the State that arose from the contract. Furthermore, Defendant's 2005 sales totaled $21,900,000,000, see Pl. Opp'n Br., Ex. L, and its 2013 sales totaled $23,700,000,000. Def. Reply Br. at 3, n.3. Thus, this contract does not even evidence a significant portion of Defendant's revenue was generated in New Jersey during this period.

Alternatively, Plaintiffs argue that the Court may exercise general jurisdiction over Defendant because Defendant consented to jurisdiction when it registered to transact business in New [*14] Jersey and designated the Corporation Trust Company, located in West Trenton, NJ, as its authorized agent for service of process. See Pl. Opp'n Br., Ex. I. This Court disagrees.

HN6[↑] In Bane v. Netlink, Inc., the Third Circuit held that a foreign corporation that registered to do business in Pennsylvania had consented to Pennsylvania's exercise of general personal jurisdiction over it. _925 F.2d 637, 641 (3d Cir. 1991)_. Central to the court's analysis was its finding that a Pennsylvania statue explicitly empowered courts to exercise general jurisdiction over corporations that registered to do business in Pennsylvania. Id. (citing _42 Pa. Cons. Stat. Ann. § 5301(a)(2)(i)_).

Following Bane, courts within this District analyzed whether business registration alone is sufficient to confer general jurisdiction under New Jersey law. First, in Sadler v. Hallsmith Sysco Food Servs., the court concluded that notwithstanding New Jersey's lack of an express provision authorizing general jurisdiction over foreign companies that register to do business in the State, business registration in New Jersey nonetheless constituted consent to general jurisdiction. _No. 08-4423, 2009 U.S. Dist. LEXIS 33682, 2009 WL 1096309, at *1 (D.N.J. Apr. 21, 2009)_. The Sadler Court based this conclusion on New Jersey's statutory requirement that foreign corporations designate an in-state [*15] agent to accept service of process. _2009 U.S. Dist. LEXIS 33682, [WL] at *2_.

HN7[↑] In Kubin v. Orange Lake Country Club, Inc., however, the court concluded that business registration alone did not constitute consent to general jurisdiction. The Kubin Court distinguished Bane based upon New Jersey's lack of an explicit statutory authorization for courts to exercise general jurisdiction over foreign corporations registering to do business in the State. See _No. 10-1643, 2010 U.S. Dist. LEXIS 107860, 2010 WL 3981908, at *3 (D.N.J. Oct. 8, 2010)_. Instead,

jurisdiction could only be exercised over a corporation that registered to do business in New Jersey if it "was actually doing business in New Jersey.'" *Kubin, 2010 U.S. Dist. LEXIS 107860, 2010 WL 3981908, at *3* (quoting *Smith v. S&S Dundalk Eng'g Works, Ltd., 139 F. Supp. 2d 610, 620 (D.N.J. 2001))*; see also *Otsuka, 2015 U.S. Dist. LEXIS 35679, 2015 WL 1305764, at *12* ("Here, the Court finds that [defendants] consented to the Court's jurisdiction by registering to do business in New Jersey, by appointing an in-state agent for service of process in New Jersey, and by actually engaging in a substantial amount of business in this State.").

The Court finds the reasoning of Kubin persuasive.[4] The single fact that Defendant registered to do business in New Jersey is insufficient to conclude that it "consented" to jurisdiction here. Defendant has not engaged in a substantial amount of business in the State. Nor was Defendant served with process in this State. Thus, the **[*16]** Court concludes it lacks general personal jurisdiction over Defendant.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**. An appropriate order will follow.

*/s/ Madeline Cox Arleo*

**MADELINE COX ARLEO**

---

[4] In the briefs, the parties discuss two recent cases addressing jurisdiction by consent: *Otsuka Pharmaceutical Co., Ltd. v. Mylan Inc., No. 14-4508, 106 F. Supp. 3d 456, 2015 U.S. Dist. LEXIS 35679, 2015 WL 1305764, at *12 (D.N.J. Mar. 23, 2015)* and *Senju Pharmaceutical Co., Ltd. v. Metrics, Inc., No. 14-3961, 96 F. Supp. 3d 428, 2015 U.S. Dist. LEXIS 41504, 2015 WL 1472123 (D.N.J. Mar. 31, 2015)*. These cases, however, applied Federal Circuit precedent, not Third Circuit law. Additionally, these cases are factually distinguishable. See *Otsuka, 2015 U.S. Dist. LEXIS 35679, 2015 WL 1305764, at *12* ("Here, the Court finds that [defendants] consented to the Court's jurisdiction by registering to do business in New Jersey, by appointing an in-state agent for service of process in New Jersey, and by actually engaging in a substantial amount of business in this State."); *Senju, 2015 U.S. Dist. LEXIS 41504, 2015 WL 1472123, at *7* (" . . . the decision to exercise jurisdiction over [defendant] is based upon the fact that [defendant] not only registered to do business in New Jersey but, under *New Jersey Court Rule 4:4-4(a)(6)*, accepted service of process through its registered agent in the state.").

UNITED STATES DISTRICT JUDGE

## ORDER

This matter having come before the Court on Defendant Raytheon Company's ("Defendant") motion to dismiss Plaintiffs James McCourt and Mabel McCourt's ("Plaintiffs") complaint for lack **[*17]** of personal jurisdiction and failure to state a claim [Dkt. No. 116];

and for the reasons set forth in an opinion issued on this date;

IT IS on this 20th day of August, 2015,

ORDERED that Defendant's Motion to Dismiss is **GRANTED**.

*/s/ Madeline Cox Arleo*

**MADELINE COX ARLEO**

UNITED STATES DISTRICT JUDGE

ⓘ Last updated  August 20, 2020   02:06:44 pm GMT

## *Trinity Packaging Supply, LLC v. Countrywide Pallet, Inc.*

United States District Court for the District of New Jersey

June 26, 2019, Decided; June 26, 2019, Filed

Civil No. 18-16115 (NLH/JS)

**Reporter**

2019 U.S. Dist. LEXIS 106515 *; 2019 WL 2611101

TRINITY PACKAGING SUPPLY, LLC, Plaintiff, v. COUNTRYWIDE PALLET, INC. d/b/a SELECT PALLET, Defendant.

## Core Terms

fraudulent, invoices, Sur-Reply, pallets, emails, purposefully, negotiating, conversion, packaging, monthly, Notice

**Counsel:  [*1]** For Trinity Packaging Supply, LLC, Plaintiff: DAVID FORNAL, SHAWN DAVID EDWARDS, MASELLI WARREN PC, PRINCETON, NJ.

For Countrywide Pallet, Inc. d/b/a Select Pallet, Defendant: FRANCIS X. RILEY III, MICHAEL ROWAN, SAUL EWING ARNSTEIN & LEHR LLP, PRINCETON, NJ.

**Judges:** NOEL L. HILLMAN, United States District Judge.

**Opinion by:** NOEL L. HILLMAN

## Opinion

**HILLMAN**, District Judge

This is a breach of contract and fraud action concerning an agreement for packaging supplies made between the parties. Presently before the Court is Defendant Countrywide Pallet, Inc. d/b/a Select Pallet's Motion to Dismiss the Complaint Pursuant to *Federal Rule of Civil Procedure 12(b)(2)* (the "Motion to Dismiss") and Plaintiff Trinity Packaging Supply, LLC's Motion to File a Sur-Reply Brief. For the reasons discussed herein, this Court will deny Defendant's Motion to Dismiss and grant Plaintiff's Motion to File a Sur-Reply Brief.

### BACKGROUND

The Court takes its facts from Plaintiff's Complaint and the parties' filings as appropriate. According to Defendant's Amended Notice of Removal, Plaintiff is a limited liability company with one member, Anthony Magaraci, whose citizenship is New Jersey. Defendant is a California corporation with its principal place of business in California. Defendant **[*2]** asserts it operates exclusively in California. (Def.'s Mot. to Dismiss 2.)

Plaintiff's Complaint reveals its business consists of wholesale packaging supply. On October 23, 2013 Plaintiff entered into a "Product Supply Agreement" (the "Contract") with a "national warehouse and freight distribution company" (the "Company") to service all of its packaging and packaging supply needs, including pallets. (Pl.'s Compl. ¶ 5.) Plaintiff arranged for Defendant to deliver and retrieve pallets for the Contract. Plaintiff alleges that Defendant agreed it would be "the exclusive broker, procuring agent and point of contact" with the Company. (Pl.'s Compl. ¶ 7.) According to Plaintiff, all business between Defendant and the Company was to "be processed through" Plaintiff. (Pl.'s Compl. ¶ 7.)

Payment — and the actions of a so-called rogue employee of Defendant — is where the controversy in

this case lies. Plaintiff and Defendant agreed Plaintiff would pay Defendant the unit cost per pallet delivered to the Company, but that Defendant would credit Plaintiff for any recycled wooden pallets ("Cores") that Defendant retrieved from the Company. (Pl.'s Compl. ¶ 8.) Depending on the quality of the Cores, **[*3]** Plaintiff could receive more or less credits. Plaintiff alleges that Defendant circumvented this process by "engaging with a rogue employee of the Company and paying that employee approximately $30,000 cash on [a] monthly basis to permit removal of Cores that would not be reported to Trinity or the Company." (Pl.'s Compl. ¶ 13.) This resulted in over-billing.

Once Plaintiff learned of this issue, Plaintiff terminated its relationship with Defendant. Plaintiff alleges that "the invoices that [it] paid during the entirety of the . . . relationship [with Defendant] have been false, misleading and incorrect." (Pl.'s Compl. ¶ 16.) Plaintiff not only complains of overpayment, but it also complains of damages done to the Contract it had with the Company. As a result of Defendant's conduct, Plaintiff alleges that it had to investigate its entire business with the Company and had to re-bid the Contract. This resulted in lower prices for the Company and consequently less money for Plaintiff.

Plaintiff filed its Complaint on October 12, 2018 in the Superior Court of New Jersey, Law Division, Camden County. The Complaint contains eight counts, which Plaintiff summarizes as "claims for breach **[*4]** of contract, quantum meruit, fraud, unjust enrichment, tortious interference with prospective economic relations, and conversion." (Pl.'s Opp'n Br. 6.)

Defendant filed a Notice of Removal on November 13, 2018 in this Court. This Court issued an Order to Show Cause on November 14, 2018 requiring Defendant to amend its Notice of Removal to properly plead the citizenship of the parties. Defendant filed an Amended Notice of Removal on November 15, 2018 properly alleging the citizenship of the parties. On November 20, 2018 Defendant filed its Motion to Dismiss. Plaintiff filed opposition, Defendant replied, and Plaintiff filed a Motion to File a Sur-Reply Brief on January 4, 2019. The two motions presently before the court have been fully briefed and are therefore ripe for adjudication.

## ANALYSIS

## A. Subject Matter Jurisdiction

This Court possesses subject matter jurisdiction over this matter pursuant to *28 U.S.C. § 1332* as the parties are diverse and the amount in controversy exceeds $75,000.

## B. Motion to Dismiss for Lack of Personal Jurisdiction Standard

A defendant may move to dismiss, in lieu of an answer, on grounds that the Court lacks personal jurisdiction to adjudicate a matter concerning a particular **[*5]** defendant. See *Fed. R. Civ. P. 12(b)(2)*. Once a *Rule 12(b)(2)* motion is filed, "a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants." *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)* (citing *Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 368 (3d Cir. 2002)*). See also *Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)* ("[O]nce a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." (citing *Narco Avionics, Inc. v. Sportsman's Mkt., Inc., 792 F. Supp. 398, 402 (E.D. Pa. 1992)*)).

When an evidentiary hearing is not held, a "plaintiff need only establish a prima facie case of personal jurisdiction." *Miller Yacht Sales, 384 F.3d at 97* (citing *Pinker, 292 F.3d at 368*). In that case, "a plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Id. But, even so, "a plaintiff may not 'rely on the bare pleadings alone' in order to withstand a motion to dismiss for lack of personal jurisdiction." *Demetro v. Nat'l Ass'n of Bunco Investigations, No. 14-6521 (KM/SCM), 2017 U.S. Dist. LEXIS 145061, at *17 (D.N.J. Sept. 7, 2017)*. A plaintiff must still provide "actual proofs, not mere allegations." Id. (quoting *Patterson v. FBI, 893 F.2d 595, 604 (3d Cir. 1990)*).

If a plaintiff is successful in doing so, the burden shifts back to the moving defendant. "Once the plaintiff has made out a prima facie case in favor of personal jurisdiction, the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Mellon Bank PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1226 (3d Cir. 1992)* (quoting *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)*).

## C. Motion to Dismiss for Lack of Personal [*6] Jurisdiction

Defendant argues this case should be dismissed because this Court lacks personal jurisdiction over it or the claims against it. Defendant's arguments can be broken down into two broad categories. First, Defendant argues it is not subject to this Court's general jurisdiction because there are no allegations of continuous and systematic contacts with New Jersey. Second, Defendant argues it is not subject to this Court's specific jurisdiction because it did not purposefully avail itself of the laws of New Jersey. Plaintiff argues this Court can assert specific jurisdiction, but presents no argument on whether the Court may assert general jurisdiction over Defendant.

Before the Court delves into the arguments of the parties, it must put those arguments into context. *Rule 4(e) of the Federal Rules of Civil Procedure* authorizes a district court to assert personal jurisdiction over a non-resident to the extent permissible under the law of the state where the district court sits. In New Jersey, "courts may exercise jurisdiction over a nonresident defendant to the uttermost limits permitted by the United States Constitution." *Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 987 A.2d 575, 589 (2010)*, rev'd on other grounds sub nom., *J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011)* (citations and internal quotations omitted). "Accordingly, in determining [*7] whether personal jurisdiction exists, we ask whether, under the *Due Process Clause*, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007)*.

The determination of whether minimum contacts exist requires an examination of "the relationship among the forum, the defendant, and the litigation." *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 150-51 (3d Cir. 1996)* (quoting *Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)*). These "minimum contacts" must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal., 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (internal citations omitted). As its corollary, due process forbids the assertion of jurisdiction over a defendant "with which the State has no contacts, ties, or relations." *Int'l Shoe Co., v. Washington, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. Such contacts may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*.

Because the Defendant's Motion to Dismiss addresses both the Court's general and specific personal jurisdiction, the Court will address each, in turn.

### a. General Jurisdiction

Defendant argues it is not [*8] subject to this Court's general jurisdiction. Specifically, Defendant argues because it is a California corporation that does not solicit customers in New Jersey, advertise in New Jersey, maintain any assets in New Jersey, or maintain any physical presence in New Jersey it cannot be said to be "at home" in New Jersey. (Def.'s Mot. to Dismiss 4.) Plaintiff presents no argument in opposition. For the sake of completeness, the Court will consider whether it may assert general jurisdiction over Defendant. General jurisdiction grants the Court the ability to hear "any and all claims" against out-of-state defendants "when their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Op., S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)*. Defendant's activities and affiliations in the forum are not so "continuous and systematic" as to render Defendant essentially at home in New Jersey. See *Goodyear Dunlop, 564 U.S. at 919*. Defendant is a California corporation that operates solely in California and does not maintain offices or personnel within the State of New Jersey. It appears Defendant's sole contact with New Jersey is with Plaintiff. This is not "continuous and systematic" but limited and focused. Thus, [*9] this Court may only assert personal jurisdiction over Defendant if it finds specific jurisdiction.

### b. Specific Jurisdiction

Defendant argues this Court cannot assert specific jurisdiction over it. Defendant's argument is essentially that Plaintiff's Complaint does not allege that it "purposefully availed" itself of New Jersey's laws. Defendant points out that the only allegation within the Complaint that explicitly discusses New Jersey is that Plaintiff is a citizen of New Jersey. Moreover, Defendant asserts, the relevant contract obligated it to perform

services in California and did not involve contacts in New Jersey. Plaintiff disagrees, citing the fact that Defendant "directed its action toward New Jersey through its continuous business relationship" with Plaintiff and the Company and that the relationship produced hundreds of invoices, reports, and checks. (Pl.'s Opp'n Br. 7.) According to Plaintiff, these communications included the misrepresentations that are at the very heart of this case.

To determine whether specific jurisdiction is present, the Court must perform a two-prong test. First, the Court must determine whether there been constitutionally sufficient minimum contacts **[*10]** between the defendant and the forum. *Burger King, 471 U.S. at 474*. The requirement for underlined purposeful minimum contacts is "the constitutional touchstone" of the minimum contacts analysis. Id. (emphasis added).

Specific jurisdiction is present only if Plaintiff's cause of action arises out of Defendant's forum-related activity — i.e., minimum contacts - such that Defendant "'should reasonably anticipate being haled into court'" in that forum. *Vetrotex, 75 F.3d at 151* (quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*). Generally, "[t]he determination of whether minimum contacts exist requires an examination of the relationship among the forum, the defendant and the litigation in order to determine whether the defendant has 'purposefully directed' its activities toward residents of the forum." *Vetrotex Certainteed Corp., 75 F.3d at 150*. Put another way, specific jurisdiction exists when a defendant's "activity . . . takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop, 564 U.S. at 919*.

Purposeful availment, however, does not exist when the contacts are "random, fortuitous, or attenuated." *Burger King, 471 U.S. at 479-80*. Nor does it exist when the contacts are "between the plaintiff (or third parties) and the forum State." *Walden v. Fiore, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*. Specific jurisdiction requires that the defendant have sufficient "suit-related conduct" to "create a substantial connection **[*11]** with the forum state." *Walden, 571 U.S. at 284*. Finally, the contacts must have some nexus with the claims. "'Specific jurisdiction is invoked when the cause of action arises from the defendant's forum related activities.'" *Vetrotex Certainteed Corp., 75 F.3d at 151* (quoting *N. Penn. Gas Co. v. Corning Nat. Gas Corp., 897 F.2d 687, 690 (3d Cir. 1990)*, cert. denied, 498 U.S. 847, 111 S. Ct. 133, 112 L. Ed. 2d 101

(1990)).

Second, "if 'minimum contacts' are shown, jurisdiction may be exercised where the court determines, in its discretion, that to do so would comport with 'traditional notions of fair play and substantial justice.'" *Vetrotex Certainteed Corp., 75 F.3d at 150-51* (citing *Int'l Shoe Co., 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95*; *Farino, 960 F.2d at 1222*.). Once a court has determined minimum contacts, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King, 471 U.S. at 477*. A court "in 'appropriate [cases]' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" Id. (quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*). Fair play and substantial justice would not be served if litigation is "'so gravely difficult and inconvenient'" that a defendant would **[*12]** be at a "'severe disadvantage.'" Id. (quoting *The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)*).

To state it another way, the exercise of specific jurisdiction is permissible where: (1) the defendant purposely directed his activities at the forum state; (2) the plaintiff's claim arises out of and relates to at least one of those specific activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice. *Isaacs v. Ariz. Bd. of Regents, 608 F. App'x 70, 74 (3d Cir. 2015)* (citing *Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007)*).

Here, the case involves contract and intentional tort claims. Thus, the Court notes some specific case law applicable to those claims or factual scenarios. While a contract with an out-of-state party underlined alone cannot automatically establish sufficient minimum contacts, in considering whether specific jurisdiction exists, a court considers not only any contract between the parties but also "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King, 471 U.S. at 479*. Moreover, "[i]n contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract underlined or its breach." *Telcordia Tech., Inc. v. Telkom*

SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006) (quoting Gen. Elec. Co. v. Deutz A.G., 270 F.3d 144, 150 (3d Cir. 2001)) (emphasis in original). In cases "where a long-term relationship has been established, [*13] actual territorial presence becomes less determinative." Id. (citing Gen. Elec. Co., 270 F.3d at 151).

The Court also notes case law relevant to a case concerning intentional tort claims. Stemming from the Supreme Court's decision in Calder v. Jones, 465 U.S. 783, 788-90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), the effects test for intentional torts requires that a plaintiff show that: (1) Defendant committed an intentional tort; (2) Plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by Plaintiff as a result of that tort; (3) Defendant expressly aimed its tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. Isaacs, 608 F. App'x at 74-75 (relying on Calder, 465 U.S. at 788-90).

### i. Specific Personal Jurisdiction for Contract Claims

Defendant argues that this Court does not possess specific personal jurisdiction over Plaintiff's contract claims. Defendant asserts it did not (1) solicit or negotiate the contract with Plaintiff in New Jersey, (2) never had a physical presence in New Jersey, (3) did not perform any part of its contract in New Jersey, and (4) did not commit any wrongful acts in New Jersey. Thus, Defendant argues, the only basis to assert personal jurisdiction is that it has contracted with a New Jersey company [*14] — and that is not enough.

Plaintiff, on the other hand, argues the Court does possess jurisdiction over the contract claims. Plaintiff argues there existed a continuous business relationship between it and Defendant for a number of years that involved a contract with it, a New Jersey company. Plaintiff also argues that, regardless of whether Defendant ever had a physical presence in New Jersey, Defendant sent "hundreds of emails," "participated in numerous telephone calls," and sent weekly or monthly invoices, reports, and checks. (Pl.'s Opp'n Br. 13.) These communications, according to Plaintiff's Complaint, are the basis for Plaintiff's contract claims. (Pl.'s Compl. ¶¶ 24-26, 32-33, 47-49.)

The Court finds this case is sufficiently similar to Burger King as to allow the Court to find minimum contacts here. As in Burger King, the fact that Defendant never physically entered New Jersey is not an impediment to

assertion of personal jurisdiction by this Court. 471 U.S. at 476 ("Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State." (emphasis in original)).

Most important to the Burger King court was the fact that the contract was a multi-year [*15] relationship "that envisioned continuing and wide-reaching contacts" with the forum state, there Florida. Id. at 479. That included making payments to and receiving instruction and oversight from Miami. Id. Here, the parties entered into an agreement that endured for five years. (Pl.'s Compl. ¶ 2.) Part of that relationship — the most relevant to the claims here presented - required Defendant to collect Cores, determine the proper credit, and send invoices, reports, and checks to Plaintiff concerning those Cores. This was a weekly or monthly occurrence over the span of five years. Moreover, the parties voluntarily entered into and accepted the terms of this agreement, making the "quality and nature" of Defendant's relationship to Plaintiff anything but "random, fortuitous, or attenuated." Burger King, 471 U.S. at 479-80. In other words, Defendant knew contact with New Jersey was a part of the relationship from the beginning.

Defendant's alleged actions caused reasonably foreseeable injuries to the Plaintiff corporation in New Jersey. (Pl. Compl., 3.) It is - at the very least - presumptively reasonable for Defendant to be called to account there for such injuries. Id. Further, like Burger King, the actions of Defendant - sending [*16] fraudulent invoices, reports - caused foreseeable injuries to Plaintiff, in New Jersey. Defendant knew that (1) Plaintiff's operations were conducted and supervised from its headquarters in New Jersey, (2) that all relevant notices and payments were to be sent to Plaintiff's headquarters in New Jersey, (3) that agreements were made in and enforced from New Jersey, and (4) that key negotiating decisions and communications via mail, phone, or email were made in and from the New Jersey. See, e.g., Burger King, 471 U.S. at 480-81.

This court "cannot conclude that [New Jersey has] no 'legitimate interest in holding [Defendant] answerable on a claim related to' the contacts. . . established in that State." Burger King, 471 U.S. at 483 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 776, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)).

Maybe most importantly, the case law states: "[i]n contract cases, courts should inquire whether the

2019 U.S. Dist. LEXIS 106515, *16

defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Telcordia Tech., Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006)* (quoting *Gen. Elec. Co. v. Deutz A.G., 270 F.3d 144, 150 (3d Cir. 2001))* (emphasis in original). The most instrumental contacts related to the contract claims are the allegedly fraudulent reports, invoices, checks, emails, and phone calls. Those contacts were allegedly purposefully made from California to Plaintiff in New Jersey.[1]

Defendant's cited case law, **[*17]** which it asserts support its personal jurisdiction argument, are inapposite. The *Vetrotex* case is distinguishable for many reasons. It involved a Pennsylvania plaintiff supplier who sent fiberglass material to a California defendant facility with maintenance of the relationship and payment occurring at the plaintiff's California office. *Vetrotex Certainteed Corp., 75 F.3d at 149*. The only relevant contacts with the forum, here Pennsylvania, was that some calls were made by the California defendant to the Pennsylvania plaintiff in the course of negotiating the supply contract. Id. The dearth of contacts in *Vetrotex* is dissimilar from the amount of relevant contacts found here.

The other cases cited by Defendant are also inapposite, as they point to the similarities between *Vetrotex* and their facts to find no personal jurisdiction. The line of cases cited by Defendant involve no allegations that:
(1) the defendant solicited the contract or initiated the business relationship leading up to the contract; (2) the defendant sent anything other than communications via e-mail to the forum state; or (3) the defendant engaged in extensive post-sale contacts with the Plaintiffs in the forum state.

*Team First Consulting, LLC v. Hanglitter* **[*18]** , No. 07-311 (DRD), 2007 U.S. Dist. LEXIS 31867, at *15 (D.N.J. Apr. 27, 2007). See also *Siegmeister v. Benford, No. 15-7099, 2017 U.S. Dist. LEXIS 84802, at *10 (D.N.J. June 1, 2017)* (same); *GMAC Real Estate, LLC v. Gate City Real Estate Co., No. 05-2253 (AET), 2005 U.S. DIST. LEXIS 24531, at *9-10 (D.N.J. Oct. 18, 2005)* (same).

As discussed supra, there is no indication that Defendant solicited the contract or initiated the business relationship. But, Defendant sent allegedly fraudulent invoices, reports, checks, emails, and calls to Plaintiff in New Jersey. And, the Court finds these are "extensive post-sale contacts," unlike the ones in Defendant's case that were for informational purposes. Accordingly, this Court finds there are sufficient minimum contacts to support the contract claims at issue here.

