**PIRO ZINNA CIFELLI PARIS & GENITEMPO, LLC**
360 Passaic Avenue
Nutley, NJ 07110
Phone: (973) 661-0710
Fax: (973) 661-5157
Alan Genitempo, Esq. – (Id. No. 023181987)
Attorney for Plaintiff, Sambit Pattanayak

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SAMBIT PATTANAYAK, | : | Civil Action |
| | : | |
| | : | DOCKET NO.: 2:29-cv-12540 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MASTERCARD, INC. | : | |
| | : | |
| Defendant, | : | |
| | : | |
| | : | |

ALAN GENITEMPO, ESQ., of full age, certifies as follows:

1.  I am an attorney at law of the State of New Jersey and partner of the firm of Piro Zinna Cifelli Paris & Genitempo, LLC ("Piro Zinna"), attorneys for Plaintiff Sambit Pattanayak ("Plaintiff") in the above-captioned matter.

2.  I make this Certification in Opposition to Defendant's Mastercard, Inc. Motion to Dismiss. I am fully familiar with the facts set forth herein.

3.  Attached hereto as **Exhibit "A"** is a true copy of Plaintiff's Complaint filed on August 13, 2019.

4.   Attached hereto as **Exhibit "B"** is a true copy of Defendant Mastercard's connection with Credit Union of New Jersey, North Jersey Federal Credit Union, and Provident Bank.

5.   Attached hereto as **Exhibit "C"** is a true copy of a search for Defendant Mastercard International, Inc's registration with New Jersey Division of Revenue Enterprise Services.

6.   Attached hereto as **Exhibit "D"** is a true copy of "New Jersey Debit Mastercard" offered by the state to receive child support payments.

7.   Attached hereto as **Exhibit "E"** is a true copy of <u>First Trenton Indem. Co. v. River Imaging, P.A.</u> 2004 WL 3316874 March 2004.

8.   Attached hereto as **Exhibit "F"** is a true copy of <u>McCourt v. A.O. Smith Water Prods. Co.</u>, No. 14-221, 2015 WL 4997403 (D.N.J. Aug. 20, 2015).

9.   Attached hereto as **Exhibit "G"** is a true copy of <u>Trevejo v. Legal Cost Control, Inc.</u>, No. A-1377-16T4, 2018 WL 1569640 (N.J. App. Div. Apr. 2, 2018).

I hereby certify that the foregoing statements made by me are true. I am aware that if the foregoing statements are willfully false, I am subject to punishment.

By:<b><i>/s/ Alan Genitempo, Esq.</i></b><br>Alan Genitempo, Esq.

Dated:    October 19, 2020

# Exhibit A

**PIRO ZINNA CIFELLI PARIS & GENITEMPO, LLC**
360 Passaic Avenue
Nutley, NJ 07110
Phone: (973) 661-0710
Fax: (973) 661-5157
Alan Genitempo, Esq. – (Id. No. 023181987)
Attorneys for Plaintiff, Sambit Pattanayak

| | |
|---|---|
| SAMBIT PATTANAYAK, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION: HUDSON COUNTY |
| | DOCKET NO.: HUD-L- |
| Plaintiff, | |
| | <u>Civil Action</u> |
| v. | |
| | **COMPLAINT AND JURY DEMAND** |
| MASTERCARD, INC. | |
| | |
| Defendant, | |

    Plaintiff, SAMBIT PATTANAYAK ("Plaintiff"), residing at 101

PARK AVENUE, APT 2D, in the city of Hoboken, County of Hudson and

State of New Jersey, by way of Complaint herein says:

## FACTS RELEVANT TO ALL COUNTS

1.     Defendant MASTERCARD ("Defendant"), is headquartered in 2000 Purchase Street, in the Town of Purchase, County of Westchester, State of New York.

2.     Plaintiff, while a resident of New Jersey, was hired in 2012 as Vice President of Product Management in Mastercard's New York offices.

3.     In October 2015, Plaintiff was transferred to Mastercard's Singapore Branch with his wife, who was also a Vice President at Mastercard at the time.

4.     From October 2015 to March 2017 Plaintiff was reporting to Mr. Richard Crum based in New York office while Plaintiff was based in Singapore.

5.     In April 2017, Plaintiff started a new job as Vice President ("VP") of Client Services within MasterCard Singapore to establish and lead the new APT division in Southeast and South Asia (about 7 countries)

6.     As VP, Plaintiff reported to Scott Setrakian in San Francisco.

7.     From 2017 to 2018, Plaintiff, executed his job duties and responsibilities with strong performance reviews and key revenue achievements.

8.   During this time, between 2017 and 2018, Plaintiff annual compensation was USD $378,160.

9.   However, for nearly two and a half years Plaintiff suffered continuous discriminatory conduct from Mastercard.

10.   Plaintiff's wife was terminated in 2016 after having raised concerns of discrimination and retaliation.

11.   At the time of her termination, Plaintiff and his wife worked for the same division with the same senior leadership and Human Resources managers, Mary Sexton and Meena Wadhera.

12.   Plaintiff is of Indian national origin and a US citizen.

13.   In March 2016, at a group meeting in New York, Mr. David Peraino, who was Plaintiff's superior, singled out Plaintiff and cursed at him using extremely abusive foul language, humiliated him and threatened him. This group meeting included Plaintiff's manager Richard Crum and the head of the department Sachin Mehra (Mr. Peraino's and Mr. Crum's manager. Mr. Crum and Mr. Mehra did nothing to stop the behavior and stayed silent. This behavior was a gross violation of the company's own documented Employee Handbook. In the meeting, Plaintiff was the only employee junior to Mr. Peraino, that was of Indian origin.

14.   Subsequently, immediately after this meeting, Mr. Peraino also cursed at Plaintiff and explicitly threatened Plaintiff in a one-on-one meeting saying, "I am going to come after

you". The company has strong written policies against this kind of behavior.

15.   Plaintiff complained to Mr. Richard Crum in person about Mr. Peraino's behavior and threats after the New York meeting in March 2016 and expected that Mr. Crum would look into it.

16.   However, at the end of 2016, Mr. Peraino explicitly pushed for and ensured a poor year-end performance review for Plaintiff (just as he had threatened to do in the March 2016 incident), resulting in Plaintiff receiving a much poorer performance review compared to prior years in the same group. While Plaintiff still received "Meets Expectations" as his performance review, a lot of his accomplishments were ignored in the performance review and the review was peppered with negative feedback with no concrete examples and proof. After receiving the performance review in January 2017, when Plaintiff asked Mr. Crum for specific examples of sub-par performance, Mr. Crum was unable to provide any concrete examples. Plaintiff had documented that he was able to accomplish all of his objectives for the year 2016. However, his superiors also severely reduced his annual bonus and did not give him an annual equity grant (which he had been receiving for multiple prior years).

17.   In February of 2017, Plaintiff reported multiple instances of harassment and discrimination to Human Resources and Employee Relations, occurring since early 2016, related to

4

national origin by his superior, David Peraino, to Mastercard's Human Resources and Employee Relations groups, based in Mastercard's HQ in New York.

18. No action was taken on his complaint and Plaintiff was asked to "move forward." When Plaintiff asked repeatedly how can Mastercard ensure this harassment behavior does not continue going forward, Mary Sexton of Human Resources and Lisa Rief of Employee Relations repeatedly asked Plaintiff instead about what the Plaintiff will do to not be a target of this behavior.

19. Subsequently, Plaintiff's manager, Richard Crum, told him that he and Sachin Mehra would like Plaintiff to seek new employment in Singapore and that Plaintiff should make this his highest priority. Plaintiff then found a new role with Mastercard's APT division as mentioned above and started the new role in April 2017.

20. In approximately July of 2017, Plaintiff informed his Managers at the APT division, Scott Setrakian and Cathy Baker, along with APT Division Human Resources, that he required a medical leave of absence.

21. As required under Mastercard's company policies, Plaintiff provided a doctor's letter to confirm a diagnosis of dysthymia, a long-term form of chronic depression, and according to doctor recommendations and company policy, took a two-month medical leave from September to the end of October 2017.

5

22. Upon Plaintiff's return to work, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job.

23. Mastercard not only denied Plaintiff's requests, but provided less support than given to peers with similar responsibilities as well as to subordinates two levels below him.

24. Plaintiff's division was grossly understaffed and overworked compared to similarly situated departments, which exacerbated his medical condition. Specifically, Plaintiff was the sole employee in the Singapore division, whereas similar international region leaders with similar mandates typically had about a dozen employees and a higher Senior Vice President ("SVP") title.

25. After Plaintiff's return from medical leave, his manager Scott Setrakian moved away from the promise he made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian origin at junior levels, there was no one at an SVP level.

26. Mr. Eric Schneider, Plaintiff's dotted-line manager based in Singapore on several occasions referred to Plaintiff as being treated by his division's leadership as the "red-headed stepchild" of the division, meaning Plaintiff was not treated on par with others at his level.

6

27.   However, Plaintiff was able to accomplish all his objectives set out for the year 2017 despite the lack of resources (though exacerbating his own medical condition). Plaintiff received a good performance review and his manager said that the Plaintiff's performance review could be characterized as "upbeat".

28.   In March of 2018, Plaintiff raised concerns to his superiors regarding the lack of hiring or moving of support staff and reduced bonus for the year 2017 despite a strong performance.

29.   In response to his complaint, Plaintiff's manager severely limited communications with him, and began making decisions about Plaintiff's work and projects in his scope without consulting him.

30.   Despite these hurdles, Plaintiff was able to exceed 2018's full-year sales targets within just the first six months of 2018. Additionally, Plaintiff received numerous compliments from his senior APT division and Mastercard Asia Pacific colleagues in 2017 and 2018. Several APT junior resources expressed desire to Human Resources and Plaintiff to move to the Singapore office to work for Plaintiff and support the excelling Singapore office. Such mobility is encouraged and normal within the APT division. Again, this performance came at a significant cost to Plaintiff's health given the lack of support and resources.

31.   In July of 2018, Plaintiff spoke with his manager Mr. Setrakian about a role change and transfer to another division. He

also discussed a transfer to another division with his dotted-line manager Eric Schneider and senior Mastercard executives including Asia-Pacific Head Ari Sarker who were happy with his work in Singapore. This was well received by Mr. Schneider and Mr. Sarker and meetings with potential hiring executives were set up. Suddenly, some of these meetings were then postponed with no explanation.

32.   On August 16, 2018, Plaintiff's manager, Mr. Setrakian, and Meena Wadhera, Human Resources, told him that the company was terminating him without any cause and presented for review a grossly inadequate separation agreement which included releasing Mastercard of any liability. Ms. Wadhera was not the Human Resources person in charge of Plaintiff's APT division but was the HR person for Plaintiff's previous division from where he transferred due to harassment and retaliation. Ms. Wadhera was also Plaintiff's wife's Human Resources manager when Plaintiff's wife was working in Singapore.

33.   On August 24, 2018, Plaintiff informed Human Resources that he had retained legal counsel and that he had claims against Mastercard under U.S. Equal Employment Opportunity laws.

34.   Two days later, on or about August 26, 2018, Plaintiff was terminated without cause. The company retaliated against his action of hiring legal counsel and mentioning claims by even rescinding the initial separation package (which was grossly

8

inadequate to begin with). Plaintiff suffered great financial cost to himself and his family.

35.  Before his termination, Plaintiff attempted to resolve his grievances with Human Resources directly. When he made a proposal to resolve the above issues, Human Resources told Plaintiff that all proposals would be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States despite the company being aware that Plaintiff had a 4-month old child in August 2017 and that moving a family with two young children with a tight time-frame would be very difficult.

36.  The relocation assistance offered to Plaintiff to move back to the U.S. was a small fraction of the relocation assistance Mastercard provided to him when he was initially transferred from New York to Singapore, and significantly less than what other employees gained when repatriating back to their originating countries.

37.  Mastercard did not provide Plaintiff with any severance package, unemployment compensation, out-placement services, medical insurance and his annual bonus. The company moved him to Singapore with his family where he did not have a strong professional or personal network as he did in his home country (United States) and then left him there without adequate resources to fend for himself, while he was taking care of his family with

young children and battling his chronic health condition of depression. Plaintiff could not even get unemployment benefits provided by his home country (the United States) as he was terminated in Singapore.

## COUNT ONE

## DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. § 10:5-1 *et seq.*

38.  Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

39.  Plaintiff was subject to unlawful discrimination based on his race and national origin.

40.  Plaintiff was repeatedly harassed and some of the harassment toward Plaintiff occurred in front of other people including his manager Richard Crum and department head Sachin Mehra.  Plaintiff was the only person junior to the harasser that was of Indian national origin.

41.  Plaintiff complained to his manager Richard Crum about David Peraino's behavior after a meeting where he threatened and humiliated Plaintiff.

42.  Richard Crum did not acknowledge Plaintiffs concerns.

43.  Mr. Peraino explicitly pushed for and ensured a poor year-end performance review for Plaintiff (just as he had threatened to do in the March 2016 incident).

10

44.   In February 2017, Plaintiff reported multiple instances of harassment and discrimination, occurring since early 2016, related to race and national origin by his superior, David Peraino, to Defendant Mastercard's Human Resources and Employee Relations groups, based in Mastercard's HQ in New York.

45.   In response to Plaintiffs harassment complaint, Mastercard's Human Resources and Employee Relations told Plaintiff to "move forward" and asked to what Plaintiff can do himself to not be a target of such behavior by his superiors. No legitimate investigation was ever conducted.

46.   Subsequently, Defendant blocked Plaintiff from projects and work which pertained to his role and reduced Plaintiffs annual bonus.

47.   APT division's management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian origin at junior levels, there was no one at an SVP level.


**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1)   compensatory damages;

2)   pre-judgment interest;

3)   punitive damages;

11

4)    counsel fees;

5)    cost of suit; and

6)    any other relief that the court deems to be just and equitable.

**COUNT TWO**

**CREATION OF A HOSTILE WORK ENVIORNMENT AND DISPARATE TREATMENT DUE TO RACE IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. § 10:5-1 *et seq.***

48. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

49. The Defendants conduct as alleged above constitutes disparate treatment based on the plaintiff's race where the Defendants subjected the Plaintiff, based on his race, to more strenuous workloads, as well as work outside his job description while workers of other race did less strenuous work within their job description.

50. Upon Plaintiff's complaints to superiors regarding instances of workplace harassment on the basis of his national origin and race, Plaintiff was told to "move forward" and told to reflect upon what Plaintiff can do himself to not be a target of such behavior by his superiors.

51. After his transfer, Plaintiff's division was grossly understaffed and overworked compared to similarly situated departments and Plaintiff was the sole employee in the Singapore

division, while similar international regions with similar mandates typically had about a dozen employees. Plaintiff was the only person of Indian origin with this type of role.

52.    Plaintiff's manager severely limited communications with him and began making decisions about Plaintiffs work and projects in his scope without consulting him. Plaintiff was also locked out of some of his responsibilities.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1)    compensatory damages;

2)    pre-judgment interest;

3)    punitive damages;

4)    counsel fees;

5)    cost of suit; and

6)    any other relief that the court deems to be just and equitable.

## COUNT THREE

## DISABILITY DISCRIMINATION AND HOSTILE WORK ENVIORNMENT IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. § 10:5-1 *et seq*

53.    Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

54.    The Defendant's conduct as alleged above and at length herein constitutes that it knowingly created a hostile atmosphere

in that it failed to provide Plaintiff the same support systems and employees as similarly situated divisions at Defendant company, forcing Plaintiff to overwork to compensate for the lack of support, and having full knowledge of Plaintiff's disability.

55.   When Plaintiff returned from his medical leave in October 2017, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job at Defendant. Defendant Mastercard not only denied Plaintiff's requests but provided less support than provided to peers with similar responsibilities as well as to subordinates two levels below him.  Plaintiff was the sole employee in his division while similarly situated departments employed approximately twelve (12) employees.

56.   After Plaintiff's return from medical leave, his manager Scott Setrakian and APT management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities.

