**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAMBIT PATTANAYAK,<br><br>　　　　　　Plaintiff,<br>vs.<br><br>MASTERCARD　　　INTERNATIONAL<br>INCORPORATED,<br><br>　　　　　　Defendant. | **Case No. 21-cv-02657-GBD**<br><br><br>**CERTIFICATION OF COUNSEL** |

I, ALAN GENITEMPO, ESQ., hereby certify as follows:

　　1.　I am a Partner with the Law Firm of Piro, Zinna, Cifelli, Paris & Genitempo, L.L.C. and I represent the Plaintiff in this matter.  I submit this certification in opposition to Defendant's motion to dismiss.

　　2.　Attached as **"<u>Exhibit A</u>"** is a true and accurate copy of Plaintiff's Amended Complaint.

　　I certify that the foregoing statements made by me are true; I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

　　　　　　　　　　　　　　　<u>**/s/ALAN GENITEMPO, ESQ.**</u>
　　　　　　　　　　　　　　　ALAN GENITEMPO, ESQ.

　　Dated: May 4, 2021

Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SAMBIT PATTANAYAK,

                  Plaintiff,

vs.

MASTERCARD INC.,

                  Defendant.

**Civil No. 21-cv-02657-GBD**

**FIRST AMENDED COMPLAINT FOR**
**EMPLOYMENT DISCRIMINATION**

**INTRODUCTION**

1.   Plaintiff, Sambit Pattanayak ("Plaintiff"), proceeding by and through his attorneys, Piro Zinna Cifelli Paris & Genitempo, LLC, brings this First Amended Complaint pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12101 *et seq.*, and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "Human Rights Law").

2.   Plaintiff's First Amended Complaint comes as the result of the transfer of this matter to the United States District Court, Southern District of New York on March 29, 2021. Plaintiff filed his initial Complaint on August 13, 2020 in the Superior Court of New Jersey, County of Hudson, setting forth causes of action in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq.

1

## JURISDICTION

3.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332.

4.    The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

## VENUE

5.    A corporation shall be deemed to be a citizen of the State where it has its principal place of business. 28 U.S.C. §1332(c)(1).

6.    The United States District Court for the Southern District of New York encompasses the counties of New York, Bronx, Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan and draws jurors from those counties.

7.    Defendant, MasterCard International Incorporated ("Defendant") is headquartered at 2000 Purchase Street, Purchase, New York 10577, a "hamlet" within Westchester County.

8.    Thus, the Southern District of New York is the proper venue.

## PARTIES

9.    Plaintiff resides at 101 Park Avenue, Apartment 2D, in the city of Hoboken, County of Hudson and State of New Jersey.

10.   Plaintiff is of Indian national origin and is a United States citizen.

2

11.  Defendant is headquartered at 2000 Purchase Street, a hamlet of the Town of Harrison, County of Westchester and State of New York.

<u>**FACTS RELEVANT TO ALL COUNTS**</u>

12.  Plaintiff was hired in 2012 as Vice President ("VP") of Product Management in Defendant's New York offices, and reported to Mr. Richard Crum ("Mr. Crum"), who was also based in New York.

13.  In October 2015, Plaintiff was transferred from the New York office to Defendant's Singapore Branch to perform his existing responsibilities.

14.  Plaintiff's wife, who was a Vice President at Defendant MasterCard working in the same division as Plaintiff, was also transferred to Singapore.

15.  From October 2015 to March 2017, while based in Singapore, Plaintiff continued reporting to Mr. Crum, who maintained his employment in Defendant's New York offices.

16.  In April 2017, Plaintiff started a new job as Vice President ("VP") of Client Services within Defendant MasterCard Singapore to establish and lead the new Applied Predictive Technologies ("APT") Division in Southeast and South Asia, which encompassed approximately seven countries.

17.  Plaintiff was hired by APT Division Head, Mr. Anthony Bruce ("Mr. Bruce"), after first interviewing with him in Singapore. Mr. Bruce was based in the United States. As VP,

3

Plaintiff reported to Mr. Scott Setrakian ("Mr. Setrakian") as Mr. Setrakian had oversight over the Asia Pacific region (but was also based in the United States).