**ii. Intentional Tort Claims**

Defendant argues that Plaintiff cannot meet the Calder effects test, while Plaintiff argues it is met in this case. The Court will address each element of the test to determine whether minimum contacts have been shown as to the intentional torts asserted. First, the Court considers whether Plaintiff has established an intentional tort. Defendant does not challenge whether the allegations state an intentional tort, but essentially argue they are duplicative of the contract claims. Thus, the Court finds Plaintiff has adequately alleged intentional torts in its complaint under Count III, fraudulent inducement, Count IV, fraudulent misrepresentation, **[*19]** Count VI, interference with contractual relations, and Count VII, conversion. Whether they are duplicative of Plaintiff's contract claims may be properly addressed via a separate motion and does not affect whether they have been adequately stated.

Second, the Court addresses whether Plaintiff felt the brunt of the harm in New Jersey, such that New Jersey could be considered the focal point of the harm. Defendant argues the brunt of the harm was suffered in California, because the performance of the contract was in California and any alleged harm, here business loss, was to California-based business. This is an over-simplified reading of the allegations here. While the harm may have been to business conducted in California, the brunt of the harm was felt in New Jersey at Plaintiff's headquarters. It is there that allegedly fraudulent invoices, reports, checks, emails, and calls were received. (Certification in Opp'n ¶¶ 9, 11-12, 14-16.) While the alleged theft of Cores occurred in California, the alleged harm was felt in New Jersey.

Finally, the Court must consider whether New Jersey was the focal point of Defendant's tortious conduct. Defendant asserts that the conduct was directed at **[*20]** California, as that was where actions concerning the Cores was conducted. The Court

---

[1] The Court notes that it is of no moment whether Plaintiff could have received email or calls in locations other than New Jersey through wireless devices or voice over internet protocol. Defendant allegedly knew it was directing these communications to New Jersey where Plaintiff was headquartered and conducted its business.

2019 U.S. Dist. LEXIS 106515, *20

agrees, as the Complaint is alleged, Defendant supplied pallets solely in California. The Court also agrees that Defendant allegedly hired someone within the Company to take pallets and that also occurred solely in California.

But these facts animate only a part of the claim. The actual conduct complained of is the fraud and conversion. And that fraud and conversion could only be committed through contact with Plaintiff in New Jersey. Plaintiff presents in its Certification in Opposition facts which would suggest fraudulent invoices were sent on a weekly or monthly basis from California to New Jersey. (Certification in Opp'n ¶ 9.) Plaintiff also presents facts which would suggest fraudulent reports — denoting the amount of Cores retrieved — and fraudulent checks — paying for the wrong amount of Cores — were sent on a weekly or monthly basis from California to New Jersey. (Certification in Opp'n ¶¶ 11-12.) Moreover, various other correspondence including letters, emails, and phone calls were directed by Defendant to Plaintiff in New Jersey. (Certification in Opp'n ¶¶ 14-16.)

Because it appears Defendant [*21] was permitted to take Cores from the Company's California facilities, the alleged fraud could only be committed by misrepresenting - through a communication directed at New Jersey — the amount to Plaintiff. Similarly, the alleged conversion could only be committed by misrepresenting the amount of Cores taken to Plaintiff. In other words, Defendant's argument places it in the position of the Company worker who was allegedly complicit in Defendant's alleged scheme. That individual's conduct occurred solely in California as he or she did not send allegedly false communications to New Jersey. The Defendant is not this individual, and appears to have engaged in conduct emanating beyond the borders of California.

This Court finds the *Calder* test has been met here. Accordingly, this Court finds Plaintiff has established minimum contacts related to the intentional tort claims asserted.

### iii. Fair Play and Substantial Justice

Now that the Court has determined that minimum contacts have been established for Plaintiff's claims, the Court must consider whether asserting personal jurisdiction will comport with notions of fair play and substantial justice. A court "in 'appropriate [cases]' may evaluate [*22] 'the burden on the defendant,' 'the forum

State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" Id. (quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980))*. Fair play and substantial justice would not be served if litigation is "'so gravely difficult and inconvenient'" that a defendant would be at a "'severe disadvantage.'" Id. (quoting *The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972))*. Defendant argues that these factors favor it, making assertion of specific personal jurisdiction by this Court improper. Plaintiff disagrees. The Court will address each factor in turn.

The first factor is a consideration of the burden on Defendant of litigating the matter in New Jersey. Defendant is a corporation operating solely in California. This litigation requires cross-country travel of Defendant's counsel, witnesses, and documents. This is a burden. Defendant's proposed solution is to require the litigation of these claims in California, where it has brought suit against Plaintiff for claims relating to the present [*23] action. But, that would require Plaintiff to carry the same burden Defendant complains of here. In other words, neither New Jersey nor California is a convenient location for both parties. While the Court finds this factor favors Defendant, it notes there is no solution to the inconvenience of litigation between entities on opposite sides of the country.

The second factor is a consideration of New Jersey's interest in adjudicating this action. Defendant argues the conduct only took place in California by a California entity, making California the forum with a greater interest in this litigation. But, there are two problems presented by this argument. One, it does not address the factor directly which queries the forum's interest. Two, as described supra, the necessary acts to complete the allegedly wrongful conduct occurred in New Jersey and its harmful effects were felt in New Jersey. It was only when the allegedly fraudulent communications were received by Plaintiff in New Jersey that it could be said any of the wrong occurred or any of the harm happened. New Jersey has an interest in regulating fraud visited upon its entities and providing proper compensation. California also has [*24] an interest in policing the alleged bad acts of its entities or the harms visited upon them. New Jersey has an interest in this matter at least as strong, if not stronger than California's interest. This favors asserting

jurisdiction here.

The third is Plaintiff's interest in convenient and effective relief. New Jersey offers that here. The fourth is what the most efficient resolution of these controversies would be. New Jersey offers the most efficient path. While California could also offer that here, the New Jersey action was the first-filed, and thus requires the Court to give it greater weight. Defendant's California action may always be transferred and consolidated with this action. There is no jurisdictional issue that this Court finds at this point which would prevent this Court from hearing those claims.[2]

On balance, it appears the factors favor New Jersey. The Court notes that New Jersey does present some inconvenience to Defendant. It requires some travel and logistical preparations. But, it is not so grossly difficult as to put Defendant here at a severe disadvantage. The Court finds it can and should assert specific personal jurisdiction as to these claims, so it will.

Because [*25]  the Court finds it may assert personal jurisdiction, it will deny as moot Plaintiff's request for jurisdictional discovery. The Court has also considered the arguments made in Plaintiff's proposed sur-reply brief and Defendant's responsive letter. The Court finds the arguments contained therein concerning Plaintiff's conduct in the California litigation brought by Defendant consistent with its position here. Otherwise, the Court finds that the arguments made therein are irrelevant to the determination of whether this Court is able to assert specific personal jurisdiction over these claims. As such, the Court will grant Plaintiff's Motion for Leave to File a Sur-Reply brief.

**CONCLUSION**

For the reasons discussed herein, the Court will deny Defendant's Motion to Dismiss and grant Plaintiff's Motion to File a Sur-Reply Brief.

An appropriate Order will be entered.

Date: June 26, 2019

At Camden, New Jersey

_____

[2] The Court finds that "shared interest of the several States in furthering fundamental substantive social policies" does not bear on the present case, or, at the very least, does not favor either forum.

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

**ORDER**

**HILLMAN**, District Judge

For the reasons expressed in the Court's Opinion filed today,

IT IS on this 26th day of June, 2019

**ORDERED** that Defendant's Motion to Dismiss [9] is hereby **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion for Leave [*26]  to File a Sur-Reply Brief [20] is hereby **GRANTED**; and it is further

**ORDERED** that the Clerk shall **FILE** Plaintiff's Sur-Reply Brief [20-1].

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

---

**End of Document**

ⓘ Cited
As of: September 14, 2020 2:27 PM Z

## *Stevens v. Welch*

United States District Court for the District of New Jersey

February 7, 2011, Decided; February 7, 2011, Filed

Civil Action No. 10-3928 (SDW)(MCA)

**Reporter**
2011 U.S. Dist. LEXIS 12142 *; 2011 WL 541808

NICHOLAS STEVENS, Plaintiff, v. CRAIG WELCH, DAN MOYSE, and ACADIASOFT, INC., Defendants.

## Core Terms

tortious

**Counsel:** [*1] For **NICHOLAS STEVENS**, **Plaintiff**: **MATTHEW A SCHIAPPA**, GALEX WOLF LLC, NORTH BRUNSWICK, NJ.

For **CRAIG WELCH, DANIEL MOYSE**, **Defendants**: **MICHAEL T. HENSLEY**, *LEAD ATTORNEY*, BRESSLER, AMERY & ROSS, P.C., FLORHAM PARK, NJ.

For **ACADIASOFT, INC.**, **Defendant**: **MICHAEL T. HENSLEY**, BRESSLER, AMERY & ROSS, P.C., FLORHAM PARK, NJ.

**Judges:** Susan D. Wigenton, United States District Judge.

**Opinion by:** Susan D. Wigenton

## Opinion

**WIGENTON**, District Judge.

Before the Court is Defendants Craig Welch ("Welch"), Dan Moyse ("Moyse"), and AcadiaSoft, Inc.'s ("AcadiaSoft") (collectively "Defendants") Motion to Dismiss Plaintiff Nicholas Stevens's ("Plaintiff" or "Stevens") complaint pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(6)*. [1] This Court has jurisdiction pursuant to *28 U.S.C. § 1332*. Venue is appropriate in this District pursuant to *28 U.S.C. § 1391(a)*. This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to *Fed. R. Civ. P. 78*. For the reasons stated below, this Court grants Defendants' Motion to Dismiss.

## I. FACTUAL AND PROCEDURAL [*2] BACKGROUND

In 2004, Welch and Moyse, both residents of Massachusetts, founded AcadiaSoft. (Compl. ¶ 9.) AcadiaSoft, a Delaware corporation with its principal place of business in Massachusetts, provides "propriety software for managing collateral and margin related transactions related to derivatives securities investments." (Id. at ¶¶ 4, 10.) AcadiaSoft developed a software program, Acadia Collateral Management ("ACM"), to "process these investments." (Id. at ¶ 10.) AcadiaSoft's customers include "investment managers, insurance companies, banks, corporations, mutual funds and hedge funds engaged in investment management activities." (Id.)

In May 2005, Welch allegedly approached Plaintiff Stevens, a resident of New Jersey, about working at AcadiaSoft. (Id. at ¶ 11.) Stevens, who would work from

_____

[1] Because the Court decides this motion on *Fed. R. Civ. P. 12(b)(2)*, it will not address Defendants' Motion to Dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*.

his home in New Jersey, would be responsible for "provid[ing] sales and business development services of" ACM, "developing strategic business relationships to further penetrate the derivatives market," and "assist[ing] in identifying and influencing potential buyers for [] AcadiaSoft." (Id.) Plaintiff maintains, and Defendants dispute, that because Fidelity Investments was AcadiaSoft's only customer **[*3]** at that time, Defendants orally offered him "'sweat equity' in AcadiaSoft, which was expressed as a percentage of what Welch would receive upon the sale of AcadiaSoft." (Id. at ¶ 12.) This "percentage was quoted at 5% or $1 [m]illion." (Id.) Moreover, Stevens alleges that Welch purported that AcadiaSoft would be sold within three years. (Id.)

Plaintiff contends that he agreed to work for Defendants pursuant to the above terms (the "Contract"). In addition, on May 11, 2005, Stevens entered into a Confidentiality Agreement (the "Agreement") with AcadiaSoft. (Aff. of Dan Moyse ¶ 2.) Relevant to this motion are Clause 7, which addresses future relations between the parties, and Clause 8, the forum selection clause.

Clause 7 reads as follows:

> Unless and until a definitive agreement between Nick Stevens and Acadia has been executed with respect to any transaction that may be discussed between them, neither Nick Stevens nor Acadia will be under any legal obligation of any kind whatsoever with respect to such transaction, by virtue of any other written or oral expression with respect to such transaction, by any officers, directors, general partners, employees, counsel, financial advisors or other **[*4]** representatives of Acadia or Nick Stevens, except for the matters specifically agreed to in this [] Agreement.

(Defs.' Ex. A ¶ 7) (emphasis added). Clause 8 provides that:

> This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the conflicts laws of Massachusetts. Any dispute arising out of this Agreement, if litigated, shall be resolved by Courts of the Commonwealth of Massachusetts, and the parties hereby consent to the jurisdiction of such courts and agree that they are a convenient forum.

(Id. at ¶ 8) (emphasis added).

Although Stevens alleges that he "embarked on an aggressive campaign to contact and introduce ACM . . . to the investment community," he did not make a sale during his tenure at AcadiaSoft. (Compl. ¶ 14.) However, Stevens maintains that he identified two potential buyers for AcadiaSoft, Omgeo and ICAP, but Welch and Moyse refused to negotiate in good faith with the potential buyers. (Id. at ¶¶ 14-16, 24-26.) Stevens asserts that he ultimately terminated his employment with Defendants in March 2009 because he was receiving "little to no compensation." (Id. at ¶ 17.) At this time, AcadiaSoft **[*5]** had yet to be sold.

Subsequently, on June 18, 2010, Plaintiff filed a complaint against Defendants in the Superior Court of New Jersey, Union County, alleging breaching of contract, misrepresentation, tortiousinterference with economic opportunity, breach of fiduciary duty and the covenant of good faith and fair dealing, quantum meruit, unjust enrichment, promissory estoppel, and constructive discharge. (Id. at ¶¶ 19-87.) Thereafter, on August 3, 2010, Defendants removed the action to the United States District Court for New Jersey and filed the subject Motion to Dismiss. Specifically, Defendants seek to dismiss Plaintiff's complaint on three alternative grounds: lack of personal jurisdiction; the forum selection clause; and failure to state a claim upon which relief can be granted.

## II. DISCUSSION

### A. LEGAL STANDARD ESTABLISHING PERSONAL JURISDICTION

To withstand a defendant's motion to dismiss for lack of personal jurisdiction under *Fed. R. Civ. P. 12(b)(2)*, a plaintiff only needs to allege sufficient facts to establish a prima facie case of jurisdiction over the defendant. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)*. Similar to a motion to dismiss **[*6]** for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, a district court is required to accept plaintiff's allegations and all reasonable inferences therefrom as true, *In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d. 538, 556 (2009)*, and "construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992)*.

Pursuant to *Fed. R. Civ. P. 4(e)*, federal "district courts

have personal jurisdiction over nonresident defendants to the extent authorized under the law of the forum state in which the district court sits." See *Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 31 (3d Cir. 1993)*. New Jersey's long arm statute provides for personal jurisdiction as far as is permitted by the *Due Process Clause of the Fourteenth Amendment*. *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004)*; see *Carteret Sav. Bank, FA, 954 F.2d at 145*. Pursuant to the two-prong test articulated in *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*, "[t]he Court must first determine whether minimum contacts exist between a defendant and the forum state." *Deflora Lake Dev. Assocs. v. Hyde Park Ltd. P'ship, 2007 U.S. Dist. LEXIS 78869, at *4-5 (D.N.J. Oct. 23, 2007)*.  **[*7]** Should the Court find that the requisite minimum contacts exist, the Court should then consider whether exercise of jurisdiction would comport with fair play and substantial justice. *Id. at *6* (internal quotations and citations omitted.)

The *Fourteenth Amendment* permits a state to exercise jurisdiction over a nonresident defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Burger King Corp., 471 U.S. at 475* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958))*. As a result, jurisdiction may not be exercised over a defendant merely "on the basis of random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person." *Deflora Lake Dev. Assocs., 2007 U.S. Dist. LEXIS 78869, at *6* (internal quotations and citations omitted). Plaintiff has the burden of proving that the defendant has purposefully availed himself or herself of the forum state. *Burke v. Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997)*.

Personal jurisdiction may be exercised on the basis of either a defendant's general or specific contacts with the forum state.  **[*8]** Id. For a court to exercise general jurisdiction over a defendant, the defendant must maintain "continuous and systematic contacts" with the forum state. *Remick v. Manfredy, 238 F.3d 248, 255 (3d. Cir. 2001)*. The facts required to establish general jurisdiction must be "extensive and persuasive." *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982)* (quoting *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877, 890 (3rd Cir. 1981)* (Gibbons, J., dissenting)). General jurisdiction can be exercised over

a defendant "even if the plaintiff's [claims] arise[] from the defendant's non-forum related activities." *Remick, 238 F.3d at 255*. [2]

Alternatively, a plaintiff may rely upon a defendant's specific contacts with the forum state if it cannot establish general jurisdiction over the defendant. Personal jurisdiction pursuant to such contacts is known as specific jurisdiction. *Id.* Specific jurisdiction **[*9]** is present when a claim is related to or arises **[*9]** out of the defendant's contacts with the forum. *Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984)*. To determine whether specific jurisdiction is present, a court must first consider whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)* (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." *Hanson, 357 U.S. at 253*. In assessing the sufficiency of the minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum and the litigation." *Keeton v. Hustler, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)* (quoting *Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977))*. Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. *United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J. 1988)*. The unilateral acts of the plaintiff, however, will not amount to minimum contacts. *Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 417, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*;  **[*10]** *Hanson, 357 U.S. at 253*.

Second, assuming minimum contacts is established, a court may inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp., 471 U.S. at 476* (quoting *Int'l Shoe Co. v. Wash., 326 U.S. 310, 320, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*. For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. See *World-Wide Volkswagen Corp., 444 U.S. at 292*. To determine reasonableness, a court considers the following factors:

---

[2] Plaintiff is not alleging that general jurisdiction exists over Defendants; therefore, this Court's exercise of jurisdiction can only be pursuant to Defendants' specific contacts with New Jersey.

the burden on the defendant, . . . the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, . . . the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering substantive social policies.

_Id._ (internal citations omitted).

In determining whether Plaintiff has established that this Court has specific jurisdiction over Defendants, the Court will engage in "a claim-specific analysis," _Remick, at 238 F.3d 255-56,_ and consider Plaintiff's contract and  [*11] tort claims separately. This is "because there are different considerations in analyzing [specific] jurisdiction over contract claims and certain tort claims." _Id._

## B. PERSONAL JURISDICTION OVER PLAINTIFF'S CONTRACT CLAIMS

Plaintiff alleges eight claims relating to his Contract with Defendants: (1) breach of contract, (2) misrepresentation, (3) breach of the covenant of good faith and fair dealing, (4) breach of fiduciary duty, (5) quantum meruit, (6) unjust enrichment, (7) promissory estoppel, and (8) constructive discharge (collectively "contract claims").

In determining Defendants' Motion to Dismiss for lack of personal jurisdiction, the Court must first consider whether minimum contacts exist between Defendants and the State of New Jersey such that this Court's exercise of specific jurisdiction over Defendants comports with due process. _Deflora Lake Dev. Assocs., 2007 U.S. Dist. LEXIS 78869, at *4-5._ This Court finds that insufficient minimum contacts exist to grant personal jurisdiction over Defendants.

Plaintiff asserts that minimum contacts exist because: (1) "it is reasonable to infer that" he negotiated the Contract from his home in New Jersey; (2) Defendants knew that Plaintiff  [*12] would work from his home as this was part of the Contract; and (3) Plaintiff spent seventy percent of his time working in New Jersey. (Pl.'s Op. Br. 6-7.)

In determining whether Defendants had requisite contacts with New Jersey, the Court "must consider the totality of the circumstances, including the location and

character of the contract negations, the terms of the contract and the parties' actual course of dealings." _Remick, 238 F.3d at 256._ Additionally, without more, the presence of a contract between a nonresident and a forum resident is insufficient to establish minimum contacts. See _Burger King Corp., 471 U.S. at 467._ Further, "informational communications in furtherance of [a] contract do not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over" the Defendants. _Sunbelt Corp., 5 F.3d at 32._

Although Defendants sent payments to Plaintiff at his home for his services, Plaintiff negotiated the Contract from his home, (Pl.'s Op. Br. 6, 7), and Defendants were aware that Plaintiff would work from his home, (Compl. ¶ 11), the "totality of the circumstances" dictates against a finding of personal jurisdiction. Plaintiff was a salesman who spent  [*13] a substantial portion, thirty percent, of his time traveling. (Compl. ¶ 18.) That Plaintiff chose to live in New Jersey and decided to use his home as a base of operations is a mere fortuity, see _Keeton, 465 U.S. at 774,_ and such fortuitousness cannot be the basis of personal jurisdiction without raising concerns of due process. Id. This Court's decision is also supported by several other factors. Though Defendants were "continuously informed," (Compl. ¶ 14), of Plaintiff's progress in finding business for AcadiaSoft, be it by phone or other method of communication, Plaintiff has not alleged that Defendants made regular visits or ever came to his New Jersey home office to discuss business matters. Compare with _Telcordia Tech, Inc., v. Telkom SA Ltd., 458 F.3d 172 (3d. Cir. 2006)_ (traveling to the forum state to consult with another party to a contract may be sufficient for minimum contacts). In any event, communication by phone or other method, even if consistent over a period of time, is not enough to confer jurisdiction as this would fall under the category of "informational communication[] in furtherance of a contract." _Sunbelt Corp., 5 F.3d. at 32; see also Stuart v. Spademan, 772 F.2d 1185, 1193 (5th Cir. 1985)_  [*14] ("an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws"). In sum, while the Court recognizes that the parties were involved in some form of business arrangement, Defendants' involvement in this arrangement within New Jersey did not rise to the level required, that of minimum contacts, for this Court to exercise jurisdiction over Defendants.

Furthermore, underlying the Court's minimum contacts analysis is the question whether Defendants could

reasonably have anticipated being haled into Court in New Jersey. _World-Wide Volkswagen Corp., 444 U.S. at 297_. The parties, as a result of their execution of the Agreement, [3] expected any legal disputes to be resolved in the "Courts of the Commonwealth of Massachusetts." (Defs.' Ex. A ¶ 8.) Nonetheless, Plaintiff contends that the Agreement is inapplicable because his claims do not "concern the improper disclosure of confidential information by any of the parties." (Pl.'s Br. 4.) Plaintiff's narrow interpretation of the Agreement is unpersuasive. As Defendants rightly assert, **[*15]** the Agreement does not exclusively pertain to confidentiality. (Defs.' Reply Br. 3.) Specifically, Clause 7 details the parties' legal obligations towards each other. (See Defs.' Ex. A ¶ 7.) Accordingly, this Court concludes that Defendants did not anticipate being haled into court in New Jersey on the basis of Plaintiff's contract claims. Thus, this Court has no jurisdiction over Defendants.

Finally, Plaintiff's request for limited discovery on this issue is futile, as the manner in which Plaintiff was paid will not affect the Court's determination.

## C. PERSONAL JURISDICTION OVER PLAINTIFF'S TORTIOUS INTERFERENCE WITH ECONOMIC OPPORTUNITY

Plaintiff also alleges a tort claim, tortious interference with economic opportunity. For this Court to have jurisdiction over the tort claim, Plaintiff must satisfy the "effects test" established by the Supreme Court in _Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)_. The Third Circuit has stated that the "effects test" requires that a plaintiff show that: (1) the defendant "committed an intentional tort," (2) "the plaintiff . . . felt the brunt of the harm . . . in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort," and (3) "the defendant . . . expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." _IMO Indus. v. Kiekert AG, 155 F.3d 254, 256 (3d. Cir. 1998)_.

Applying the three part test **[*17]** set forth in _IMO Indus._, this Court concludes that Plaintiff has not established personal jurisdiction over Defendants with respect to his tort claim. Plaintiff has satisfied the first two parts of _IMO Indus._'s three part test because tortious interference with economic opportunity is an intentional tort, _Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 750, 563 A.2d 31 (1989)_, and Plaintiff suffered the brunt of the harm in New Jersey because he resides there. But, the Court finds that Plaintiff has not sufficiently shown that Defendants expressly aimed their tortious conduct at New Jersey, such that New Jersey is "the focal point of the tortious activity." _IMO Indus., 155 F.3d at 256_. The basis of Plaintiff's tort claim is that Defendants decision not to sell AcadiaSoft was done in bad faith to deprive Plaintiff of his "sweat equity." (Compl. ¶¶ 36-41.) Taken as true, these allegations are insufficient to support the Court's exercise of personal jurisdiction over Defendants. A defendant's knowledge that a plaintiff resides in the forum state, without more, will not amount to "behavior intentionally targeted and focused" on the forum state. _IMO Indus., 155 F.3d at 263_ (internal **[*18]** citations omitted). In a case similar to the one at bar, _Esab Grp., Inc. v. Centricut, Inc., 126 F.3d 617 (4th Cir. 1997)_, which has been treated favorably by the Third Circuit, a corporation located in South Carolina initiated a lawsuit against a New Hampshire company. _Id. at 621_. The Plaintiff alleged that the defendant had participated in a conspiracy to appropriate plaintiff's trade secrets and customer lists. Id. The Plaintiff claimed that the court had jurisdiction over the Defendant because the Defendant knew the acquisition of the Plaintiff's trade secrets could decrease the Plaintiff's sales. _Id. at 625_. The Fourth Circuit held that such knowledge could not be the sole basis for concluding that the Defendant expressly aimed its tortious conduct at the forum. Id. According to the Fourth Circuit, if the court were to hold that such knowledge alone would be sufficient, "[i]nstead of grounding jurisdiction on a defendant's decision to purposely avail[] itself of the privilege of conducting activities within the forum state or on a defendant's

---

[3] Plaintiff, relying on _Rosenau v. Unifund Corp., 539 F.3d 218, 225 (3d Cir. 2008)_, argues that the Court can only consider the Agreement if this motion is converted into a motion for summary judgment under _Fed. R. Civ. P. 56(c)_ because it is outside of the pleadings. (Pl.'s Br. 1, 4.) However, although the general rule is that "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." _In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d. Cir. 1997)_ (internal quotations and citations omitted); see also _DiFronzo v. Chiovero, 406 Fed. Appx. 605, 2011 U.S. App. LEXIS 640, at *4 (3d. Cir. Jan. 12, 2011)_. **[*16]** Here, the Court finds that the Agreement is integral to the complaint because it expresses the parties' intent.

activities expressly aimed at the forum state, jurisdiction would depend on a plaintiff's decision about where to establish residence." *Id. at 625-26* **[*19]** (internal quotations and citations omitted). Similarly, Plaintiff rests his argument that he satisfies the third prong of IMO Indus. on Defendants' awareness of the consequences of their alleged tortious activity. For the reasons stated above, this is insufficient.