57.   The hostile environment at Defendant company exacerbated Plaintiff's medical condition and culminated in his termination less than one month after Plaintiff finally requested a transfer and role change to mitigate the toll the hostile environment took on his health.

58.   Defendant Mastercard discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment in the form

14

of discrimination based on Plaintiff's disability which was severe and pervasive.

59. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

1) compensatory damages;

2) pre-judgment interest;

3) punitive damages;

4) counsel fees;

5) cost of suit; and

6) any other relief that the court deems to be just and equitable.

<u>**COUNT FOUR**</u>

<u>**RETALIATION AND WRONGFUL TERMINATION IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. § 10:5-1 *et seq***</u>

60. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above in paragraphs "1" through "59" with the same force and effect as if more fully set forth herein.

61.  The Defendant's conduct as alleged above constitutes retaliation.

62.  Approximately one month after Plaintiff reported multiple instances of harassment and discrimination to Human Resources and Employee Relations group in February 2017, Plaintiff was told to "move forward" and subsequently expressed that Plaintiff should make it his highest priority to seek other employment.

63.  Plaintiff's wife was terminated with settlement agreement in 2016 following her own allegations. Plaintiff may have been retaliated against as a result of her grievances against the very same division and human resources personnel, Mary Sexton and Meena Wadhera.

64.  Defendant retaliated against Plaintiff by lowering Plaintiff's bonus, and removing some of his benefits.

65.  Defendant significantly docked Plaintiff's pay reducing his annual bonus and totally eliminating his annual equity grant, which Plaintiff has received in each of his prior years.

66.  While in the APT division in Singapore, Defendant took retaliatory action against Plaintiff upon Plaintiffs request for a role change and potential relocation after experiencing workplace harassment on the basis of his race and national origin, and later his attempt to resolve issues with his division being understaffed and being locked out of his responsibilities.

16

67. Defendant ensured that Plaintiff's division was understaffed, with Plaintiff being the sole employee and other similarly situated divisions having approximately twelve employees.

68. Mr. Eric Schneider, Plaintiff's dotted-line manager based in Singapore on several occasions referred to Plaintiff as being treated by APT as the "red-headed stepchild" of the APT organization, meaning Plaintiff was not treated on par with others at his level.

69. A month after Plaintiff requested a role change due to the repeated harassment in Singapore, Plaintiff was terminated without cause.

70. Before his termination, Plaintiff attempted to resolve his grievances and claims with Human Resources directly with the help of his U.S. counsel. When he made a proposal to resolve the above issues, Human Resources told him that all proposals will be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States. This relocation assistance represented a small fraction of the relocation provided to Plaintiff when he was initially transferred from New York to Singapore, and significantly less than other employees repatriated back to their originating countries.

17

71.  As a direct and proximate result of Defendant's unlawful and retaliatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

72. Defendant's unlawful and retaliatory conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the following:

      1)   compensatory damages;

      2)   pre-judgment interest;

      3)   punitive damages;

      4)   counsel fees;

      5)   cost of suit; and

      6)   any other relief that the court deems to be just and equitable.

### JURY DEMAND

Plaintiff demands trial by jury as to all matters herein.

### DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates ALAN GENITEMPO, ESQ. as trial counsel for the within matter.

## DEMAND FOR INSURANCE INFORMATION

Pursuant to R. 4:10(b), demand is hereby made that Defendants disclose to Plaintiff's attorney whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment and provide Plaintiff's attorney with true copies of such insurance agreements or policies including, but not limited to, any and all declaration sheets.  This demand shall be deemed to include and cover not only primary coverage but also any and all excess, catastrophe and umbrella policies.

## CERTIFICATION

I certify, pursuant to R.4:5-1, that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action at this time.

PIRO, ZINNA, CIFELLI,
PARIS & GENITEMPO, LLC
Attorneys for Plaintiff

BY:**/s/Alan Genitempo, Esq.**
     ALAN GENITEMPO, ESQ.

Dated: August 13, 2020

19

# Civil Case Information Statement

## Case Details: HUDSON | Civil Part Docket# L-002944-20

**Case Caption:** PATTANAYAK SAMBIT  VS MASTERCARD, INC.

**Case Initiation Date:** 08/13/2020

**Attorney Name:** ALAN JOSEPH GENITEMPO

**Firm Name:** PIRO ZINNA CIFELLI, ET AL

**Address:** 360 PASSAIC AVE

NUTLEY NJ 071102787

**Phone:** 9736610710

**Name of Party:** PLAINTIFF : Pattanayak, Sambit

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Sambit Pattanayak?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE

### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO

    **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO

    **If yes, for what language:**


**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

08/13/2020

Dated

/s/ ALAN JOSEPH GENITEMPO

Signed

# Exhibit B

New Jersey State Employee Job Furlough  Hardship



Schedule an Appointment

e-Banking Login

Credit Cards

Home ▸ Personal Banking ▸ Loans ▸ Credit Cards

# The best to know when you're on the go.

A+   A-

 Apply Now

Calculators

Rates

**Explore:**

Auto & Truck Loans

Auto & Truck Loan Rates

 Our MasterCard® Credit Cards are such great financial tools. They can be used for everyday purchases, they're very handy when it comes to emergencies, and they can even help you improve your credit score if used wisely.

## Whatever your financial objective is, we have all your bases covered with the following card programs:

**Platinum.** A fantastic card for our members seeking a low rate.

**Platinum Rewards.** For our members who use their credit card often, tend to pay off their balances each

 Credit Union of New Jersey — The freedom to prosper.

Schedule an Appointment          e-Banking Login

Personal Loans

Personal Loan Rates

Lifestyle Loans

Mortgages

Mortgage Loan Originators

Home Equity Products

Home Loan Rates

Student Loans

Student Loan Debt Consolidation

## Here's how our cards stack up:

| Type of Card | Platinum | Platinum Rewards | Student | Secured |
|---|---|---|---|---|
| **New Account Special Offer** | 2.99% APR* for 12 months on Purchases, Balance Transfers, and Cash Advances | 5,000 Bonus Points** | N/A | N/A |
| **Reward Points** | N/A | 1 point for every dollar spent in purchases | N/A | N/A |
| **Rate** <br> **Pricing & Terms** | As low as 8.15% to 16.15% APR variable | As low as 9.15% to 17.15% APR variable | As low as 13.99% | As low as 14.99% |
| **Credit Limit** | Up to $25,000 | Up to $25,000 | Up to $25,000 | Up to $25,000 |
| **Annual Fee** | $0 | $0 | $0 | $0 |
| Apple Pay™ | ✓ | ✓ | ✓ | ✓ |
| Samsung Pay™ | ✓ | ✓ | ✓ | ✓ |
| Google Pay™ | ✓ | ✓ | ✓ | ✓ |

New Jersey State Employee Job Furlough  Hardship



Schedule an Appointment

e-Banking Login



| Emergency Card Replacement and Emergency Cash Disbursement | ✓ | ✓ | ✓ | ✓ |
|---|---|---|---|---|

**Travel Accident Insurance Disclosure**

## Credit Card Alerts Now Available!

Now you can receive near real-time alerts about your credit

| Trip Interruption/ Trip Cancellation Disclosure | ✓ | ✓ | ✓ | ✓ |
|---|---|---|---|---|

**Enjoy the freedom to prosper.** If you have questions about our portfolio of credit cards, feel free to give us a

| e-Statements | ✓ | ✓ | ✓ | ✓ |
|---|---|---|---|---|
| Auto Rental Collision Damage Waiver | ✓ | ✓ | ✓ | ✓ |

Popular Credit and Debit Questions

**What do you offer for Credit Cards?**
*CU of NJ has a number of credit card solutions to meet your needs. We offer a MasterCard Platinum... ...*

**What is the maximum withdrawal in cash I can get from your ATM machine?**
*There is a cash withdrawal limit of up to $725 at the ATM depending on the type of account you... ...*

**how to request a credit card limit increase?**
*Thank you for contacting Credit Union of New Jersey.  You may apply for a limit increase online... ...*

New Jersey State Employee Job Furlough  Hardship



Schedule an Appointment

e-Banking Login



 **How much cash can be withdrawn from an ATM on a daily basis?**
*Cash withdrawal limits are: $259 for student checking accounts and $725 for all other accounts…. …*

 **Are there service fees for ATM withdrawals?**
*Credit Union of New Jersey does not charge for ATM withdrawals as long as they are made from a CU… …*

 **How long does it take to get my card?**
*Once your card has been ordered, it may take 7-10 days for it to arrive. If you have not… …*

**Service Fees for ATM withdrawals?**
*CU of NJ has a charge of $2 per transaction done at a foreign (non CU of NJ owned) ATM. We have… …*

\*  APR=Annual Percentage Rate.

\*\*  Subject to credit approval. 5,000 bonus points are received after account opening.

# Build your relationship with us through these other related products:



Payment Protection



Lifestyle Loans



Personal Loans

New Jersey State Employee Job Furlough  Hardship



Schedule an Appointment

e-Banking Login

 New Jersey State Employee Job Furlough  Hardship



Schedule an Appointment

e-Banking Login

and services.





## Contact Us

609.538.4061
800.538.4061
Branch Locations
NMLS #401368
Transit #231278614

## Support

Our Rates
Lost/Stolen Card
Enroll in e-Banking
ATM Locator

## Community

Our Foundation
Facebook
Twitter
LinkedIn
YouTube

## Legal

Privacy
Forms & Disclosures
NCUA

Great

377 reviews

Equal Opportunity Lender

© 2020 Credit Union of New Jersey. All rights reserved. Site designed and managed by Raoust+Partners.

- About Us
- Contact Us
- Rates
- Routing# 221275025



Online Banking:

Enroll
Password Reset

English
Español (Spanish)

- Checking & Savings
  - Credit & Debit Cards
  - Loans
  - Convenient Services
  - Business Accounts

-

Search

MasterCard Debit Card

North Jersey Federal Credit Union > Credit & Debit Cards > MasterCard Debit Card

# MasterCard® Debit Card

An NJFCU Mastercard Debit Card lets you pay for purchases anywhere MasterCard® is accepted. The purchase amount is deducted automatically from available funds in your Checking Account. You can also use the card to access your NJFCU accounts at most ATM's.

# Lost or Stolen Credit/Debit Card

If your credit card is lost or stolen, call us as soon as possible at 973-785-9200 and use option 6, which will direct you to MasterCard® to initiate the cancellation process. After your lost or stolen card has been canceled, come down to the Totowa, Elmwood Park or Newark University Hospital Rutgers branch to register and receive your new card onsite. If you find difficulty using the phone number above, you can contact MasterCard® directly at 800-262-2024.

- Credit & Debit Cards
- Credit Card Payments
- Classic Card
- Liberty Card
- Platinum Rewards Card
- Business Rewards Card
- MasterCard Debit Card
- Visa Gift Card



We are here to grow your business.



About Us
Contact Us
Rates
Forms & Disclosures

Privacy Disclaimer

Accessibility Statement

Checking

Share Savings Account

Certificates

Money Market Account

Kids Kash Club

Vacation & Holiday Club

Credit Card Payments

Classic Card

Liberty Card

Platinum Card

Business Rewards Card

MasterCard Debit Card

Visa Gift Card


Home

Home Equity Line of Credit

Auto

Personal

Student

Refinancing

Loan Calculator


Online Banking

NJFCU Mobile App

Pop Money

Bill Pay

TAP

Teacher Benefits

Overdraft Protection

Greenpath


Business Checking

Commercial Lending

Business Services

Select Employee Groups







- English

- Español (Spanish)

SERVICE CENTER ▼

![Provident Bank logo] Provident BANK
Commitment you can count on™

About   Investor Relations   Branch Locator   Education   Press   Financial Wellness   Careers   Contact Us

ENG   ESP   🔍

LOGIN

PERSONAL SERVICES       BUSINESS SERVICES       WEALTH MANAGEMENT       DIGITAL BANKING

# PROVIDENT DEBIT MASTERCARD®

At Provident Bank, we're committed to providing you with fast, convenient access to the money in your Provident Bank personal checking account - where and when you want it! That's why we are proud to announce our newly designed Provident Debit Mastercard. Powered by Mastercard International, our new card can help you make purchases safely and conveniently with added benefits whether you're close to home or traveling.



## The Benefits Are Global

In addition to acceptance at millions of locations and ATMs worldwide, you will receive an expansive range of benefits, including:

**Extended Warranty**

When you make a purchase with your Provident Debit Mastercard, you may receive double the original manufacturer's or store brand warranty for up to one year.[1]

**Satisfaction Guarantee**

If you are dissatisfied with your purchase within 60 days of the purchase date and the store will not accept the item for return,[1] you will receive a refund up to $250.

**Zero Liability Protection Against Unauthorized Purchases**

In the event that your card is used to make unauthorized purchases - whether made in a store, by phone, or online - you may not be held liable.[2]

# Exhibit C



Search Types

Help (/DOR/BusinessNameSearch/Home/Help)

# Business Name Search

Required Fields [ * ]

## Search Criteria

**Business Name** *

> mastercard

Use "%" as a wildcard

Search →                                                    x Cancel (/DOR/BusinessNameSearch/)

**Show**

10 ∨

**entries**

| Business Name | Entity Id | Type |
|---|---|---|
| MASTERCARD INTERNATIONAL INCORPORATED | 0400221668 | FR (Foreign For-Profit Corporation) |
| MASTERCARD TRAVELERS CHEQUE, INC. | 0100436785 | FR (Foreign For-Profit Corporation) |

Showing 1 to 2 of 2 entries                                    « Previous   Next »

---

**Division of Revenue & Enterprise Services**

PO (Post Office) Box 450

Trenton, NJ (New Jersey) 08646-0303

**Support**

Division of Revenue & Enterprise Services Web Site (http://www.state.nj.us/treasury/revenue/)

Search Help (/DOR/BusinessNameSearch/Home/Help)

Contact Us (https://www.njportal.com/ErrorPages/Contact.aspx)

**Polices & Procedures**

Privacy Policy (https://www.njportal.com/ErrorPages/Privacy.aspx)

Accessibility Policy (https://www.njportal.com/ErrorPages/Accessibility.aspx)

Security Policy (https://www.njportal.com/ErrorPages/Security.aspx)

Legal Statements & Disclaimers (https://www.njportal.com/ErrorPages/Disclaimer.aspx)

Information on Novel Coronavirus

October 8, 2020

Coronavirus is still active in NJ. Wear a mask. Keep a 6ft. distance in public

NJ Poison Control Center and 211 provide COVID-19 information: Call: **2-1-1**; Call (24/7); **1-800-962-1253**; Text: **NJCOVID to 898-211**; More Information: **covid19.nj.gov**

COVID ALERT NJ

Download COVID Alert NJ app for free today. Visit **covid19.nj.gov/app**

OFFICIAL SITE OF THE STATE OF NEW JERSEY

Translate    Search

**COVID-19 Related Tax Information**

**Information about the Federal Economic Impact Payment – Stimulus Check**

**Important Information About Retail COVID-19 Fees and Sales Tax**

Home  /  Corporation Filing Responsibilities

# Corporation Filing Responsibilities

Every New Jersey corporation acquires a taxable status beginning either on the date of its incorporation, or on the first day of the month following its incorporation if so stated in its Certificate of Incorporation. Every corporation which incorporates, qualifies or otherwise acquires taxable status in New Jersey must file a Corporation Business Tax return, Form CBT-100. A tax return must be filed for each fiscal year, or part thereof, beginning on the date the corporation acquired a taxable status in New Jersey regardless of whether it had any assets or conducted any business activities.

In general, corporations required to file the CBT-100 include:

- Every corporation existing under the laws of the State of New Jersey; and
- Every foreign corporation which either:
  - Holds a general Certificate of Authority to do business in New Jersey issued by the New Jersey Division of Revenue;
  - Holds a certificate, license or other authorization issued by any other New Jersey department or agency authorizing the corporation to engage in activity in New Jersey;
  - Does business in New Jersey;
  - Employs or owns capital in New Jersey;
  - Employs or owns property in New Jersey; or
  - Maintains an office in New Jersey.