18.  At Mr. Bruce's request, Plaintiff continued to meet with Mr. Bruce one-on-one to update him on progress in the Southeast and South Asia region.

19.  From 2017 to 2018, Plaintiff, executed his job duties and responsibilities with strong performance reviews and key revenue achievements.

20.  During this time, between 2017 and 2018, Plaintiff annual compensation was USD $378,160.

21.  However, for nearly two and a half years (from March 2016 through August 2018), Plaintiff suffered continuous discrimination, harassment, and retaliation by Defendant.

22.  Although Plaintiff was based in Singapore, each of Plaintiff's managers were located in the United States. Plaintiff frequently traveled to the United States to meet with his managers, superiors, colleagues, clients and partners.

23.  Plaintiff's wife was then terminated in 2016 after having raised concerns of discrimination and retaliation against her which began in New York, prior to the Singapore transfer, in mid-2015.

24.  At the time of her termination, Plaintiff and his wife worked for the same division with the same senior leadership and Human Resources managers, Ms. Mary Sexton and Ms. Meena Wadhera.

25.  In March of 2016, at a group meeting in Defendant's New York office, Mr. David Peraino ("Mr. Peraino"), who was Plaintiff's superior, singled out Plaintiff, cursed at him using extremely abusive, foul language, humiliated him, and threatened him.

26.  Said group meeting included Plaintiff's manager, Mr. Crum, and the head of the department, Mr. Sachin Mehra ("Mr. Mehra"), who was Mr. Peraino's and Mr. Crum's manager. Also present in the meeting were Mr. Jud Staniar (Plaintiff's peer) and Mr. Ilya Shell (one level junior to Plaintiff).

27.  Mr. Crum and Mr. Mehra failed to stop or prevent the behavior and stayed silent as Mr. Peraino carried on. This behavior was a gross violation of the company's own documented Employee Handbook.

28.  Plaintiff was the only employee junior to Mr. Peraino that was of Indian origin.

29.  Mr. Peraino only singled out Plaintiff despite the fact that he was working collaboratively on the project at issue in the meeting with Mr. Crum, Mr. Peraino, Mr. Shell, and Mr. Stanier. Executive Vice President, Mr. Mehra, was also regularly updated on all key aspects of the project by Plaintiff and this team.

5

30.   Shortly after the aforementioned March meeting, Mr. Peraino, in his private office, cursed at Plaintiff and explicitly threatened Plaintiff in a one-on-one session, stating, "I am going to come after you". Defendant has strong written policies against such behavior.

31.   The same day, Plaintiff complained to his manager Mr. Crum, in-person, about Mr. Peraino's behavior and threats after both the New York meeting in March 2016 and the more recent incident.

32.   Plaintiff expected Mr. Crum and Defendant would look into his complaints, as the company's Employee Handbook states that such harassment incidents should be reported to the Manager or HR, and Plaintiff followed company policy.

33.   Thereafter, in May of 2016, Plaintiff was informed that his job responsibilities and performance objectives were being changed, mid-year, from "creating" and constructing new payment products to "selling" new products around the world to banks.

34.   Plaintiff submitted a written complaint to his manager, Mr. Crum, explaining his role and expertise was in developing and creating new products for the group, and not sales. Plaintiff further explained that changing his role and objectives in the middle of the year was not reasonable and would not help him succeed. Plaintiff, in the middle of the year, was now being asked to create, build, and sell new products and he was told that his

6

success for the year will be measured primarily by the number of "sales" of these new products. Plaintiff was not provided with any sales training as he requested.

35.  This role of selling new products was the responsibility of Mr. Peraino and his team, as well as over a dozen sales and business development personnel at the division run by Mr. Mehra. Neither Mr. Crum, nor any other member of his team was asked to do sales. In fact, no one else in the division run by Mr. Mehra, including the sales organization, had a sales target for the new product Plaintiff was helping create, except the Plaintiff.

36.  Plaintiff's title was Product Development, not Sales. Despite this, Plaintiff was suddenly asked to do the work of dozens of personnel in a compressed timeframe (by end of 2016). This decision was made by Mr. Mehra and his reports, Mr. Peraino and Mr. Crum. This was part of the ongoing hostile environment created by Defendant ensuring Plaintiff failed his objectives.