## III. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED.

**SO ORDERED.**

/s/ Susan D. Wigenton

**Susan D. Wigenton, U.S.D.J.**

---

**End of Document**

Laura Victorelli

## *Croat v. Mission Fine Wines, Inc.*

United States District Court for the District of New Jersey

April 21, 2020, Decided; April 21, 2020, Filed

Civ. Action No. 19-17786 (FLW)

**Reporter**
2020 U.S. Dist. LEXIS 70145 *

ANNA CROAT, Plaintiff, v. MISSION FINE WINES, INC. and/or JOHN DOES (1-10), individually, jointly and severally, Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** **[*1]** For ANNA CROAT, Plaintiff: IAN MICHAEL BRYSON, LEAD ATTORNEY, Derek Smith Law Group, PLLC, Philadelphia, PA.

For MISSION FINE WINES, INC., Defendant: GREGORY N. FILOSA, Filosa Law Firm, NEW YORK, NY.

**Judges:** Hon. Freda L. Wolfson, Chief United States District Judge.

**Opinion by:** Freda L. Wolfson

# Opinion

**WOLFSON, Chief Judge**:

This matter comes before the Court on a motion to dismiss under *Federal Rules of Civil Procedure 12(b)(2)*, filed by Defendant Mission Fine Wines, Inc. and/or John Does (1-10) ("Mission")("Defendant"), seeking dismissal of the Complaint by Plaintiff Anna Croat ("Plaintiff") for lack of personal jurisdiction. Alternatively, Defendant

seeks dismissal of the Complaint under *Federal Rules of Civil Procedure 12(b)(6)* for failure to state a claim. For reasons set forth herein, this Court lacks personal jurisdiction over Defendant, and Defendant's motion to dismiss is **GRANTED**.

## I. BACKGROUND

Defendant is a business entity existing and incorporated under the laws of the State of New York, with its principal place of business located in Staten Island, New York. Compl. at ¶ 3. Plaintiff was hired as an Account Manager by Defendant on November 1, 2018. Palmiotti Aff. at ¶ 8.[1] Throughout her employment, Plaintiff was at all relevant times a citizen of New Jersey.

Approximately two weeks **[*2]** after her hire date, Plaintiff became pregnant. *Id.* at ¶ 12. Because Plaintiff needed to attend various pregnancy-related medical appointments, she requested reasonable accommodations from Defendant to attend those appointments. *Id.* at ¶ 13. Plaintiff alleges that in April 2019, she had given advance notice to leave work early for a pregnancy-related appointment, and her supervisor made a remark about the frequency of her medical

---

[1] As explained more fully *infra*, for the purposes of assessing personal jurisdiction, the Court may rely on affidavits submitted by the parties to resolve jurisdictional facts. Compl. at ¶ 2. At the time Plaintiff accepted employment, the parties agreed that Plaintiff would work three days a week from the Defendant's main office in Staten Island, New York, and two days a week from the Defendant's Yadley, Pennsylvania office. *Id.* at ¶ 8; Palmiotti Aff. at ¶ 9. While Plaintiff alleges she also would work one day a week from her home in New Jersey, Defendant explained that Plaintiff was never required to do so. Compl. at ¶ 8; Palmiotti Aff. at ¶ 10. Instead, Plaintiff was informed that there would be occasions where she would not be required to report to either out-of-state office, and she could work from home then, if she chose. Palmiotti Aff. at ¶ 10. During the course of the employment, Plaintiff alleges that she worked from her home in New Jersey approximately one day a week. Compl. at ¶ 8.

appointments by comparing her to her male coworker. *Id.* at ¶¶ 15-16. According to Plaintiff, her supervisor then informed her that working from home was no longer possible, because Plaintiff's male coworker did not have that option. *Id.* at ¶ 17. A short time later, on April 15, 2019, Plaintiff was fired by Defendant. *Id.* at ¶ 18. Plaintiff alleges the grounds for termination was that she was not "passionate enough" and that she "was not making enough sales." *Id.* Plaintiff claims these grounds for termination were pretext for unlawful sex discrimination, since Plaintiff's performance had always exceeded expectations, she had never been notified of any performance deficiencies, and had never been given a negative performance review. *Id.* at ¶¶ 18, 19. Plaintiff **[*3]** alleges that under these facts, Defendant violated *New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq.*, and Plaintiff is therefore entitled to damages. Compl. at ¶¶ 1, 34.

On July 31, 2019, Plaintiff filed a complaint against Defendant in the Superior Court of New Jersey, Law Division, Somerset County. In her Complaint, Plaintiff asserted claims for discrimination and retaliation against Defendant under NJLAD. Defendant removed the action to this Court on September 9, 2019. In the instant matter, Defendant moves to dismiss Plaintiff's Complaint pursuant to *Federal Rules of Civil Procedure 12(b)(2)* for lack of personal jurisdiction, or alternatively, for failure to state a claim. Specifically, Defendant argues Plaintiff failed to establish the requisite "purposeful availment" necessary for a finding of specific jurisdiction, as well as the requisite "systematic and continuous" activities in the forum state required for a finding of general jurisdiction. Alternatively, Defendant contends Plaintiff's Complaint should be dismissed for failure to state a claim, because NJLAD's protections apply only where the claimant was employed in New Jersey, and New Jersey was not Plaintiff's place of employment.

## II. STANDARD OF REVIEW

"A federal **[*4]** court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004)* (citing *Fed. R. Civ. P. 4(e)*); see also *Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 144 (3d Cir. 1992)*). "[T]he New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process." *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)* (citations omitted). Thus, the central inquiry is whether Defendant has "certain minimum contacts with.... [New Jersey]

such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. In order to resolve this, the Court must determine whether it has general or specific jurisdiction over Defendant.

On a motion to dismiss for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)*, "when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc., 384 F.3d at 97*; see also *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003)*. Still, plaintiff "'bears the burden to prove, by a preponderance of the evidence,' that personal jurisdiction is proper." *Cerciello v. Canale, 563 Fed.Appx. 924, 925 n.1 (3d Cir. 2014)* (quoting *Carteret Sav. Bank, FA, 954 F.2d at 146*). "Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who must show that the **[*5]** assertion of jurisdiction would be unreasonable." *Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F.Supp.2d 629, 633 (D.N.J. 2004)* (citing *Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1226 (3d Cir. 1992)*). In the context of assessing personal jurisdiction, "[w]hile disputed issues are construed in favor of the plaintiff, allegations may be contradicted by the defendant through opposing affidavits or other evidence, at which point the plaintiff must respond with 'actual proofs, not mere allegations.'" *Am. Bd. of Internal Med. V. Rushford, No. 14-6428, 2015 U.S. Dist. LEXIS 116861, 2015 WL 5164791, at *5 (D.N.J. Sept. 2, 2015)* (quoting *Patterson by Patterson v. FBI, 893 F.2d 595, 603 (3d Cir. 1990))*.

## III. DISCUSSION

"There are two distinct theories under which personal jurisdiction can arise: general and specific." *Allaham v. Naddaf, 635 Fed. Appx. 32, 37-38 (3d Cir. 2015)* (citing *Grimes v. Vitalink Commc'ns Corp., 17 F.3d 1553, 1559 (3d Cir. 1994))*. Here, I note that although Plaintiff does not identify under which theory she is asserting jurisdiction, based on her brief, it appears that Plaintiff seeks to invoke this Court's specific jurisdiction over Defendant. Plaintiff argues that Defendant availed itself of New Jersey's law when it permitted Plaintiff to work from home in the New Jersey. However, regardless which theory Plaintiff pursues, Plaintiff cannot satisfy either jurisdictional ground.

## A. General Jurisdiction

General jurisdiction exists when the defendant's affiliations with the forum state are "so continuous and systematic as to render [it] essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)* (internal citations and quotations omitted). **[\*6]** General jurisdiction allows a court to assert personal jurisdiction over an out-of-court defendant when "that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum." *Mellon Bank P.S.F.S. v. Farino, 960 F.2d 1217, 1221 (3d Cir.1992)*. "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler AG v. Bauman, 571 U.S. 117, 137, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)* (citation omitted). Indeed, when the forum is not the place of incorporation or principal place of business, "exceptional" circumstances are needed to establish general jurisdiction. *See id. at 139 n.19*.

Here, Plaintiff does not allege that Defendant is incorporated or has a principal place of business in New Jersey. Rather, in her Complaint, Plaintiff explicitly alleges that New Jersey is neither Defendant's state of incorporation nor principal place of business. Compl. at ¶ 3. Nor has Plaintiff alleged any facts sufficient to find that this is "an 'exceptional' case such that the place of incorporation/principal place of business rule should be disregarded." *Barth v. Walt Disney Parks & Resorts U.S., Inc., 697 Fed.Appx. 119, 120 (3d Cir. 2017)*. Rather, Plaintiff has only established that Defendant employed Plaintiff, a resident of New Jersey, and that Plaintiff allegedly worked **[\*7]** one day a week from her home in New Jersey, which was a personal choice made by Plaintiff. That single allegation, standing alone, falls far short of the "continuous and systematic" affiliations with New Jersey required to find that Defendant is subject to general jurisdiction in New Jersey. *See JWQ Cabinetry, Inc. v. Granada Wood & Cabinets, Inc., No. 13-4110, 2014 U.S. Dist. LEXIS 68293, 2014 WL 2050267, at \*3 (D.N.J. May 19, 2014)* (finding that general jurisdiction was lacking, where the plaintiff "only offered evidence that shows that [the defendant] conducted some business in New Jersey . . . .").

Furthermore, Defendant's lack of "continuous and systematic" affiliations with New Jersey is supported by Defendant's Affidavit from Joseph Palmiotti. Defendant does not regularly conduct or transact business in New Jersey, nor does it have any offices or facilities in New Jersey. Palmiotti Aff. at ¶ 4. Defendant does not own, lease, possess, or operate real or personal property in New Jersey, and does not maintain a mailing address or post office box in New Jersey. Palmiotti Aff. at ¶ 4. Defendant also does not pay property taxes in New Jersey, does not have a bank account in New Jersey, and does not have a registered agent in New Jersey. Palmiotti Aff. at ¶ 5. While Defendant may have some consumers located in New Jersey, **[\*8]** Defendant does not direct any advertisements specifically targeting residents of New Jersey nor does it derive substantial revenue from goods used or consumed, or services rendered in New Jersey. Palmiotti Aff. at ¶ 6. Plaintiff does not take issue with any of these facts. As such, general jurisdiction is clearly lacking.

## B. Specific Jurisdiction

Specific jurisdiction exists over a non-resident defendant where the plaintiff's claim "'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Daimler, 571 U.S. at 127* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*); *see Bristol—Myers Squibb Co. v. Superior Court, 137 S. Ct. 1773, 1781, 198 L. Ed. 2d 395 (2017)* ("In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'") (quoting *Goodyear, 564 U.S. at 919*). Courts apply a three part test to determine whether specific jurisdiction over a non-resident defendant exists: "First, the defendant must have purposefully directed [its] activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with **[\*9]** fair play and substantial justice." *Petrucelli v. Rusin, 642 Fed. Appx. 108, 110 (3d Cir. 2016)* (internal citations and quotations marks omitted). In establishing specific jurisdiction, it is not necessary that the defendant be physically located in the forum state while committing the alleged act. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*. Even a single act may satisfy the "purposeful availment" requirement if it creates a "substantial connection" with the forum. *Id. at 476 n.18*.

Here, Plaintiff argues that specific jurisdiction has been established in the instant case because Defendant permitted Plaintiff to work from her home in New Jersey one day a week. Plaintiff cites *Telebright Corporation Inc. v. Director, New Jersey Division of Taxation, 424 N.J. Super. 384, 38 A.3d 604 (App. Div. 2012)* for support. However, *Telebright* is legally and factually distinguishable. In *Telebright*, the court affirmed a Tax Court decision which found that an out-of-state corporation with a single employee who worked remotely full-time from her residence in New Jersey was "doing business in New Jersey" and was required to file New Jersey Corporation Business Tax returns. *Id. at 388*. *Telebright* is legally distinguishable from the instant case, because the court there was not analyzing whether New Jersey courts had personal jurisdiction over an employee-defendant of an out-of-state corporation, or whether the company had purposefully availed itself **[*10]** of New Jersey's law. Instead, the court determined whether the company had sufficient "minimum connection" with New Jersey to permit taxation consistent with the *Due Process Clause*. *Id. at 393*. Moreover, *Telebright* is factually distinguishable, because the employee there worked from home in New Jersey on a full-time basis and was the only employee of the company. *Id. at 388*. In the instant case, even the most favorable reading of Plaintiff's Complaint establishes that Plaintiff spent only one-sixth of her time working for Defendant from her home in New Jersey. *See* Compl. at ¶ 8.

I agree with Defendant that Plaintiff, here, has failed to establish the requisite "purposeful availment" necessary for a finding of specific jurisdiction. "Under the purposeful availment inquiry, the act itself must deliberately target the forum state and establish such a relationship between the defendant and the forum such that it is reasonable for the defendant to answer for such acts in that state." *Walburn v. Rovema Packaging Machs., L.P., No. 07-3692 (PGS), 2008 U.S. Dist. LEXIS 25369 (D.N.J. Mar. 28, 2008)*. Here, Plaintiff resides in New Jersey and she made the personal choice of working from her residence at times when Defendant did not require Plaintiff to work in either of its offices, **[*11]** i.e., New York or Pennsylvania. These were unilateral decisions by Plaintiff and not the result of deliberate direction or requirement by Defendant. Because it is well-established that "jurisdiction may not be exercised over a defendant merely 'on the basis of random, fortuitous, or attenuated contacts, or the unilateral activity of another party or a third person,'" specific jurisdiction over Defendant cannot attach under these circumstances. *Stevens v. Welch, No. 10-3928,*

*2011 U.S. Dist. LEXIS 12142, at *7 (D.N.J. Feb. 7, 2011)* (quoting *Deflora Lake Dev. Assocs. v. Hyde Park Ltd. P'ship, No. 07-0899, 2007 U.S. Dist. LEXIS 78869, at *6 (D.N.J. Oct. 23, 2007))*. The instant case is analogous to *Stevens*, where the court declined to find personal jurisdiction over an out-of-state defendant-employer with a plaintiff-employee who was a New Jersey resident. *Stevens, 2011 U.S. Dist. LEXIS 12142, at *11-14*. There, the plaintiff was also a salesperson who spent a substantial portion of his time traveling. *Id. at *12-13*. The court considered the totality of the circumstances and concluded there was no specific jurisdiction even though defendants had sent payments to plaintiff in New Jersey, plaintiff negotiated his employment contract from New Jersey, and defendants were aware that Plaintiff would work from home. *Id. at *12*. Specifically, the court noted "[t]hat Plaintiff chose to live in New Jersey and decided to use his home as a base of operations is a mere fortuity **[*12]** . . . and such fortuitousness cannot be the basis of personal jurisdiction without raising concerns of due process." *Id. at *13*.; *see also Walburn v. Rovema Packaging Machs., L.P., No. 07-3692, 2008 U.S. Dist. LEXIS 25369 (D.N.J. Mar. 28, 2008), at *20* ("Plaintiff's residence in New Jersey was a unilateral act in the sense that the contacts with the forum occurred as a result of Plaintiff's unilateral choice of residence," and therefore did not serve as the basis for personal jurisdiction over Defendant).

Accordingly, the Court lacks specific jurisdiction over Defendant.

## IV. CONCLUSION

For the above reasons, Defendants' motion to dismiss for lack of personal jurisdiction is **GRANTED**. Because Defendant's motion to dismiss based on lack of personal jurisdiction is granted, I need not consider the remaining aspect of Defendant's motion to dismiss for failure to state a claim.

DATED: April 21, 2020

/s/ Freda L. Wolfson

Hon. Freda L. Wolfson

U.S. Chief District Judge

**ORDER**

2020 U.S. Dist. LEXIS 70145, *12

**THIS MATTER** having been opened to the Court by GREGORY N. FILOSA, Esq., counsel for Defendant Mission Fine Wines, Inc. ("Defendant"), on a motion to dismiss; it appearing that Plaintiff Anna Croat ("Plaintiff"), through her counsel, IAN MICHAEL BRYSON, Esq., opposes the motion; the Court having considered the parties' submissions in connection with **[*13]** the motion without oral argument pursuant to *Fed. R. Civ. P. 78*, for the reasons stated in the Opinion filed herewith, and for good cause shown,

**IT IS** on this 21st day of April, 2020.

**ORDRED** that Defendant's motion to dismiss is **GRANTED**;

**ORDERED** that Plaintiff's claims are dismissed **WITHOUT PREJUDICE**; and it is further

**ORDERED** that this case shall be marked **CLOSED**.

/s/ Freda L. Wolfson

Hon. Freda L. Wolfson

U.S. Chief District Judge

---

End of Document

✚ Last updated  August 24, 2020   08:37:27 am GMT

## *Sonic Supply, LLC v. Universal White Cement Co.*

United States District Court for the District of New Jersey

July 25, 2008, Decided; July 29, 2008, Filed

Civil Action No. 07-CV-04529 (DMC)

**Reporter**

2008 U.S. Dist. LEXIS 58769 *; 2008 WL 2938051

SONIC SUPPLY, LLC, Plaintiff, v. UNIVERSAL WHITE CEMENT COMPANY, INC., Defendant.

**Notice:** NOT FOR PUBLICATION

## Core Terms

venue, cement, inconvenience, correspondence, convenience, comport

**Counsel:  [*1]** For SONIC SUPPLY, LLC, Plaintiff: ROGER MARION, LEAD ATTORNEY, TODTMAN NACHAMIE SPIZZ & JOHNS, NEW YORK, NY.

For UNIVERSAL WHITE CEMENT COMPANY, INC., Defendant: JEROLD C. FEUERSTEIN, LEAD ATTORNEY, KRISS, FEUERSTEIN & KATZ, LLP, NEW YORK, NY.

**Judges:** Hon. Dennis M. Cavanaugh, U.S.D.J.

**Opinion by:** Dennis M. Cavanaugh

## Opinion

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendant Universal White Cement Company, Inc. ("Defendant") to transfer venue pursuant to *28 U.S.C. §1391* and *28 U.S.C. §1404*. Pursuant to *Fed. R. Civ. P. 78*, no oral argument was heard. After carefully considering the submissions of the parties and based upon the following, it is the finding of this Court that venue is transferred from the United States District Court for the District of New Jersey ("District of New Jersey") to the United States District Court for the District of Arizona ("District of Arizona").

**I. BACKGROUND** [1]

A. Factual Background

Plaintiff Sonic Supply, LLC ("Plaintiff") is a New Jersey Limited Liability Company that buys construction materials, including cement, and later resells the materials.  **[*2]** Plaintiff entered into an agreement in April 2007 to purchase 12,500 metric tons of Portland cement from Defendant (the "Agreement"). Defendant is an Arizona corporation maintaining its primary place of business at 5610 West Maryland Avenue, Glendale, Arizona 85301. Per the Agreement, Defendant would receive $ 637,500 to pay for the cement and Plaintiff would receive $ 25,000 as commission. Plaintiff wired the entire $ 637,500 to Defendant, who accepted payment in May 2007 pursuant to Defendant's assertions that the cement was available and could be shipped promptly if payment was remitted for the cement. Plaintiff demanded a performance bond and proof of product from Defendant, but Defendant failed to supply either. After Plaintiff remitted payment, Defendant was required to furnish the cement to Plaintiff. Plaintiff made several inquiries regarding the

_____

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers.

status of the cement order and was told by Defendant that shipment was delayed. Plaintiff has not received the cement and Plaintiff's attorneys have demanded that Defendant refund Plaintiff the $ 637,500 paid for the cement. Defendant has not complied with this demand and none of the money has been refunded.

B. Procedural History

Plaintiff [*3] commenced this action on September 21, 2007. Plaintiff filed a Complaint alleging breach of contract, conversion and unjust enrichment. Plaintiff seeks compensatory, consequential and punitive damages. Defendant had until October 29, 2007 to submit an answer, at which time Defendant filed a motion to extend the time to answer until December 28, 2007. Defendant did not answer on December 28, 2007, but rather filed a motion to dismiss for lack of personal jurisdiction and improper venue and a motion for a more definite statement. Subsequently, Plaintiff filed an Amended Complaint on January 18, 2008 to resolve ambiguities in the original Complaint. On April 1, 2008, this Court denied Defendant's motion to dismiss for lack of personal jurisdiction and improper venue and the motion for a more definite statement as moot because the motions were made pursuant to the original Complaint, which was no longer the operative complaint. This Court also granted Plaintiff and Defendant ten days to submit a brief addressing whether venue should be transferred to the District of Arizona. Plaintiff submitted a brief on April 11, 2008. Rather than submitting a response to the Court's request, Defendant [*4] filed a motion to transfer venue to the District of Arizona.

II. DISCUSSION

A. Venue

In the current case, venue in the District of New Jersey is inappropriate under 28 U.S.C. §1391. First, Plaintiff's choice of forum is improper and fails to satisfy the requirements of 28 U.S.C. §1391(a)(1) because Defendant does not reside in the District of New Jersey. Under 28 U.S.C. §1391(c), a defendant corporation, such as Defendant, "shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." Defendant is not subject to personal jurisdiction in the District of New Jersey and, therefore, cannot be said to reside in the district for purposes of 28 U.S.C. §1391(a)(1).

New Jersey does, however, permit long-arm jurisdiction to the extent that it comports with the Due Process Clause of the Constitution of the United States. See N.J. Ct. R. 4:4-4. Thus, federal courts applying New Jersey's long-arm jurisdiction may assert personal jurisdiction over nonresident defendants to the extent that it is permitted under due process principles. See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 258-59 (3d Cir. 1998). Here, the exercise of [*5] the Court's jurisdiction comports with due process if Defendants have "purposefully directed [their] activities toward residents of the forum state, or otherwise 'purposefully availed [themselves] of the privilege of conducting activities within the forum state thus invoking the benefits and protection of its laws.'" Id. at 259 (internal citations omitted); see also World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980); Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). Furthermore, personal jurisdiction may be exercised under either a general or specific jurisdiction theory. See Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001).

In order for the District of New Jersey to have specific jurisdiction over Defendant, two requirements must be satisfied. See IMO Indus., Inc., 155 F.3d 254, 259 (3d Cir. 1998). First, Defendant must have "constitutionally sufficient minimum contacts with [New Jersey]." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 451 (3d Cir. 2003) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). Second, to satisfy the due process requirements, personal jurisdiction over Defendant must comport with "traditional notions of fair play and substantial [*6] justice," such that Defendant "should reasonably anticipate being haled into court in the forum." Id. (internal quotation marks and citations omitted).

In deciding whether Defendant has sufficient minimum contacts, this Court must examine "the relationship among the forum, the defendant, and the litigation," Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prod. Co., 75 F. 3d 147, 150 (3d Cir. 1996) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977), to find "some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New Jersey], thus invoking the benefits and protections of its laws." Id. (quoting Hanson, 357 U.S. at 253). "An individual's contract with an out-of-state party alone cannot automatically establish sufficient minimum contacts in the other party's home forum," so Defendant must have more interaction

with New Jersey than merely the contract to sell cement to Plaintiff in order for this Court to exercise personal jurisdiction. See *Isenberg v. Yanni's Remodeling, No. 07-3646, 2007 U.S. Dist. LEXIS 80899, at *7 (E.D. Pa. Oct. 31, 2007)* (quoting *Burger King, 471 U.S. at 478*).

In the current case, Defendant does not have **[*7]** the necessary contacts with New Jersey sufficient for the exercise of specific personal jurisdiction in New Jersey to be consistent with due process. Plaintiff asserts that Defendant has sufficient minimum contacts with New Jersey because Defendant sent the contract at issue to Plaintiff in New Jersey to be executed and Defendant regularly telephoned and e-mailed Plaintiff in New Jersey regarding the contract. These contacts, however, are insufficient. The United States Court of Appeals for the Third Circuit has held that "informational communications in furtherance of [a contract between a resident and a nonresident] does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]." *Vetrotex Certainteed Corp., 75 F. 3d at 152* (quoting *Sunbelt Corp. v. Noble, Denton, & Assoc., Inc., 5 F.3d 28, 32 (3d Cir. 1993))*; see also *Isenberg at *10*. The telephone calls from Defendant to Plaintiff in New Jersey to complete the contract were merely in furtherance of such contract and are not sufficient action by the Defendant to constitute purposeful availment of New Jersey. Likewise, the Third Circuit has also held that phone **[*8]** calls and correspondence to the forum state can only be sufficient to establish minimum contacts for personal jurisdiction when the cause of action arises specifically from those phone calls and other correspondence. See *Isenberg, 2007 U.S. Dist. LEXIS 80899, at *10* (citing *Grand Entm't Group. Ltd. v. Star Media Sales, Inc., 988 F. 2d 476, 483 (3d Cir. 1993))*. The cause of action in the present case did not arise from any of the communications between Defendant and New Jersey, but rather arose from an alleged breach of the contract between the two parties. Therefore, Defendant does not have sufficient contacts to establish specific personal jurisdiction.