All corporations, whether domestic or foreign, must also submit an annual report and the associated filing fee electronically with the Division of Revenue and Enterprise Services (DORES). The formation or registration date is the annual report filing due date. For more information, visit DORES' website.

Last Updated: Monday, 02/24/20





2020 Census Toolkit

2020 Census FAQ



Follow on Social Media

 

Back to top



## Division of Taxation

About Us

Taxation Branches

Taxes We Administer

Top Debtors

Who We Are

Individuals

Auction Information

Check My Refund Status

File an Income Tax Return

Inheritance and Estate Tax

Make a Payment

Military Personnel

More Services

Payment Plan Information

Print Your 1099-G

Respond to a Notice

Property Tax Relief Programs

Business

All Business Services

Auction Information

Close a Business

File & Pay

Register a Business

Tax Professionals

All Tax Professional Services

Approved Software

e-File Mandate

NJ Manual of Audit Procedures (NJ MAP)

Request a Speaker

Statutes, Regulations and Laws

Find Forms/Returns

Corporation Business Tax

Employer Payroll Taxes

Other Taxes & Fees

Partnerships

Personal Income Tax

Property Tax Relief

Sales and Use Tax






Back
to top

Help & Resources

NJ Tax FAQs

NJ Tax Calendar

NJ Tax E-News

Publications

Tax Guides

Videos

Contact Taxation

By Phone

Email

In Person

In Writing

Rules & Authority

Proposed Rules

Reports

Rule Comments

Rule e-Notification

Statutes & Rules

## Treasury

Treasurer Elizabeth Maher Muoio

Treasury Home

Press Releases

Moderation Policy

Contact Treasury

## Statewide

Governor Phil Murphy

Lt. Governor Sheila Oliver

NJ Home

Services A to Z

Departments/Agencies

FAQs

Contact Us

Privacy Notice

Legal Statement & Disclaimers

Accessibility

»









Copyright © State of New Jersey, 1996- 2020 Department of the Treasury
Division of Taxation
PO Box 281
Trenton, NJ 08695-0281
Site Maintained by Division of Revenue and Enterprise Services

Back
to top

Exhibit D



Services / Programs    Resources /
Forms      FAQs      Contact Us

Select Language ▼  Disclaimer

**NEED HELP?**
Type a subject or Keyword      SEARCH

Case Info      **Custodial Parents**      Non-Custodial Parents      Locate Offices

County Offices      Docume      Employers      Payment Options

**NEW JERSEY DEPARTMENT OF HUMAN SERVICES**

## Receiving
# Child Support

| PAGES |
|---|
| Receiving |
| Child Support |

**Articles & Resources**

NJ Child Support Handbook and Brochure

**more articles >**

The New Jersey Child Support Program offers two options for receiving support payments – direct deposit or the New Jersey Debit MasterCard® (NJ Debit Card) – that make receiving support payments faster, easier and safer.

Direct deposit means that support payments are deposited directly into the custodial parent's bank account (either checking or savings). To be eligible for direct deposit, you must receive your payments directly from the New Jersey Child Support Program. To sign up, you must complete an authorization form, which is available at your local child support office or can be downloaded by clicking here.

Custodial parents who do not already use or apply to use direct deposit will receive a NJ Debit Card. Your support payments are posted to your NJ Debit Card account. You do not need to have a bank account. You can use the card to get cash at banks and ATMs, make purchases or get cash back, and to check your balance. Each month you will get one free cash withdrawal per deposit. The NJ Debit Card offers a 24-hour customer service line at 1-866-461-4094;

### View Your Case Info

**CLICK HERE**

Custodial Parents

Non-Custodial Parents

Fatherhood

Teens & Pre-teens

Outreach Programs

NJ Child Support Staff

Locate Local County Offices

Military

Other Social Services

**Apply For Child Support & Estimate Payments**
Any individual can apply for all of the available child support services.

**Child Support Guidelines**
NJ Child Support Guidelines for Attorneys and the Court Staff

**Child Support Payment Center**
Payment Options

Pay Online
Payment Coupons

or you can visit their website at
www.eppicard.com.

**Payment Coupon**
Print coupon, complete
required information, then
mail with your payment.

Custodial parents who are starting or
changing direct deposit or starting a New
Jersey Debit Card account should allow
approximately ten days for payments to
reach the account.

## Forms Download Center

Child Support Application

Direct Deposit Form

Non-dissolution FD case-How to file a
non-divorce application for custody,
child/spousal support or parenting time
(visitation)

FM Motion for Modification Kit

FD Application for Modification Kit



SITE MAP   SEARCH   PRIVACY NOTICE
LEGAL STATEMENT & DISCLAIMERS
ACCESSIBILITY STATEMENT
COPYRIGHT ©2020 NJ CHILD SUPPORT. ALL RIGHTS RESERVED.

## IMPORTANT INFORMATION REGARDING YOUR PAYMENTS



# The New Jersey Debit MasterCard® Card

**The New Jersey Debit Card** *is the new way* to receive your payments. This is a prepaid debit card designed specifically for New Jersey. You can get cash at banks and ATMs and make purchases at most stores in the USA and around the world. It is accepted everywhere MasterCard debit cards are accepted and is subject to all of the terms and conditions of use.

## Benefits of the New Jersey Debit Card include:
- No waiting for the check to be mailed
- No worries about getting your check cashed
- Spend your money by presenting your debit card
- Use your money throughout the month; safe, fast and convenient
- Customer Service 800 number to answer questions and obtain your balance

## To Make Purchases
- Simply present your card when paying.
- The money is automatically deducted from your account.
- You may also ask for "cash-back" with your purchase at many merchant locations.
- A $0.20 (20 cents) fee will be charged for those transactions only when you use your PIN.

## To Get Cash at an ATM or Bank
- You are allowed one (1) free cash withdrawal for each deposit to your account per calendar month.
- At any ATM press either the checking or savings button on the ATM.
- Select Cash Withdrawal
- Enter the amount of cash needed and press Enter.
- Don't forget your receipt.

## Other ATM Fees
- Each month, you are allowed two (2) balance inquiries at ATMs
- After that your account is charged $0.40 each time.

## Surcharge Fees
- Some ATMs will also apply an individual convenience fee called a surcharge to use their ATM.
- Avoid this fee by using any PNC Bank or Wachovia Bank ATMs.
- Always read the ATM messages carefully.
- You may cancel if you wish to avoid the fee, or press Enter and pay the fee.
- Look for these brand marks:

  

PNC Bank, Member FDIC, is a registered trademark of the PNC Financial Services Group, Inc.

Wachovia Bank, N.A., Member FDIC. Wachovia is a registered trademark of Wachovia Corporation.

## Customer Service Fees
- You are allowed four (4) free calls to the Customer Service automated voice response unit each month to check your balance or hear your transaction history.
- After four calls, your account is charged $0.25.
- To avoid these charges, sign-on to www.EPPICard.com to view your account.
- There is no charge for reporting a lost or stolen card or to question a transaction posted to your account.

## Are there fees for using the card?
- There are no monthly fees for managing your funds.
- **You can receive one (1) free cash withdrawal per deposit to your account per calendar month from any bank teller window in any bank displaying the MasterCard® brand mark OR at any Wachovia Bank ATM.** (Unused free withdrawals expire on the last day of the month following the deposit. For example: An unused free withdrawal for any deposit made in March will expire on April 30.) After that, the following fees will apply for other transactions exceeding the number of monthly deposits:

**Wachovia Banks:**
| | |
|---|---|
| ATM | $1.25 each time (no surcharge fee) |
| Bank Teller | $2.00 each time |

**PNC Banks:**
| | |
|---|---|
| ATM | $1.25 each time (no surcharge fee) |
| Bank Teller | $2.00 each time |

**Other Banks displaying the MasterCard® brand mark:**
| | |
|---|---|
| ATM | $1.25 each time (plus any surcharge fee) |
| Bank Teller | $2.00 each time |

**Other Fees:**
| | |
|---|---|
| ATM Balance Inquiry | $0.40 after second request |
| ATM Denial for Insufficient Funds | $0.40 each time |
| Monthly Account Access via IVR (balance inquiry) | $0.25 after 4th call |
| Card Replacement | $5.00 |
| Expedited Card Delivery | $12.00 |
| International Transactions | $3.00 |

## Do I have a choice on how I get my payments?
Yes, there are two options. You may use direct deposit, or you may select the New Jersey Debit Card If you already have a bank account, your payments can be deposited into your account using Direct Deposit. Just fill out the Direct Deposit form and return it to the FSPC. If you already use direct deposit, you will continue to receive your payments this way.

**If you do nothing, you will receive a New Jersey Debit Card and payments will be posted to this account.**

## How do I get a New Jersey Debit Card?
- Validate the address on your notification letter. If your address has changed or if this letter was forwarded by the post office you must contact your local probation office or complete the enclosed change of address form.
- Your card will be sent to you by mail. Activate your card immediately.
- You can use your card only after payments are made to your account.

## Spend your money at your convenience
You can use your New Jersey Debit Card at merchant locations worldwide; anywhere you see the MasterCard® brand mark. Your card is safer and more convenient than using cash or checks.

Use your card at:
- Banks and ATMs for cash
- Grocery stores
- Clothing, department, and discount stores
- Office and school supply stores
- Doctors' offices
- Restaurants
- Drug stores and pharmacies

### Your card can be used wherever you see these brand marks:

    

The New Jersey Debit Card is issued by Comerica Bank.
ACS is an authorized representative of Comerica Bank.

## Visit our Web site for balance information
# www.EPPICard.com

# Exhibit E

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

2004 WL 3316874
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey, Law Division.

FIRST TRENTON INDEMNITY COMPANY,
Red Oak Insurance Company and Travelers
Casualty and Surety Company, Plaintiffs,
v.
RIVER IMAGING, P.A., Edgewater Diagnostic
Imaging, P.A., Dr. Stephen A. Zinn, Healthcare
Integrated Services, Inc., Elliott Vernon, Mark
Vernon, Lynn A. Fox, George Braff, M.D.,
ABE Grossman, SJG Medical Management,
Edgewater Imaging Associates, L.P., Healthcare
Imaging Services of Edgewater, Inc., as General
Partner of Edgewater Imaging Associates, L.P.,
Healthcare Imaging Services of Edgewater,
Inc., a/k/a Healthcare Imaging Services,
Inc., of Edgewater, Healthcare Imaging
Services, Inc., and John Does 1-5, Defendants,
and
Dr. Stephen A. ZINN, Third Party Plaintiff,
v.
Elliott VERNON, Mark Vernon, Lynn A. Fox,
George Braff, M.D., ABE Grossman, SJG
Medical, Inc., a/k/a SJG Medical Management,
Edgewater Imaging Associates, L.P., Healthcare
Imaging Services of Edgewater, Inc., as General
Partner of Edgewater Imaging Associates, L.P.,
Healthcare Imaging Services of Edgewater,
Inc., a/k/a Healthcare Imaging Services, Inc.
of Edgewater, Individually, and, Healthcare
Imaging Services, Inc., Third Party Defendants.
LIBERTY MUTUAL INSURANCE
COMPANY, Plaintiff,
v.
HEALTH CARE INTEGRATED SERVICES, INC.,
Edgewater Diagnostic Imaging, P.A., Health Care
Imaging Services of Edgewater, Inc., Edgewater

Imaging Associates, L.P., Monmouth Diagnostic
Imaging, P.A ., Healthcare Imaging Services of
Monmouth, Inc., Monmouth Imaging Associates,
L.P., Wayne MRI, P.A., Healthcare Imaging
Servicies of Wayne, Inc., Wayne Imaging Associates,
L.P., Healthcare Imaging Services of Rittenhouse
Square, Inc., Rittenhouse Square Imaging, P.C.,
Rittenhouse Square Imaging Associates, L.P., Kings
Medical Diagnostic Imaging, P.C., M.R. Radiology
Imaging of Lower Manhattan, P.C., His Imaging,
LLC, Meadowlands Imaging, P.A., River Imaging,
P.A., Stephen Zinn, M.D., P.A., Omni Medical
Imaging, Inc., SJG Medical, Inc., Stephen A. Zinn,
M.D., Practice Management Corporation, Elliot
H. Vernon, Jerald L. Fisher, Shawn A. Friedkin,
Mitchell Hymonwitz, Munr Kazmir, M.D., Dominick
A. Polimenti, Joseph J. Raymond, Manmonhan A.
Patel, Michael Weiss, Michael Licamele, Lynn Fox,
Robert Baca, Scott McGrory, Mark Vernon, Denise
Kanze, Janet Romaniello, Christina Orban, Denise
Kallas, Denise Lotito, Kevin Anderson, Martha
Minehan, Chris Schemenski, Paulette D'Auria,
Robert Maskulyak, Collen Gavin, Don Demartino,
Michael Rutkin, William Crescenzi, Calvin Sprung,
A.M. Carrick, Melanie Buckholz, R. Tighe, Peter
Lieto, C. Stout, M. Sargent, ABE Grossman, Jatin
Gajarawala, M.D., Thuraiasah Vijayanathan, M.D.,
Jay Garsman, M.D., George Braff, M.D., Arthur
Greene, M.D., Dilip Kapadia, M.D., Robert Wallner,
M.D., Allen Cummings, M.D., Ulises C. Sabato,
M.D., Zelig Weinstein, M.D., Stanley Sprecher,
M.D., and John Does (1-50), John Roes (1-50),
ABC Company (1-20, XYZ, PC (1-20), Defendants,
and
Dr. Stephen A. ZINN, Third Party Plaintiff,
v.
Elliott VERNON, Mark Vernon, Lynn A. Fox,
George Braff, M.D., ABE Grossman, SJG
Medical, Inc., a/k/a SJG Medical Management,
Edgewater Imaging Associates, L.P., Healthcare
Imaging Services of Edgewater, Inc., as General
Partner of Edgewater Imaging Associates, L.P.,
Healthcare Imaging Services of Edgewater,

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

Inc., a/k/a Healthcare Imaging Services, Inc.
of Edgewater, Individually, and, Healthcare
Imaging Services, Inc., Third Party Defendants.
STATE of New Jersey, Intervenor,
v.
HEALTHCARE INTEGRATED SERVICES, INC.,
River Imaging, Edgewater Diagnostic Imaging, Mark
R. Vernon, Elliott H. Vernon, Steven A. Zinn, George
Braff, M.D., ABE Grossman, SJG Medical a/k/
a SJG Medical Management, Edgewater Imaging
Associates, L.P., Healthcare Imaging Services of
Edgewater, Inc. as General Partner of Edgewater
Imaging Associates, LP, Healthcare Imaging
Services of Edgewater, Inc. a/k/a Healthcare
Imaging Services, Inc., Lynn Fox, Monmouth
Diagnostic Imaging, PA, Healthcare Imaging
Services of Monmouth, Inc ., Monmouth Imaging
Associates, LP, Wayne MRI, PA, Healthcare
Imaging Services of Wayne, Inc., Wayne Imaging
Associates, LP, His Imaging, LLC, Edgewater
Diagnostic, Bloomfield Diagnostic, Echelon MRI,
Eschelon X-Ray, Mainland Diagnostic, Monrow
Diagnostic Practice Management Corp., Robert
Walner, DO, Meadowlands Imaging, PA., Omni
Medical Imaging, Inc., Jerald L. Fisher, Shawn
S. Friedkin, Mitchell Hymonwitz, Munk Kazmir,
MD, Dominick AL Plameni, Joseph Raymond,
Monmohan A. Patel, Michael Weiss, Michael
Licamele, Scott McCrory, Robert Maskulyak, Jatin
Gajarawala, MD, Thuraiasah Vijay Anathan, MD,
Jay Garsman, MD, Arthur Greene, MD, Dilip
Kapadia, MD, Allen Cummings, MD, Ulises C.
Sabato, MD, Zelig Weinstein, MD, Stanley Sprecher,
MD, Arnold Olafson, MD, John Does 1-50, Jane
Does 1-50, (said John Does and Jane Does being
fictitious names, true names being unknown),
and ABC Businesses and/or Corporations
1-75, (said ABC Business and/or Corporations
being incorporated or unincorporated business
entities, true names being unknown), Defendants.
PRUDENTIAL PROPERTY AND CASUALTY
INSURANCE COMPANY OF NEW JERSEY,
Prudential Commerical Insurance Company

of New Jersey, Prudential General Insurance
Company of New Jersey, Plaintiffs,
v.
BLOOMFIELD DIAGNOSTIC IMAGING,
Edgewater Diagnostic Imaging, PA, Echelon
Diagnostic Imaging, PC, Healthcare Integrated
Services, Inc., Mainland Diagnostic Imaging,
PLC, Monmouth Diagnostic Imaging, PA, SJG
Medical, Inc., Wayne MRI, P.A., John Does 1-50
and Jane Does 1-50 (fictitious names whose

Identities are presently unknown), Defendants. [1]

No. MRS-L-149-01, MRS-
L-2189-01, MRS-L-1702-02.
|
March 22, 2004.
|
Decided March 22, 2004.