37.  The Division's annual performance review calibration meeting took place at the end of 2016 and included Defendant managers such as Mr. Mehra, Mr. Crum, Mr. Peraino, Human Resources personnel such as Ms. Sexton, and International Regional Leads such as Mr. Jason Fryer from Singapore.

38.  At this calibration meeting, Mr. Peraino explicitly pushed for, and ensured, a poor year-end performance review for Plaintiff, just as he had threatened to do in the March 2016

7

incidents in New York.  This resulted in Plaintiff receiving a much poorer performance review compared to prior years in the same group.

39.  Plaintiff was informed of Mr. Peraino's active role in pushing for a poor performance review for Plaintiff during the performance review meeting by Mr. Jason Fryer, who had attended the group performance meeting at the end of 2016.

40.  In February of 2017, Mr. Crum provided Plaintiff his performance review, which was both written and verbal. While Plaintiff received "Meets Expectations" as his performance rating, many of his accomplishments were ignored in the performance review, and the review was peppered with negative written feedback with no concrete examples or proof.

41.  After receiving the performance review, Plaintiff asked Mr. Crum for specific examples of sub-par performance. Mr. Crum was unable to provide any concrete examples and refused to document his responses. Plaintiff had documented that he was able to accomplish all of his objectives for the year 2016 in his self-appraisal.

42.  Mr. Crum also provided Plaintiff with details of his severely reduced annual bonus compared to prior years, and that he would not receive an annual equity grant which he had previously received for multiple years, and was received by many of Plaintiff's peers that year.

8

43.    Additionally, Mr. Crum told Plaintiff that he and Mr. Mehra wanted Plaintiff to seek new employment in Singapore, and informed Plaintiff that he should make this his highest priority.

44.    After receiving the details surrounding his performance review and compensation in February 2017, Plaintiff reported multiple instances of harassment, discrimination, and retaliation, which had been ongoing since early 2016, to Defendant's Human Resources and Employee Relations groups based in New York.

45.    No action was taken in relation to Plaintiff's complaint and Plaintiff was asked to "move forward." Plaintiff repeatedly asked Defendant how it would ensure the harassment and discrimination Plaintiff was subject to would not continue going forward. Rather than ensuring the harassment and discrimination would cease, Ms. Sexton of Defendant's Human Resources and Ms. Lisa Rief of Defendant's Employee Relations repeatedly asked Plaintiff what he would do to not be a target of harassment and discrimination.

46.    Per Mr. Crum's directive to find new employment, Plaintiff found a new role with Defendant's APT division in Singapore and started the new role in April of 2017.

47.    In or around July of 2017, Plaintiff informed his Managers in the APT division, Mr. Setrakian and Ms. Cathy Baker ("Ms. Baker"), Head of APT Division Human Resources, that he required a medical leave of absence.

48. As required under Defendant's company policies, Plaintiff provided a doctor's note to confirm a diagnosis of dysthymia, a long-term form of chronic depression, and according to doctor recommendations and company policy, took a two-month medical leave from September of 2017 to the end of October of 2017.

49. In accordance with Defendant's leave policy, Mr. Setrakian and Ms. Baker informed Plaintiff that employees were able to take up to two months paid leave and an additional four months of unpaid medical leave. However, Plaintiff was denied an extension beyond two months by Mr. Setrakian.

50. Upon information and belief, Plaintiff was treated much differently than a colleague in Defendant's Singapore office who requested leave due to a health/personal condition. For example, Plaintiff was informed a colleague, who upon information and belief was not in Plaintiff's protected class, was given approximately one year off work to focus on her personal situation, and all her benefits and accrued compensation were preserved.

51. Upon Plaintiff's return to work, he requested accommodations based upon his chronic medical condition and as well as the resources he was told would be hired when he started his new job at APT division.