Specific personal jurisdiction over an out-of-state defendant must also comport with traditional notions of "fair play and substantial justice." *Burger King, 471 U.S. at 476* (citing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The Supreme Court of the United States has set-forth a variety of relevant factors to the "fair play and substantial justice" inquiry including "the burden on the defendant," "the forum State's interest in adjudicating the dispute" and "plaintiff's interest in obtaining

convenient and effective relief." **[*9]** See *id.* (quoting *World-Wide Volkswagen Corp., 444 U.S. at 292*). Here, the exercise of personal jurisdiction over Defendant would offend "fair play and substantial justice" in the District of New Jersey, but not in the District of Arizona. The burden on Defendant, if subject to personal jurisdiction in the District of New Jersey, would be great. Defendant would be unfairly forced to litigate in a forum far from home, a forum of which it did not purposefully avail itself. Personal jurisdiction in the District of Arizona is appropriate because Defendant is an Arizona corporation with all of its offices and facilities in Arizona. Defendant has sought the protection of Arizona's laws and, therefore, could fairly expect to be haled into court in Arizona. The District of Arizona also has a greater interest in adjudicating the dispute than the District of New Jersey because the claims arose out of actions that occurred in Arizona. Defendant's decision to commit the alleged breaches occurred at one of its facilities in Arizona and merely the effects of such decisions were felt in New Jersey. Plaintiff has an interest in obtaining convenient and effective relief of its claims against Defendant. **[*10]** While Plaintiff will have to travel to Arizona to litigate this matter, Plaintiff has not offered any evidence to show that this would be a major inconvenience to its business or that the relief provided by the District of Arizona would be less effective than that offered by the District of New Jersey. Therefore, specific personal jurisdiction in the District of New Jersey is also lacking because it does not comport with notions of "fair play and substantial justice."

Although this Court cannot exercise jurisdiction over Defendant because the "cause of action does not arise out of or relate to the [Defendant's] activities in [New Jersey]," *Helicopteros Nacionales de Colombia, S.A. v. Hall et. al., 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*, it may still exercise general jurisdiction if it finds that Defendant's contacts with the District of New Jersey are "continuous and systematic." *Id. at 416*. Defendant, however, does not have such contacts with New Jersey as to make the assertion of general jurisdiction by this Court consistent with due process. Defendant is an Arizona corporation, has no offices or manufacturing facilities in New Jersey, does not do business in nor solicit business from New Jersey, **[*11]** does not have an agent or property in New Jersey, nor is it licensed to conduct business in New Jersey. Plaintiff asserts that its contracts with Defendant, as well as Defendant's repeated correspondence with Plaintiff in New Jersey, are sufficient "continuous and systematic" contacts to establish general jurisdiction. The Supreme Court of the

United States, however, has upheld general jurisdiction in a case in which a Defendant held an office in the forum State, conducted various business transactions in the State and corresponded *from* the State, not *to* the State. See *Helicopteros, 466 U.S. at 415* (citing *Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 438, 445, 72 S. Ct. 413, 96 L. Ed. 485, 63 Ohio Law Abs. 146 (1952))*. In Helicopteros, the defendant corporation, like the Defendant in the current case, held no place of business in the forum State nor was licensed to do business in the forum state. See *id. at 416*. Unlike the Defendant here, the defendant in Helicopteros sent its chief executive officer and other personnel *to* the forum state for contract negotiations and training, yet the Supreme Court still found general jurisdiction to be lacking. See id. Defendant's contacts with New Jersey are even less than those of the **[*12]** defendant in *Helicopteros* with the forum state and, therefore, general jurisdiction does not exist over Defendant in the District of New Jersey.

Thus, Defendant is not subject to personal jurisdiction in the District of New Jersey and, therefore, for the purposes of venue selection, is not deemed to reside in the District of New Jersey. Thus, pursuant to *28 U.S.C. § 1391(a)(1)*, the requirements for proper venue are not satisfied.

Second, pursuant to *28 U.S.C. §1391(a)(2)*, a substantial part of the events or omissions giving rise to the claims must have occurred in the judicial district. See *28 U.S.C. §1391 (a)(2)*. The District of New Jersey is an inappropriate venue because all of the alleged events or omissions giving rise to Plaintiff's claims occurred in Arizona. While the effects of the events giving rise to Plaintiff's claims are felt by Plaintiff in New Jersey, the events giving rise to Plaintiff's allegations occurred in Arizona. Defendant asserts that all of its operations are located in Arizona, meaning that all business decisions are made in Arizona. Therefore, any decisions made by Defendant regarding the contract with Plaintiff were made in Arizona including the decisions **[*13]** to allegedly not ship the cement nor refund Plaintiff's money. Thus, pursuant to *28 U.S.C. §1391(a)*, Plaintiff fails to meet the requirements for proper venue because the events or omissions that gave rise to the claims did not occur in New Jersey, but rather occurred in Arizona.

Finally, pursuant to *28 U.S.C. §1391(a)(3)*, venue is proper in a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action

may otherwise be brought. See *28 U.S.C.§1391(a)(2)*. As set forth above, New Jersey does not have personal jurisdiction over Defendants. Thus, *28 U.S.C. §1391(a)(3)* is inapplicable.

Venue is improper in the District of New Jersey because Defendant does not reside in the District of New Jersey, a substantial part of the events or omissions giving rise to the claims did not occur in the District of New Jersey and Defendant is not subject to personal jurisdiction in the District of New Jersey. Therefore, venue must be transferred.

B. Transfer of Venue

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or **[*14]** division where it might have been brought." *28 U.S.C. § 1404(a)*. The Court has broad discretion in deciding whether transfer is warranted and must consider both the public and private interests of the parties. See *Plum Tree, Inc. v. Stockment, 488 F.2d 754, 756 (3d Cir. 1973)*. Although *28 U.S.C. § 1404* expressly includes three factors, the Court may also consider other factors. See *SEC v. Page Airways, Inc., 464 F. Supp. 461 (D. D.C. 1978)*. The public factors to be considered include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora from court congestion; (4) the local interest in deciding controversies; (5) the public policies of the fora; and (6) in diversity cases, the familiarity of the trial judge with the applicable state law. See *id. at 879-80*. The private factors include: (1) plaintiff's original choice of forum; (2) the defendant's preference; (3) where the claim arose; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses **[*15]** may be unavailable for trial in one of the fora; and (6) the location of books and records to the extent that the files cannot be produced in the alternative forum. See *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)* (citations omitted). Generally, a plaintiff's choice of forum is accorded great weight. See *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*. Deference to the plaintiff's selected forum may be overcome, however, "if the private and public interest factors clearly point toward trial in an alternative forum." Id.

The presumption favoring a plaintiff's choice of forum is not dispositive of the motion. See *Tischio v. Bontex,*

*Inc.,* 16 F. Supp. 2d 511, 521 (D. N.J. 1998). Plaintiffs' choice of forum is given less weight when transferring venue would result in only negligible inconvenience to the plaintiff. See *Oudes v. Block, 516 F. Supp. 13, 14 (D. D.C. 1981)*. Additionally, a plaintiff's choice is afforded less deference when their choice of forum "has little connection with the operative facts of the lawsuit." *Tischio,* 16 F. Supp. 2d at 521; see also *Am. Tel. & Tel. Co. v. MCI Commc'ns Corp., 736 F. Supp. 1294, 1306 (D. N.J. 1990)*.

*Section 1404* does more **[*16]** than codify the doctrine of *forum non conveniens; § 1404* permits transfer upon a lesser showing of inconvenience than is required under common law doctrine and it allows the court to exercise broader discretion in transferring the case under the statute than would be permitted under *forum non conveniens.* See *Commercial Solvents Corp. v. Liberty Mut. Ins. Co., 371 F. Supp. 247 (S.D.N.Y. 1974)*. *28 U.S.C. § 1404* is similar to the common law doctrine of *forum non conveniens,* but it authorizes transfers within the federal court system with a lesser burden, both substantially and procedurally, than a motion to dismiss. See *Reyno v. Piper Aircraft Co., 630 F.2d 149 (3d Cir. 1980)*, rev'd on other grounds, *454 U.S. 235, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*. *Section 1404(a)* is intended to enlarge common law power under the doctrine of *forum non conveniens;* this section allows courts to grant transfers upon a lesser showing of inconvenience than is required at common law. See *De Lay & Daniels, Inc. v. Allen M. Campbell Co., Gen. Contractors, Inc., 71 FRD 368 (D. S.C. 1976)*.

Questions concerning whether transfer of venue should be granted under *28 U.S.C. § 1404(a)* depend upon the particular circumstances of each case. See *Mills v. Colgate-Palmolive Co., 232 F. Supp. 577 (S.D.N.Y. 1964)*; **[*17]** *Sell v. Greyhound Corp., 228 F. Supp. 134 (E.D. Pa. 1964)*. Variables render every motion to transfer unique. See *Secs. & Exch. Com. v. Golconda Mining Co., 246 F. Supp. 54 (S.D.N.Y. 1965)*. Although *28 U.S.C. § 1404(a)* mentions only three factors to consider in determining whether to grant or deny a motion to transfer, the Court is not limited to those rather broad generalities, but may consider other factors which are subsumed by purpose of statute. See *SEC v. Page Airways, Inc., 464 F. Supp. 461 (D. D.C. 1978)*.

In the current case, the relevant public and private factors concerning venue point to the District of Arizona. Plaintiff's claims, as explained above, arose in Arizona. The majority of the evidence, witnesses and files regarding the alleged breach are located in Arizona. The trial would be much more expeditious and inexpensive if the case were to come to fruition in the fora where these necessary elements are located. Plaintiff has not offered any reason for this Court to believe, nor does this Court have any independent reason to believe, that transferring venue would cause Plaintiff more than a negligible inconvenience. Plaintiff is an established corporation which would **[*18]** not suffer much financial hardship by having its officers travel to Arizona to complete this litigation. Plaintiff's choice of forum is, therefore, given less weight. See *Oudes, 516 F. Supp. at 14*. Likewise, Plaintiff's choice of forum is also given less weight because the District of New Jersey "has little connection with the operative facts of the lawsuit" aside from Plaintiff being a corporation of the forum State and corresponding with Defendant from the state. See *Tischio,* 16 F. Supp. 2d at 521. Finally, Defendant would be greatly inconvenienced by being forced to litigate in a forum in which it is not subject to personal jurisdiction, would require much hassle to assemble the necessities of litigation and removed from the acts it allegedly committed. Defendant, therefore, meets the lesser showing of inconvenience required by *28 U.S.C. § 1404*.

Thus, venue is transferred from the District of New Jersey to the District of Arizona.

### III. __CONCLUSION__

For the reasons stated, it is the finding of this Court that venue is transferred to the District of Arizona. An appropriate Order accompanies this Opinion.

/s/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: July 25, 2008

ℹ️ Last updated  August 24, 2020   10:41:15 am GMT

# *China Shipping (N. Am.) Agency Co. v. Lighthouse Trucking, Inc.*

United States District Court for the District of New Jersey

January 30, 2009, Decided; January 30, 2009, Filed

Civil Action No. 08-2368 (JAG)

**Reporter**
2009 U.S. Dist. LEXIS 7538 *; 2009 WL 249221

CHINA SHIPPING (NORTH AMERICA) AGENCY CO.,
INC., Plaintiff, v. LIGHTHOUSE TRUCKING, INC., et
al., Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

Trucking, entities, settlement, purposefully, nonresident,
venue

**Counsel:  [*1]** For CHINA SHIPPING (NORTH
AMERICA) AGENCY CO., INC., Plaintiff: BRYAN D.
PRESS, LEAD ATTORNEY, LITTLE FALLS, NJ.

For LIGHTHOUSE TRUCKING, INC., LIGHTHOUSE
INTERMODAL, LLC, LIGHTHOUSE EQYIPMENT &
STORAGE MGNT, LLC, formerly known as
LIGHTHOUSE EQUIPMENT STORAGE
MANAGEMENT, LLC, SWORD TRANSPORTATION,
INC., formerly known as LIGHTHOUSE
TRANSPORTATION, INC., SWORD LOGISTICS, INC.,
M & K COMPANY, MICHAEL MAAS, also known as
MIKE MAAS, also known as MICHAEL MASS, PATSY
JEAN MAAS, j/s/a, also known as PATSY MAAS, agent
of, PATSY J. HOWARD MAAS, M & K TRANSPORT,
Defendants: FREDERICK BENNO POLAK, LEAD
ATTORNEY, POST, POLAK, GOODSELL, MACNEILL
& STRAUCHLER, PA, ROSELAND, NJ.

**Judges:** JOSEPH A. GREENAWAY, JR., U.S.D.J.

**Opinion by:** JOSEPH A. GREENAWAY, JR.

## Opinion

*GREENAWAY, JR., U.S.D.J.*

This matter comes before this Court on the motion to
dismiss for lack of personal jurisdiction, pursuant to
*FED. R. CIV. P. 12(b)(2)*, and/or improper venue,
pursuant to *FED. R. CIV. P. 12(b)(3)*, by defendants
Lighthouse Trucking, Inc. ("Lighthouse Trucking"),
Lighthouse Intermodal, LLC, Lighthouse Equipment and
Storage, LLC, Sword Transportation, Inc. ("Sword
Transportation"), Sword Logistics, Inc., M&K Company;
M&K Transport, Michael Maas a/k/a  **[*2]** Mike Maas
a/k/a Michael Mass, and Patsy Jean Maas a/k/a Patsy
Mass, a/k/a Patsy J. Howard Maas (hereinafter
collectively referred to as "Defendants"). For the
reasons set forth below, Defendants' motion seeking
dismissal for lack of personal jurisdiction shall be
granted. As a consequence, Defendants' motion to
dismiss for improper venue shall be denied, as moot.

### I. *FACTS*

Plaintiff, China Shipping (North America) Agency Co.
Inc. ("China Shipping"), is a corporation organized and
existing under the laws of the State of New Jersey, with
its principal place of business at 11 Phillips Parkway,
Montvale, New Jersey. (Compl. at P 4.) Defendant
Lighthouse Trucking is a corporation organized and
existing under the laws of the state of Texas. (*Id.* at P
5.) Lighthouse Intermodal, LLC. is a limited liability

company organized and existing under the laws of the state of Texas. (*Id.* at P 6.) Lighthouse Equipment & Storage Management, LLC f/k/a Lighthouse Equipment Storage Management, LLC is a limited liability company organized and existing under the laws of the State of Texas. (*Id.* at P 7.) Sword Transportation is a corporation organized and existing under the laws of the State of Texas. (*Id.* at P 8.) **[*3]** Sword Logistics, Inc. is a corporation organized and existing under the laws of the state of Texas. (*Id.* at P 9.) M&K Company is a business entity which held itself out as a corporation, authorized to do business in the State of Texas. (*Id.* at P 10.) M&K Transport is a business entity which held itself out as a corporation, authorized to do business in the State of Texas. (*Id.* at P 11.) Defendants Michael Maas a/k/a Mike Maas a/k/a Michael Mass is an individual and resident of the State of Texas, who serves as a principal of the various defendant corporation(s)/limited liability companies named in the Complaint. (*Id.* at P 12.) Defendant Patsy Jean Maas a/k/a Patsy Mass a/k/a Patsy J. Howard Maas is an individual and resident of the State of Texas. (*Id.* at P 13.)

Plaintiff alleges that Defendants are engaged in the business of trucking and related services. (*Id.* at P 34.) The Lighthouse entities are operated by the same principals, Michael Maas and Patsy Maas. (*Id.* at P 35.) Plaintiff alleges that the Defendants have entered into contracts with Plaintiff that require that fees be paid for accessorial and per diem rentals of trucking containers or chassis. (*Id.* at P 38.) The contracts **[*4]** require that fees for trucking containers and/or chassis need to be undertaken by way of billing by the entities to their customers. (*Id.* at P 39.)

Plaintiff alleges that on or about 2006, Plaintiff instituted an action against Lighthouse Trucking and Michael Maas a/k/a/ Mike Maas, in the County Court at Law, Dallas County, Texas. (*Id.* at P 15.) In that complaint, Plaintiff alleges that Defendants Lighthouse Trucking and Mike Maas were in default on payments per diem and accessorial charges in excess of $ 468,600.00, incurred from December 2004 through November 2006. (*Id.* at P 16.) A stipulation of settlement was agreed upon in the Texas lawsuit on June 5, 2007. (*Id.* at P 17.) The stipulation required that Mr. Maas be removed from the litigation and the remaining defendant, Lighthouse Trucking agreed to make payments towards the settlement. (*Id.*) Lighthouse Trucking made payments, pursuant to the settlement agreement, for which it received a significant discount of the $ 468,600.00 (*Id.* at P 18.)

Plaintiff also alleges that Lighthouse Trucking and its alter ego(s) and successor(s)-in-interest, named as Defendants in the instant Complaint, together with its principals, continued to incur **[*5]** charges and create new arrearages by failing to pay continuing per diem and accessorial charges, despite being under the constraint of a stipulation of settlement and the agreement governing the relationship between Plaintiff and Defendants. (*Id.* at P 20.)

Plaintiff alleges that in March 2008, Defendants, specifically Lighthouse Trucking, defaulted on payments due and owing pursuant to the settlement agreement. (*Id.* at PP 21-22.) Defendants have failed to make payments due for March, April, and May of 2008 respectively. (*Id.* at P 22.)

Shortly before the Texas settlement agreement went into effect, Defendants "shifted their focus from "Lighthouse' to 'Sword'". (*Id.* at P 23.) Plaintiff believes that Defendants changed company names in an intentional attempt to avoid making full and timely payments of the amounts due and owing pursuant to Defendants' contracts with Plaintiff. (*Id.* at P 29.) Defendants created entities with names using variants of "Sword" to replace the "Lighthouse" entities and transfer the value of the Lighthouse entities to the Sword entities. (*Id.* at P 23.) Sword Transportation, Inc. and/or Sword Logistics, Inc. are engaged in the same type of drayage [1] as the other **[*6]** corporate and non-corporate parties named in the Complaint. (*Id.* at P 24.) The Sword entities are operated by the same principals and use the same business address with the same customer base. (*Id.*) The Sword entities took over the customers, the routes, and the payments from various customers from the various predecessor corporate and non-corporate entities. (*Id.* at P 26.) Plaintiff states that the Sword entities, as successors in interest, following the settlement, undertook and failed to make payments for the new bills totaling $ 443, 955.00, above and beyond that contained in the Texas settlement. (*Id.* at P 27.) Plaintiff also alleges that the Sword entities in their own name, failed to make a payment of an additional $ 198,261.00 for per diems and accessorial charges incurred between November of 2007 and March 2008. (*Id.* at P 28.) Plaintiff has made demand for payment of the various amounts due, to no avail. (*Id.* at P 31.)

## II. *STANDARD OF REVIEW*

### A. *Personal Jurisdiction*

---

[1] Drayage is the hauling of goods.

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute **[*7]** to determine if personal jurisdiction is permitted over the defendant. Second, the court must determine whether the exercise of jurisdiction violates the *Due Process Clause of the Fourteenth Amendment*. *See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)*; *Vetrotex Certained Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996)*. In this forum, the inquiry is collapsed into a single step, because New Jersey's long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process, as defined under the Constitution of the United States. As such, federal law defines the parameters of this Court's in personam jurisdiction. *See IMO Indus., Inc., 155 F.3d at 259*.

The *Fourteenth Amendment* permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958))*. The plaintiff has the burden of proving that the defendant purposefully availed **[*8]** itself of the forum state. *Burke v. Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997)*.

Specific jurisdiction is invoked when a claim is related to or arises out of the defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)* (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." *Hanson, 357 U.S. at 253*. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)*. Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. *United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F. Supp. 317, 320 (D.N.J.*

*1988)*. The unilateral acts of the plaintiff, however, will not amount to minimum contacts. **[*9]** *Helicopteros Nacionales de Colombia, 466 U.S. at 414*; *Hanson, 357 U.S. at 253*. The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiff. *See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984)*.

Assuming minimum contacts have been established, a court must then consider whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King, 471 U.S. at 476* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*; *see also Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 201 (3d Cir. 1998)*. For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. *World-Wide Volkswagen, 444 U.S. at 292*.

To determine reasonableness, a court considers the following factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) **[*10]** the shared interest of the states in furthering substantive social policies. *Id.* Only in "rare cases [do the] minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 116, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (Brennan, J., concurring) (quotations omitted); *Pennzoil, 149 F.3d at 207*.

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, 466 U.S. at 416*. To establish general jurisdiction, the plaintiff "must show significantly more than mere minimum contacts" with the forum state. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987)*. Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive." *Reliance Steel Prods. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982)*.

**B. *Venue***

28 U.S.C. § 1391(a) provides that [*11] venue is proper in a district for an action based solely on diversity jurisdiction: 1) where any defendant resides, if all defendants reside in the same state; 2) where a substantial part of the events occurred that give rise to the claim; or, in the event that neither 1) nor 2) is proper, 3) where any defendant is subject to personal jurisdiction. A defendant corporation is deemed to reside, for purposes of venue under 28 U.S.C. § 1391, in any judicial district in which the corporation is subject to personal jurisdiction at the time litigation is commenced. 28 U.S.C. § 1391(c). The substantiality requirement of 28 U.S.C. § 1391(a)(2) is designed to protect the defendant from being "haled into a remote district having no real relationship to the dispute" based on events having only a "tangential connection" with the forum. Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994).

### III. *ANALYSIS*

Federal courts do not have jurisdiction over a nonresident defendant unless the nonresident defendant has purposefully established "minimum contacts" with the forum state such that the court's exercise of jurisdiction comports with notions of "fair play and substantial justice." [*12] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

Applying the "minimum contacts" analysis, the establishment of personal jurisdiction over a nonresident defendant is based on a determination of whether the defendant has purposefully availed itself of the benefits and protections of the forum's state's laws by conducting activities within the forum state. See Asahi Metal Indus. Co. v. Superior Ct. of Cal., 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987). In order to measure minimum contacts, courts consider the following factors (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relation of the cause of action to the contact; (4) the interest of the forum state in providing a forum for its residents to resolve disputes; and (5) the convenience of the parties. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994). Minimum contacts are not established unless the court finds that it has either specific or general jurisdiction over the defendant. See Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 150-51 (3d Cir. 1996).

**A. *Specific jurisdiction***

In order to establish specific jurisdiction, the [*13] nonresident defendant's contacts with the forum state must arise from or be directly related to the plaintiff's cause of action. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. at 414 n.8. This Court cannot exercise specific jurisdiction over a nonresident defendant unless the nonresident defendant's activities were purposefully directed to the forum state and the litigation resulted from alleged injuries that "arise out of" or "relate to" those activities. See id. at 414.

In the instant case, Defendants contend they have had no business dealings with Plaintiff in the State of New Jersey. (Aff. of Mike Maas at PP 4-11). None of the Plaintiff's causes of action arise from business dealings conducted in the state of New Jersey. (Id.) All of the business dealings between Plaintiff and Defendants occurred in the State of Texas, and on occasion in neighboring states. (Id.) Defendants Lighthouse Trucking and Sword Transportation used trucking containers owned by Plaintiff to haul cargo within the State of Texas. (Id.) Plaintiff only offers as evidence of minimum contacts the communications between Plaintiff, based in New Jersey, and the Defendants, based in Texas. "The numerous [*14] contacts by Plaintiff per se, its collection agency, and counsel, all from New Jersey, should be construed as sufficient "fair warning" to these defendants that they would be brought here, especially after their default on a prior settlement in a Texas matter." (Id.) Thus, none of the Defendants have engaged in activities purposefully directed to the state of New Jersey, and Plaintiff's causes of action do not arise out of, or relate to, activities of the Defendants within the state of New Jersey.

This Court's exercise of jurisdiction over the Defendants would offend traditional notions of fair play and substantial justice. See Int'l Shoe Co., 326 U.S. at 316. This Court's assumption of jurisdiction over the Defendants also would place a substantial burden on the Defendants. None of the Defendants reside or engage in any activity connected to the state of New Jersey. All of the defendants reside within the state of Texas and all of the transactions with Plaintiff occurred in the state of Texas. (Aff. of Mike Maas PP 4-11.) The interests of the forum state in adjudicating this matter are minimal, since only the Plaintiff resides in New Jersey. Plaintiff also conducts business in the [*15] state of Texas, whereas none of the Defendants has any relationship to the state of New Jersey. Plaintiff's suit would more easily be resolved in the state of Texas.

2009 U.S. Dist. LEXIS 7538, *15

This Court lacks specific jurisdiction over the Defendants, because none of the events that give rise to Plaintiff's cause of action occurred in the state of New Jersey and Defendants have had no contact with the state of New Jersey.

**B.** *General Jurisdiction*

General jurisdiction over a defendant is established when the defendant has engaged in "continuous and systematic" activities within the forum state. *See* Helicopteros Nacionales de Colombia, 466 U.S. at 414-16. None of the Defendants has had contacts with the state of the New Jersey that could be characterized as "continuous and systematic." (Aff. of Mike Maas PP 4-11.) None of the business entities Defendants maintain a place of business in the state of New Jersey, or engage in any business dealings in New Jersey that would subject them to jurisdiction within the state. (Id.) Since none of the Defendants have engaged in "continuous and systematic" activities in New Jersey, this Court cannot exercise general jurisdiction over the Defendants.

**IV.** *CONCLUSION*

For the reasons **[*16]** set forth above, Defendant's motion to dismiss for lack of personal jurisdiction, pursuant to FED. R. CIV. P. 12(b)(2), shall be granted. Defendant's motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(3), shall be denied, as moot. [2]

/s/ Joseph A. Greenaway, Jr.

JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: January 30, 2009

---

End of Document

---

[2] Since this Court shall grant Defendants' motion to dismiss for lack of personal jurisdiction, it need not decide whether venue in this Court is proper. The motion to dismiss for improper venue is denied, as moot.

⚠ Last updated  August 24, 2020   05:45:07 pm GMT

## *Walters v. Safelite Fulfillment, Inc.*

United States District Court for the District of New Jersey

March 28, 2019, Decided; March 28, 2019, Filed

Civil No. 18-11111(RMB/JS)

**Reporter**
2019 U.S. Dist. LEXIS 52355 *; 2019 WL 1399550

NICHOLAS WALTERS, Plaintiff, v. SAFELITE FULFILLMENT, INC., et al., Defendants.

**Subsequent History:** Motion denied by, Without prejudice *Walters v. Safelite Fulfillment, Inc., 2019 U.S. Dist. LEXIS 222925 (D.N.J., Dec. 31, 2019)*

**Prior History:** *Klein v. Safelite Grp., Inc., 2018 U.S. Dist. LEXIS 105586 (D.N.J., June 25, 2018)*

## Core Terms

discriminatory, terminated, email

**Counsel:  [*1]** For Nicholas Walters, Plaintiff: Robert W. Smith, Esq.; Christopher J. Eibeler, Esq., SMITH EIBELER, LLC, Holmdel, New Jersey.