**Attorneys and Law Firms**

Thomas M. Mulvihill for plaintiff Liberty Mutual Insurance
Company (Pringle Quinn Anzano, PC, attorneys; Mr.
Muvihill, on the brief).

Kathleen G. Waldron for intervenor State of New Jersey
(State of New Jersey, Office of the Attorney General; Mrs.
Waldron, on the brief).

Emilia M. De Meo for defendant Michael Licamele
(Robertson, Freilich, Bruno & Cohen, LLC, attorneys; Ms.
De Meo, Jeffery A. Cohen, Kevin J. O'Connor, Jennifer A.
Leighton, on the brief).

OPINION

VILLANUEVA, J.

**\*1**  This is a motion by a former director of HealthCare
Integrated Services, Inc. to dismiss the complaint against him
for lack of personal jurisdiction. The question presented is
whether a non-resident director of a Delaware corporation
with its principal place of business in New Jersey where it
allegedly operated illegal MRI facilities is subject to personal
jurisdiction here in a lawsuit for insurance fraud involving

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

the facilities. The court holds that he is subject to personal jurisdiction.

*Procedural History*

Michael Licamele is named as a defendant in two of the four complaints in the present consolidated actions. The first complaint in which he is a named defendant was filed by Liberty Mutual Insurance Company, Docket Number MRS-L-2189-01. Licamele was not named in the original complaint, but was named in the first amended complaint filed by Liberty Mutual on April 28, 2003. On July 17, 2003, Licamele filed an answer to the Liberty Mutual amended complaint where he raised the ninth affirmative defense of lack of personal jurisdiction.

The second complaint in which Licamele was mentioned was filed by the State of New Jersey ("State") as Intervenor, under the same docket number of the first case MRS-L-149-01 in the consolidated actions. Licamele was not named in the original intervenor complaint, but was later named in the first amended complaint filed by the State on July 16, 2003. Licamele filed an answer to the intervenor's amended complaint on August 21, 2003, but the affirmative defense of lack of personal jurisdiction was not asserted.

On October 15, 2003, counsel for defendant Licamele filed the present motion to dismiss the complaints for lack of personal jurisdiction in both the Liberty Mutual action and the State action, originally returnable November 7, 2003. A letter dated October 28, 2003, from Deputy Attorney General Kathleen Waldron to the court confirmed the court's adjournment of Licamele's motion to November 21, 2003, and that her opposition papers would be filed by November 11, 2003. Mrs. Waldron submitted opposition papers dated November 10, 2003, but were not filed with the court until November 12, 2003. Mrs. Waldron contended that Licamele had waived the defense of lack of personal jurisdiction by failing to plead it in his answer of August 21, 2003, and therefore could not raise it pursuant to *R.* 4:6-3. Counsel for Licamele, apparently realizing their error, promptly filed an amended answer pursuant to *R.* 4:9-1 to include the *R.* 4:6-2(b) affirmative defense of lack of personal jurisdiction.[2]

A letter dated November 14, 2003, from Licamele's counsel to the court, confirmed the court's adjournment of the motion to December 5, 2003, and stated that reply papers

would be submitted by November 24, 2004. With the permission and consent of the court and all counsel involved, on November 21, 2003, defense counsel was granted an additional adjournment of the motion to December 19, 2003, and their reply was due no later than December 10, 2003. On December 19, 2003, oral argument was heard on the motion. Based on the arguments presented, the court entered an order on December 22, 2003, ordering the deposition of Licamele to obtain additional facts relating to the limited issue of jurisdiction over Licamele.

**\*2** After Licamele's deposition on January 5, 2004, additional briefs were submitted to the court by all parties. A further hearing was held on January 29, 2004, at which time this court heard additional oral argument on the motion based on the new information obtained at Licamele's deposition. An order was entered by the court on January 29, 2004, "requesting" that Licamele provide for *incamera* review by the court, statistical patient information relating to his pharmaceutical corporations which conduct business in New Jersey. On February 11, 2004, this information was provided to the court for *incamera* review.

*Issue of Waiver of the R. 4:6-2(b) Defense*

To properly raise the *R.* 4:6-2(b) affirmative defense of lack of personal jurisdiction, the defense must be brought either as a motion before an answer is filed or raised in the answer to the complaint and brought by motion within 90 days after the filing of an answer. *See R.* 4:6-2, *R.* 4:6-3. In relevant part, *R*. 4:6-3 states, "Defenses (b)(c) and (d) in *R.* 4:6-2 shall be raised by motion within 90 days after service of the answer, provided that the defense has been asserted therein and provided, further, that no previous motion to which *R.* 4:6-6 is applicable has been made." No prior motions have been made which would implicate *R.* 4:6-6; therefore, it is not applicable herein.

In the Liberty Mutual action, the answer contained a properly-pled *R.* 4:6-2(b) affirmative defense of lack of personal jurisdiction. Licamele's subsequent motion to dismiss was brought within the 90-day period as prescribed by *R.* 4:6-3, and therefore Licamele has properly raised this affirmative defense in the Liberty Mutual action.

In the State action, the original answer failed to raise the affirmative defense of lack of personal jurisdiction.[3] The

2004 WL 3316874

State raised the argument in its reply brief that Licamele waived the defense by not pleading it in his answer. However, both the motion and the amended answer were filed within 90 days of the filing of the first answer to the intervenor's complaint. Despite the premature filing of the motion to dismiss based on *R.* 4:6-3 without having properly pled the defense in its pleading, the defendant corrected this defect in a timely fashion by amending his pleading to conform to his motion papers in an appropriate time frame as prescribed by *R.* 4:9-1. Therefore, the motion was properly made, and the *R.* 4:6-2(b) affirmative defense of lack of personal jurisdiction was properly raised.

*The HIS Corporation*

The subject of this litigation is primarily the legality of the business engaged in by HealthCare Integrated Services, Inc. ("HIS") (formerly known as HealthCare Imaging Services, Inc. before August 1, 1999) in operating MRI and medical diagnostic facilities in New Jersey. HIS was a publicly-traded company on the American Stock Exchange (symbol: HII); however, it is no longer actively traded and is in bankruptcy proceedings. In HIS's peak revenue year of 1999, it had revenue of almost of $22,000,000 and assets of $39,000,000. In 2000, it had revenue of $17,000,000 and assets of $19,000,000.

**\*3** The plaintiffs allege that HIS engaged in insurance fraud by submitting bills for PIP benefits for which they were not entitled to receive. Grounds cited which would deny eligibility for PIP benefits are: (1) services rendered by unlicensed MRI facilities; (2) services rendered by improperly licensed MRI facilities; (3) services not actually performed; (4) over billing for services; and (5) improper corporate ownership of medical facilities by lay persons in contravention of the corporate practice of medicine doctrine.

*Michael Licamele's Role as a Director*

According to Licamele, he joined the board of directors of HIS on December 29, 2000, at the behest of his friend [4] Elliott Vernon, Chairman and CEO of HIS. [5] Licamele testified at his deposition that he did little or no investigative work about HIS before he joined the board of directors. [6] Licamele received no salary for his work as director; however, he was compensated with stock options as part of HIS's "1996 Stock

Option Plan for Non-Employee Directors" also referred to in HIS documents as the "Director's Plan."

One of the first actions Licamele took as director was to sign off on HIS's fiscal year 2000 SEC Form 10-K report, submitted in April 2001. According to Licamele's testimony at his deposition, he did not review the Form 10-K report at the time he signed it. Rather, he received by FedEx a signatory sheet as director, signed it, and returned it via FedEx to Vernon. Licamele does not recall whether the whole report was sent to him with the signatory sheet, or it was sent under separate cover at another time. He also testified that he did not read the report he signed off on until he was named as a defendant in the present litigation. Aside from this shocking revelation, the sad truth is that if Licamele had actually read the Form 10-K report before he signed it, he would have learned of the tenuous legality of HIS's business and his potential liability exposure. In relevant part the report states:

GOVERNMENT REGULATION

LICENSING AND CERTIFICATION LAW

All states in which the Company currently operates have laws that may require licensing of healthcare facilities and personnel, compliance with standards of testing and obtainment of Certificates of Need ("CON") and other required certificates for certain types of healthcare facilities and major medical equipment, such as an outpatient diagnostic imaging center using MRI or other diagnostic imaging equipment. At the present time, the licensing and certification laws of New Jersey and New York pertain to the Company's operations.

Although the licensing and certification law programs vary from state to state, generally such programs require state approval before acquiring and operating major medical equipment or establishing new inpatient services, but various exceptions apply. In New York, for example, the acquisition of MRI equipment to be placed outside of a hospital or other licensed healthcare facility which is leased and operated by an independent physician or group of physicians (such as the New York City Facility) does not require a CON. Where a CON is required, approval of the acquisition of MRI equipment may be tied to the satisfaction of various criteria relative

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

to costs, need for the services and quality of construction and operation. In New Jersey, CON approval formerly required for MRI equipment has been eliminated; HOWEVER[,] instead New Jersey has implemented licensure requirements for most facilities offering MRI services. The licensure requirements include standards for building compliance, equipment compliance and certain operational standards. The Company believes it is in compliance with these standards at all sites which it operates in New Jersey. The certification and licensure requirements of these states can serve as a barrier to entry and can increase the costs and delays in certain expansions or renovations or the addition of healthcare services in the area covered by such requirements.

**\*4** *Although the Company believes that currently it has obtained all necessary licenses and certifications, the failure to obtain a required license or certification could have a material adverse effect on the Company's business. The Company believes that the provision of healthcare services will continue to be subject to intense regulation at the federal and state levels and cannot predict the scope and affect thereof nor the cost to the Company of compliance.*

CORPORATE PRACTICE OF
MEDICINE: FEE SPLITTING

The laws of many states, including all of the states in which the Company currently operates, prohibit unlicensed business corporations from exercising control over the medical judgements [sic] or decisions of physicians and from engaging in certain financial arrangements, such as fee-splitting with physicians. These laws and their interpretations vary from state to state. These laws are interpreted by both the courts and regulatory authorities. In the Company's physician management/consulting operations, the Company provides management, administrative, technical and other non-medical services to the practices in exchange for a fee. The Company intends to structure its relationships with practices to keep the Company from engaging in the unlicensed corporate practice of medicine or exercising control over the medical judgements [sic] or decisions of the practitioners. *There can be no assurance that regulatory authorities or other parties will not assert*

*that the Company is engaged in the unlicensed corporate practice of medicine in such states or that the payment of service fees to the Company by the practices under its management/consulting agreements constitutes fee-splitting or the unlicensed corporate practice of medicine. If such a claim were successfully asserted, the Company (and these practices) could be subject to civil and criminal penalties and could be required to restructure or terminate its contractual arrangements. Such results could have a material adverse effect on the Company's business, financial condition and results of operations.*

Several of the diagnostic imaging facilities in New Jersey owned by the Company have sought and been granted a license to operate MRI and other diagnostic imaging modalities by the State. At such facilities, for billing purposes the service provider is deemed to the facility owner and bills are issued in the name of such owner. Irrespective of these billing arrangements, the radiologists or other licensed physicians who furnish professional services at the facility exercise complete independence in medical decisions and medical oversight of the facility.

*HIS SEC Form 10-K for the fiscal year ending December 31, 2000,* at p. 16-17. [Emphasis added.] [7]

Thus, in the Form 10-K Licamele signed in April 2001, he acknowledged the company's exposure to potential civil and criminal litigation. As a director of HIS, Licamele should have realized that he too could be named in such an action against the company and be subject to liability as a director of the company, which is exactly what happened.

**\*5** According to the annual proxy statement of HIS dated December 6, 2001, Licamele is listed as holding unexercised options to buy 1,000 shares of HIS stock. The report also lists four standing committees of the corporation: the Audit Committee, the Stock Option Committee, the Compensation Committee, and the Executive Committee. Licamele is listed as being a member of three of the four standing committees, those being the Audit Committee, the Stock Option Committee, and the Compensation Committee. Licamele's role on the Audit Committee is of particular concern to the court.

The Audit Committee of HIS was composed of two members, Licamele and Michael Weiss. The report of the Audit

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

Committee for the fiscal year 2000, approved and endorsed by both Licamele and Weiss, was included in the 2001 proxy statement. Attached as Appendix A to the shareholder's report, is the charter of the Audit Committee. The charter contains the specifically enumerated duties of the directors of the Audit Committee. In relevant part:

Internal Audit Department and Legal Compliance

13. As the Audit Committee deems necessary or appropriate, review with the Company's counsel any legal matters that could have a significant impact on the organization's financial statements, *the Company's compliance with applicable laws and regulations, inquiries received from regulators or governmental agencies.*

Other Audit Committee Responsibilities

14. Annually prepare a report to shareholders as required by the Securities and Exchange Commission. The report should be included in the Company's annual proxy statement.

[Emphasis added.]

In the annual proxy statement for 2001, no mention was made regarding any investigation undertaken by the Audit Committee to inquire as to the legality or compliance with the law by HIS as enumerated by section 13 of the charter. When the SEC Form 10-K report is read along side the 2001 proxy statement, a worrisome picture is painted of the legality of HIS's operations. Licamele was on notice, based on the fact that he signed his name to both documents, to inquire as to the past and continuing legality or illegality of the HIS corporation's activities. However, Licamele did not make a thorough inquiry.

According to Licamele's certification and testimony at his deposition, he did in fact attend general board of director meetings and Audit Committee meetings of HIS. However, none of these meetings that Licamele attended were conducted in New Jersey; rather they were held in New York City. Still other meetings were held with Licamele telephonically, but it is unclear whether any of these telephonic conferences originated in New Jersey or were with people in New Jersey.

In Licamele's deposition, he states that he resigned from the board of directors by letter dated July 29, 2002. He gave three reasons for resigning as a director: (1) HIS's independent auditor Deloitte & Touche LLP had not been paid; (2) the Sarbanes-Oxley Act of 2002 [8] was going into effect the next day and therefore he didn't feel qualified to serve on the Audit Committee; and (3) the director's liability insurance was being reduced from five million to two million dollars. This admission by Licamele only confirmed the obvious, that he was never qualified to serve on the Audit Committee, let alone on the board of directors of a multi-million dollar public corporation.

**\*6** Licamele was a sham corporate director, merely a "rubber stamp" for his friend Elliott Vernon's actions. Licamele apparently used his credentials and good name to cover up an alleged massive insurance fraud conspiracy perpetrated by Elliott Vernon and other members of the board of directors. Because of Licamele's actions as director, such as signing off on the SEC Form 10-K report and annual proxy statement, *without actually reading the documents he was endorsing,* Licamele participated in the conspiracy to conceal the alleged ongoing insurance fraud.

Furthermore, no reasonable person would accept the responsibility of being on an Audit Committee of a multi-million dollar public corporation without receiving some compensation or benefit. [9] As outlined above, the duties of a director on the Audit Committee are very important, and Licamele performed none of them-yet by signing the various reports and statements he purportedly declared to the world that he did. That is fraud on the public and the shareholders of HIS. In Licamele's resignation letter, he states that he "did not feel he was qualified" to serve on an Audit Committee. That is an understatement. Licamele was never qualified to serve on an Audit Committee, and his sole purpose as a director apparently was to sign off on documents to give the appearance of propriety. His actions as a director are akin to willful blindness; he chose not to ask the questions a reasonable person would have in his situation. Therefore, there is no doubt in the court's opinion that Licamele was a sham corporate director who merely rubber stamped corporate actions.