52. During a conversation with Mr. Ed Lee ("Mr. Lee"), SVP of APT Division, Mr. Lee stated that based upon his discussion with Mr. Setrakian (Plaintiff's manager), he was aware that the

10

APT Division had decided to hold back moving allocated resources to Plaintiff given Plaintiff's health issues and potentially non-existent long-term career at the company. Said holding back of designated resources further exacerbated Plaintiff's health situation.

53. Subsequently, Defendant not only denied Plaintiff's requests, but upon information and belief, provided less support than given to peers not in Plaintiff's protected class with similar responsibilities, as well as to subordinates two levels below him.

54. Plaintiff's main request for accommodation and support was additional staff which would help Plaintiff balance his workload. Plaintiff was tasked with completing the work of several employees with weekly international travel and working extremely long hours and weekends, which exacerbated his medical condition, and concerned his medical doctor.

55. The six equivalent international regional teams were staffed with approximately six to twelve consultants and salespeople. The heads of these international teams had a similar mandate to the Plaintiff but held the title of SVP. Additionally, these international teams also had administrative and clerical support.

56. Comparatively, Plaintiff was the only employee covering his region as a one-person team without administrative and clerical support.

57.   Plaintiff requested personnel support from Mr. Setrakian and Ms. Baker before and after his return from medical leave. Yet, none was provided. Plaintiff was to lead the Southeast and South Asia region with staff in Singapore (per his written job description) but staffing was delayed and blocked, particularly after the disclosure of his medical condition.

58.   After Plaintiff's return from medical leave, his manager Mr. Setrakian also moved away from the promise he made in May of 2017, wherein he stated making Plaintiff an SVP on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian origin at junior levels, there were none at an SVP level.

59.   Mr. Eric Schneider ("Mr. Schneider"), Plaintiff's dotted-line manager based in Singapore, on several occasions, referred to Plaintiff as being treated by his division's leadership as the "red-headed stepchild" of the division, meaning Plaintiff was not treated on par with others at his level.

60.   Regardless, Plaintiff was able to accomplish all his objectives set out for the year 2017 despite the lack of resources. Plaintiff received a good performance review and his manager said that the Plaintiff's performance review could be characterized as "upbeat".

61.   In March of 2018, Plaintiff raised concerns to his supervisors, Human Resources, and superiors regarding the

continued lack of hiring or moving of support staff, as well as Plaintiff's reduced bonus for the year 2017, despite Plaintiff's strong performance.

62. In response to his complaint, Plaintiff's manager, Mr. Setrakian, severely limited communications with him, and began making decisions about Plaintiff's work and projects in his scope without consulting him.

63. Mr. Setrakian's behavior also became much more distant and uninterested in Plaintiff's achievements and career after his complaint. Plaintiff communicated this to Mr. Setrakian but Mr. Setrakian's attitude did not change.

64. Despite these hurdles, Plaintiff was able to exceed 2018's full-year sales targets within just the first six months of 2018, all while exacerbating his medical condition. Additionally, Plaintiff received numerous compliments from other senior APT division colleagues, and Defendant MasterCard Singapore and Asia Pacific colleagues in 2017 and 2018.

65. Several APT junior colleagues expressed desire to APT Human Resources and Plaintiff to move to the Singapore office to work for Plaintiff and support the excelling Singapore office. Such mobility is encouraged and normal within the APT division and happens quickly (within 2 months or less).

66. In July of 2018, Plaintiff, suffering continued medical issues, spoke with his manager, Mr. Setrakian, about a role change

and transfer to another division. This conversation was not received well.

67.   Plaintiff also discussed a transfer to another division with his superior in Singapore, Mr. Schneider, and senior Defendant executives including Asia-Pacific Head, Mr. Ari Sarker, who were happy with his work in Singapore. The discussions were well received and meetings with potential hiring executives were set up. However, the meetings were postponed with no explanation.

68.   On August 16, 2018, Plaintiff's manager, Mr. Setrakian, and Defendant's Human Resources personnel, Ms. Wadhera, informed Plaintiff that Defendant would be terminating him without cause, and presented for review a grossly inadequate separation agreement which included releasing Defendant of any liability.

69.   Ms. Wadhera was not the Human Resources person in charge of Plaintiff's APT division but was the Human Resources person for Plaintiff's previous division from where he transferred due to harassment and retaliation. Ms. Wadhera was also Plaintiff's wife's Human Resources manager when Plaintiff's wife was working in Singapore.