For Safelite Fulfillment, Inc., Defendant: Kerri A. Wright, Esq., PORZIO, BROMBERG & NEWMAN, P.C., Morristown, New Jersey.

For Safelite Fulfillment, Inc., Defendant: Daniel J. Clark, Esq., VORYS, SATER, SEYMOUR, AND PEASE LLP, Columbus, Ohio; Liana R. Hollingsworth, Esq., Cleveland, Ohio.

**Judges:** RENÉE MARIE BUMB, UNITED STATES

DISTRICT JUDGE.

**Opinion by:** RENÉE MARIE BUMB

## Opinion

[Dkt. No. 15]

**RENÉE MARIE BUMB**, United States District Judge:

Plaintiff Nicholas Walters ("Plaintiff") brought this action against Defendant Safelite Fulfillment, Inc. ("Defendant" or "Safelite"), alleging retaliation and associational discrimination/wrongful discharge in violation of the *New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et. seq.* ("NJLAD"). Now, this matter comes before this Court upon Defendant's Motion to Dismiss Plaintiff's Complaint in its entirety (the "MTD")[Dkt. No. 15-1], pursuant to *Fed. R. Civ. P. 12(b)(6)*.[1] For the reasons set forth herein, Defendant's Motion to Dismiss will be **GRANTED**.

## I. BACKGROUND & PROCEDURAL HISTORY

Plaintiff Nicholas Walters is a resident of Connecticut and was previously employed by Defendant for about twelve years. **[*2]** According to Plaintiff, he began working for Safelite at a location in Cherry Hill, New Jersey in 2005 and remained at that location until March

---

[1] Alternatively, Defendant asks this Court to consider summary judgment or transfer of this case to the United States District Court for the District of Connecticut. As this Court will dismiss Plaintiff's Complaint for failure to state a claim, the Court does not address these alternative requests.

2015, when he was transferred to a location in Connecticut. [See Compl., at ¶¶ 8-10, 25]. During his employment, Plaintiff states that he was promoted twice, first to Assistant Store Manager in 2011 and then to Store Manager in September 2015. [Id., at ¶¶ 9-10, 25]. Approximately two years after being transferred to Connecticut, Plaintiff's employment was terminated in April 2017.

In July 2016, over a year after Plaintiff's transfer to Connecticut, Plaintiff alleges that managers in the Philadelphia region began discriminating against Greg Manning, a technician at the Cherry Hill location, upon Mr. Manning's return to work from a medical leave for ankle surgery. According to Plaintiff, Mr. Manning was subjected to discriminatory conduct, such as ridicule and other mistreatment, based on his disabilities, which included diabetes and obesity. [See Compl., at ¶¶ 30-36]. Mr. Manning was eventually placed on administrative leave on December 2, 2016. [Id. at ¶ 104]. After Plaintiff learned about the situation from Mr. Manning, Plaintiff sent an email **[*3]** to Dale Sweigart, stating that he was "concerned" about the situation with Mr. Manning. [Id.]. In that email, Plaintiff allegedly noted that Plaintiff "had complained of unfair treatment due to his diabetes and weight." On December 7, 2016, Defendant terminated Mr. Manning's employment. [Id. at ¶ 122].

Plaintiff alleges his email regarding Mr. Manning was subsequently forwarded by Philadelphia-area managers to Plaintiff's own Connecticut-based managers, including the local HR representative in Connecticut. [See Compl., at ¶¶ 105-116]. According to Plaintiff, the Philadelphia-area management team shared his email regarding Mr. Manning with Plaintiff's local management for the sole purpose of "further[ing] the Company's plan to retaliate against Plaintiff Walters in his own employment for opposing the unlawful conduct directed at Mr. Manning and for having encouraged Mr. Manning to exercise his rights." [Id. at ¶ 116].

Plaintiff contends that, following his complaint regarding Mr. Manning's treatment, Defendant retaliated against him through "an unwarranted and pretextual discipline warning on February 10, 2017 and putting him on a Personal Development Plan on February 20, 2017." [Compl., **[*4]** at ¶ 149]. Additionally, Plaintiff claims that he was scolded by management for reporting the discriminatory conduct towards Mr. Manning, because Plaintiff "was going to get the Company sued as a result of sending the email." [Id. at ¶¶ 137-143]. On or about April 10, 2017, Plaintiff was terminated from his

employment with the Safelite location in Connecticut. [Id. at ¶ 150].

On June 27, 2018, Plaintiff filed his Complaint, alleging that Defendant violated NJLAD (1) by retaliating against Plaintiff for complaining about and objecting to discriminatory conduct towards Mr. Manning; and (2) for terminating Plaintiff for associating with Mr. Manning. In response, Defendant moves to dismiss Plaintiff's NJLAD claims under *Fed. R. Civ. P. 12(b)(6)*.

## II. LEGAL STANDARD

To withstand a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*(quoting Bell Atlantic *Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. at 662*. "[A]n unadorned, the defendantunlawfully-harmed-me accusation" does **[*5]** not suffice to survive a motion to dismiss. *Id. at 678*. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (quoting *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*.

In reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012)*. When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that form the basis of a claim. See *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*; *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)*.

## III. DISCUSSION

In its Motion to Dismiss, Defendant contends that Plaintiff cannot maintain a cause of action under the

NJLAD because Plaintiff was not employed in the state of New Jersey. [See MTD, at 3]. In response, Plaintiff argues that there is "clear legal precedent recognizing that the broad protections provided under the LAD apply to persons who live outside New Jersey who are impacted by discrimination that took place in New Jersey.[2] [See Plaintiff's **[*6]** Response in Opposition to Defendant's MTD ("Pl.'s Resp."), Dkt. No. 18, at 1]. The Court disagrees with Plaintiff's assertion that any such "clear legal precedent" exists.

Contrary to Plaintiff's contention otherwise, "New Jersey courts have consistently applied the law of the state of employment to claims of workplace discrimination and, therefore, only apply the NJLAD if the claimant was employed in New Jersey." *McGovern v. Sw. Airlines, 2013 U.S. Dist. LEXIS 3095, 2013 WL 135128, at *1 (D.N.J. Jan. 8, 2013)*(Simandle, C.J.); see also *Buccilli v. Timby, Brown & Timby, 283 N.J.Super. 6, 10-11, 660 A.2d 1261 (App.Div.1995)*(a New Jersey resident, employed in Pennsylvania, could not assert a claim under the NJLAD against a law firm even though it had offices in New Jersey); *Satz v. Taipina, 2003 U.S. Dist. LEXIS 27237, 2003 WL 22207205, at *18 (D.N.J. Apr. 15, 2003)*(Simandle, J.), aff'd, *122 F. App'x 598 (3d Cir.2005)*(holding that plaintiff could not assert a claim under the NJLAD where defendants had offices in New Jersey, but plaintiff worked exclusively in Pennsylvania and Delaware); *Brunner v. Allied Signal, Inc., 198 F.R.D. 612, 613-14 (D.N.J. Jan. 17, 2001)*(Orlofsky, J.)(holding that the NJLAD does not apply to claims brought by a New Jersey resident against a New Jersey company when claimant was employed exclusively in Pennsylvania). The "restriction on the extraterritorial application of the NJLAD is rooted in the well-settled understanding that New Jersey law regulates conduct in New Jersey, not outside the state." *Peikin v. Kimmel & Silverman, P.C., 576 F.Supp.2d 654, 657-658 (D.N.J. Aug. 21, 2008)* **[*7]** (Simandle, J.).

As alleged, for the entire period, beginning when Plaintiff first complained about the treatment of Mr. Manning through Plaintiff's termination in April 2017, Plaintiff both resided and was employed in the state of Connecticut. In this case, Plaintiff alleges that the discriminatory conduct against Mr. Manning, which occurred at a Cherry Hill, New Jersey location,

perpetrated by Philadelphia-area managers, did not begin until July 2016. This was over a year after Plaintiff was transferred to work at a Safelite location in Connecticut.

Although Plaintiff was working in New Jersey when he allegedly protested discriminatory conduct towards Shelby Klein in "late 2014/early 2015," [Compl., at ¶¶ 17-23], Plaintiff never alleges in his Complaint that his defense of Ms. Klein led to any adverse employment action against him. Rather, Plaintiff makes this argument for the first time in response to the motion to dismiss. [Pl.'s Resp., at 18-19]. Indeed, Plaintiff's Complaint specifically notes that Plaintiff received a positive performance evaluation and a promotion, even after complaining about the treatment of Ms. Klein. [See Compl., at ¶¶ 28-29]. Regardless, Plaintiff does not **[*8]** allege that he suffered any adverse employment actions related to that incident until two years later, when he was employed in Connecticut.

In his response brief, Plaintiff incorrectly claims that *Trevejo v. Legal Cost Control, Inc., 2018 N.J. Super. Unpub. LEXIS 727, 2018 WL 1569640 (App. Div. Apr. 2, 2018)* supports the proposition that out-of-state employees can bring a cause of action under NJLAD. Although the plaintiff in <u>Trevejo</u> resided in Massachusetts and worked from home, she alleged that she "telecommuted" to the office in New Jersey using technology provided by the company. *2018 N.J. Super. Unpub. LEXIS 727, [WL] at *2*. Even under those circumstances, the court did not conclude that the plaintiff could maintain an NJLAD claim. Rather, the court merely found that further discovery was necessary because it was "unable to determine whether plaintiff is protected under the NJLAD." *2018 N.J. Super. Unpub. LEXIS 727, [WL] at *4*. In the instant case, Plaintiff, a store manager in Connecticut, does not allege that he had any work responsibilities at all in New Jersey.

The other cases Plaintiff cites to support his position are equally inapplicable.[3] *Notably, Craig v. Suburban*

---

[2] Plaintiff mischaracterizes Defendant's argument for dismissal as one regarding the impact of a plaintiff's <u>state of residency</u> on the ability to maintain an NJLAD claim. Instead, the question before this Court is the relevance of a plaintiff's <u>state of employment</u>.

[3] Other cases cited by Plaintiff do not even involve claims arising under the NJLAD. Although cited to support the argument that out-of-state employees can bring an NJLAD claim, *Mehlman v. Mobil Oil Corp., 153 N.J. 163, 707 A.2d 1000 (1998)* involved *New Jersey's Conscientious Employee Protection Act ("CEPA")*, not the NJLAD. Similarly, *D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 628 A.2d 305 (1993)*, "does not involve the NJLAD or its extraterritorial effect" and "does not serve as a persuasive authority" on that issue. See *Seibert v. Quest Diagnostics Inc., 2012 U.S. Dist.*

*Cablevision, 274 N.J. Super. 303, 644 A.2d 112 (App. Div. 1994)*, aff'd *140 N.J. 623, 660 A.2d 505 (1995)*, did not address the question of whether the NJLAD applies to out-of-state employees (even though Plaintiff cites Craig for this proposition). Instead, Craig held that plaintiffs, who were employed in New Jersey, had standing **[*9]** to bring associational discrimination claims under the NJLAD.

Finally, Plaintiff argues that he should be allowed to pursue a NJLAD claim because "New Jersey has a strong interest in eradicating the cancer of discrimination in its state." [See Pl.'s Resp., at 19]. However, New Jersey courts have already rejected public policy arguments for applying the NJLAD to out-of-state employees, reasoning that the "law of the state of the employee's workplace applies to claims arising from his employment because the state has an unusually strong interest in applying its own law to employment contracts involving work in [its] state." *Diana v. AEX Group, 2011 U.S. Dist. LEXIS 100928, at *7-8 (D.N.J. Sept. 7, 2011)*(Sheridan, J.).

Ultimately, Plaintiff's NJLAD claims fail because he was employed outside the state of New Jersey. Even if Plaintiff had plausibly alleged that he was the victim of discriminatory decision-making that occurred within New Jersey, which he does not, that would still probably be insufficient to survive a motion to dismiss. "Whether Plaintiff worked for a New Jersey entity or not, and whether the alleged discriminatory conduct emanated from New Jersey or not, it is clear that Plaintiff performed her duties ... elsewhere, but at no time did she work in **[*10]** New Jersey. In these circumstances, the Plaintiff's connection to New Jersey is insufficient to assert an NJLAD cause of action." See *Albert v. DRS Techs., Inc, 2011 U.S. Dist. LEXIS 55320, 2011 WL 2036965, at *2 (D.N.J. May 23, 2011)*(Martini, J.)(dismissing plaintiff's NJLAD claims where she worked for New Jersey corporation and alleged that the discriminatory decision to terminate her was made in New Jersey, but she worked in Florida).

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss will be **GRANTED**. Accordingly, Plaintiff's Complaint will be **DISMISSED**, without prejudice. Although Plaintiff will be granted thirty (30) days leave to

*LEXIS 42708, 2012 WL 1044308, at *7 (D.N.J. Mar. 28, 2012)*(Hayden, J.).

amend his Complaint and address the aforementioned deficiencies, this Court is skeptical of Plaintiff's ability to assert a claim under the NJLAD. An Order consistent with this Opinion shall issue on this date.

DATED: March 28, 2019

/s/ Renée Marie Bumb

RENÉE MARIE BUMB

UNITED STATES DISTRICT JUDGE

## ORDER

**RENÉE MARIE BUMB**, United States District Judge:

This matter comes before the Court upon a Motion to Dismiss [Dkt. No. 15], filed by Defendant Safelite Fulfillment, Inc. ("Defendant"), seeking the dismissal of Plaintiff Nicholas Walters' Complaint [Dkt. No. 1], pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons set forth in the accompanying Opinion of the same **[*11]** date,

**IT IS** on this, the **28th** day of **March 2019**, hereby

**ORDERED** that Defendant's Motion to Dismiss [Dkt. No. 15] is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint [Dkt. No. 1] is **DISMISSED**, without prejudice; and it is further

**ORDERED** that Plaintiff is permitted thirty (30) days leave to file an amended complaint, to the extent Plaintiff is able to address the deficiencies set forth in the accompanying Opinion.

/s/ Renée Marie Bumb

RENÉE MARIE BUMB

UNITED STATES DISTRICT JUDGE

 Last updated  August 24, 2020   05:52:21 pm GMT

## Albert v. DRS Techs., Inc.

United States District Court for the District of New Jersey

May 23, 2011, Decided; May 23, 2011, Filed

Civil Action Number: 2:10-cv-03886

**Reporter**
2011 U.S. Dist. LEXIS 55320 *; 2011 WL 2036965

HEIKE ALBERT, Plaintiff, v. DRS TECHNOLOGIES, INC, DRS RSTA, INC., a wholly owned subsidiary of DRS TECNOLOGIES, INC., Defendants.

## Core Terms

terminate, entity

**Counsel:** **[*1]** For HEIKE ALBERT, <u>Plaintiff:</u> STEVEN L. WITTELS, SANFORD, WITTELS & HEISLER, LLP, FORT LEE, NJ.

For **DRS TECHNOLOGIES, INC., DRS RSTA, INC.,** <u>Defendants:</u> **JOSHUA DAVID RINSCHLER**, DRINKER BIDDLE & REATH LLP, FLORHAM PARK, NJ.

**Judges:** HON. William J. Martini, United States District Judge.

**Opinion by:** William J. Martini

## Opinion

### MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff Heike Albert was terminated by her employer, DRS RSTA, Inc., a Delaware corporation with its principal place of business in Florida. Albert worked for DRS RSTA, Inc. in Florida. She now brings a Title VII gender discrimination claim and related causes of action under the New Jersey Law Against Discrimination (NJLAD), *N.J. Stat. Ann. § 10:5-1 et seq.* The basis for the state causes of action is that her employer is a wholly owned subsidiary of a New Jersey-based entity, DRS Technologies, Inc. Albert further alleges that the discriminatory conduct was connected to the New Jersey entity and the decisions of its employees. Thus the discriminatory conduct emanated from New Jersey. Defendants seek to dismiss the New Jersey state causes of action, and to transfer the motion to the Middle District of Florida.

For the reasons elaborated below, the Court will **GRANT [*2]** the Defendants' motion, will **DISMISS the** NJLAD claims (counts 3 and 4), and will **TRANSFER** the action to the Middle District of Florida.

### II. STANDARD OF REVIEW

*Motion to Dismiss.* The Defendants' motion to dismiss is brought pursuant to the provisions of *Federal Rule of Civil Procedure 12(b)(6).* This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)*, and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (abrogating "no set of facts" language found in *Conley v.*

*Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's **[*3]** cause of action. *Id.* Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)* (quoting *Twombly, 550 U.S. at 555*).

*Motion to Transfer.* Transfer is sought under *28 U.S.C. § 1404(a)* ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."). In deciding whether to grant a transfer, the Court will balance both private and public factors. The list of non-exclusive private factors include: plaintiff's forum choice; the defendant's preference; where the claim arose; convenience of parties; and convenience of witnesses — "but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*. **[*4]** The list of non-exclusive public factors include: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *Id. at 879-80*. The burden rests on the movant, and Plaintiff's choice of venue should not be "lightly disturbed." *Id. at 879*.

### III. FACTS

The basic facts do not appear in dispute. Plaintiff was an employee of DRS RSTA, Inc. (RSTA), a Delaware corporation with its principal place of business in Florida. Albert was employed in Florida. RSTA is a wholly owned subsidiary of DRS Technologies, Inc. (DRS), a Delaware corporation with its principal place of business in New Jersey. After being terminated, Albert exhausted administrative remedies, and then brought the instant action. In her four-count complaint she

asserts two counts under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000(e)-5(f) et seq.*, both a gender discrimination claim and a retaliation **[*5]** claim. She also asserts two counts under NJLAD, both a gender discrimination claim and a retaliation claim. Albert's position is that the discriminatory conduct emanated from New Jersey, from DRS, and its employees, thus giving her a sufficient connection to this Court (the New Jersey forum) and the New Jersey state law causes of action (NJLAD).

### IV. ANALYSIS

*Motion to Dismiss.* Plaintiff acknowledges that she worked for Defendants in Florida. Plts.' Br 1. Her position is that because she worked for a "New Jersey corporation, and [because] the decision to terminate her employment was made in New Jersey," she can maintain this action in New Jersey and assert her NJLAD counts. *Id.* at 4-5. Plaintiff's position is somewhat obscure. She acknowledges that RSTA was her employer. RSTA is not a New Jersey corporation, nor does it have its principal place of business in New Jersey. It appears Plaintiff is asserting that she worked for a New Jersey corporation because RSTA is wholly owned by DRS, an entity with a principal place of business in New Jersey.

Whether Plaintiff worked for a New Jersey entity or not, and whether the alleged discriminatory conduct emanated from New Jersey or not, it is clear **[*6]** that Plaintiff performed her duties in Florida, and, perhaps, occasionally elsewhere, but at no time did she work in New Jersey. In these circumstances, the Plaintiff's connection to New Jersey is insufficient to assert an NJLAD cause of action. *Norenius v. Multaler, Inc., 2008 N.J. Super. Unpub. LEXIS 2923, 2008 WL 4162878, at *7, (N.J. Super. App. Div. Sept. 11, 2008)* ("We do not perceive that the protections afforded to 'inhabitants' under the LAD were intended to extend to 'inhabitants' of other states employed exclusively within the borders of those states."); *Satz v. Taipina, 2003 U.S. Dist. LEXIS 27237, 2003 WL 22207205, at *16 (D.N.J. April 15, 2003)* ("New Jersey courts have consistently applied the law of the state of employment to workplace claims, and have therefore *only applied the NJLAD if the plaintiff worked in New Jersey.*" (emphasis added)). It appears the NJLAD counts must be dismissed.

*Motion to Transfer.* Plaintiff supports her forum choice by arguing that the burden is on the movant, that her forum choice should not be lightly disturbed, that the

adjudication of NJLAD counts favor a New Jersey judge and forum, and that discovery will establish that the decision to terminate Albert was made in New Jersey, thereby requiring access **[*7]** to New Jersey witnesses and documents. The Court has already determined that the NJLAD counts should be dismissed. Plaintiff's claim in regard to New Jersey witnesses and documents is wholly speculative. It seems clear that any number of witnesses discussed in her complaint are Florida residents, i.e., her RSTA co-workers and supervisors. Plaintiff lives in Florida and her (immediate, if not only) employer is a Florida-based entity. The Court sees little reason to defer to Plaintiff's forum choice because her employer's parent corporation's principal place of business is in New Jersey and because discovery might reveal that some part of the alleged wrongful termination decision emanated from New Jersey. Weighing the public and private factors, the Court finds that transfer is in order.

## V. CONCLUSION

For the reasons elaborated above, the Court **GRANTS** the Defendants' motion, **DISMISSES the** NJLAD claims (counts 3 and 4), and **TRANSFERS** the action to the Middle District of Florida.

**DATE: May 23, 2011**

/s/ William J. Martini

**William J. Martini, U.S.D.J.**

End of Document

 Caution
As of: September 14, 2020 2:32 PM Z

## *Satz v. Taipina*

United States District Court for the District of New Jersey

April 15, 2003, Decided

CIVIL NO. 01-5921 (JBS)

**Reporter**
2003 U.S. Dist. LEXIS 27237 *; 2003 WL 22207205

WILLIAM SATZ, Plaintiff, v. DENNIS TAIPINA and NOVARTIS PHARMACEUTICALS CORP., Defendants.

**Subsequent History:** Later proceeding at *Satz v. Taipina,* 122 Fed. Appx. 598, 2005 U.S. App. LEXIS 4418 (3d Cir. N.J., 2005)

## Core Terms

restraining, territory, ex-wife, divorce, workplace, gender, violence, discriminatory, vacation, termination, emotional, distress, beater, infliction, disability, privacy, stress, permanent, attended, domestic, pretext, mixed, talk, Pharmaceuticals, headquarters, trigger, dinner, email, drop, temporary

**Counsel:  [*1]**  Deborah H. Simon, Esquire, MAGER WHITE & GOLDSTEIN, LLP, Westmont, New Jersey - and - Kenneth D. Federman, Esquire, ROTHBERG & FEDERMAN, P.C., Bensalem, Pennsylvania, Attorneys for Plaintiff William Satz.

Steven M. Berlin, Esquire, Caroline J. Berdzik, Esquire, BUCHANAN INGERSOLL, P.C., Princeton, New Jersey, Attorney for Defendants Dennis Taipina and Novartis Pharmaceuticals Corp.

**Judges:** JEROME B. SIMANDLE, United States District Judge.

**Opinion by:** JEROME B. SIMANDLE

## Opinion

**TABLE OF CONTENTS**

Go to table1

[*2] I. INTRODUCTION

Defendant Novartis Pharmaceuticals Corporation ("Novartis") made two decisions at issue in this case: first, it decided to transfer plaintiff William Satz from the "Philly South" sales district; then it decided to terminate plaintiff's employment with Novartis. Plaintiff, a Caucasian male, filed a Complaint with this Court, alleging that these two decisions were discriminatory. [1]

_____

[1] Plaintiff's Complaint includes the following twelve counts: (I) discrimination in violation of *section 1981* of the Civil Rights Act of 1988, *42 U.S.C. § 1981*, (II) retaliation in violation of *42 U.S.C. § 1981*, (III) discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e*, (IV) sex discrimination in violation of the New Jersey Law Against Discrimination (NJLAD), *N.J.S.A. § 10:5-1*, (V) aiding and abetting a violation of the NJLAD, (VI) handicap discrimination in violation of the NJLAD, (VII) hostile work environment in violation of the NJLAD, (VIII) retaliation in violation of the NJLAD, (IX) discrimination in violation of Pennsylvania Human Relations Act (PHRA), *43 P.S. § 951*, (X) intentional infliction of emotional distress, (XI) infringment of protected privacy rights, and (XII) discrimination in violation of the Pennsylvania Equal Rights Amendment (PERA).

Plaintiff has requested a voluntary dismissal with prejudice of the *section 1981* claims in Count I and II of his Complaint. See

**[\*3]** The decisions were made in light of plaintiff's relationship with another Novartis salesperson, his ex-wife. In July 2000, when plaintiff and his ex-wife were both assigned to the Philly South sales district, they had an out-of-work domestic dispute and were both arrested on domestic violence charges. Based on the dispute, plaintiff's ex-wife obtained a restraining order against plaintiff and told her supervisor at Novartis, defendant Dennis Taipina, about it. Because of the restraining order against plaintiff, Taipina, along with other Novartis management employees, decided to separate plaintiff and his ex-wife by transferring plaintiff to another sales district. By the time Taipina told plaintiff of the transfer, plaintiff had also obtained a restraining order. Plaintiff told Taipina about his order, but Taipina did not change his decision to transfer plaintiff and allow plaintiff's ex-wife to remain in the Philly South district.

Plaintiff argues that the transfer decision was discriminatory because it was based on the "gender-based presumption -- that he was the wrongdoer in an out-of-work confrontation . . . because he was a male." (Pl.'s Br. at 2.) He argues that when he contested **[\*4]** the discriminatory transfer decision, he was terminated from his employment at Novartis in retaliation. Defendants argue that the decision to transfer plaintiff was not based on his gender, but was based on their understanding that they were bound by a court order to ensure plaintiff had no contact with his ex-wife. The restraining order against plaintiff became a permanent order against him. They also argue that plaintiff's eventual termination was based solely on his failure to comply with his manager's performance expectations.

This motion for summary judgment requires the Court to first consider whether plaintiff, who was employed exclusively in Pennsylvania and Delaware by defendants who had offices in New Jersey, may pursue claims against defendants under the New Jersey Law Against Discrimination (NJLAD), *N.J.S.A. § 10:5-1*. Then the Court must consider whether there remains any material question of fact regarding plaintiff's claims of discrimination, invasion of privacy, and intentional infliction of emotional distress.

---

Pl.'s Br. at 3 n. 2. Defendant argued that claims for reverse gender discrimination and retaliation were not cognizable under *section 1981* because the purpose of *section 1981* is to provide a remedy for racial discrimination. See Defs.' Br. at 4-5 (citing *St. Francis College v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 2026-28, 95 L. Ed. 2d 582 (1987)*). This Court agrees and will dismiss the claims in Counts I and II of plaintiff's complaint in the Order filed with this Opinion.