*Personal Jurisdiction*

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

For a New Jersey court to exercise jurisdiction over a citizen of another state, it must first establish long-arm jurisdiction over that person pursuant to *R.* 4:4-4(b)(1). This rule has been interpreted by the Supreme Court of New Jersey to vest state courts with jurisdiction over non-residents to "the uttermost limits permitted by the United States Constitution."*AvdelCorporation v. Mecure,* 58 *N.J.* 264, 268, 277 A.2d 207 (1971). In the present case Licamele has not questioned the long-arm jurisdictional authority of the State of New Jersey, therefore the procedural due process requirements are deemed satisfied.

Once the elements of long-arm jurisdiction are satisfied, the court then must consider whether the contacts the defendant has with the forum state are sufficient to support specific or general jurisdiction. To establish specific jurisdiction over a non-resident defendant, the cause of action must arise out of the defendant's activities in the state, or the cause of action must relate to the defendant's activities in the state. To establish general jurisdiction, the defendant must have continuous and systematic contact with the state. If the contacts of a defendant have been deemed by the court to be sufficient to establish specific or general jurisdiction, the court must then balance the state's interests against the defendant's interest as not to offend the notions of fair play and substantial justice.

*Specific Jurisdiction*

**\*7** The standard to establish specific jurisdiction over a defendant has been well defined by both the United State Supreme Court and the Supreme Court of New Jersey. This court relies upon the standard set forth by the Supreme Court of New Jersey in *Waste Management, Inc. v. Admiral Ins. Co.,* 138 *N.J.* 106, 649 A.2d 379 (1994),

> If a cause of action arises directly out of a defendant's contacts with the forum state, the court's jurisdiction is "specific." *Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 322, 558 A.2d 1252 (1989). If, however, the suit is not related directly to the defendant's contacts with the forum state, but is based instead on the defendant's continuous and systematic activities in the forum, then the State's exercise of jurisdiction is "general." *Id.* at 323, 558 A.2d 1252;*seealsoHelicopteros Nacionales de Colum., S.A. v. Hall,* 466 *U.S.* 408, 414 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404, (1984) (discussing general jurisdiction).

In *Hanson v. Denckla,* 357 *U.S.* 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283, (1958), the Supreme Court, striking down an exercise of personal jurisdiction over out-of-state defendants, pointed to a shift from the rigid rule of *Pennoyer v. Neff,* 95 *U.S.* 714, 24 L.Ed. 565 (1878), which had required actual presence in a state, to a more flexible standard of "minimum contacts" under *International Shoe v. Washington,* 326 *U.S.* 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). "Minimum contacts" are the threshold requirements for specific personal jurisdiction. *Hanson,supra,* 357 *U.S.* at 253. "[I]t is essential that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." *Id.* at 253 (citing *International Shoe,supra,* 326 *U.S.* at 319).

In *World-Wide Volkswagen v. Woodson,* 444 *U.S.* 286 (1980), the Supreme Court clarified the purposes of the "minimum contacts" doctrine: to protect a defendant against litigating in an inconvenient forum and to ensure that States not exceed their jurisdictional limits under our federal system. *Id.* at 291-92. The first interest, that of ensuring against litigating in inconvenient forums, requires that "maintenance of the suit '... not offend 'traditional notions of fair play and substantial justice.' " ' *Id.* at 292 (quoting *International Shoe,supra,* 326 *U.S.* at 316 (quoting *Milliken v. Meyer,* 311 *U.S.* 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940))). That end is achieved through the requirement that "[t]he relationship between the defendant and the forum ... be such that it is 'reasonable ... to require the corporation to defend the particular suit which is brought there.' " *Ibid.* (quoting *International Shoe,supra,* 326 *U.S.* at 317 (omission in original)). The second interest, the jurisdictional limitations, "has been relaxed substantially over the years" because of the "fundamental transformation in the American economy." *Id.* at 292-93. Nonetheless, minimum contacts remain the threshold requirement of jurisdiction. *Id.* at 294.

**\*8** Critical to the due-process analysis is the question whether the defendant should reasonably anticipate being haled into court in the forum state. *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The record must demonstrate that the defendant has purposefully availed itself of the privilege

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

of engaging in activities within the forum state, thereby gaining the benefits and protections of its laws. *Id.* at 475. In that way defendants are protected against being haled into court in a foreign jurisdiction solely on the basis of random, fortuitous, or attenuated contacts or as a result of the unilateral activity of some other party. *Ibid.*

Once the court finds that a defendant has purposefully established minimum contacts within the forum state, other factors, such as the State's interests in adjudicating the suit and the plaintiff's interest in obtaining relief, may properly be weighed in determining whether those minimum contacts establish jurisdiction consistent with considerations of fair play and substantial justice. Those considerations may even "serve to establish the reasonableness of jurisdiction upon a lesser showing of jurisdiction than would otherwise be required." *Id.* at 477, 649 A.2d 379. However, a court may not weigh those other factors until it has found that the defendant has experienced sufficient minimum contacts to satisfy the threshold determination.

In *Burger King,* the Supreme Court considered whether a "contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's forum." 471 *U.S.* at 478. "[T]he answer," the Court declared, "clearly is that it cannot." *Ibid.* That answer is based on the fact that a contract is " 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." ' *Id.* at 479 (quoting *Hoopeston Canning Co. v. Cullen,* 318 *U .S.* 313, 317, 63 S.Ct. 602, 87 L.Ed. 777 (1943)). Thus, "in determining whether the defendant purposefully established minimum contacts with the forum," courts must consider such factors as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479.

In *Asahi Metal Industry Co. v. Superior Court of California,* 480 *U.S.* 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court affirmed the rule that the substantial connection between the defendant and the forum state necessary for a finding of minimum contacts "must come about by *an action of the defendant purposefully directed toward the forum State."Id.* at 112.

The Court also listed several factors for courts to evaluate when determining the reasonableness of an exercise of jurisdiction: the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of controversies, and the shared interest of the States in furthering fundamental substantive social policies. *Id.* at 113. Moreover, when the suit involves an alien defendant, a court must be "unwilling[ ] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.* at 115.

B

**\*9** Ensuring that an application of the minimum-contacts test satisfies the jurisdictional requirement of due process calls for a case-by-case analysis of a defendant's relationship with the forum state. *Charles Gendler & Co. v. Telecom Equip. Corp.,* 102 *N.J.* 460, 470, 508 A.2d 1127 (1986). That analysis has two parts. The first is to determine whether minimum contacts exist at all. That first step "ensures that a state's grasp does not exceed its jurisdictional reach," and, in doing so, protects the primary interest of the restriction: preserving "the defendant's liberty interest in not being subject to the entry of a judgment in a jurisdiction with which the defendant does not have sufficient minimum contacts." *Ibid.* The second part of the analysis is to weigh "the sufficiency of the contacts for jurisdictional purposes[, which] depends on 'the relationship among the defendant, the forum, and the litigation....' " *Id.* at 471, 508 A.2d 1127 (quoting *Shaffer v. Heitner,* 433 *U.S.* 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (omission in original)).

The sufficiency of those contacts depends on "the purposeful act of the defendant, not the unilateral activity of another who merely claims a relationship to the defendant." *Ibid.* In weighing the sufficiency of the contacts, this Court considers whether the cause of action arose out of the defendant's contacts within this State. If the two are related, the contacts support the exercise of jurisdiction. *Ibid.* If the cause of action is unrelated to the contacts, "the defendant's contacts must be so continuous and substantial as to justify subjecting the defendant to jurisdiction." *Id.* at 472, 649 A.2d 379. The more the defendant has purposefully directed its

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

activities to the forum state, and the greater the benefits it has received from its contacts with the forum state, the more reasonable the exercise of jurisdiction becomes. *Id.* at 473, 649 A.2d 379.

The Supreme Court has established a trend of " 'expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." ' *Ibid.* (quoting *McGee v. International Life Ins. Co.,* 355 *U.S.* 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). "Focusing on the foreseeability of being haled into court," *id.* at 475, the Court adopted the stream-of-commerce theory as an "independent basis to satisfy the minimum-contacts standard." *Id.* at 476. In *Gendler,* we adopted that theory, noting that it would not subject local retailers and distributors to foreign jurisdiction, because unlike the markets of major distributors, the local operators' foreseeable market is constrained. *Id.* at 477. Moreover, a defendant that "prohibits distribution of its products in a particular state would not reasonably expect its products to be sold in that state," *id.* at 481, and would therefore not be subject to the jurisdiction of that state on a stream-of-commerce theory.

If, however, the minimum-contacts threshold is met through the actions of the defendant without regard to the plaintiff's unilateral activities, a court, in considering the relationship between the defendant, the forum, and the litigation, may then consider the plaintiff's residence in the forum state to determine whether the defendant's contacts to that forum state justify an exercise of jurisdiction. In *Lebel,supra,* we found that a Florida seller of a luxury boat became subject to this State's jurisdiction when he telephoned his New Jersey buyer, mailed the contract of sale to New Jersey, and received payment from New Jersey. We concluded that those facts supported an exercise of specific jurisdiction over that sale, because "the defendant purposely directed his activities at the forum state." 115 *N.J.* at 327, 558 A.2d 1252. Thus, we held that a " 'plaintiff's residence in the forum may, *because of defendant's relationship with the plaintiff,* enhance the defendant's contacts with the forum." ' *Id.* at 327, 558 A.2d 1252 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 *U.S.* 770, 780, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

**\*10** Such a finding of enhancement of defendant's contacts must be based on the relationship of the plaintiff's residence in the forum state to the transaction with the defendant that gives rise to the suit-that is, the defendant must avail itself of the plaintiff's residence in the transaction. Put differently, the defendant must be aware that the transaction "will have direct consequences in [the forum state] such that it should [be] aware of the possibility of litigation arising in that forum." *Id.* at 328, 649 A.2d 379. In measuring the defendant's expectations concerning that possibility, we consider the facts of the case under the *World-Wide Volkswagen* standard of reasonable anticipation of being haled into court. *SeeLebel,supra,* 115 *N.J.* at 330.

Once the defendant is found to have minimum contacts to the forum, "the 'fair play and substantial justice' inquiry must still be made." *Id.* at 328, 649 A.2d 379. That inquiry places the burden on the defendant to make a " 'compelling case" ' that some consideration makes the exercise of jurisdiction unreasonable. *Ibid.* (quoting *Burger King,supra,* 471 *U.S.* at 477). In *Lebel,* we gave as examples of such considerations the factors listed in *Asahi,supra,* 480 *U.S.* at 113: the burden on defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of disputes, and the shared interest of the states in furthering fundamental substantive social policies. We further observed that the burden of a defendant coming to the plaintiff's state, as opposed to the plaintiff going to the defendant's home state, is too slight an imbalance to defeat jurisdiction. *Id.* 115 *N.J.* at 328-29, 558 A.2d 1252. As the Appellate Division has properly noted, "In actions based on contract, plaintiff's selection of forum will not be disturbed except in the most exceptional of circumstances, in recognition of the fact that such transactions have 'evidential roots in several jurisdictions." ' *Star Video Entertainment v. Video U.S.A. Assocs.,* 253 *N.J.Super.* 216, 226-27, 601 A.2d 724 (1992) (citation omitted) (quoting *Starr v. Berry,* 25 *N.J.* 573, 587, 138 A.2d 44 (1958)). In those suits based on contract in which the defendant has minimum contacts to the forum state, we look to whether the forum is manifestly inappropriate or chosen for purposes of vexation or harassment. *Id* . at 227,601 A.2d 724.

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

>*Id.* at 119-25, 649 A.2d 379.]

Applying this standard this court has identified the following contacts that Licamele directed at or performed within the State of New Jersey which support specific jurisdiction:

1. Served as a director of HIS from December 29, 2000 to July 29, 2002, a period of approximately one year and seven months.

2. Accepted two nominations and was elected twice to the board of directors of HIS by the shareholders.

3. Voluntarily accepted the position as a director of a multi-million dollar, publicly-traded corporation with its sole corporate office in New Jersey.

**\*11** 4. Voluntarily accepted the position as a director of a multi-million dollar, publicly-traded corporation with an overwhelming majority, if not all, of its business conducted in New Jersey.

5. Accepted coverage of a corporate director liability insurance policy in the amount of $5,000,000 paid for by HIS on Licamele's behalf.

6. Was compensated for work as director of HIS in the form of options to purchase 1,000 shares of HIS stock at the fair market value of the stock on the date of issuance of the option.

7. Attended and participated in general board of director meetings of the HIS corporation where decisions were made about the New Jersey operations of HIS.

8. Attended and participated in Audit Committee meetings of the HIS corporation where decisions were made about the New Jersey operations of HIS.

9. Signed the HIS Audit Committee report included in the HIS SEC Proxy Statement dated December 6, 2001.

10. Signed the HIS SEC Form 10-K Statement for the fiscal year ending December 31, 2000, on or about April 16, 2001.

This court concludes based upon the substantial nature and quantity of the specific contacts purposefully directed at New Jersey that Licamele has purposefully availed himself of the privilege of conducting activities within the forum state, and

thus has invoked the benefit and protection of its laws. *Waste Management Inc.,supra,* 138 *N.J.* at 120, 649 A.2d 379. There is no doubt that without the "rubber-stamp" actions of Licamele by signing off acknowledging the legitimacy of the corporate actions by HIS in New Jersey, the continuation of the alleged fraud by HIS could not have been accomplished.

Licamele knew that HIS and its directors would be sued in New Jersey if it failed to comply with the laws and regulations of New Jersey based upon the cautionary warnings contained in the HIS SEC Form 10-K as to the tenuous legality of the HIS operations because of the high degree of regulation of health care service providers in New Jersey, which Licamele signed off on as having read and approved. Moreover, Licamele served on the Audit Committee whose duties included verification that HIS was in compliance with the laws and regulations of the State of New Jersey. It should come as no surprise to Licamele that Liberty Mutual and the State of New Jersey are now suing him here for allegedly participating in the illegal activities which were the subject of the cautionary statement in the report that he signed in April 2001. Therefore, Licamele should have reasonably anticipated that he would be haled into court in New Jersey. *Id.* at 120-21, 649 A.2d 379.

The defendant having met both elements to satisfy specific jurisdiction, the court now must perform a balancing test so that the finding of jurisdiction does not offend the traditional notions of fair play and substantial justice. *Id.* at 121, 649 A.2d 379. The elements of the balancing test are: (1) the burden on defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in efficient resolution of disputes; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Id.* at 125, 649 A.2d 379.

**\*12** There is little or no burden on the defendant in defending the present action in New Jersey. The defendant is using New Jersey counsel, who also represents HIS and other directors, to defend him in this action. The mere fact that the defendant resides in another state is not sufficient to defeat jurisdiction, "the burden of a defendant coming to the plaintiff's state, as opposed to the plaintiff going to the defendant's home state, is too slight an imbalance to defeat jurisdiction." *Id.* at 125, 649 A.2d 379. No arguments have been raised by defendant Licamele which address this issue.

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

The State of New Jersey has very strong public policy interests in litigating this action in its courts. The primary interest is the aggressive prosecution and prevention of insurance fraud within the State. This is evidenced by the enactment of new statutes, organization and funding of the Office of Insurance Fraud Prosecutor, and the affirmation of this policy by the courts. *See* Automobile Insurance Cost Reduction Act, *N.J.S.A.* 39:6A-1.1 to -35; New Jersey Insurance Fraud Prevention Act, *N.J.S .A.* 17:33A-1 to -30; *Merin v. Maglaki* 126 *N.J.* 430, 599 A.2d 1256 (1992); *Longobardi v. Chubb* 121 *N.J.* 530, 582 A.2d 1257 (1990).