70.   On August 24, 2018, Plaintiff informed Human Resources that he had retained legal counsel and that he had claims against Defendant under U.S. Equal Employment Opportunity laws.

71.   Two days later, on or around August 26, 2018, Plaintiff was terminated without cause. Defendant retaliated against

Plaintiff's action of hiring legal counsel and discussing claims by rescinding the initial separation package (which was grossly inadequate to begin with and required Plaintiff agreeing to legal jurisdiction of Singapore giving up his US EEO rights). Plaintiff suffered great financial cost to himself and his family.

72. Prior to his termination, Plaintiff attempted to resolve his grievances with Human Resources directly. When he made a proposal to resolve the above issues, Human Resources told Plaintiff that all proposals would be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States despite the company being aware that Plaintiff had a 4-month old child in August 2017, and that moving a family with two young children with a tight time-frame would be very difficult.

73. The relocation assistance offered to Plaintiff to move back to the United States was a small fraction of the relocation assistance Defendant provided to him when he was initially transferred from New York to Singapore, and significantly less than what other employees, who were not in Plaintiff's protected class, gained when repatriating back to their originating countries.

74. Defendant did not provide Plaintiff with any severance package, unemployment compensation, out-placement services, medical insurance, or his accrued annual bonus. Defendant moved

him to Singapore with his family where he did not have a strong professional or personal network as he did in his home country (United States) and subsequently left him there without adequate resources to fend for himself, while he was taking care of his family with young children and battling his chronic health condition of depression.

75.  Moreover, Plaintiff was not eligible for unemployment benefits, as he was terminated in Singapore.

76.  As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## COUNT ONE

### UNLAWFUL DISCRIMINATION BASED UPON RACE AND NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A. § 2000e et seq.

77.  Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

78.  Plaintiff was subject to unlawful discrimination based upon his race and national origin.

16

79.   Plaintiff was repeatedly harassed by his managers and superiors, which partially occurred in front of other Defendant employees, including in front of his manager, Mr. Crum, and department head Mr. Sachin Mehra.

80.   Plaintiff was the only employee junior to the harassers that was of Indian national origin.

81.   Plaintiff complained to his manager Mr. Crum about Mr. Peraino's abusive behavior, threats, and humiliating treatment occurring on multiple occasions. Mr. Crum did not acknowledge Plaintiffs concerns.

82.   Mr. Peraino explicitly pushed for and ensured a poor year-end performance review for Plaintiff (just as he had threatened to do in the March 2016 incident).

83.   In February 2017, Plaintiff reported multiple instances of harassment and discrimination, occurring since early 2016, related to race and national origin by his superior, Mr. Peraino, to Defendant MasterCard's Human Resources and Employee Relations groups, based in Defendant's headquarters in New York.

84.   In response to Plaintiffs harassment complaint, Defendant's Human Resources Department and Employee Relations Department told Plaintiff to "move forward" and asked to what Plaintiff can do himself to not be a target of such behavior by his superiors, essentially laying blame on Plaintiff. No legitimate investigation was ever conducted.

17

85.   Subsequently, Defendant blocked Plaintiff from projects and work which pertained to his role and reduced Plaintiffs annual bonus.

86.   APT division's management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian national origin at junior levels, there was not one employee of Indian national origin at an SVP level.

87.   Despite Plaintiff exceeding 2018's full-year sales targets within just the first six months of 2018, he was unlawfully terminated by Defendant in August of 2018.

88.   Mr.   Setrakian,   and   Defendant's   Human   Resources personnel, Ms. Wadhera, informed Plaintiff that Defendant was terminating him without cause, and presented for review a grossly inadequate separation agreement which included releasing Defendant of any liability.

89.   As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

18

90.   Accordingly,   Plaintiff   was   subject   to   unlawful discrimination based on his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

      1)   compensatory damages;

      2)   pre-judgment interest;

      3)   punitive damages;

      4)   counsel fees;

      5)   cost of suit; and

      6)   any other relief that the court deems to be just and equitable.