As explained herein, this Court finds that plaintiff may not assert the NJLAD against defendants because plaintiff was not employed **[\*5]** in New Jersey as required by New Jersey law. This Court also finds that plaintiff has failed to raise any issue of material fact regarding his discrimination claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e*, the Pennsylvania Human Relations Act (PHRA), *43 P.S. § 951*, and the Pennsylvania Equal Rights Amendment (PERA), or regarding his privacy and intentional infliction of emotional distress claims. Therefore, this Court will grant defendants' motion for summary judgment and will dismiss plaintiff's complaint.

## II. BACKGROUND

### A. The parties

Novartis, a corporation headquartered in East Hanover, New Jersey, develops, manufactures, and sells pharmaceutical products. (Berlin Cert., Ex. G, Taipina Aff. P1.) Novartis was formed in 1997 after the merger of its predecessor, the Sandoz Corporation, and CIBA-Geigy. (Id.) Plaintiff was employed at Sandoz in 1988 as a pharmaceutical sales representative and worked "on the road every day visiting physicians, pharmacies, hospitals, nursing homes or other healthcare providers." (Simon Cert., Ex. A, W. Satz Dep. 69:3-15; Pl.'s Facts PP1, 2.)

In 1993, **[\*6]** plaintiff married another sales representative, Rosemarie Satz. (Berlin Cert., Ex. E, R. Satz Dep. 78:18-21; Id., Ex. K at 2.) The Satzes were eventually transferred into the same "Philly South" sales district, which included two sales territories in Southern New Jersey and three territories in Philadelphia. [2] (Id., Ex. B, Taipina Dep. 4:15-24; Id., Ex. E, R. Satz Dep. 78:4-24.) The Satzes worked in different sales territories in the sales district; plaintiff worked in Northeast Philadelphia and Mrs. Satz worked in South Jersey. (Id. at 25:3-11; Berlin Cert., Ex. E, R. Satz Dep. 7:13-19). They both worked for manager Dennis Taipina, who worked under Howard Goldberg, the regional director of sales for Delaware, New Jersey, and Pennsylvania. (Id., Ex. B, Taipina Dep. 4:13-16; Id. Ex. C, Goldberg Dep. 5:1-14; Id., Ex. E, R. Satz Dep. 6:13-17; Id., Ex. G,

---

[2] Plaintiff first worked in Media, Pennsylvania and was transferred about five times before his assignment to the Philly South district. (Berlin Cert., Ex. F, W. Satz Dep. 69:21-70:3.)

Taipina Aff. P1.)

**[\*7]** At work, plaintiff and Mrs. Satz did not interact daily because they visited different doctors' offices. (Id., Ex. B, Taipina Dep. 25:9-11; Id., Ex. E, R. Satz Dep. 14:22-24.) About twenty-five to thirty days per year, though, they attended the same district meetings, district dinner programs, and company events. (Id., Ex. B, Taipina Dep. 13:4-19.)

Plaintiff was considered a successful salesperson. His counterpart in Northeast Philadelphia, Rick Miller, explained:

> Bill just was, he was different. He just had those rapports that were unbreakable, and it didn't matter who his competitors were. . . . He brought something different to the table.
> I think the biggest thing that I saw when we rode together or we worked together in physicians' offices was . . . he brought a value to the physician and was able to teach them and ensure something with them that was different than the average guy. He was passionate. . . . Most reps a lot of times don't get in to see the physician, they wait or just drop samples. Bill never dropped samples. He would get to see the physician and they were excited to see him.

(Simon Cert., Ex. G, Miller Dep. 23:4-24:10.) Plaintiff's annual **[\*8]** reviews for 2000 and 2001 show that he generally "met expectations." [3] (Id., Ex. H.)

## B. The divorce

Mrs. Satz filed for divorce in November 1999. (Berlin Cert., Ex. E, R. Satz Dep. 6:1-8, 7:20-8:1; Id., Ex. K.) The divorce was finalized in June 2000, with Mrs. Satz receiving rights to the marital home in Cinnaminson, New Jersey. (Id.) Plaintiff moved to a home he purchased in Huntington Valley, Pennsylvania. (Simon Cert., Ex. J, W. Satz Dep. 190:9-10.)

The Satzes' manager, Dennis Taipina, was aware that the Satzes were having marital problems. (Berlin Cert., Ex. E, R. Satz Dep. 16:6-8; Id., Ex. G, Taipina Aff. PP4, 6.) Prior to the divorce, he says that "both acknowledged that the divorce was stressful [but] assured [him] that they would remain professional and would not allow their working relationship or Novartis

business to be affected by the pending divorce." (Id. P6.) **[\*9]** Taipina says he then watched their relationship "degrade" as they soon seemed "uncomfortable in each other's presence," and he saw the effects of the divorce on their sales performance which for "both Rosemarie and William Satz began to slip below Company expectations." (Id. P7.)

It is not clear whether Mrs. Satz actually told Taipina that it was difficult working in the same district as plaintiff. Taipina testified, and noted contemporaneously, that Mrs. Satz approached him at a May 10, 2000 district meeting and "told me that she was having troubles at home and that she was no longer comfortable working with Bill Satz within the district." (Berlin Cert., Ex. B, Taipina Dep. 12:2-21; Id., Ex. G, Taipina Aff. P8; Simon Cert., Ex. L at 1.) Mrs. Satz has no "recollection of ever complaining to any manager at Novartis that [she] could not work in the same district with [her] husband," but does recall a conversation with Taipina at the May 10th meeting where she told him that she "was still going through a difficult time at home" and that she was "stressed out." (Berlin Cert., Ex. E, R. Satz Dep. 8:12-16, 18:2-19:18.)

Taipina says that Mrs. Satz did not ask him to transfer **[\*10]** plaintiff out of the territory, but said she was unwilling to transfer and asked him to "come up with a solution." (Id., Ex. B, Taipina Dep. 14:7-17, 18:22-19:8). Taipina called plaintiff and offered to transfer him to another sales district, thinking "why have two people that are married, let alone divorced, working in the same district with all the open territories [that are] available." (Id., Ex. D, W. Satz Dep. 103:7-21.) Plaintiff did not want to transfer and no transfer was made. (Id., Ex. G, Taipina Aff. PP9-10; Simon Cert., Ex. A, W. Satz Dep. 91:5-92:5.) Taipina did report the problem to his manager, Howard Goldberg, and to human resources because he says he knew he needed advice about the situation. (Berlin Cert., Ex. B, Taipina Dep. 19:14-20; Id., Ex. H, DiPaolo Dep. 49:15-51:3.)

## C. The "domestic violence" dispute on July 11, 2000

On July 11, 2000, plaintiff and Mrs. Satz had a fight at the former marital home in Cinnaminson, New Jersey. (Berlin Cert., Ex. D, W. Satz Dep. 199:17-202-25; Id., Ex. E, R. Satz Dep. 12:2-4.) The underlying facts of the day are in dispute, but it is clear that plaintiff and Mrs. Satz called the police who arrived **[\*11]** and arrested both plaintiff and Mrs. Satz on domestic violence

---

[3] Plaintiff was "below expectations" for improving productivity and customer focus. (Simon Cert., Ex. H.)

charges. [4] (Id., Ex. D, W. Satz Dep. 203:8-20.) At the police station, an officer asked if either would like a restraining order, but neither obtained one. (Id., Ex. F, W. Satz Dep. 49:21-25.) Plaintiff says that the only reason he did not get one was because he did not have time to go to Family Court that day since he was leaving the following day for vacation. (Id. at 49:25-50:11.)

### [*12] D. The temporary restraining order

On July 12, 2000, plaintiff left on his planned vacation. (Id., Ex. E, R. Satz Dep. 12:5-14.) Also on July 12, 2000, Mrs. Satz, after speaking with her divorce attorney, obtained a temporary restraining order against plaintiff. (Id. at 12:5-13:22.) Mrs. Satz says that, although she did not understand the exact nature of the restraining order, she felt that she needed to tell her manager Taipina about it since it might affect her work performance. (Id. at 13:12-16, 22:11-15, 32:4-16; Berlin Cert., Ex. B, Taipina Dep. 39:12-15.) The stress of the divorce had already caused her to lose sleep and weight and take a lot of sick days. (Id., Ex. E, R. Satz Dep. 16:3-5, 25:12-15.)

On July 15, 2000, while plaintiff was still on vacation, Mrs. Satz attended a Novartis function with the other Philly South sales representatives. (Simon Cert., Ex. F, Taipina Dep. 71:5-72:23.) Taipina remembers that Mrs. Satz tried to pull him aside during the dinner, looking "disheveled and very stressed out" and said that she needed to tell him "what was going on at home," but Taipina said it was not a good time to talk with all the sales representatives **[*13]** present and asked her to contact him later. (Id. at 73:12-76:18.) On Monday, July 17, 2000, she called him and told him "that I got a restraining order on Bill" and explained "exactly what happened, that he got physical with me, and that my divorce lawyer recommended I get a restraining order."

---

[4] The facts of July 11, 2000 are not pertinent to the present dispute, though plaintiff has continued to argue that he was not at fault that day. The issue before the Court at this time is not whether plaintiff or Mrs. Satz was to blame for the July 11, 2000 incident, whether the police incorrectly charged plaintiff, or whether plaintiff or Mrs. Satz was more likely to engage in violent behavior. Instead, this Court must decide whether defendants engaged in discriminatory behavior when they learned that something happened on July 11, 2000 that caused Mrs. Satz to obtain a restraining order against plaintiff. Because this Court is not called upon to decide what happened on July 11, 2000, this Court will refrain from delving into the marital dispute here.

(Berlin Cert., Ex. E, R. Satz Dep. 13:18-22.)

### E. The decision to transfer plaintiff

Taipina had never had to "deal with" a restraining order before and thought it was a "pretty significant" issue to take care of because it involved domestic violence. (Berlin Cert., Ex. B, Taipina Dep. 39:10-20). He called his manager, Howard Goldberg and told him that Mrs. Satz said "there was a restraining order from her against Bill and that they couldn't work together." (Id. at 40:5-11.) Taipina did not have a copy of the restraining order and did not get a copy of it until about a year later. (Id. at 40:12-23; Berlin Cert., Ex. J; Simon Cert., Ex. D, R. Satz Dep., 33:3-9.)

Taipina did not investigate the underlying allegations in the restraining order because he thought that it was "none of [his] business." (Berlin Cert., Ex. B, Taipina Dep. 42:11-24.) Still, he and Goldberg felt a **[*14]** "sense of urgency" that plaintiff and Mrs. Satz be separated immediately because of the restraining order. (Id. at 45:5-24, 67:19-21, 132:19-20.) They thought they needed to ensure "the safety and well-being of the individuals involved as well as those that might be affected" in the workplace, (Berlin Cert., Ex. G, Taipina Aff. P12), and needed to transfer plaintiff to a position where he could perform his job requirements, which included attendance at "district meetings, regional/area meetings, launch meetings, dinner programs or other district functions," without seeing Mrs. Satz, (id. P13).

Taipina and Goldberg called Lisa DiPaolo in human resources who contacted the Novartis Legal Department. (Berlin Cert., Ex. B, Taipina Dep. 68:15-19; Id., Ex. C, Goldberg Dep. 122:2-12, 124:1-8; Id., Ex. H, DiPaolo Dep. 56:8-24.) All agreed that plaintiff and Mrs. Satz should not work in the same district and that plaintiff should be the one transferred to another district because the restraining order was against him. (Id., Ex. B, Taipina Dep. 50:3-9, 69:10-11; Id., Ex. C, Goldberg Dep. 126:9-10, 135:3-6; Id., Ex. H, DiPaolo Dep. 60:16-19, 65:13-18.) They did not **[*15]** actually see the restraining order or know whether it was temporary or permanent when they made their decision. (Id., Ex. B, Taipina Dep. 50:3-9; Id., Ex. C, Goldberg Dep. 146:7-18; Id., Ex. H, DiPaolo Dep. 74:13-18.) Taipina says that all he "cared [was] that [it] existed and . . . that it would affect today . . . and the days after that . . . in the workplace" because it affected two salespeople in his district. (Id., Ex. B, Taipina Dep. 142:15-17, 143:7, 184:16-20.)

"It was important to [Taipina] that the transfer t[ake] place the day [he] found out about the restraining order," especially because a district meeting was scheduled for about two weeks later on August 1st. (Id. at 67:12-21.) Taipina says that human resources looked into the territories available for the transfer and told him the only available territory was in Carlisle, Pennsylvania. (Id. at 63:4-10, 64:15-16.) Goldberg says he did not know that the Carlisle territory was about three and one-half hours from plaintiff's house, but recalls that he was told it was the "closest territory to his home that was open." (Berlin Cert., Ex. C, Goldberg Dep. 178:5-21.) Ms. DiPaolo says that she **[*16]** tried to place plaintiff in a territory that was close to his home, but was restrained by the territories that were available. (Berlin Cert., Ex. H, DiPaolo Dep. 71:17-20.) A territory closer than Carlisle "did not exist." (Id., Ex. B, Taipina Dep. 67:10-11; Id., Ex. C, Goldberg Dep. 172:2-5.)

Plaintiff returned from vacation on July 19th and found Mrs. Satz's restraining order in his mail. (Berlin Cert., Ex. F, W. Satz Dep. 49:9-12.) He called his attorney who told him to get a restraining order against Mrs. Satz, which he did. (Id. at 49:12-14.) While at work on Thursday, July 20, 2000, plaintiff received a call from Taipina who told him he was being transferred to Carlisle, Pennsylvania. (Id., Ex. B, Taipina Dep. 65:4-23; Simon Cert., Ex. A, W. Satz Dep. 93:1-24.)

Plaintiff was "shocked" that Taipina knew about the restraining order. (Berlin Cert., Ex. B, Taipina Dep. 141:9-11.) He told Taipina that he also had a restraining order against Mrs. Satz. (Id.) Upon learning this, Taipina did not change his mind. (Id. at 144:16-17.) He says that he could have, but he thought that the second order gave him "all the more reason" to transfer one of the Satzes and **[*17]** did not see how transferring Mrs. Satz was a "better answer" to the problem. (Id. at 150:12-16, 153:23-24.) He did not investigate the details of the underlying dispute, figuring that he could not really believe either rendition of the story and should base his decision on what he knew with certainty -- that a restraining order existed which required separation of the Satzes. (Id. at 182:9-18, 183:14-15.)

Taipina asked plaintiff to consider accepting the Carlisle territory and give him an answer by Monday, July 24th. (Id. at 198:12-24.) He admits that because the territory was the only one available, if plaintiff did not accept it, "technically, he would resign." (Id. at 65:15-23.) Plaintiff says that Taipina actually told him that he had "48 hours to transfer to Carlisle or resign because you're a bully and a wife beater." (Berlin Cert., Ex. F, W. Satz Dep.

95:7-8; Simon Cert., Ex. A, W. Satz Dep. 45:19-22, 93:19-94:15.) Taipina, however, says that his conversation with plaintiff was "professional in all respects" and that he never told plaintiff he was a "wife beater" or a "bully." (Berlin Cert., Ex. G, Taipina Aff. P16.)

Plaintiff was frustrated; he thought that **[*18]** when "two people get into a fight outside of work, the [company] should talk to both people before making a decision, rather than relying on the truth of one person's statement." (Berlin Cert., Ex. F, W. Satz Dep. 46:5-9.) He thinks that Novartis "should have conducted an investigation at that point rather than tell me the decision was final [and] kill somebody's career and reputation over a bitter ex-wife who's telling lies." (Id. at 46:21-47:11.) He felt that the company relied on the societal stereotype that "the male is generally the aggressor," and simply assumed he was at fault and should be punished by a transfer. (Id. at 120:6-12.) He admits this is "conjecture" because he does not know "what happened behind the scenes," but says he knows that Novartis "made a final decision without hearing what I had to say. So I can only assume in my own mind that it was discrimination." (Id. at 120:24-121:5.)

Taipina insists that:

> [plaintiff's] gender was not a factor in the Company's decision to transfer him out of the Philadelphia South district. Mr. Satz was transferred based upon the need to maintain compliance with the restraining order, the needs of the business **[*19]** and the need to insure the safety and well-being of all those involved who might be affected.

(Berlin Cert., Ex. G, Taipina Aff. P19.) Ms. DiPaolo also says the transfer decision was "a business decision which needed to be made. . . . Rosemary Satz had a restraining order against Bill Satz . . . [the decision] had nothing to do with his gender or anything else." (Id., Ex. H, DiPaolo Dep. 200:19-201:5.)

### F. Plaintiff's medical leave

Plaintiff says he was so "stressed out" by the restraining order and the transfer that he visited his family physician. (Id., Ex. F, W. Satz Dep. 96:6-18.) He feared:

> repercussions that were about to occur such as my reputation was in the trash, everybody was going to know I was transferred to Carlisle, Pennsylvania for something . . . they thought I did because of the

company's actions, the detriment to the fact I just purchased a house outside my territory in Northeast Philadelphia, and I had my father in a nursing home with less than a year to live . . .

(Id.) Plaintiff did not know if he could handle the demands of co-parenting and a long commute and a new client base. (Id. at 96:19-25.) His doctor prescribed **[*20]** an anti-anxiety medication, Ativan, and filled out forms so that he could take disability leave. (Id. at 96:6-97:25.)

Plaintiff called Lisa DiPaolo to tell her that he needed to take disability leave. (Berlin Cert., Ex. H, DiPaolo Dep. 95:13-21.) Ms. DiPaolo says plaintiff also told her that "his stress could all be alleviated, and there would be no need for him to go out on short-term disability and take leave if he had a different territory." (Id.) Taipina says plaintiff left him a similar voice mail message, stating that "[t]he cause of my stress is this territory transfer. I would be ready to come right back to work if this was over. . . . All my stress would be relieved if Rosemarie was transferred instead of me." (Simon Cert., Ex. L at 3.) Plaintiff says that he does not recall these conversations. (Id., Ex. A, W. Satz Dep. 115:11-117:2.)

Novartis had a policy which allowed it to contest any employee's request for disability leave, but it did not contest plaintiff's request. (Berlin Cert., Ex. H, DiPaolo Dep. 99:10-15.) During leave, plaintiff received full salary, benefits, and a commission as if he was an employee working in the Philly South district. (Id. **[*21]** , Ex. B, Taipina Dep. 179:6-21.) Plaintiff admits that he was told that he would not need to transfer to Carlisle, but could instead choose from the territories available at the end of his leave. (Complaint P34.) However, he says he was not treated properly during his disability leave because Taipina collected his computer and his samples, told him he could no longer use his company credit card, and only paid him the "national average commission." (Simon Cert., Ex. A, W. Satz Dep. 26:22-28:8; 98:5-101:10.)

### G. The permanent restraining order

On July 26, 2000, Mrs. Satz and plaintiff agreed to a permanent restraining order. (Berlin Cert., Ex. F, W. Satz Dep. 38:7-42:3.) Plaintiff says he only agreed to it because he wanted to see his daughter and "all this other stuff, not harassing, not threatening, not stalking her, I wasn't going to do anyway. . . . My whole state of mind was that if I sign this, then this afternoon I can go pick up my daughter. . . I would have signed anything

just about." (Id. at 42:19-44:16.)

The Order, which is still in effect, states:

1. The Defendant, William Satz, is prohibited from having any oral, written, personal or other form of contact **[*22]** with the Plaintiff, Rosemarie Satz, except as set forth hereinbelow.
2. The Defendant, William Satz, is prohibited from making or causing anyone else to contact or make harassing communications to the Plaintiff, Rosemarie Satz, except as set forth hereinbelow.
3. The Defendant, William Satz, is prohibited from stalking, following or threatening to harm, to stalk or to follow the Plaintiff, Rosemarie Satz, except as set forth hereinbelow.
4. Since both parties are presently employed by the same employer and some contact between the parties is required by virtue of their employment, the parties shall be permitted to have contact as required by their employer.
5. The parties shall have telephone contact necessary to confirm the parenting schedule contained in the Settlement Agreement and the parties shall have contact necessary to pick up and drop off the child for parenting time, however, each party shall remain in their motor vehicle or residence at the time of the transfer.
6. Each party shall request that the Municipal Prosecutor dismiss their respective Complaints filed in the Municipal Court regarding the incident of 7/11/00.

7. Neither party shall disclose any part of this **[*23]** Consent Order to their employer except for paragraph 4.

(Berlin Cert., Ex. L.)

On August 10, 2000, in accordance with the terms of the permanent restraining order, plaintiff and Mrs. Satz voluntarily dismissed their claims regarding the July 11th dispute. (Id., Ex. F, W. Satz Dep. 35:10-25.) Plaintiff says he understood this settled the charges and eliminated the need for a court hearing about the facts of the July 11th dispute. (Id. at 44:17-25.)

### H. Alleged discriminatory remarks

While on disability leave, plaintiff says he started to get "the cold shoulder" from a friend who said he "heard some terrible things" about plaintiff. (Simon Cert., Ex. A, W. Satz Dep. 129:6-21.) Plaintiff then learned from his Philly South counterpart, Rick Miller, that Taipina "made

reference to the fact that Bill was a wife beater in front of" a group of Novartis employees, (id., Ex. G, Miller Dep. 118:1-24), and told Miller personally to "cut his ties" to plaintiff because "the more you associate with Bill Satz the worse for you," (id. at 40:13-16), since "[plaintiff] is a wife beater, he is a frigging loser," (id. at 115:13-16). Miller told plaintiff that he heard **[*24]** Taipina tell some of plaintiff's physician clients in the Philly South district that plaintiff "beat his wife, and that's why he's no longer with us." (Id. at 37:10-21.)

Miller says that he thought plaintiff was transferred to Carlisle because Taipina could not fire him, but could "make his life miserable so he wouldn't want to work for the company any more." (Id. at 38:7-10.) He says that when Taipina "talked about Carlisle, Pennsylvania, he made light of it, jokingly, you know, that it was like in boonesville," (id. at 41:11-15,) and said with a "big smile on his face, . . . [y]ou don't have to worry about Satz any more, he is out of here," (id. at 113:1-8.)

Plaintiff decided to take action because "the only way to get somebody to change their minds on that was to prove to them that I wasn't a wife beater." (Simon Cert., Ex. A, W. Satz Dep. 129:6-130:16.) He voluntarily set up and took a lie detector test which found him truthful when he said he never hit his wife, (id., Ex. BB), and he forwarded the results to human resources and "pleaded with [Taipina] to reconsider the decision against me," (id., Ex. A, W. Satz Dep. 144:9-22.)

Plaintiff also filed **[*25]** a discrimination charge with the PHRC and the EEOC on December 15, 2000 alleging gender discrimination. Taipina was aware that plaintiff filed the charges and filed an affidavit stating that:

> [c]ontrary to Mr. Satz's allegations, he was not discriminated against in any way. His transfer was based solely upon the fact that a restraining order had been obtained preventing him from having any contact with his wife.

(Berlin Cert., Ex. B, Taipina Dep. 137:16-22; Id., Ex. G, Taipina Aff. P3.)

## I. Selection of a new sales territory

On December 8, 2000, DiPaolo sent plaintiff a letter informing him that his "short-term disability period of 26 weeks will end on January 18, 2001." (Id., Ex. M.) Plaintiff says he was not "emotionally prepared" to return to work, but that "time heals all wounds" and he felt he needed to return to work so he could pay child support, feed his family, and prove to his coworkers that

he had not done anything wrong. (Id., Ex. F, W. Satz Dep. 145:6-146:7.)

Ms. DiPaolo says she called field management services and asked them to compile a current report of available territories. (Id., Ex. H, DiPaolo Dep. 104:3-23.) Plaintiff says **[*26]** he considered territories in Manhattan, Northern New Jersey, Bethlehem, Pennsylvania, and Newark, Delaware and that he thought the Bethlehem territory was closest to his home. (Simon Cert., Ex. A, W. Satz Dep. 158:1-160:13.) Ms. DiPaolo says she knew plaintiff "wasn't happy," but thought he would only be happy if he was "back in his original territory." (Berlin Cert., Ex. H, DiPaolo Dep. 108:9-19.)

Plaintiff asked DiPaolo if he could use his earned vacation time instead of accepting the Bethlehem territory in case Novartis initiated a new specialty sales force near his home. (Berlin Cert., Ex. F, W. Satz Dep. 161:6-13.) DiPaolo denied his request, so on January 18, 2001, plaintiff accepted the Bethlehem territory, stating:

> I will accept Bethlehem, PA as my territory assignment. I do not like it. It is too far from my home, my sick parents, and my daughter. It is also giving my ex-coworkers reason to believe Rosemarie's false accusations, as the company is definitely not standing behind me at this time. I request a transfer to NE Phila territory in any division ASAP. I've worked too hard for too long to be banished and ostracized like this.

(Id. at 161:8-11; Simon **[*27]** Cert., Ex. A, W. Satz Dep. 162:2-22; Berlin Cert., Ex. O.)

Plaintiff drove two hours to Bethlehem, Pennsylvania on January 19th and met his new manager, Jackie Esposito. (Satz Aff. P14.) He says he then learned for the first time that the territory extended an additional 100 miles north. (Simon Cert., Ex. A, W. Satz Dep. 164:10-21.) Either Jackie Esposito, (Satz Aff. PP15-16), or plaintiff, (Berlin Cert., Ex. H, DiPaolo Dep. 122:19-22), called DiPaolo and told her that the territory would not work because of the length of plaintiff's commute, (id. at 122:21-24).