Both plaintiffs' interests in obtaining relief overlap and are almost identical. The State of New Jersey as intervenor seeks to aggressively prevent insurance fraud under the Insurance Fraud Prevention Act, seeking penalties and fines to punish those who commit insurance fraud, deter others from committing insurance fraud, protect insurance companies within the state, and reduce the burden passed onto the policy premium paying citizens of the state. Liberty Mutual has similar interests to that of the State to aggressively pursue those who commit insurance fraud, to deter future fraud and minimize the cost of fraudulent claims which reduces profits of the company and increases its policy premiums.

There is a general social policy of all states to eliminate insurance fraud; however, the most efficient resolution in combating insurance fraud is in the state in which the fraud occurs. No other state forum is more attuned to preventing insurance fraud in New Jersey than the New Jersey Superior Court. Moreover, it is the shared interest of several states along with the burden on the interstate judicial system that the present insurance fraud actions be conducted in the Superior Court of New Jersey, and not in all the states where the directors reside.

This court finds that the interests of the forum state, plaintiff's interests in obtaining relief, the intorstate judicial system's interest in efficient resolution of disputes, and the shared interest of the states in furthering fundamental substantive social policies outweigh the slight burden on Licemele. Therefore, maintaining this litigation against Licamele in New Jersey does not offend the traditional notions of fair play and substantial justice.

This court having found sufficient minimum contacts, reasonable anticipation by Licamele that he would be the subject of litigation in New Jersey, and applied the fair play and substantial justice balancing test, finds that specific personal jurisdiction exists over Licamele by the Superior Court of New Jersey.

*General Jurisdiction*

 **\*13** The standard to establish general jurisdiction over a defendant has been well defined by both the United State Supreme Court and the Supreme Court of New Jersey. This court relies upon the standard set forth by the Supreme Court of New Jersey in *Waste Management, Inc.,supra,* 138 *N.J.* at 119-25, 649 A.2d 379 and *Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 558 A.2d 1252 (1989), [10]

At this point, we must digress slightly to note that the Supreme Court varies the measure of minimum contacts depending on the nature of the case. If the cause of action relates directly to the contacts, as here, it is one of "specific jurisdiction." "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 *U.S.* 408, 414 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404. Commentators have questioned the application of these distinctions between "dispute-blind and dispute-specific" jurisdiction concepts. Twitchell, *"The Myth of General Jurisdiction,"* 101 *Harvard L .Rev.* 610, 614 (1988) ("encourag[ing] courts to think seriously about the meaning of the general/specific jurisdiction typology that they have so eagerly embraced before they commit themselves to an unnecessarily constrained view of the scope of their adjudicatory power."). Nevertheless, our Court in *Gendler* implicitly endorsed the Supreme Court's "specific"/"general" jurisdiction dichotomy. *SeeGendlor,supra,* 102 *N.J.* at 471-72, 508 A.2d 1127.

General jurisdiction subjects the defendant to suit on virtually any claim, even if unrelated to the defendant's contacts with the forum, but is unavailable unless the defendant's activities in the forum state can be characterized as "continuous and systematic" contacts.

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

*Helicopteros Nacionales,supra,* 466 *U.S.* at 416. The greater measure of the contacts for general jurisdiction is deemed relevant because of the limited interest of the forum state in entertaining the coincidental litigation. *Bearry v. Bcech Aircraft Corp.,* 818 *F.2d* 370, 374 (5th Cir.1987).

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Keeton,supra,* 465 *U.S.* at 774;*World-Wide Volkswagen,supra,* 444 *U.S.* at 299). The question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen,supra,* 444 *U.S.* at 297. Of course, the mere foreseeability of an event in another state is "not a 'sufficient benchmark' for exercising personal jurisdiction." *Burger King,supra,* 471 *U.S.* at 474 (quoting *World-Wide Volkswagen,supra,* 444 *U.S.* at 295). Thus, we must determine whether defendant purposely created contacts with New Jersey.

**\*14** Of course, the mere transmittal of messages by mail or telephone within the state is not the critical factor, it is the nature of the contact. *Baron & Co. v. Bank of N.J.,* 497 *F.Supp.* 534 (E.D.Pa.1980) (fact that defendant had made phone calls, mailed checks, and sent correspondence to plaintiff in Pennsylvania is not sufficient to draw defendant into Pennsylvania for purposes of personal jurisdiction); *Pennsylvania Mfrs. Ass'n Ins. Co. v. Township of Gloucester,* 493 *F.Supp.* 1047 (E.D.Pa.1980) (Pennsylvania insurer could not sue foreign municipality in forum state despite two complaint letters sent to insurer in forum state). But when a merchant uses the instrumentalities of commerce to tap an interstate market for its product, such wire and mail communications are relevant contacts to be considered. *United Coal Co. v. Land Use Corp.,* 575 *F.Supp.* 1148, 1157 (W.D.Va.1983) (fact that "[t]elephone conversations, telexes and letters traveled to and from the state, establishing an agreement" considered as part of the contacts sustaining jurisdiction of the forum); *Hoster v. Monongahela Steel Corp.,* 492 *F.Supp.* 1249 (W.D.Okla.1980) (defendants who made several telephone calls to plaintiff, corresponded twice

with plaintiff, and sent agent to negotiate with plaintiff held to have sufficient contacts to establish jurisdiction in plaintiff's state). Remember that in this case it is alleged that the defendant's representations via mail and telephone to New Jersey were fraudulent.

> We would be closing our eyes to the realities of modern business practices were we to hold that a corporation subjects itself to the jurisdiction of another state by sending a personal messenger into that state bearing a fraudulent misrepresentation but not when it follows the more ordinary course of employing the United States Postal Service as its messenger.... Where a defendant knowingly sends into a state a false statement, intending that it should then be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state.

> >*Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 *F.*2d 1062, 1066 (4th Cir.1982) (quoting *Murphy v. Erwin-Wasey, Inc.,* 460 *F.*2d 661, 664 (1st Cir.1972) (citations omitted)).]

Some confusion on the relevance of the use of mails, telephone, or other communication may arise from the qualitative nature of contacts required to establish the "systematic and continuous course of business" that sustains general jurisdiction. *SeeThos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 *F.*2d 1247, 1254 (9th Cir.1980) (holding isolated acts by the defendant in the forum state unrelated to the cause of action insufficient to establish personal jurisdiction). "When, however, a non-resident defendant purposely directs its activities to the forum, and the litigation results from alleged injuries that arise out of or relate to those activities, the forum may assert personal jurisdiction over the defendant." *Hughes v. Balemaster, Inc.,* 652 *F.Supp.* 1350, 1351-52 (E.D.Mo.1987); *seealsoMaglio & Kendro, Inc. v. Superior Enerquip Corp.,* 233 *N.J.Super.* 388, 558 A.2d 1371 (App.Div.1989) (finding personal jurisdiction over nonresident defendant who telephoned plaintiff located in forum state to solicit performance of services). Contrary New Jersey cases dealing with the significance of telephone contacts are distinguishable. *SeeDeLear v. Rozel Packing Corp.,* 95 *N.J.Super.* 344, 231 A.2d 232 (App.Div.1967) (incidental telephone contacts from New York lender to New Jersey borrower not

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)
2004 WL 3316874

sufficient to establish personal jurisdiction in trustee's suit to set aside preference); *William Sternberg & Assoc. v. Litho Supply, Inc.,* 219 *N.J.Super.* 201, 205, 530 A.2d 53 (Law Div.1987) ("mere broker" in sale of goods neither manufactured in nor destined for New Jersey cannot establish jurisdiction based on telephone negotiations and choice of law clause).

**\*15** >Id. at 322-28, 558 A.2d 1252.]

Thus, the framework for the general jurisdiction analysis is similar to that of specific jurisdiction; however, the sufficiency of the contacts need to be such that they are continuous and systematic as to conclude that the defendant has purposefully availed himself or herself of the forum as to be generally answerable for any action arising therein.

Applying this standard this court has identified the following continuous and systematic contacts which evidence that Licamele purposefully availed himself of the State of New Jersey which support general jurisdiction:

1. Filed non-resident New Jersey tax returns for the years 2000-2002, reporting taxable income generated in New Jersey in the amounts of $1,270 (2000), $115,452 (2001), and $11,501 (2002), totaling $128,223.

2. CEO and shareholder of a privately-held internet pharmacy called ComputeRx Pharmacy, Inc., which regularly conducts business with New Jersey residents.[11] Specifically, the pharmacy conducted the following transactions with New Jersey residents for the time period of 2000-2002:(1) in the year 2000, 51 patients, 400 prescriptions filled, totaling $58,800.20; (2) in the year 2001, 49 patients, 395 prescriptions filled, totaling $64,262.64; (3) in the year 2002, 61 patients, 413 prescriptions filled, totaling $69,169.60. The total value of the 1,208 transactions with New Jersey residents for this time period was $192,232.44.

3. In his capacity as a pharmacist with ComputeRx, Licamele personally filled five prescriptions for New Jersey residents in 2000.

4. CEO and shareholder of a privately-held internet pharmacy called Broncho Dose Ltd., which regularly conducts business with New Jersey residents. Specifically, the pharmacy conducted the following transactions with New Jersey residents for the time period of 2000-2002:(1) in the year 2000, no transactions; (2) in the year 2001, 3 patients, 7 prescriptions filled, totaling $1,306.89; (3) in the year 2002, 10 patients, 31 prescriptions filled, totaling $6,490 .91. The total value of the 17 transactions with New Jersey residents for this time period was $7,790.80.

5. Both internet drug companies regularly use the mail to send shipments to its customers in New Jersey.

6. Engaged in negotiations with Elliott Vernon regarding the sale of ComputeRx Pharmacy, Inc. to HIS, however no sale was consummated.

7. Attended a political fundraiser hosted by Elliott Vernon at his home in New Jersey where Licamele made a contribution by check of approximately $5,000.

8. Additional contributions solicited by Elliott Vernon to political campaigns of approximately $15,000 were made by Licamele.

This court concludes based upon the continuous and systematic contacts in which Licamele has purposefully availed himself of the privilege of conducting activities within New Jersey as to be generally answerable for any action arising therein. The substantial quantity of personal income and business revenue derived solely from New Jersey during the time period in question warrants a finding of general jurisdiction alone.

**\*16** However, the nature of the intermingled personal/ business relationship with Elliott Vernon makes it very difficult to separate for purposes of general jurisdiction analysis: (1) general business contacts with New Jersey through Elliott Vernon; (2) personal contacts with New Jersey through Elliott Vernon; and (3) HIS business contacts with New Jersey through Elliott Vernon. It is important to highlight that regardless of how the contact is classified, the overall conclusion can only be that Licamele has substantial continuous and systematic contacts with New Jersey. The nature of Licamele's contacts with New Jersey are not tangential or insignificant. Licamele derives a significant beneficial economic interest from his various activities in New Jersey.

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

The defendant having the continuous and systematic contacts to satisfy general jurisdiction, the court now must perform a balancing test so that the finding of personal jurisdiction does not offend the traditional notions of fair play and substantial justice. The court reiterates and incorporates the balancing test in its specific personal jurisdiction analysis, *supra,* as applicable to general personal jurisdiction analysis, and adds the conclusion that the finding of general jurisdiction does not offend the traditional notions of fair play and substantial justice with one caveat.

Unlike most cases where personal jurisdiction is based on either specific or general grounds, the present case contains support for personal jurisdiction on both specific and general grounds. Therefore, the mitigating general jurisdiction balancing factors which typically favor the defendant are not present. These are: (1) limited interest of the forum in litigating the case; (2) attenuated or random contacts; and (3) mere foreseeablity of action in another state. *Lebel,supra,* 115 *N.J.* at p. 322-25, 558 *A.*2d 1252. New Jersey is the correct forum to litigate this action because it has the greatest interest in the litigation. Licamele's contacts are continuous and systematic-not attenuated or random, and the ongoing personal and business activities conducted by Licamele warrant a finding of general jurisdiction.

*Non-Resident Director Status*

This court would be remiss if it did not address the issue raised by Licamele and briefed by both parties of New Jersey law regarding personal jurisdiction over tortious activities committed by a non-resident corporate director.

The question arises from the fact that the director in this case is a non-resident director rather then a resident director. New Jersey courts have already concluded that conduct of a corporate director in his or her corporate capacity can be imputed to the individual. *SeeTrustees of Structural Steel v. Huber,* 136 *N.J.Super.* 501, 505, 347 *A.*2d 10 (App.Div.1975) (citing *McGlynn v. Schultz,* 95 *N.J.Super.* 412, 416, 231 *A.*2d 386 (App.Div.1967), *certif.den.*50 *N.J.* 409, 235 *A.*2d 901 (1967); *Sensale v. Applikon Dyeing & Printing Corp.,* 12 *N.J.Super.* 171, 175, 79 *A.*2d 316 (App.Div.1951)). The defendant has highlighted the lack of opinions applying this principle to non-resident corporate directors by New Jersey courts which forced both parties to look to other state court opinions and federal court opinions for guidance. Additionally, this court has conducted additional research on this very topic and has concluded the same-the New Jersey courts have not addressed this issue with clarity as other courts in other jurisdictions have. [12] However, this does not mean the answer cannot be reasoned from existing New Jersey case law.

**\*17** There exist opinions in which other states have split on the issue of whether the tortious activities of non-resident corporate directors extends personal liability to them, and thus personal jurisdiction to the respective state court. [13] Authority for such decisions by other courts does not come from one source, rather a plethora of sources depending on the state. Delaware, for example, has a specific statute on point which states that Delaware courts have personal jurisdiction over nonresident directors of Delaware corporations. *See*10 *Del.C.* § 3114(a).

The absence of a definitive New Jersey case on this non-resident director issue was highlighted by the New Jersey federal district court, when it attempted to reason what New Jersey law might be in *Educational Testing Service v. Katzman,* ("ETS") 631 *F.Supp.* 550, 556 (D.N.J.1986). In *ETS,* the court was forced to rely upon Pennsylvania federal court decisions, the only other federal courts in the third circuit; however, the New Jersey district court was quick to point out that those cases cited applied Pennsylvania law not New Jersey law. *Id.* at 558. The *ETS* decision is flawed because it attempted to infer what the direction of New Jersey law might be based on recent United States Supreme Court decisions. *Id.* at 559. This court finds that inference was not correct. The only case which the district court in *ETS* identified as being on point was, *Trustees of Structural Steel v. Huber,supra.* In that case, the appellate division clearly articulated the following standard of New Jersey law,

> It is well established that while a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, if he directs the tortious act to be done, or participates or cooperates therein, he is personally liable to third persons injured or damaged thereby, even though liability may also attach to the corporation. *McGlynn v. Schultz,* 95 *N.J.Super.* 412, 416, 231 *A.*2d 386 (App.Div.1967), *certif.den.*50 *N.J.* 409, 235 *A.*2d 901 (1967); *Sensale v. Applikon Dyeing*

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

& *Printing Corp.,* 12 *N.J.Super.* 171, 175, 79 A.2d 316 (App.Div.1951).

>136 *N.J.Super.* at 505, 347 A.2d 10.]

The *Huber* opinion goes on to conclude that New Jersey court's jurisdiction extends, " 'to the uttermost limits permitted by the United States Constitution,' *Avdel Corporation v. Mecure,* 58 *N .J.* 264, 268, 277 A.2d 207 (1971)." *Huber* at 505-6, 347 A.2d 10. Thus, based on the above authority, this court has reasoned: (1) New Jersey courts have consistently exercised jurisdiction to the maximum limits of the federal constitution; (2) corporate directors can be personally liable for their actions taken in their corporate capacity; (3) other states have asserted jurisdiction over non-resident corporate directors who commit tortious acts directed at or within said state; (4) therefore, there is no reason why New Jersey would not aggressively pursue its exercise of jurisdiction within the "uttermost limits" of the federal constitution to include tortious actions committed by non-resident corporate directors directed at New Jersey. Any assertion or argument made by the defendant's counsel otherwise would be inconsistent with existing New Jersey case law and public policy.