### COUNT TWO

### UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A. § 2000e(3)(a)

91.   Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

92.   Plaintiff was subject to unlawful retaliation by Defendant.

93.   Approximately one month after Plaintiff reported multiple instances of harassment and discrimination to Defendant's Human Resources and Employee Relations group in February 2017,

Plaintiff was told to "move forward" and subsequently expressed that Plaintiff should make it his highest priority to seek other employment.

94. Plaintiff's wife was terminated with a settlement agreement in 2016 following her own allegations. Upon information and belief, Plaintiff was retaliated against as a result of her grievances against the very same division and human resources personnel, Mary Sexton and Meena Wadhera.

95. Defendant retaliated against Plaintiff by lowering Plaintiff's bonus, and removing some of his benefits.

96. Defendant significantly docked Plaintiff's pay reducing his annual bonus and totally eliminating his annual equity grant, which Plaintiff has received in each of his prior years.

97. While in the APT division in Singapore, Defendant took retaliatory action against Plaintiff upon Plaintiffs request for a role change and potential relocation after experiencing workplace harassment on the basis of his race and national origin, and later his attempt to resolve issues with his division being understaffed and being locked out of his responsibilities.

98. Defendant ensured that Plaintiff's division was understaffed, ostensibly in an effort to drive Plaintiff out of the company, with Plaintiff being the sole employee and other similarly situated divisions having approximately twelve employees.

99.  Mr. Schneider, Plaintiff's dotted-line manager based in Singapore on several occasions referred to Plaintiff as being treated by APT as the "red-headed stepchild" of the APT organization, meaning Plaintiff was not treated on par with others at his level.

100. A month after Plaintiff requested a role change due to the repeated harassment in Singapore, Plaintiff was terminated without cause.

101. Before his termination, Plaintiff attempted to resolve his grievances and claims with Human Resources directly with the help of his U.S. counsel. When he made a proposal to resolve the above issues, Human Resources told him that all proposals will be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States. This relocation assistance represented a small fraction of the relocation provided to Plaintiff when he was initially transferred from New York to Singapore, and significantly less than other employees repatriated back to their originating countries.

102. As a direct and proximate result of Defendant's unlawful and retaliatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and

21

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

103. Defendant's unlawful and retaliatory conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

        1)    compensatory damages;

        2)    pre-judgment interest;

        3)    punitive damages;

        4)    counsel fees;

        5)    cost of suit; and

        6)    any other relief that the court deems to be just and equitable.

## COUNT THREE

### UNLAWFUL CREATION OF A HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A. § 2000e et seq.

104. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

105. Defendant's conduct as alleged above constitutes disparate treatment based on the Plaintiff's race where the Defendants subjected the Plaintiff, based on his race, to more strenuous workloads, as well as work outside his job description

22

while workers of other race did less strenuous work within their job description.

106. Upon Plaintiff's complaints to superiors regarding instances of workplace harassment on the basis of his national origin and race, Plaintiff was told to "move forward" and told to reflect upon what Plaintiff can do himself to not be a target of such behavior by his superiors.

107. After his transfer, Plaintiff's division was grossly understaffed and overworked compared to similarly situated departments and Plaintiff was the sole employee in the Singapore division, while similar international regions with similar mandates typically had about a dozen employees. Plaintiff was the only person of Indian origin with this type of role.

108. Plaintiff's manager severely limited communications with him and began making decisions about Plaintiffs work and projects in his scope without consulting him. Plaintiff was also locked out of some of his responsibilities.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

      1)    compensatory damages;

      2)    pre-judgment interest;

      3)    punitive damages;

      4)    counsel fees;

      5)    cost of suit; and

6) any other relief that the court deems to be just and equitable.

## COUNT FOUR

### UNLAWFUL DISABILITY DISCRIMINATION AND THE UNLAWFUL CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C.A. § 12101 et seq.

109. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

110. Plaintiff was subject to unlawful discrimination due to his status as a disabled person.

111. Plaintiff was a member of a protected class, namely, a qualified individual with a disability.

112. Defendant's conduct as alleged at length herein constitutes that Defendant knowingly created a hostile atmosphere in that it failed to provide Plaintiff the same support systems and employees as similarly situated divisions at Defendant company, forcing Plaintiff to overwork to compensate for the lack of support, and having full knowledge of Plaintiff's disability.