Ms. DiPaolo looked at a "fresh list" of available open territories and offered plaintiff the Newark, Delaware territory, where he would work for manager Doug Pace. (Id. at 132:5-13; Berlin Cert., Ex. F, W. Satz Dep. 167:12-14.) Plaintiff says he thought the territory was limited to the northern part of Delaware around Wilmington, and only found out after he accepted the territory that it extended as far south as Dover. (Id. at

167:20-168:9, 169:8-12.) [5]

#### [*28] J. Plaintiff's Delaware performance

Plaintiff started working in Delaware on February 1, 2001. He immediately told his manager, Doug Pace, that Delaware was not his first choice and that he wanted to use ten to thirteen vacation days between February 5 and March 6 for his "daughter, personal days, and vacation days that I'm entitled to." (Simon Cert., Ex. A, W. Satz Dep. 199:12-25; Berlin Cert., Ex. F, W. Satz Dep. 15:15-17; Id., Ex. T.) Plaintiff says that he had a right to use his earned vacation to take his fiance to the Dominican Republic for her birthday to spend time with his daughter, and no one had a right to tell him otherwise. (Simon Cert., Ex. A, W. Satz Dep. 200:1-202:18.) Pace approved the vacation request, though Ms. DiPaolo recalls that Pace questioned plaintiff's commitment to his work "because he, right off the bat, was requesting vacation days prior to being acclimated into the territory itself." (Berlin Cert., Ex. H, DiPaolo Dep. 142:91-24.)

Plaintiff made clear from the start that he wanted to transfer out of Delaware as soon as he could, but was told that he could not transfer until he fulfilled a one-year commitment to the Delaware territory. ( [*29] Id., Ex. F, W. Satz Dep. 177:17-23.) Plaintiff says he never heard of the one-year commitment before he accepted the Delaware territory, (id. at 190:4-20; Simon Cert., Ex. A, W. Satz Dep. 177:17-23,) but Pace says he thought the one-year requirement was light because the company generally "strictly enforced a two-year policy," (Berlin Cert., Ex. P, Pace Dep. 92:9-13.) Pace thought Novartis was giving plaintiff "some type of leeway" to help "get him to where he wants to go" while still ensuring that he would be committed to his present assignment. (Id.) Plaintiff thought Pace looked at him "with contempt" as though he was "taking [his] eye off the ball of what was supposed to be happening at Delaware" when he asked to transfer. (Berlin Cert., Ex. F, W. Satz Dep. 186:15-25.) He admits that he was not happy in the Delaware territory, but says he "kept it totally inside as much as

---

[5] After he accepted the Delaware position, but before he began work in Delaware, plaintiff learned of an opening in Philadelphia in the Pediatric Sales Division. (Berlin Cert., Ex D, W. Satz Dep. 121:1-6.) He applied and interviewed for the position after he began his work in Delaware, but was not chosen. (Berlin Cert., Ex. F, W. Satz Dep. 177:9-11; Berlin Cert., Ex. V.) He says that Novartis hired four individuals with less experience. (Satz Aff. P19.)

[he] could" and "devoted [him]self to selling Novartis products to [his] customers in Delaware." (Satz Aff. P28; Simon Cert., Ex. A, W. Satz Dep. 172:24-173:8.) He also says he never told Pace he hated Delaware, only that he "hated the drive" to Delaware and "hated being assigned to th[e Delaware] [*30] territory because of the drive." (Berlin Cert., Ex. F, W. Satz Dep. 188:17-24.)

Plaintiff's counterpart in Delaware was Ashleigh Hulme. (Id., Ex. I, Hulme Dep. 54:1-5.) Plaintiff spent his first day in Delaware driving with Ms. Hulme to familiarize himself with her and with the territory. (Id. at 54:22-55:5.) Plaintiff told Ms. Hulme that he was in Delaware because of the dispute he had with his ex-wife on July 11 and that "he was suing Novartis for discrimination against him believing her word over his word as far as the allegations of hitting her." (Id. at 56:10-12.) Ms. Hulme says plaintiff told her he was asking for five million dollars from Novartis and would not "be around long" since he assumed the lawsuit would settle soon, (id. at 56:16-20,) but plaintiff says he does not recall saying anything about five million dollars and that he does not have "any set figure in mind" for his recovery, (Simon Cert., Ex. A, W. Satz Dep. 218:23-219:11). Ms. Hulme says she never told anyone at Novartis about the conversation. (Berlin Cert., Ex. I, Hulme Dep. 56:22-57:21.)

Ms. Hulme says she had trouble working with plaintiff from the beginning. (Id. at 65:14-16.) He was [*31] not there much because of his vacation, personal, and sick days and he had trouble with his commute and with finding certain offices, though he never purchased a map. (Id. at 65:14-66:2.) She was frustrated because plaintiff would promise to drop off samples in the "next day or two," but when she followed up, she would find that the samples were never dropped off. (Id. at 67:9-13.) She also found that plaintiff had not met certain doctors in the territory long after she thought he should have introduced himself, and sat with Philadelphia doctors, instead of Delaware doctors, at lunch meetings. (Id. at 67:6-8, 68:16-69:3.)

Ms. Hulme talked to plaintiff and he promised to "make sure from now on he would be where he needed to be." (Id. at 67:18-19.) While the problems sometimes improved, they never fully resolved, so after a "number of talks" with plaintiff over a "couple of months," she approached Pace. (Id. at 69:9-14, 80:1-6.) She told Pace she was not "getting the support and the help from [plaintiff] that I need in order to be successful in the territory" because she constantly had to double-check everything plaintiff did and often "just go ahead and do

the **[*32]** job on [her] own." (Id. at 67:20-68:8; 68:9-15.) Pace says he realized that Ms. Hulme was "frustrated and concerned that the situation would jeopardize the business in North Delaware." (Berlin Cert., Ex. P, Pace Dep. 191:11-13.)

Pace had positive and negative experiences with plaintiff in Delaware. Early on, he observed plaintiff in the field and reported that:

> Bill, you are grasping the geography of this new territory well . . . You are extremely passionate and polite in the offices which makes your time with the office staff as well as your actual sales presentation sincere and convincing! Nice job! . . . You have the most experience and sell with enthusiasm and conviction which is contagious. To your district members these qualities are invaluable and they will be looking up to you. You are closing on every call. This is one of the most important steps in the Novartis Sales Model. Thank you for your efforts!

(Id., Ex. T.) He often noted, though, that plaintiff was not at all enthusiastic about the Delaware territory. He says plaintiff "expressed . . . his dissatisfaction with the territory and the drive . . . It seemed just about every time I talked to **[*33]** him it came up." (Id., Ex. P, Pace Dep. 159:23-160:5.) Pace wrote in his notes that plaintiff "[t]old me he hates the drive, hates the territory." (Id., Ex. X at 1.)

Pace had other qualms with plaintiff's performance in Delaware. On March 27, 2001, he was disappointed that plaintiff called in sick to a dinner program and did not make sure his doctors attended. (Id.) Plaintiff says that he never received an invitation to the program. (Simon Cert., Ex. A, W. Satz Dep. 212:10-213:16.)

Also in March, Pace was upset when he found that plaintiff did not "review [his] electronic mail on a daily basis." (Id., Ex. CC.) He wrote plaintiff a memo on March 29, 2001 which he copied to Regional Director Gary Branch, explaining that he expected representatives in his district to check email daily and informing plaintiff that "two separate electronic messages that were sent to you via Lotus Notes on 3/1/2001 and 3/2/2001 were not opened and read for over two weeks. The return receipts were stamped 3/20/2001 and 3/26/2001 respectively." [6] (Id.) Plaintiff

says this was a "disciplinary letter" that Pace wrote and copied to his boss to "tr[y] to get me fired because this is **[*34]** a very, very minor thing." (Simon Cert., Ex. A, W. Satz Dep. 193:3-20, 197:2-8.) Plaintiff sent Pace an email to express his disappointment, stating that:

> you felt the need to email me and then copy Gary Branch with your message about 2 e-mails . . . I had no need to open these . . . Why did you copy Gary Branch on that, but not the email you sent me on my positive teamwork? Do I have a target on my back? . . . I have been working my tail off in Delaware.

(Simon Cert., Ex. LL.) Pace wrote back, informing plaintiff that it was not only his expectation that his staff read and respond to e-mail daily, but that it was "a Sales Functional Competency within the organization that falls under Territory Management." (Id., Ex. MM.)

 **[*35]** On April 30, 2001, Pace observed plaintiff in the field. Plaintiff arrived thirty minutes late, but otherwise maintained a positive attitude and performed well. (Berlin Cert., Ex. X at 2.) Pace wrote a positive evaluation for the day, stating:

> Bill, thank you for an organized well planned out day! . . . I get a good sense that you are starting to build some relationships with these physicians and that you are starting to get some good time with them. You definitely get their attention and they appear to be listening to you. . . . Your closing skills rank you by far in the top of the district! Your closing skills today exceeded my expectations! You are selling with passion and clearly believe in your promoted products. You have the most experience in the field out of anyone in the district and I expect you to be a leader in the district and lead by example! Stay focused! I promise you, you'll get to where you want to go.

(Simon Cert., Ex. NN.)

Then, on May 2, 2001, a "very large meeting [with] all the reps from New York, Pennsylvania, Delaware and New Jersey . . . about 2500 reps" began. (Berlin Cert., Ex. F, W. Satz Dep. 230:8-14, 233:22-24.) Pace says that plaintiff's **[*36]** conduct during the three-day meeting was the "final straw" leading to his termination. (Id., Ex. P, Pace Dep. 253:22-254:20, 257:6-10.) First, plaintiff arrived late. (Id. at 235:5-8.) Then, he sat with Philadelphia sales representatives instead of with his

---

[6] Pace also thought plaintiff was not reading his mail when he "had no idea what I was talking about" at an April 6, 2001 district teleconference. (Berlin Cert., Ex. P, Pace Dep. 184:6-11; Id., Ex. X at 2.) Plaintiff says he could not respond to the

question about the e-mailed material that day because he had not yet been trained on the particular data program that it referred to. (Simon Cert., Ex. A, W. Satz Dep. 214:1-215:18.)

Delaware district. (Id.) Then, he did not attend the evening awards banquet, a dinner that was a "very big deal dinner. . . a major production . . . stage, screen, so forth." (Berlin Cert., Ex. P, Pace Dep. 242:1-5; Id., Ex. S, Branch Dep. 73:17-24.)

Plaintiff says that his May 2, 2001 behavior is explainable. First, he was late because he was working. (Simon Cert., Ex. A, W. Satz Dep. 234:18-22.) Second, he did not sit with his district since, when he was late he "ran into the back of the room and grabbed a table rather than disrupt 2500 people to look to see whether they were sitting together or not." (Id. at 234:18-235:2.) Third, he did not attend the banquet because he had to go home to get his anxiety medication which he thought he might need since "the meeting was for the award that I would have won in the year 2000 with my entire ex-district there who would have been looking at me like I was a wife beater. [*37] " (Berlin Cert., Ex. F, W. Satz Dep. 232:17-21, 235:3-24.) Once home, he found his fiance was suffering complications from her pregnancy and he needed to care for her. (Id. at 240:1-23.) [7]

Plaintiff says Pace "accosted [him] at the door" the next day and told him that he had missed a mandatory meeting and he was going to have to write him up. (Simon Cert., Ex. A, W. Satz Dep. 238:11-13.) Plaintiff says that he responded by saying:

> Doug, I didn't know the meeting was mandatory. There was free-flowing alcohol and 2500 people there. It's not like we were crunching numbers. Second of all I was ineligible for the award, and thirdly, I had a family emergency.

(Id. at 238:11-23.) Sales representative [*38] Rick Miller says that other sales representatives did not attend the banquet and that he is "not aware of anyone ever being disciplined except Bill Satz, for missing an awards banquet." (Miller Aff. P17.)

Pace called Ms. DiPaolo and told her that he would like to fire plaintiff. (Berlin Cert., Ex. P, Pace Dep. 232:15-253:2.) He says that his decision was grounded in the "belief that this individual was not willing to accept the commitment" to Delaware based on his own observations and on Ms. Hulme's complaints. (Id. at 254:15-21, 257:6-258:11.) As a result, plaintiff's

employment with Novartis was terminated on May 16, 2001. (Berlin Cert., Ex. F, W. Satz Dep. 241:2.) Pace explained that:

> I believed in Bill. As I mentioned in my field contacts, I thought he could be a tremendous asset to this company, to my team through leadership, and he knows that I have said that to him. But when you have a group of sales representatives, young tenured sales representatives that could be influenced either negatively or positively, it came to a point, I would not go on like this. . . When I added up not meeting expectations, the constant complaining about the territory, his counterpart [*39] calling me and complaining, my belief was that it was not getting any better.

(Id., Ex. P, Pace Dep. 160:9-22.) Pace says plaintiff's discrimination action that was pending against the company did not influence his decision because, while he "heard bits and pieces along the way," and was aware that "there was some type of suit against the company, . . . it was left at that." (Berlin Cert., Ex. P, Pace Dep. 84:8-21.) He says that he "didn't want to know [the problem]. That's none of my business." (Id. at 84:8-11.) Plaintiff admits that he cannot remember telling Pace his "why [he] was at odds with human resources," and says that "until the day [he] was fired, [Pace] stood by his story that he had no idea." (Berlin Cert., Ex. F, W. Satz Dep. 192:1-11.)

Plaintiff filed suit in this Court against Novartis and Dennis Taipina on December 19, 2001 alleging claims of reverse gender discrimination and retaliation, handicap discrimination, hostile work environment, intentional infliction of emotional distress, and infringement of protected privacy rights based on the decisions of Novartis to transfer him from the Philly South District and to terminate his employment. [*40] Defendants filed a motion for summary judgment on February 21, 2003, arguing that there is no material question of fact regarding any of his claims because the record shows that plaintiff was not discriminated against. The Court heard oral argument on March 7, 2003.

## III. DISCUSSION

Defendants seek summary judgment on plaintiff's claims, arguing that plaintiff cannot assert claims under the New Jersey Law Against Discrimination because he was employed exclusively in Pennsylvania and Delaware and that there is no material question of fact

---

[7] Pace says plaintiff initially said he stayed home to celebrate because his girlfriend told him she was pregnant. (Berlin Cert., Ex. P, Pace Dep. 246:9-22.) When he found out plaintiff had known of the pregnancy since February, he felt plaintiff had lied. (Id., Ex. I, Hulme Dep. 130:16-131:21.)

regarding plaintiff's claims of gender discrimination, invasion of privacy, and intentional infliction of emotional distress.

## A. Standard of Review

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A fact is "material" if it might affect **[*41]** the outcome of the suit under the applicable rule of law. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 143 L. Ed. 2d 731 (1999)* (quoting *Liberty Lobby, 477 U.S. at 255*). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby, 477 U.S. at 250*. [8]

### **[*42] B. Analysis**

Defendants seek summary judgment on the claims in plaintiff's twelve count complaint. The parties have

agreed that the claims in Counts I and II of plaintiff's complaint should be dismissed with prejudice because plaintiff cannot pursue a claim for gender discrimination or retaliation under *section 1981* of the Civil Rights Act of 1988, *42 U.S.C. § 1981*, which provides a remedy for racial discrimination. The Court must now determine (1) whether plaintiff, who was employed in Pennsylvania and Delaware, may pursue the New Jersey Law Against Discrimination claims contained in five counts of his Complaint; (2) whether there remains a material issue of fact regarding his discrimination claims brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e*, the Pennsylvania Human Relations Act (PHRA), *43 P.S. § 951*, and the Pennsylvania Equal Rights Amendment (PERA); (3) whether there remains a material issue of fact regarding his privacy claim; and (4) whether there remains a material issue of fact regarding his intentional infliction of emotional distress claim.

### 1. NJLAD claims

 **[*43]** The Court must first determine whether plaintiff can assert claims under the New Jersey Law Against Discrimination (NJLAD) when defendants had offices in New Jersey, but plaintiff worked exclusively in Pennsylvania and Delaware. Defendants argue that summary judgment must be granted because plaintiff cannot assert NJLAD claims because he did not work in New Jersey. (Defs.' Br. at 25.) Plaintiff, however, argues that his employment situation had a sufficient connection to New Jersey to allow him to assert the NJLAD. (Pl.'s Br. at 36.)

The NJLAD was enacted in 1945 with a goal of "nothing less than the eradication of the cancer of discrimination." *McKenna v. Pacific Rail Serv., 32 F.3d 820, 840 (3d Cir. 1994)* (citing *Lehmann v. Toys "R" Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993)*). The New Jersey Supreme Court explained that the NJLAD shows that the "clear public policy of this state is to abolish discrimination in the workplace," especially gender discrimination which is "peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." *McKenna, 32 F.3d at 840* (quoting *Lehmann, 132 N.J. at 600;* **[*44]** *Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652 (1988)*). No longer is employment discrimination "just a matter between employer and employee. The public interest in a discrimination-free workplace infuses the [NJLAD] inquiry." *McKenna, 32 F.3d at 840*.

The NJLAD, however, does not apply every time a

---

[8] The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately has the burden of persuasion at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex, 477 U.S. at 325*. The non-moving party "may not rest upon the mere allegations or denials of" its pleading and must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine issue. *Fed. R. Civ. P. 56(e)*; *Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)*.

plaintiff alleges that he has suffered discrimination. Instead, for New Jersey "substantive law to be [applied] in a constitutionally permissible manner, [New Jersey] must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Blakey v. Continental Airlines, Inc., 164 N.J. 38, 65, 751 A.2d 538 (2000)* (quoting *Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981)*).

New Jersey courts have found that it is unfair to subject an employer to different legal requirements if its employees reside in different states. *Buccilli v. Timby, Brown & Timby, 283 N.J. Super. 6, 11, 660 A.2d 1261 (App. Div. 1995)* (citing cases). Employment cases which straddle state lines can involve several different states, including the state of the employee's [*45] residence, the state where the employee works, the state where the employer's headquarters is located, the state where the employer does business, and the state where the alleged discrimination occurred. Generally, though, regardless of the number of states involved, New Jersey courts have applied the law of the state where the employee works to claims of workplace discrimination. The *Buccilli* court explained that the "claim of a New Jersey resident for her allegedly wrongful dismissal from out-of-state employment is governed by the law of the state in which she was employed." *Buccilli, 283 N.J. Super. at 10*. Where "workers who reside in several states work side by side," an employer's "relationship with its employees in [one] office should not be subject to different legal principles depending on the state of the employee's domicile." *Shamley v. I.T.T. Corp., 869 F.2d 167, 172 (2d Cir. 1989)*. The law of the state of the employee's workplace applies to claims arising from his employment because the state has an "unusually strong interest in applying its own law to employment contracts involving work in [its] state." *Id.*

New Jersey courts [*46] have consistently applied the law of the state of employment to workplace claims, and have therefore only applied the NJLAD if the plaintiff worked in New Jersey. [9] When a New Jersey resident

worked exclusively in Pennsylvania, Pennsylvania law (the law of the state of her workplace) applied and the NJLAD (the law of the state of her residence) did not. *Buccilli, 283 N.J. Super. at 10-11*. Likewise, when a New Jersey resident worked in New York, New York law applied and New Jersey law did not. *Id.* (citing *Shamley, 869 F.2d at 172*); see also *Perry v. Prudential-Bache Securities, Inc., 738 F. Supp. 843, 854 (D.N.J. 1989)*. When a New Jersey resident worked for an employer whose headquarters were in New Jersey, but worked exclusively in the Pennsylvania office, Pennsylvania law (the law of the state of her workplace) applied and the NJLAD (the law of the state of her residence and the employer's headquarters) did not. *Brunner v. AlliedSignal, Inc., 198 F.R.D. 612, 613-14 (D.N.J. 2001)*. When a New Jersey resident worked for the state of Illinois in an office in New Jersey, New Jersey law applied. *McDonnell v. State of Illinois, 319 N.J. Super. 324, 340-41, 725 A.2d 126 (App. Div. 1999).* [*47] [10]

---

because the alleged discriminatory actions, though they occurred outside New Jersey, were targeted toward plaintiff in New Jersey. *Id. at 529*.

[10] The parties have extensively argued whether the New Jersey Supreme Court's decision in *Blakey v. Continental Airlines, Inc., 164 N.J. 38, 751 A.2d 538 (2000)*, applies to this case. There, a pilot was a resident of the state of Washington, but was based out of New Jersey. She filed discrimination charges based on conduct that occurred in New Jersey and voluntarily transferred to Houston, Texas. *Id. at 47-48*. The first discrimination case concluded, and plaintiff filed a second case based on alleged discrimination she suffered while stationed in Texas; she argued that comments were posted on an internet web-board as retaliation for her first lawsuit. *Id. at 51, 54*.

In the second lawsuit, the defendants filed a motion to dismiss for lack of personal jurisdiction. *Id. at 54*. The New Jersey Supreme Court considered whether the out-of-state defendants had sufficient "minimum contacts" with New Jersey "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id. at 66*. The court did not consider a choice of law issue, but remanded the case to the Law Division for a factual inquiry into defendants' contacts with the State of New Jersey. *Id. at 71-73*.

Plaintiff argues that this Court should apply the NJLAD because the plaintiff in *Blakey* had a "personal residence and work connections [which] bore no relationship to New Jersey" and the "court did not adopt a blanket rule that an out of state plaintiff is not entitled to the protection of the antidiscrimination law of New Jersey." (Pl.'s 3/13/03 Ltr. Br.) However, the New Jersey court was not asked to adopt a blanket rule because it

---

[9] But see *Bowers v. NCAA, 151 F. Supp. 2d 526 (D.N.J. 2001)*. Plaintiff argues that *Bowers* supports his claims because the court applied the NJLAD to the claims of the plaintiff regardless of his state of employment. *Bowers*, however, dealt with public accommodation claims, and not employment discrimination claims, so plaintiffs' state of employment was irrelevant. The court applied the NJLAD

**[\*48]** Here, during the period when the alleged discrimination occurred, plaintiff worked exclusively in Pennsylvania and Delaware. He was on vacation from his Northeast Philadelphia, Pennsylvania territory when Mrs. Satz obtained the restraining order and told defendants about it. He was at work in Pennsylvania on July 20, 2000 when he was told that he was being transferred to Carlisle, Pennsylvania. (Berlin Cert., Ex. F, W. Satz Dep. 49:9-12; Id., Ex. B, Taipina Dep. 65:4-23.) He took disability leave and was paid his salary and benefits as though he was working in the Northeast Philadelphia, Pennsylvania territory. (Berlin Cert., Ex. B, Taipina Dep. 179:6-21.) After his leave, he accepted a transfer to the Bethlehem, Pennsylvania territory. (Simon Cert., Ex. A, W. Satz Dep. 158:1-160:13; Berlin Cert., Ex. O.) After one day in the Bethlehem, Pennsylvania territory, plaintiff accepted a transfer to the Newark, Delaware territory. (Berlin Cert., Ex. F, W. Satz Dep. 167:12-14; Id., Ex. H, DiPaolo Dep. 132:5-13.) While assigned to the Delaware territory, he attended the May 2, 2001 district meeting at the Marriott in Philadelphia, Pennsylvania, where his manager (whose office was in **[\*49]** Delaware) decided plaintiff should be fired. (Berlin Cert., Ex. F., W. Satz Dep. 230:1-14; Id., Ex. P, Pace Dep. 253:22-254:20, 257:6-10.) Plaintiff was told of his termination in Delaware on May 16, 2001. (Berlin Cert., Ex. F, W. Satz Dep. 241:2.)

While plaintiff has pointed out the several connections that this case has with the state of New Jersey, they are insufficient to trigger application of the *NJLAD* to his claims. First and foremost, plaintiff's claims are about an allegedly wrongful transfer in Pennsylvania and an allegedly wrongful termination in Delaware. As the New Jersey Appellate Division has held, a claim for an "allegedly wrongful dismissal from out-of-state employment is governed by the law of the state in which []he was employed." *Buccilli, 283 N.J. Super. at 10.* Plaintiff was never employed in New Jersey. Plaintiff's office was mobile since he worked out of his car, yet he has not shown any evidence that he traveled for business purposes into New Jersey at any time pertinent to his claims.

___

was not presented with a choice of law issue.

This Court thus finds that the *Blakey* case does not impact the question before the Court at this time as to whether the NJLAD applies to the claims here. Personal jurisdiction has not been contested here as the defendants are residents or employees which have almost daily contact with the State of New Jersey. The *Blakey* case, therefore, does not add clarity to the issue presently before this Court.

Second, New Jersey courts have found that the connections this case has to New Jersey are insufficient to trigger the NJLAD for the benefit of an out-of-state **[\*50]** employee. Defendant Novartis is headquartered in East Hanover, New Jersey, and Taipina, Goldberg, and DiPaolo, individuals involved in the decision to transfer plaintiff, have offices in New Jersey. (Berlin Cert., Ex. B, Taipina Dep. 7:16-21; Id., Ex. G, Taipina Aff. P1.) However, the *Brunner* court found that a company's New Jersey headquarters does not trigger application of the NJLAD. See *Brunner, 198 F.R.D. at 613-14*.

Third, the other connections that this case has to New Jersey occurred before the July 2000 decision to transfer plaintiff and the May 2001 decision to terminate his employment. While plaintiff initially worked in the Pennsylvania portion of the Philly South sales district which straddled New Jersey and Pennsylvania, plaintiff did not work in the Philly South district after he was told of the transfer decision. (Berlin Cert., Ex. B, Taipina Dep. 4:15-24, 179:6-21; Id., Ex. E, R. Satz Dep. 78:4-24.) He immediately took disability leave and never again reported to the Philly South district.

Likewise, while plaintiff did live at one time in New Jersey, not only is his state of residence insufficient to trigger the NJLAD, see *Buccilli, 283 N.J. Super. at 10-11,* **[\*51]** but he moved to Huntington Valley, Pennsylvania in early 2000 because of his divorce, (Simon Cert., Ex. J, W. Satz Dep. 190:9-10). Mrs. Satz did continue to live and work in New Jersey after the divorce and the domestic dispute was at her New Jersey home on July 11, 2000, (Berlin Cert., Ex. B, Taipina Dep. 25:3-11, 142:15-17, 184:16-20; Id., Ex. E, R. Satz Dep. 12:5-14; Simon Cert., Ex. J, W. Satz Dep. 191:23-192:21), but this action is not about plaintiff's marriage, divorce, or the merits of the July 11, 2000 domestic dispute. This action is about whether defendants discriminated against plaintiff, a Pennsylvania resident employed in Pennsylvania, when they learned of the restraining order. Plaintiff's underlying marital problems in New Jersey do not change the fundamental nature of this action. It remains a claim about an "allegedly wrongful dismissal from out-of-state employment" and is thus "governed by the law of the state in which []he was employed." *Buccilli, 283 N.J. Super. at 10*. Plaintiff was not employed in New Jersey.