**\*18** Licamele's motion to dismiss is denied.

**All Citations**

Not Reported in A.2d, 2004 WL 3316874

# Footnotes

1    It should be noted that the caption of the complaints contain different spellings of the same person's name, amongst other typographical and spelling errors. (ex. Elliot Vernon and Elliott Vernon; the latter being correct.) The court is aware of these inaccuracies; however, the caption cannot be modified unless amended by the parties.

2    *R.* 4:9-1 states, "A party may amend any pleading as a matter of course at any time before a responsive pleading is served *or,if the pleading is one to which no responsive pleading is to be served, and the action has not been placed upon the trial calendar, at any time within 90 days after it is served."* [Emphasis added.] Therefore, the answer of Licamele was properly amended pursuant to *R.* 4:9-1 to include the *R.* 4:6-2(b) affirmative defense of lack of personal jurisdiction.

3    This court believes that failure to raise the defense of lack of personal jurisdiction was an accidental omission by Licamele's counsel because it was properly raised in the answer to the Liberty Mutual complaint filed over one month earlier.

4    On his many trips to New Jersey, Licamele attended at least one political function at Elliott Vernon's home and later contributed substantial money to various national political candidates solicited by Vernon.

5    Elliott Vernon is also a defendant in the present consolidated actions.

6    Based upon oral argument heard on December 19, 2003, this court determined that the limited deposition of Licamele on jurisdictional issues might help to resolve whether personal jurisdiction over the defendant was appropriate. Pursuant to a court order dated December 22, 2003, the deposition of Licamele was taken on January 5, 2004, as to jurisdictional issues only.

7    It is undisputed that Licamele signed his name to this document on or about April 16, 2001, as reported in the HIS SEC Form 10-K for the fiscal year ending December 31, 2000, at p. 65, 347 A.2d 10.

8    *The Sarbanes-Oxley Act of 2002,Pub.L.* 107-204, July 30, 2002, 116 *Stat.* 745, which enacted 15 *U.S.C.A.* 7201 to 7266, 15 *U.S.C.A.* 78d-3, 78**o**-6, and 78kk, and 18 *U.S.C.A.* 1348 to 1350, 1514A, 1519, and 1520, amended 11 *U.S.C.A.* 523, 15 *U.S.C.A.* 77h-1, 77s, 77t, 78c, 78j-1, 78*I*, 78m, 78**o**, 78**o**-4, 78**o**-5, 78p, 78q, 78q-1, 78u, 78u-1, 78u-2, 78u-3, 78ff, 80a-41, 80b-3, and 80b-9, 18 *U.S.C.A.* 1341, 1343, 1512, and 1513,

Balcazar, Xena 10/14/2020
For Educational Use Only

First Trenton Indem. Co. v. River Imaging, P.A., Not Reported in A.2d (2004)

2004 WL 3316874

28 *U .S.C.A.* 1658, and 29 *U.S.C.A.* 1021, 1131, and 1132, enacted provisions set out as notes under 15 *U.S.C.A.* 78a, 78***o***-6, 78p, and 7201, 18 *U.S.C.A.* 1341 and 1501, and 28 *U.S.C.A.* 1658, and amended provisions set out as notes under 28 *U.S.C.A.* 994.

9    While Licamele did receive options to buy 1,000 shares of stock in HIS sometime in 2001 and received director liability insurance coverage of $5,000,000, he vehemently denied that he has ever been compensated for his work as director. Licamele stated that he has never exercised the stock options, received any form of salary from HIS, nor been compensated for expenses incurred by him as director. Despite Licamele's denial of receiving any benefits for his work as a director, one benefit was to have the directors' liability insurance carrier, not only pay any judgment up to $5,000,000 that might be rendered against him, but to provide him with a lawyer to defend any case against him for his activities as a director. That is exactly what has happened here because he is represented by the same law firm that represents HIS and the other directors.

10   In *Lebel,* the Court ultimately concluded that specific jurisdiction existed against the defendant. However, it is generally cited as authority on general jurisdiction because the Court clearly articulates and defines the legal analysis to be applied to the dichotomy between general and specific personal jurisdiction analysis. This court relies upon *Lebel* for the legal standard to determine if general jurisdiction exists, and the import and significance of how courts should interpret telephonic and mail contacts with a forum in reference to the personal jurisdiction analysis.

11   While the actions of the ComputeRx Pharmacy, Inc. (a Connecticut corporation) are technically those of a private corporation, the significance of the corporate activities in New Jersey should not be overlooked. Licamele operates this corporation for his personal gain and is not only the owner and founder, but has total control over where his corporation conducts its business as its CEO. Licamele, through his corporation, made the voluntary decision to advertise, sell, and deliver products directed at the New Jersey marketplace via the Internet. For the court to ignore the fact that Licamele purposely avails himself of the New Jersey marketplace through his private corporation, rather than himself individually, is not equitable. Moreover, the significant revenues generated solely by the New Jersey market indicates that Licamele, through his corporation, derives significant income and profits from New Jersey.

12   *See In Personam Jurisdiction Over Nonresident Director of Forum Corporation Under Long-Arm Statutes,* 100 *A.L.R.*3d 1109 (1980) for a discussion on the wide variation of results on this topic.

13   *See e.g. Witt v. Scully,* 539 *F.*2d 950 (3rd. Cir.1976) (applying Pennsylvania law to determine that the contacts defendant had with Pennsylvania were not sufficient to trigger personal jurisdiction over a non-resident corporate director under Pennsylvania's long-arm statute.) *But See e.g. International Business Machines v. Martin Propert & Cas. Ins. Agency, Inc.,* 261 *Ill.App.*3d 851 (1st Dist.1996) (applying Illinois long-arm statute to confer personal jurisdiction over a non-resident corporate director.)

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit F

McCourt v. A.O. Smith Water Products Co., Not Reported in F.Supp.3d (2015)

---

2015 WL 4997403
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

James McCOURT and Mabel McCourt, Plaintiffs,
v.
A.O. SMITH WATER PRODUCTS
CO., et al., Defendants.

Civil Action No. 14–221.
|
Signed Aug. 20, 2015.

**Attorneys and Law Firms**

F. Alexander Eiden, Robert Michael Silverman, Weitz & Lumenberg PC, Cherry Hill, NJ, for Plaintiffs.

George R. Talarico, Aileen E. McTiernan, Locke Lord LLP, Brian Jonathan Sorensen, Joseph P. Lasala, Donna Dubeth Gardiner, Joseph D. Rasnek, McElroy Deutsch Mulvaney & Carpenter LLP, Morristown, NJ, Linton W. Turner, Jr., Mayfield, Turner, O'Mara & Donnelly, Cherry Hill, NJ, Eric John Kadish, Lina Maria Carreras, Maron Marvel Bradley & Anderson LLC, Jason T. Scheets, Kelley Jasons, Mark J. Skinner, Swartz Campbell LLC, Mark F. MacDonald, Baginski Mezzanotte Hasson & Rubinate, Philadelphia, PA, Marc J. Wisel, McGivney & Kluger, P.C., Florham Park, NJ, Michael A. Tanenbaum, Sedgwick LLP, Ethan D. Stein, Gibbons, PC, George W. Keefer, William E. Frese, Esq., John C. Garde, McCarter & English, LLP, Christopher J. Keale, Sedgwick LLP, Newark, NJ, Angela A. Iuso, Connell Foley, LLP, Roseland, NJ, Richard Dominick Picini, Caruso Smith Edell Picini, PC, Fairfield, NJ, Lisa Pascarella, Pascarella Divita, PLLC, Holmdel, NJ, John S. McGowan, Chatham, NJ, Michael Joseph Block, Wilbraham, Lawler & Buba, Haddonfield, NJ, Tara Lynne Pehush, K&L Gates LLP, New York, NY, Marc Scott Gaffrey, Hoagland, Longo, Moran, Dunst & Doukas, Esqs., New Brunswick, NJ, for Defendants.

**OPINION**

ARLEO, District Judge.

**\*1** Before this Court is the motion of Defendant Raytheon Company ("Defendant") to dismiss Plaintiffs James McCourt and Mabel McCourt's ("Plaintiffs") complaint for lack of personal jurisdiction and failure to state a claim [Dkt. No. 116]. For the reasons set forth herein, the Court grants Defendant's motion to dismiss for lack of personal jurisdiction.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

This case arises out of Mr. McCourt's alleged exposure to asbestos. Sec. Am. Compl., Dkt. No. 113. Mr. Court, who was a Florida resident, does not allege he was exposed to any of Defendant's asbestos-containing products in New Jersey. *See id.* Rather, the Second Amended Complaint asserts the Court may exercise jurisdiction over Defendant because it is "doing business in New Jersey." *Id.* ¶ 3.

Defendant is a Delaware Corporation with its principal place of business in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 60. Defendant has registered with the State to transact business in New Jersey and has designated the Corporation Trust Company of West Trenton, NJ as its registered agent. Pl. Opp'n Br., Ex. I. The Complaint in this case was not served on this agent, but instead on Defendant by way of certified mail in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 134–1.

Defendant does not maintain any bank accounts in the State and does not own any real property in the State, but leases two office spaces in New Jersey. [1] Abbott Aff. ¶ 3, Dkt. No. 60. A total of thirty employees, out of the company's approximately 63,000 employees, work in these locations. [2] *Id.* Defendant's employees neither enter into contracts nor make any sales at either facility. *Id.* Instead, at one facility that employs 28 individuals, Defendant performs software development and testing for a limited number of customers. *Id.* Two persons are employed at the other facility, which performs limited support functions for certain customers. *Id.* In the past five years, Defendant has not initiated any legal proceedings in New Jersey. *Id.*

According to a 2006 news article, in or around 2006, Defendant entered into a two-year, $100,000,000 contract with PATH to provide airport security systems at airports in both New York and New Jersey. *See* Pl. Opp'n Br., Ex. M.

McCourt v. A.O. Smith Water Products Co., Not Reported in F.Supp.3d (2015)

It is unclear what the contract involved in New Jersey and what percentage of the contract's revenues were attributable to the New Jersey locations Defendant was to service. In any event, Plaintiff has offered no evidence suggested the contract was extended past 2008. This contract represented a small percentage of Defendant's income during that time. *See* Pl. Opp'n Br., Ex. L (stating Defendant's 2005 sales totaled $21,900,000,000); *see also* Def. Reply Br. at 3, n. 3 (listing Defendant's 2013 total sales at $23,700,000,000).

**II. DISCUSSION**

**A. Applicable Law**

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.2004). Although the plaintiff must ultimately prove personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the early stages of litigation. *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). Rather, the plaintiff must "present[ ] a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Id.* at 1223 (internal quotations and citations omitted). Once the plaintiff meets this burden, the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable. *Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 150 (3d Cir.1992) (citation omitted).

 **\*2**  In general, a federal court sitting in diversity must engage in a two-step inquiry to determine whether it may properly exercise personal jurisdiction: (1) the court must determine whether the relevant state long-arm statute permits the exercise of jurisdiction; and (2) if it does, the court must satisfy itself that the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 258–59 (3d Cir.1998). Because New Jersey's long-arm statute extends the state's jurisdictional reach as far as the Constitution permits, this Court need only consider the propriety of exercising personal jurisdiction under the federal constitutional standard. *Id.* at 259; *see also Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 698 n. 5 (3d Cir.1990) (stating that "New Jersey courts look to

federal law for interpretation of the limits on in personam jurisdiction").

Here, Plaintiff asserts only general jurisdiction over Defendant. General jurisdiction may be invoked even when the Plaintiff's claim does not "arise out of or is unrelated to the defendant's contacts with the forum." *Carteret Sav. Bank, FA,* 954 F.2d at 149 (quoting *Dollar Sav. Bank v. First Sec. Bank of Utah,* 746 F.2d 208, 211 (3d Cir.1984)). General jurisdiction is satisfied when the defendant's affiliations with the forum state are so "continuous and systematic" as to render them "at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* —— U.S. ——, ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011).

In *Daimler AG v. Bauman,* the Supreme Court emphasized that the general jurisdiction inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' [but] whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.' " —— U.S. ——, ——, 134 S.Ct. 746, 761, 187 L.Ed.2d 624 (2014) (quoting *Goodyear,* 131 S.Ct. at 2851). The Supreme Court explained that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id.* at 760. For a corporate defendant, "the place of incorporation and principal place of business are paradig[m] ... bases for general jurisdiction." *Id.* (internal citation and quotation omitted).

The *Daimler* Court did recognize the possibility that, in an "exceptional" case, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n. 19. However, an approach that "approve[s] the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business ... is unacceptably grasping." *Id.* at 761 (internal citation and quotation omitted).

**III. ANALYSIS**

 **\*3**  In this case, Plaintiffs fail to demonstrate that Defendant's activities in New Jersey are so continuous and systematic as to render it "at home" in this forum. [3] Defendant is a Delaware Corporation with its principal place of business

Balcazar, Xena 10/14/2020
For Educational Use Only

McCourt v. A.O. Smith Water Products Co., Not Reported in F.Supp.3d (2015)

in Massachusetts. Abbott Aff. ¶ 4, Dkt. No. 60. Therefore, neither of the two typical scenarios in which a corporation is "at home" are present here, and the Court must consider whether this is an "exceptional" case in which Defendant's operations are so substantial that they render it "at home" in New Jersey.

As set forth above, Defendant does not maintain any bank accounts in the State and does own any real property in the State, but leases two small office spaces in New Jersey with minimal employees. *Id.* ¶ 3. Out of 63,000 total employees, only 30 or 31 work in these two New Jersey locations. *Id.* Furthermore, in the past five years, Defendant has not initiated any legal proceedings in New Jersey. *Id.*

In support of their argument that the Court may exercise general personal jurisdiction over Defendant, Plaintiffs rely upon: (1) the fact that Defendant has defended itself in another litigation in this forum; (2) Defendant leasing two office locations and employing 30/31 workers in the State; (3) a 1998 news article in which it was reported that Defendant was transferring 1,000 workers from Philadelphia to Princeton; (4) a 2006 news article reporting a two-year $100,000,000 contract between Defendant and PATH for services to be provided in New York and New Jersey; (5) the fact that one of Defendant's subsidiary's website lists an employee as its "East Coast USA Regional Sales Manager" and his territory includes New Jersey; (6) that two of Defendant's New Jersey employees are listed as "Rapid Response Contacts;" and (7) a current job posting for a position in New Jersey. *See* Pl. Opp'n Br. at 6–8.

The foregoing contacts do not come close to evidencing that Defendant is "at home" in New Jersey. Even if the Court were to assume that the "current" job posting was filed and Defendant thus has 31 employees in this State, these employees would constitute only .0492% of Defendant's workforce. Furthermore, while Plaintiffs put much weight on the fact that Defendant entered into a $100,000,000 contract with PATH, this two-year contract was entered into eight years before the Complaint was filed, there is no evidence its term was extended. Plaintiff has also failed to demonstrate the nature of the contacts with the State that arose from the contract. Furthermore, Defendant's 2005 sales totaled $21,900,000,000, *see* Pl. Opp'n Br., Ex. L, and its 2013 sales totaled $23,700,000,000. Def. Reply Br. at 3, n. 3. Thus, this contract does not even evidence a significant portion of

Defendant's revenue was generated in New Jersey during this period.

Alternatively, Plaintiffs argue that the Court may exercise general jurisdiction over Defendant because Defendant consented to jurisdiction when it registered to transact business in New Jersey and designated the Corporation Trust Company, located in West Trenton, NJ, as its authorized agent for service of process. *See* Pl. Opp'n Br., Ex. I. This Court disagrees.

**\*4** In *Bane v. Netlink, Inc.,* the Third Circuit held that a foreign corporation that registered to do business in Pennsylvania had consented to Pennsylvania's exercise of general personal jurisdiction over it. 925 F.2d 637, 641 (3d Cir.1991). Central to the court's analysis was its finding that a Pennsylvania statue explicitly empowered courts to exercise general jurisdiction over corporations that registered to do business in Pennsylvania. *Id.* (citing 42 Pa. Cons.Stat. Ann. § 5301(a)(2)(i)).