113. When Plaintiff returned from his medical leave in October 2017, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job at Defendant. Defendant not only denied Plaintiff's requests but provided less support than provided to peers with similar responsibilities as well as to subordinates two

levels below him. Plaintiff was the sole employee in his division while similarly situated departments employed approximately twelve (12) employees.

114. After Plaintiff's return from medical leave, his manager Scott Setrakian and APT management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities.

115. The hostile environment created and fostered by Defendant exacerbated Plaintiff's medical condition and culminated in his termination less than one month after Plaintiff finally requested a transfer and role change to mitigate the toll the hostile environment took on his health.

116. Defendant discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment in the form of discrimination based on Plaintiff's disability which was severe and pervasive.

117. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1) compensatory damages;

2) pre-judgment interest;

3) punitive damages;

4) counsel fees;

5) cost of suit; and

6) any other relief that the court deems to be just and equitable.

## COUNT FIVE

### UNLAWFUL RACE AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUIVE LAW § 290 et seq.

118. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

119. Plaintiff was subject to unlawful discrimination based upon his race and national origin.

120. Plaintiff was repeatedly harassed by his managers and superiors, which partially occurred in front of other Defendant employees, including in front of his manager, Mr. Crum, and department head Mr. Sachin Mehra.

121. Plaintiff was the only employee junior to the harassers that was of Indian national origin.

122. Plaintiff complained to his manager, Mr. Crum, about Mr. Peraino's abusive behavior, threats, and humiliating treatment occurring on multiple occasions. Mr. Crum did not acknowledge Plaintiffs concerns.

123. Mr. Peraino explicitly pushed for and ensured a poor year-end performance review for Plaintiff (just as he had threatened to do in the March 2016 incident).

124. In February 2017, Plaintiff reported multiple instances of harassment and discrimination, occurring since early 2016, related to race and national origin by his superior, Mr. Peraino, to Defendant MasterCard's Human Resources and Employee Relations groups, based in Defendant's headquarters in New York.

125. In response to Plaintiffs harassment complaint, Defendant's Human Resources Department and Employee Relations Department told Plaintiff to "move forward" and asked to what Plaintiff can do himself to not be a target of such behavior by his superiors, essentially laying blame on Plaintiff. No legitimate investigation was ever conducted.

126. Subsequently, Defendant blocked Plaintiff from projects and work which pertained to his role and reduced Plaintiffs annual bonus.

127. APT division's management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT

had numerous employees of Indian national origin at junior levels, there was not one employee of Indian national origin at an SVP level.

128. Despite Plaintiff exceeding 2018's full-year sales targets within just the first six months of 2018, he was unlawfully terminated by Defendant in July of 2018.

129. Mr. Setrakian, and Defendant's Human Resources personnel, Ms. Wadhera, informed Plaintiff that Defendant was terminating him without cause, and presented for review a grossly inadequate separation agreement which included releasing Defendant of any liability.

130. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

131. Accordingly, Plaintiff was subject to unlawful discrimination based on his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant for the following:

7)    compensatory damages;

8)    pre-judgment interest;

9)    punitive damages;

10)   counsel fees;

11)   cost of suit; and

12)   any other relief that the court deems to be just and equitable.

**COUNT SIX**

**UNLAWFUL DISABILITY DISCRIMINATION AND THE CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUIVE LAW § 290 et seq.**

132. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

133. Plaintiff was subject to unlawful discrimination due to his status as a disabled person.

134. Plaintiff was a member of a protected class, namely, a qualified individual with a disability.

135. Defendant's conduct as alleged at length herein constitutes that Defendant knowingly created a hostile atmosphere in that it failed to provide Plaintiff the same support systems and employees as similarly situated divisions at Defendant company, forcing Plaintiff to overwork to compensate for the lack of support, and having full knowledge of Plaintiff's disability.