Therefore, plaintiff may not assert claims against defendants under the NJLAD and this Court will grant summary judgment on plaintiff's **[\*52]** NJLAD claims in

Counts IV, V, VI, VII, and VIII of his complaint.

## 2. Reverse gender discrimination claims under Title VII, the PHRA, and the PERA

Defendants seek summary judgment on the discrimination claims in plaintiff's complaint, arguing that there is no material issue of fact regarding the claims brought under Title VII, the PHRA, [11] or the PERA. [12]

---

[11] Defendants argue that summary judgment should be granted on plaintiff's PHRA claim for the same reasons it should be granted on plaintiff's Title VII claim. (Def.'s Br. at 47-48.) Defendants are correct that Pennsylvania courts analyze PHRA claims of discrimination under the standards of Title VII, *Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002)*, so this Court will consider both claims in this section.

[12] This Court will also consider the PERA claim with plaintiff's PHRA and Title VII claims. Defendants argue that the Court should grant summary judgment on the PERA claim for the same "reasons why all his other claims based on alleged discrimination should be dismissed." (Defs.' Br. at 55.)

This Court notes that a plaintiff may pursue claims under the PHRA and the PERA simultaneously. See *Imboden v. Chowns Comms., 182 F. Supp. 2d 453, 458 (E.D. Pa. 2002)* (holding that "while the PHRA preempts common law remedies for discrimination, it does not preempt state constitutional claims pursuant to the PERA"). The PHRA follows the Title VII standard, as noted supra, note 12, to prohibit discrimination based on gender. The PERA, on the other hand, prohibits gender from being used "as an exclusive classifying tool." *Commonwealth v. Butler, 458 Pa. 289, 296, 328 A.2d 851 (1974)*.

The Court may consider the PHRA and PERA together in this case because they both allow distinctions between genders when the distinction is based on something other than gender. The PHRA requires that the plaintiff present a prima facie case of discrimination by showing that he was treated less favorably than others similarly situated individuals because of his sex. See *Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999)*. Similarly, the PERA does not prohibit differential treatment if it is "reasonably and genuinely based on . . . characteristics unique to one sex." *Fischer v. Dept. of Public Welfare, 509 Pa. 293, 314, 502 A.2d 114 (1985)*. In this way, both the PHRA and the PERA prohibit discrimination based on distinctions which "rely on and perpetuate stereotypes as to the responsibilities and capabilities of men and women," *id. at 313*, which is what plaintiff has alleged here -- that the company relied on the societal stereotype that the male is generally the aggressor in a domestic violence incident when it transferred him to Carlisle, Pennsylvania.

(Defs.' Br. at 5, 47, 55.) Plaintiff, however, argues that there is both direct and indirect evidence of discrimination that precludes summary judgment.

[*53] In reverse gender discrimination cases, the plaintiff may proceed under two theories: the "mixed motives" theory of *Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)*, and the "pretextual" theory of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Under each theory, the basic premise is the same -- that the employment action was discriminatory -- but the burden of proof is different.

In a "mixed motives" case, the plaintiff must offer "direct evidence" of discrimination which shows that an "unlawful motive was a substantial motivating factor in th[e employer's] decision." *Wilson v. Susquehanna Twp. Police Dept., 55 F.3d 126, 129 (3d Cir. 1995)* (quoting *Miller v. Cigna Corp., 47 F.3d 586, 594 (3d Cir. 1995)*). Then, the "defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." *Wilson, 55 F.3d at 129* (quoting *Price Waterhouse, 490 U.S. at 258*).

In a "pretext" case, "plaintiffs [may] proceed without direct proof of illegal discrimination [*54] [because] circumstances are such that common sense and social context suggest that discrimination has occurred." *Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999)*. In such cases, the plaintiff bears a heavier burden of proof. *Wilson, 55 F.3d at 130*. He must first establish a prima facie case of discrimination by presenting "sufficient evidence to allow a fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others

---

This Court will not consider defendants' argument that Pennsylvania courts have incorrectly found that state action is not needed to sustain a cause of action under the PERA because, as explained below, summary judgment is appropriate on all plaintiff's discrimination claims. The law of Pennsylvania, however, clearly states that state action is "irrelevant to the interpretation of the scope of the PERA." See *Hartford Acc. and Indem. Co. v. Ins. Comm. of the Commonwealth, 505 Pa. 571, 482 A.2d 542 (1984)*; see also *Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 789 (3d Cir. 1990)*; *Imboden, 182 F. Supp. 2d at 458*; *Bartholomew v. Foster, 115 Pa. Commw. 430, 541 A.2d 393, 396 (Pa. Cmwlth. 1988)*; *Welsch v. Aetna Ins. Co., 343 Pa. Super. 169, 494 A.2d 409, 412 (Pa. Super. Ct. 1985)*.

because of his . . . sex." *Id. at 163*. The burden then shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the employment action which, if taken as true, would permit a factfinder to conclude that unlawful discrimination was not the reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*; *McDonnell Douglas, 411 U.S. at 802-03*. Then, the burden shifts back to the plaintiff to show that the employer's stated reason for the action is a pretext for the employer's actual discriminatory motivation. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*; **[*55]** *Burdine, 450 U.S. at 253, 256*; *McDonnell Douglas, 411 U.S. at 804-05*. [13]

**[*56]** Here, plaintiff has argued that he may proceed under both the mixed motives and the pretext theories. The Court will consider each in turn.

**(a) Mixed motives theory**

A plaintiff who claims that he has direct evidence of discrimination "faces a heavy burden" before he is able to utilize the mixed motives theory of discrimination. *Hankins v. City of Philadelphia, 189 F.3d 353, 364 (3d Cir. 1999)*. [14] "Stray remarks in the workplace,

---

[13] A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (1) discrediting the employer's proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Therefore, if a plaintiff points to evidence that discredits the defendant's proffered reasons, the plaintiff can survive summary judgment without presenting evidence of discrimination beyond that in his prima facie case. *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)*. The plaintiff can discredit the employer's explanation by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id. at 765*.

[14] Once the plaintiff passes the initial hurdle, however, his burden becomes lighter than the burden imposed in a McDonnell Douglas pretext case because direct evidence, such as "conduct or statements by persons involved directly reflecting the discriminatory attitude goes far beyond the weaker inference of improper motive raised by the plaintiff's prima facie case under the pretext framework." *Id.* (quoting

statements by nondecisionmakers, or even statements by decisionmakers unrelated to the decisional process itself, will not trigger a *Price Waterhouse* analysis." *Id.* Instead, the plaintiff must point to "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting a discriminatory attitude." *Id.* (quoting *Starceski, 54 F.3d at 1096*).

**[*57]** Comments which have triggered the <u>Price Waterhouse</u> analysis include the statement to African American that the position was being reserved for the "gay, white community," *Hankins, 189 F.3d at 365*, and the explanation given to a female that she did not get the job because "Miles wanted a man," *Wilson, 55 F.3d at 130*. "The most obvious and compelling example [of direct evidence] would be a remark to the effect that 'I won't hire you because you are a woman' or 'I'm firing you because you're not a Christian.'" *Hankins, 189 F.3d at 365* (quoting *Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997)*). Seen in the light most favorable to a plaintiff, such comments, when alleged, support a plaintiff's burden on a motion for summary judgment. [15]

**[*58]** Here, plaintiff presented the testimony of Novartis salesperson Rick Miller, who testified that Taipina, who was involved in the decision to transfer plaintiff, "made reference to the fact that [plaintiff] was a wife beater in front of our group," and told a physician that plaintiff "beat his wife and that's why he's no longer with us." (Simon Cert., Ex. G, Miller Dep. 37:10-21, 118:1-24.) Plaintiff testified that Taipina told him that he had forty-eight hours to either make the transfer to Carlisle, Pennsylvania or resign "because you're a bully and a wife beater." (Berlin Cert., Ex. F, W. Satz Dep. 95:7-8; Simon Cert., Ex. A, W. Satz Dep. 45:19-22, 93:19-94:15.) Plaintiff says that these comments show that Taipina had a discriminatory animus against men as aggressors and that Taipina then acted on this discriminatory animus when he transferred him to "boonesville," hoping he would quit and Novartis would not need to fire him. (Berlin Cert., Ex. F, W. Satz Dep. 120:24-121:5; Simon Cert., Ex. G, Miller Dep. 41:11-15, 113:1-8.)

---

*Starceski v. Westinghouse Elec. Corp. 54 F.3d 1089, 1096 (3d Cir. 1995)*).

[15] The defendant may argue at trial either (1) he never said what plaintiff testified he said, or (2) he made the statement, but it did not reflect discriminatory intent. *Hankins, 189 F.3d at 365*. At the summary judgment stage, however, the Court may not make such judgments. *Id.*

This Court finds that no reasonable jury could find that Taipina's alleged use of the term "wife beater" in the context of this case shows that he had a **[*59]** discriminatory animus against men. [16] Defendants argue that "[t]he term 'wife-beater' does not directly reflect gender-bias against males. At its most derogatory use it conveys a belief that a person has engaged in certain behaviors or actions; not an expression of animosity towards that person as a male." (Defs. Br. at 9.) This Court agrees. Taipina's reference to plaintiff as a "wife beater" was geared toward plaintiff's behavior. It is undisputed that Taipina knew that Mrs. Satz, plaintiff's ex-wife, had obtained a restraining order against plaintiff because "he got physical with me." (Berlin Cert., Ex. E, R. Satz Dep. 13:18-22.) Taipina had been aware of the Satzes marital problems throughout their divorce proceedings, had watched their relationship degrade, and had previously been approached by Mrs. Satz about her stress at home. (Id. at 8:12-16, 18:2-19:18; Berlin Cert., Ex. G, Taipina Aff. PP4-7.) Before he ever knew of the restraining order, he had spoken to his manager and to human resources for advice regarding the tension he sensed between the ex-spouses employed in his district. (Id., Ex. B, Taipina Dep. 19:14-20.) Taipina's "wife beater" comment was not made **[*60]** in reference to all males; it was made in reference to a male who had a restraining order entered against him because of an act of violence against his ex-wife. The term may have been unpalatable or harsh, but it was not discriminatory toward the male gender. No reasonable jury could find that plaintiff has met the "heavy burden" needed to sustain a mixed motives discrimination claim. No material fact tends to support plaintiff's claim of direct discrimination.

**(b) Pretext theory**

Defendants also argue that plaintiff cannot prevail under the pretext theory of discrimination of _McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973),_ **[*61]** because he has failed to present a prima facie case of discrimination and because he has failed to show that their legitimate business reason for transferring plaintiff was pretextual.

Defendants argue that he has not presented any evidence that could allow a fact finder to conclude that defendants treated plaintiff less favorably than other similarly situated employees because he was the only employee who had a restraining order against him when defendants decided to transfer him and that he has not presented anything to indicate that his transfer was for any reason other than the legitimate need to comply with the restraining order and maintain a safe work environment for fellow employee Rosemarie Satz. Plaintiff, however, argues that he has presented a prima facie case of discrimination because he was treated differently from his similarly situated ex-wife as discrimination based on his gender. He asks the Court to find that the existence of the restraining order did not distinguish plaintiff and his ex-wife and to find that it was a pretext for discrimination.

Plaintiff admits that the restraining order provided a sufficient basis and a legitimate reason to separate plaintiff **[*62]** and his ex-wife. [17] He argues (1) that he was similarly situated in spite of the restraining order, and (2) that although it is being presented as the legitimate business reason for the transfer, it is a pretextual reason covering actual discrimination. This Court finds that plaintiff was not similarly situated when the transfer decision was made and that, even if he was, he has raised no issue of fact about defendants' asserted legitimate business reason.

First, plaintiff argues that he became similarly situated with his ex-wife when he obtained a restraining order against her, but defendants still treated him differently. He does not dispute that defendants made their decision to transfer him when he did not have a restraining order, that **[*63]** defendants were only aware of one restraining order when they made their decision, or that a permanent restraining order still prohibits him from most contact with his ex-wife. He argues, though, that defendants should have reconsidered their decision once they learned he had a restraining order and should have "conducted an investigation at that point rather than tell me the decision was final [and] kill somebody's career and reputation over a bitter ex-wife who's telling lies." (Berlin Cert., Ex. F, W. Satz Dep. 46:21-47:11.)

---

[16] It is not clear whether Taipina made these "wife beater" comments as he testified that he never told plaintiff that he was a "wife beater and a bully." (Berlin Cert., Ex. G, Taipina Aff. P16.) On this motion for summary judgment, this Court must view all evidence in the light most favorable to plaintiff, so will assume for the purposes of this motion that such comments were made.

---

[17] Separating an employee from another employee against whom she has a restraining order is a legitimate business consideration. See, e.g. _Retter v. Georgia Gulf Corp., 755 F. Supp. 637, 640 (D.N.J. 1991)_ (separating employee who bickered with co-workers).

2003 U.S. Dist. LEXIS 27237, *63

Plaintiff, however, has presented nothing to undermine the fact that defendants made the decision to transfer plaintiff when they knew of only one restraining order. He has presented the testimony of Dennis Taipina where he admitted that he could have reconsidered his decision, (Berlin Cert., Ex. B, Taipina Dep. 150:12-16), but he has not presented anything that supports his allegation that defendants should have reconsidered the decision they had previously made with the advice of the human resources department and the legal department. Plaintiff and his ex-wife were not similarly situated when the decision to transfer plaintiff was made; he was restrained **[*64]** from contact with fellow salesperson Rosemarie Satz; therefore, he has not presented a prima facie case of differential treatment based on sex.

Second, even if plaintiff were able to present a prima facie case of discrimination, he cannot raise any question of fact about defendants' legitimate business reason for the decision they made. [18] Plaintiff argues that defendant's Policy Manual raises an issue because defendants did not investigate the situation and talk to plaintiff as required by their "Policy Against Workplace Threats and Violence." This Court, however, finds that the Policy Manual does not raise any issue of fact that undermines defendants' stated reason for plaintiff's transfer.

**[*65]** Plaintiff is correct that the Novartis "Policy Against Workplace Threats and Violence" states that:

> The local Crisis Management Team will conduct an investigation immediately upon notification of a threat of violence, and notify the Security Department. The Security Department will provide support and counsel as needed.

(Simon Cert., Ex. S at 1.2.1 (emphasis added)). However, this investigation provision does not apply to plaintiff's situation. The manual differentiates between threats of violence in the workplace, for which immediate notification and investigation is needed, and protective and restraining orders for which the company

must be notified so it can comply with the order. An employee's report that another employee threatened her or mistreated her requires an investigation because the report is a mere allegation. The Manual, thus provides for immediate investigation, "removal [or] suspension of an employee being investigated," implementation of immediate "security provisions," and "prompt and appropriate intervention" to ensure the safety of the threatened employee, (id. at 1.2.1-1.2.4), while also requiring "prompt and appropriate disciplinary **[*66]** action" to any "employee who maliciously and falsely accuses another employee of a threat or an act of violence" to ensure the protection of the accused employee, (id. at 1.5).

Restraining orders, on the other hand, are not mere accusations, but are orders of the court which establish that violence has occurred or has been threatened and which require action. [19] **[*67]** Plaintiff himself consented to making the restraining order against him permanent while dropping the temporary order against his ex-wife. No longer can the company investigate whose word to believe or whether the threat actually occurred; instead the company must accept the order of the court and comply with it. The Manual thus requires the employee to notify the employer of the restraining order so that it can implement measures which "protect[] the life, safety and health of employees." (Id. at 1.6.) [20]

---

[18] Plaintiff argues that the decision to transfer him to Carlisle was discriminatory and intended to punish him because it was farther from his home than other available territories. Defendants dispute that there were other territories available. This Court finds that it is not material whether or not territories were available that were closer than Carlisle, because it is undisputed that plaintiff never worked in Carlisle. He was instead given the opportunity to chose another territory at the end of his six-month disability leave.

[19] Under the New Jersey Prevention of Domestic Violence Act, *N.J.S.A. 2C:25-17 et seq.*, the court may provide "emergency, ex parte relief in the nature of a temporary restraining order" if it is "necessary to protect the life, health or well-being of a victim on whose behalf the relief is sought." *N.J.S.A. 2C:25-28(a)*, *(f)*. The temporary restraining order remains in effect until a judge of the Family Part of the Chancery Division of the New Jersey Superior Court issues either a permanent restraining order or an order dissolving the temporary restraining order. *N.J.S.A. 2C:25-28(i)*. The statute further provides that "[a]ny temporary or permanent restraining order issued pursuant to this act shall be in effect throughout the State, and shall be enforced by all law enforcement officers." *N.J.S.A. 2C:25-28(p)*.

[20] The "Protective/Restraining Order" provision provides:

> Employees who obtain a protective or restraining order against another person must register the order with a designated member of the local Crisis Management Team. This information will remain confidential and be provided only to persons with responsibility for protecting the life, safety and health of employees and other persons engaged in the businesses of Novartis Pharmaceuticals Corporation.

Here, the record shows that defendants acted in good faith and with the belief that plaintiff needed to be separated from his co-worker Rosemarie Satz because the court had prohibited him from contacting her. Plaintiff has not presented a scintilla of evidence, other than his admitted "conjecture" that discrimination must have occurred because he was transferred, (see Berlin Cert., Ex. F, W. Satz Dep. 120:24-121:5), to contradict the evidence in the record that supports defendant's legitimate business need to comply with a court order and protect its employees from conflict, violence, and confrontation **[*68]** in the workplace. As a result, this Court finds that summary judgment should be granted in defendant's favor as to the discrimination claims in Counts III, IX, and XII of plaintiff's complaint. [21]

---

(Simon Cert., Ex. S at 1.6.)

[21] While plaintiff bases his Title VII, PHRA, and PERA discrimination claims on the transfer decision and his NJLAD retaliation claim on the termination decision, this Court has considered whether there is question of fact of discrimination based on the termination decision. The Court finds that no material questions of fact remain.

First, plaintiff has not shown that defendant Dennis Taipina, manager of the Philly South district, was in any way involved in the decision to terminate plaintiff from the Newark, Delaware district.

Second, plaintiff has not shown circumstances from which a reasonable jury could infer that defendant Novartis terminated him because of his sex, rather than his performance. He has raised no issue of fact regarding the legitimate business reason that his termination was justified because he "was not willing to accept the commitment" to Delaware "when [his manager] added up not meeting expectations, the constant complaining about the territory, his counterpart calling me and complaining, my belief was that it was not getting any better." (Berlin Cert., Ex. P, Pace Dep. 160:9-22, 254:15-21, 257:6-258:11.)

Plaintiff has presented the affidavit of salesperson Rick Miller who stated that he is not aware that any other Novartis salesperson was disciplined for missing a banquet or for failing to open two e-mail communications, (Miller Aff. PP17, 19-21), and two positive field observation reports indicating that he was an excellent and enthusiastic salesperson, (Simon Cert., Exs. T, NN). However, he has also presented the Novartis policy on "Dealing with Substandard Performance" which allows discharge if an employee's "performance issues return" in spite of counseling from his supervisor, (id., Ex. PP), and a record that is replete with evidence that plaintiff's performance in Delaware did not meet his manager's expectations regardless of the number of times he was approached about substandard performance.

**[*69] 3. Privacy claims**

This Court will also grant summary judgment on plaintiff's claim that defendants infringed his privacy rights by obtaining "highly private and personal information from Rosemarie Satz . . . and us[ing] it as the basis for a punitive employment decision." (Pl.'s Br. at 47.) To establish a claim for unreasonable intrusion, a plaintiff must show that the defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion of another or of his private affairs or concerns, in a manner that would be highly offensive to a reasonable person. *Restatement (Second) of Torts § 652(B)*; see also *Pro Golf Mfg. v. Tribune Review Newspaper Co., 570 Pa. 242, 247, 809 A.2d 243 (2002)*; *Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 94, 609 A.2d 11 (1992)*. Here, the record is clear, as plaintiff argued in support of his discrimination claims, that defendants did not investigate the private details of the July 11, 2000 incident, but accepted the validity of the public court order. Moreover, it is undisputed that the tension between the Satzes had

---

Plaintiff himself admits that he was not happy with Delaware, that he told his manager, Doug Pace, that he hated driving to Delaware and hated being assigned to the Delaware territory. (Berlin Cert., Ex. F, W. Satz Dep. 186:15-25, 188:17-24.) He also admits that he never told Pace, who fired him, about the events of July 11, 2000. (Id. 192:1-11.) He admits that Pace sent him a message with his expectations about e-mail correspondence, but maintains that he had no need to open the emails and that such a "minor thing" should not be held against him. (Simon Cert., Ex. A, W. Satz Dep. 193:3-20, 197:2-8; Id., Ex. LL.) He admits that Pace confronted him when he was late to the May 2001 district meeting and did not attend its dinner, but he argues that Pace's expectations were unreasonable since he was ineligible to receive any awards and because there was "free-flowing alcohol" there. (Simon Cert., Ex. A, W. Satz Dep. 238:11-23.) Beyond plaintiff's mere assertion that he "devoted [him] self to Delaware" and "kept [his unhappiness] totally inside as much as he could," (Satz Aff. P28; Simon Cert., Ex. A, W. Satz Dep. 172:24-173:8), he has not presented this Court with any evidence that could cause a reasonable factfinder to conclude that Novartis, through Doug Pace, terminated plaintiff's employment as discrimination based on his gender rather than his attitude.

Therefore, this Court will also grant summary judgment on plaintiff's discrimination claims to the extent they allege that plaintiff's termination was discriminatory (rather than retaliatory). This Court offers no opinion regarding plaintiff's retaliation claim because it was alleged solely under the NJLAD, which claim was dismissed for lack of the NJLAD's applicability to plaintiff's Delaware employment.

spilled into the workplace leading to noticeable discomfort **[\*70]** between the two co-workers when in each other's presence leading up to and after their divorce. The company had a legitimate interest in paying attention to a workplace conflict which had its genesis in the employees' private lives. Therefore, because there is a complete absence in the record of any indication that defendants intentionally intruded into plaintiff's private affairs, this Court will grant summary judgment on plaintiff's privacy claim in Count XI of his complaint.

### 4. Intentional infliction of emotional distress

This Court will also grant summary judgment on plaintiff's intentional infliction of emotional distress claim. To sustain a claim for intentional infliction of emotional distress, plaintiff needs to show extreme and outrageous conduct by the defendant that is intentional or reckless and that causes the plaintiff severe emotional distress. *Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988)*; *Hoy v. Angelone, 456 Pa. Super. 596, 691 A.2d 476, 482 (Pa. Super. Ct. 1997)*, aff'd, *554 Pa. 134, 720 A.2d 745 (Pa. 1998)*. The conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, **[\*71]** and to be regarded as atrocious, and utterly intolerable in a civilized society." *Snyder v. Specialty Gas Prods., Inc., 441 Pa. Super. 613, 658 A.2d 366, 375 (Pa. Super. Ct. 1995)*; *Buckley, 111 N.J. at 366*.

Plaintiff argues that defendants' decisions to transfer him and to terminate him were extreme and outrageous. For reasons explained supra, however, this Court has found that defendants' transfer and termination decisions were legitimate business decisions. As such, this Court also finds that they were not extreme and outrageous and did not exceed all possible bounds of decency. Therefore, this Court will grant defendants' motion for summary judgment on the intentional infliction of emotional distress claim in Count X of plaintiff's complaint.

## IV. CONCLUSION

For the reasons discussed herein, and because plaintiff has not produced evidence which raises a question of fact regarding the claims in his complaint, the motion for summary judgment of defendants Dennis Taipina and Novartis Pharmaceuticals Corp. will be granted and

Plaintiff's Complaint will be dismissed with prejudice.

The accompanying Order is entered.

April 15, 2003

DATE

JEROME B. **[\*72]** SIMANDLE

United States District Judge

### ORDER

This matter having come before the Court upon the motion of defendants Dennis Taipina and Novartis Pharmaceuticals Corp. for summary judgment on the claims in the Complaint of plaintiff William Satz, pursuant to *Rule 56, Fed., R. Civ. P.* [Docket Item 40-1]; and the Court having considered the parties' written submissions, the oral arguments made on March 7, 2003, and the supplemental letter briefs dated March 13, 2003 and March 18, 2003; and for the reasons expressed in Opinion of today's date;

**IT IS** this 15th day of April, 2003, hereby

**ORDERED** that Counts I and II of the Complaint are voluntarily **DISMISSED WITH PREJUDICE;** and

**IT IS FURTHER ORDERED** that the motion for summary judgment of defendants Dennis Taipina and Novartis Pharmaceuticals Corp. on plaintiff William Satz's Complaint [Docket Item 40-1] as to the remaining Counts III through XII be, and hereby is, **GRANTED,** and **JUDGMENT** is entered in favor of defendants as to these counts; and

**IT IS FURTHER ORDERED** that Plaintiff's Complaint be, and hereby is, **DISMISSED WITH PREJUDICE;**

**[\*73]** No costs.

JEROME B. SIMANDLE

United        States        District        Judge

**Table1 (**_Return to related document text_**)**

I.      INTRODUCTION

II.     BACKGROUND

    A.    The parties

    B.    The divorce

    C.    The "domestic violence" dispute on July 11, 2000

    D.    The temporary restraining order

    E.    The decision to transfer plaintiff

    F.    Plaintiff's medical leave

    G.    The permanent restraining order

    H.    Alleged discriminatory remarks

    I.    Selection of a new sales territory

    J.    Plaintiff's Delaware performance

III.    DISCUSSION

    A.    Standard of Review

    B.    Analysis

        1.    NJLAD claims

        2.    Reverse gender discrimination claims under
           Title VII, the PHRA, and the PERA

           (a) Mixed motives theory

           (b) Pretext theory

        3.    Privacy claims

        4.    Intentional infliction of emotional distress

Laura Victorelli

2003 U.S. Dist. LEXIS 27237, *73

    IV.    CONCLUSION

**Table1 (***Return to related document text***)**

---

End of Document