Following *Bane,* courts within this District analyzed whether business registration alone is sufficient to confer general jurisdiction under New Jersey law. First, in *Sadler v. Hallsmith Sysco Food Servs.,* the court concluded that notwithstanding New Jersey's lack of an express provision authorizing general jurisdiction over foreign companies that register to do business in the State, business registration in New Jersey nonetheless constituted consent to general jurisdiction. No. 08–4423, 2009 WL 1096309, at \*1 (D.N.J. Apr.21, 2009). The *Sadler* Court based this conclusion on New Jersey's statutory requirement that foreign corporations designate an in-state agent to accept service of process. *Id.* at \*2.

In *Kubin v. Orange Lake Country Club, Inc.,* however, the court concluded that business registration alone did not constitute consent to general jurisdiction. The *Kubin* Court distinguished *Bane* based upon New Jersey's lack of an explicit statutory authorization for courts to exercise general jurisdiction over foreign corporations registering to do business in the State. *See* No. 101643, 2010 WL 3981908, at \*3 (D.N.J. Oct.8, 2010). Instead, jurisdiction could only be exercised over a corporation that registered to do business in New Jersey if it "was actually doing business in New Jersey.' " *Kubin,* 2010 WL 3981908, at \*3 (quoting *Smith v. S & S Dundalk Eng'g Works, Ltd.,* 139 F.Supp.2d 610,

McCourt v. A.O. Smith Water Products Co., Not Reported in F.Supp.3d (2015)

620 (D.N.J.2001)); *see also Otsuka,* 2015 WL 1305764, at *12 ("Here, the Court finds that [defendants] consented to the Court's jurisdiction by registering to do business in New Jersey, by appointing an in-state agent for service of process in New Jersey, and by actually engaging in a substantial amount of business in this State.").

The Court finds the reasoning of *Kubin* persuasive. [4] The single fact that Defendant registered to do business in New Jersey is insufficient to conclude that it "consented" to jurisdiction here. Defendant has not engaged in a substantial amount of business in the State. Nor was Defendant served with process in this State. Thus, the Court concludes it lacks general personal jurisdiction over Defendant.

**IV. CONCLUSION**

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED.** An appropriate order will follow.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4997403

**Footnotes**

1    Defendant had, until 2011, also leased a third office space in the State.

2    Plaintiff asserts that Defendant had recently posted a job advertisement for a position in New Jersey. Assuming the position was filled, Defendant's total employees in the State would increase to 31 out of 63,000. Additionally, Plaintiff has provided the Court with a news article from 1998, which represents that Defendant had stated, in 1996, it would relocate 1,000 workers from Pennsylvania to New Jersey. This article's subject, however, was Defendant's need to reduce its workforce and Plaintiff has presented no evidence that any of these 1,000 employees worked for Defendant in New Jersey during the relevant period.

3    Plaintiffs object to Defendant's decision to limit its interrogatory responses to the five-year period prior to this litigation. The Court, in analyzing general jurisdiction, must examine a defendant's contacts over a "reasonable period" of time. *Leja v. Schmidt Mfg., Inc.,* No. 01–5042, 2005 WL 1366533, at *4 (D.N.J. June 7, 2005). Here, the Court concludes five years is a reasonable period of inquiry, *id.; see also Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 569 (2d Cir.1996), and has even considered contacts pre-dating this period for purposes of this motion.

4    In the briefs, the parties discuss two recent cases addressing jurisdiction by consent: *Otsuka Pharmaceutical Co., Ltd. v. Mylan Inc.,* No. 14–4508, 2015 WL 1305764, at *12 (D.N.J. Mar.23, 2015) and *Senju Pharmaceutical Co., Ltd. v. Metrics, Inc.,* No. 14–3961, 2015 WL 1472123 (D.N.J. Mar.31, 2015). These cases, however, applied Federal Circuit precedent, not Third Circuit law. Additionally, these cases are factually distinguishable. *See Otsuka,* 2015 WL 1305764, at *12 ("Here, the Court finds that [defendants] consented to the Court's jurisdiction by registering to do business in New Jersey, by appointing an in-state agent for service of process in New Jersey, and by actually engaging in a substantial amount of business in this State."); *Senju,* 2015 WL 1472123, at *7 ("... the decision to exercise jurisdiction over [defendant] is based upon the fact that [defendant] not only registered to do business in New Jersey but, under New Jersey Court Rule 4:4–4(a)(6), accepted service of process through its registered agent in the state.").

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit G

Trevejo v. Legal Cost Control, Inc., Not Reported in Atl. Rptr. (2018)
2018 WL 1569640, 2018 Fair Empl.Prac.Cas. (BNA) 114,333

2018 WL 1569640

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of New Jersey, Appellate Division.

Susan TREVEJO, Plaintiff–Appellant,

v.

LEGAL COST CONTROL, INC. and John
Marquess, Defendants–Respondents.

DOCKET NO. A–1377–16T4
|
Argued February 27, 2018
|
Decided April 2, 2018

On appeal from Superior Court of New Jersey, Law Division,
Camden County, Docket No. L–0703–16.

**Attorneys and Law Firms**

Deborah L. Mains argued the cause for appellant (Costello &
Mains, LLC, attorneys; Deborah L. Mains, on the brief).

Walter F. Kawalec, III, argued the cause for respondents
(Marshall Dennehey Warner Coleman & Goggin, attorneys;
Walter F. Kawalec, III, on the brief).

Before Judges Gilson and Mayer.

**Opinion**

PER CURIAM

 **\*1**  Plaintiff Susan Trevejo appeals from a December 2, 2016
order granting summary judgment in favor of defendants
Legal Cost Control (LCC) and John Marquess, as well as
discovery orders dated June 10, 2016 and August 5, 2016.
Plaintiff contends the motion judge prematurely granted
summary judgment to defendants absent full and complete
discovery. We agree and reverse.

Plaintiff filed an age discrimination complaint against
defendants alleging violation of the New Jersey Law
Against Discrimination (NJLAD), N.J.S.A. 10:5–1 to –42.
Defendants moved for summary judgment, arguing plaintiff
was not an "inhabitant" of New Jersey and, therefore, could

not pursue a NJLAD claim. By order dated June 10, 2016, the
motion judge denied defendants' motion without prejudice,
and ordered limited discovery "on the issue of plaintiff's status
to make a claim under the NJLAD."

Plaintiff served supplemental interrogatories in accordance
with the June 10, 2016 order. Defendants objected to the
interrogatories as beyond the scope of the court's order,
causing plaintiff to file a motion to compel discovery
responses. By order dated August 5, 2016, the motion judge
granted plaintiff's motion, in part, compelling defendants
to respond to the interrogatory seeking information on the
individual or individuals who supervised plaintiff in 2015,
and extending the time for discovery limited to "[p]laintiff's
status to make a claim under the NJLAD."

The motion judge also permitted the parties to conduct
depositions on the limited issue framed in the discovery
orders. The depositions of plaintiff, Marquess, and Marquess'
wife were conducted in or around September 2016. During
the depositions of Marquess and his wife, defense counsel
instructed them not to answer questions that counsel believed
were "beyond the scope" of the discovery orders. When
it became apparent that defense counsel objected to any
questions perceived to be "beyond the scope" of the
judge's discovery orders, plaintiff's counsel terminated the
depositions of defendants' witnesses. [1]

Two weeks later, defendants renewed their motion for
summary judgment, arguing plaintiff was not an "inhabitant"
entitled to pursue a NJLAD claim. Plaintiff opposed the
motion, arguing defendants' failure to allow complete and
full discovery foreclosed plaintiff's ability to demonstrate her
right to pursue a NJLAD claim. Plaintiff argued the meaning
of the term "inhabitant" in the NJLAD was a novel issue that
required sufficient discovery prior to any determination by the
court as a matter of law.

When defendants refiled their summary judgment motion, the
following facts were undisputed.

 **\*2**  LCC is a New Jersey corporation located in Haddonfield.
Marquess is president and part owner of LCC. Plaintiff was
employed by LCC from May 2003 until she was terminated
in February 2015. Plaintiff is not a resident of New Jersey.
Plaintiff never lived in New Jersey. Plaintiff never sought, or

Trevejo v. Legal Cost Control, Inc., Not Reported in Atl. Rptr. (2018)
2018 WL 1569640, 2018 Fair Empl.Prac.Cas. (BNA) 114,333

received, benefits from the State of New Jersey. Plaintiff lives in Massachusetts, pays property taxes in Massachusetts, and has a Massachusetts driver's license.

During her employment with LCC, plaintiff worked from her home. LCC provided a company computer to plaintiff, which she used to connect remotely from her home to LCC's computer server. Plaintiff used a company-paid telephone for daily conference calls with other LCC employees, some of whom were located in New Jersey.

Plaintiff never worked in LCC's Haddonfield office, although she did visit New Jersey on company business a few times between 2003 and 2008. Plaintiff did not travel to New Jersey from 2009 through her termination in 2015.

Plaintiff received health insurance through LCC's insurance provider, Amerihealth New Jersey. LCC employees were not required to be New Jersey residents to qualify for the company health plan.

Based on these facts, the motion judge found plaintiff failed to show sufficient contacts with New Jersey to be an "inhabitant" to pursue a NJLAD claim. The judge concluded:

> [S]he's not an inhabitant .... Not even close .... The point is, New Jersey doesn't even have an interest. In this case, from the plaintiff's perspective, she did not perform her work her[e]. She did not do anything of any consequence that was job related here and that's the [c]ourt's determination.
>
>     ....
>
> There is not sufficient contact to—even under the most liberal of constructions that are permitted, [to] have her avail herself of the LAD statute.

Plaintiff appealed. On appeal, plaintiff argues that the motion judge (1) misapplied his discretion in limiting the scope of discovery; and (2) granted summary judgment prematurely absent a full factual record.

We apply "an abuse of discretion standard to decisions made by our trial courts relating to matters of discovery." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). "That is, [w]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or

its determination is based on a mistaken understanding of the applicable law.' " Ibid. (alteration in original) (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005) ).

A party claiming summary judgment is premature must "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action." Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (citation omitted); see also Trinity Church v. Lawson–Bell, 394 N.J. Super. 159, 166 (App. Div. 2007) ("A party opposing summary judgment on the ground that more discovery is needed must specify what further discovery is required, rather than simply asserting a generic contention that discovery is incomplete.").

We find the motion judge misapplied his discretion by overly restricting the scope of discovery. Plaintiff required broader discovery to prove she was entitled to pursue her NJLAD claims and articulated the specific discovery necessary to maintain her discrimination claim in New Jersey. Plaintiff alleged she was "telecommuting" from Massachusetts to New Jersey through the use of the software connecting her, via a company supplied computer, to LCC's network and her use of a company supplied telephone to conduct telephone conferences with other LCC employees. Plaintiff asserts she requires discovery regarding "the nature and substance of [p]laintiff's electronic and other 'virtual' contact and connection to [d]efendants' New Jersey office as part of her day to day work." These inquiries, as well as other inquiries, must be permitted to allow plaintiff to develop a full and complete record prior to any judicial determination that plaintiff is, or is not, entitled to protection under the NJLAD.

**\*3** The predominant goal of the NJLAD "is nothing less than the eradication of the cancer of discrimination in the workplace." Garnes v. Passaic County, 437 N.J. Super. 520, 532 (App. Div. 2014) (quoting Bergen Commercial Bank v. Sisler, 157 N.J. 188, 199 (1999) ). The NJLAD is a remedial statute that has been broadly construed to protect not only "aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace." Hoag v. Brown, 397 N.J. Super. 34, 47 (App. Div. 2007).

Defendants focus on the term "inhabitant" set forth in the legislative findings and declarations section of the NJLAD. See N.J.S.A. 10:5–3. Nowhere in the NJLAD statute is the term "inhabitant" defined or otherwise expressed. Nor

Trevejo v. Legal Cost Control, Inc., Not Reported in Atl. Rptr. (2018)
2018 WL 1569640, 2018 Fair Empl.Prac.Cas. (BNA) 114,333

is there any published case issued by a New Jersey court defining the term "inhabitant" under the NJLAD. Contrary to defendants' argument, the NJLAD prohibits unlawful employment practices and unlawful discrimination against "any individual." See N.J.S.A. 10:5–12(a). While a statute's preamble may aid in determining legislative intent, "[t]he preamble, however, should be read in harmony with the statute that it introduces, whenever possible." DiProspero v. Penn, 183 N.J. 477, 496 (2005).

The NJLAD explicitly uses the term "person[ ]" to identify who is protected from discriminatory and unlawful employment practices and conduct. As defined in the statute, the term "person" is not restricted to "inhabitants" of this State. See N.J.S.A. 10:5–5(a). Instead, the NJLAD affords

all persons ... the opportunity to obtain employment, and to obtain all accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression ..., subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

[N.J.S.A. 10:5–4.]

A plain reading of the NJLAD reveals the term "person" is used throughout the statute, while the term "inhabitant" is only mentioned in the legislation's preamble. For example, N.J.S.A. 10:5–12(d) protects "any person because that person has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD] ... ;" N.J.S.A. 10:5–12(f) protects "any person" in a place of public accommodation; N.J.S.A. 10:5–12(g) and (h) protect "any person" in the transacting of real property; N.J.S.A. 10:5–12(i) protects "any person" in the transacting of any loan, extension of credit or financial assistance; N.J.S.A. 10:5–12(l) protects "any person" in the transacting of goods and services; and N.J.S.A. 10:5–12(q) protects "a person" based on their religious observances and beliefs.

Given the consistent use of the term "person[ ]" in the substantive provisions of the NJLAD, limiting protection of the statute to "inhabitants" of this State would be an overly restrictive reading of a statute with an expressly broad purpose—the elimination of discriminatory conduct. We conclude that discovery is required to determine where the discriminatory conduct took place—in New Jersey or Massachusetts—and to explore whether plaintiff was employed in New Jersey or Massachusetts. To limit discovery on whether plaintiff is an "inhabitant" of New Jersey cannot be harmonized with the overarching goal of the NJLAD, affording protection to "persons" who experience discrimination in this State.

**\*4** On this limited record we are unable to determine whether plaintiff is protected under the NJLAD. We agree that plaintiff requires additional discovery, including the following: where plaintiff's co-employees worked; whether those co-employees worked from home; the nature of the software used by plaintiff and other LCC employees to conduct business on behalf of LCC; the location of the server used to connect plaintiff and other employees to LCC's office in New Jersey; the location of the internet service provider allowing plaintiff and other employees to connect to LCC's office in New Jersey; the individual or individuals who made the decision to terminate plaintiff and the basis for the decision; and any other issues relevant to plaintiff's contacts with New Jersey and her work for LLC that may demonstrate her entitlement to protection under the NJLAD.

Based upon current computer technology and the forward thinking concept of "telecommuting," we are satisfied that determining who may be entitled to protection under the NJLAD is a novel question of law that involves highly significant policy considerations. Discovery yet to be completed may shed light on the matter. See Jackson v. Muhlenberg Hosp., 53 N.J. 138, 142 (1969); see also Edwards v. McBreen, 369 N.J. Super. 415, 423 (App. Div. 2004) (declining to reach a novel issue of law on an incomplete record).

For these reasons, we reverse the order granting summary judgment in favor of defendants and remand for further proceedings to permit development of a fact-specific record to determine whether plaintiff is entitled to protection under the NJLAD.

**Balcazar, Xena 10/14/2020**
**For Educational Use Only**

2018 WL 1569640, 2018 Fair Empl.Prac.Cas. (BNA) 114,333

Reversed and remanded. We do not retain jurisdiction.

**All Citations**

Not Reported in Atl. Rptr., 2018 WL 1569640, 2018 Fair Empl.Prac.Cas. (BNA) 114,333

## Footnotes

1    <u>Rule</u> 4:14–3(c) specifies that the only objections permissible during a deposition are as to "the form of a question or to assert a privilege, a right to confidentiality," or protective orders previously entered. <u>See also</u> Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3 on <u>R.</u> 4:14–3 (2018) (noting "[a] witness may not be instructed not to answer unless the objection is one permitted by the rule").

End of Document                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.