136. When Plaintiff returned from his medical leave in October 2017, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job at Defendant. Defendant not only denied Plaintiff's requests but provided less support than provided to peers with similar responsibilities as well as to subordinates two levels below him. Plaintiff was the sole employee in his division while similarly situated departments employed approximately twelve (12) employees.

137. Human Resources promised to Plaintiff before his medical condition was disclosed were held back from relocating to Singapore and hiring plans were frozen as Plaintiff's long-term career in the APT division and company with his medical condition was questioned. This further exacerbated Plaintiff's medical condition.

138. After Plaintiff's return from medical leave, his manager Scott Setrakian and APT management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities.

139. The hostile environment created and fostered by Defendant exacerbated Plaintiff's medical condition and culminated in his termination less than one month after Plaintiff finally requested a transfer and role change to mitigate the toll the hostile environment took on his health.

140. Defendant discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment in the form of discrimination based on Plaintiff's disability which was severe and pervasive.

141. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant for the following:

   7) compensatory damages;

   8)   pre-judgment interest;

   9)   punitive damages;

   10)  counsel fees;

   11)  cost of suit; and

   12)  any other relief that the court deems to be just and equitable.

**COUNT SEVEN**

**UNLAWFUL RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUIVE LAW § 290 et seq.**

142. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

143. Plaintiff was subject to unlawful retaliation by Defendant.

144. Approximately one month after Plaintiff reported multiple instances of harassment and discrimination to Defendant's Human Resources and Employee Relations group in February 2017, Plaintiff was told to "move forward" and subsequently expressed that Plaintiff should make it his highest priority to seek other employment.

145. Plaintiff's wife was terminated with settlement agreement in 2016 following her own allegations. Upon information and belief, Plaintiff was retaliated against as a result of her grievances against the very same division and human resources personnel, Mary Sexton and Meena Wadhera.

146. Defendant retaliated against Plaintiff by lowering Plaintiff's bonus, and removing some of his benefits.

147. Defendant significantly docked Plaintiff's pay reducing his annual bonus and totally eliminating his annual equity grant, which Plaintiff has received in each of his prior years.

148. While in the APT division in Singapore, Defendant took retaliatory action against Plaintiff upon Plaintiffs request for a role change and potential relocation after experiencing

workplace harassment on the basis of his race and national origin, and later his attempt to resolve issues with his division being understaffed and being locked out of his responsibilities.

149. Defendant ensured that Plaintiff's division was understaffed, with Plaintiff being the sole employee and other similarly situated divisions having approximately twelve employees.

150. Mr. Schneider, Plaintiff's dotted-line manager based in Singapore on several occasions referred to Plaintiff as being treated by APT as the "red-headed stepchild" of the APT organization, meaning Plaintiff was not treated on par with others at his level.

151. A month after Plaintiff requested a role change due to the repeated harassment in Singapore, Plaintiff was terminated without cause.

152. Before his termination, Plaintiff attempted to resolve his grievances and claims with Human Resources directly with the help of his U.S. counsel. When he made a proposal to resolve the above issues, Human Resources told him that all proposals will be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States. This relocation assistance represented a small fraction of the relocation provided to Plaintiff when he was initially transferred from New York to Singapore, and

significantly less than other employees repatriated back to their originating countries.

153. As a direct and proximate result of Defendant's unlawful and retaliatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

154. Defendant's unlawful and retaliatory conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

     7)    compensatory damages;

     8)    pre-judgment interest;

     9)    punitive damages;

     10)   counsel fees;

     11)   cost of suit; and

     12)   any other relief that the court deems to be just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury as to all matters herein.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates ALAN GENITEMPO, ESQ. as trial counsel for the within matter.

### CERTIFICATION

I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

**PIRO, ZINNA, CIFELLI,
PARIS & GENITEMPO, LLC**
Attorneys for Plaintiff,
Sambit Pattanayak

BY:**/s/Alan Genitempo, Esq.**
ALAN GENITEMPO, ESQ.

**CARABBA LAW FIRM P.C.**
Attorneys for Plaintiff,
Sambit Pattanayak

BY:**/s/Anthony Carabba, Esq.**
ANTHONY CARABBA, JR. ESQ.

Dated: April 28, 2021