**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAMBIT PATTANAYAK,<br><br>                    Plaintiff,<br>vs.<br><br>MASTERCARD INC.,<br><br>                    Defendant. | **Civil No. 21-cv-02657-GBD**<br><br>**SECOND AMENDED COMPLAINT FOR<br>EMPLOYMENT DISCRIMINATION** |

## INTRODUCTION

1.    Plaintiff, Sambit Pattanayak ("Plaintiff"), proceeding by and through his attorneys, Piro Zinna Cifelli Paris & Genitempo, LLC and CARABBA LAW FIRM P.C., brings this Second Amended Complaint pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12101 et seq., and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "Human Rights Law").

## JURISDICTION

1.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332.

2.    The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

**VENUE**

3.    A corporation shall be deemed to be a citizen of the State where it has its principal place of business. 28 U.S.C. §1332(c)(1).

4.    The United States District Court for the Southern District of New York encompasses the counties of New York, Bronx, Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan and draws jurors from those counties.

5.    Defendant, MasterCard International Incorporated ("Defendant") is headquartered at 2000 Purchase Street, Purchase, New York 10577, a "hamlet" within Westchester County.

6.    Thus, the Southern District of New York is the proper venue.

**PARTIES**

7.    Plaintiff, a United States citizen of Indian national origin, resides in the City of Hoboken, County of Hudson and State of New Jersey.

8.    Defendant is headquartered at 2000 Purchase Street, a hamlet of the Town of Harrison, County of Westchester and State of New York.

**FACTS RELEVANT TO ALL COUNTS**

9.    Plaintiff was hired in 2012 as Vice President ("VP") of Product Management in Defendant's New York offices and reported to

Senior Vice President Richard Crum ("Crum"), who was also based in New York.

10.  In October 2015, Plaintiff was transferred from Defendant's New York office to Defendant's Singapore Branch to perform his existing responsibilities.

11.  From October 2015 to March 2017, while based in Singapore, Plaintiff continued reporting to Crum, who maintained his employment in Defendant's New York offices.

12.  In April 2017, Plaintiff started a new job as Vice President ("VP") of Client Services within Defendant MasterCard Singapore to establish and lead the new Applied Predictive Technologies ("APT") Division in Southeast and South Asia, which encompassed approximately seven countries.

13.  Plaintiff was hired by APT Division Head, Anthony Bruce ("Bruce"), after first interviewing with him in Singapore. Bruce was based in the United States.

14.  As VP in the APT Division, Plaintiff reported to Scott Setrakian ("Setrakian"), as Setrakian had oversight over the Asia Pacific region but was also based in the United States.

15.  At Bruce's request, Plaintiff continued to meet with him one-on-one to update him on progress in the Southeast and South Asia region.

16.  Although Plaintiff was based in Singapore, each of Plaintiff's managers were located in the United States. Plaintiff

engaged in daily interactions with his United States based managers and superiors, and also frequently traveled to the United States to meet with his managers, superiors, colleagues, clients, and partners.

## I.   <u>Plaintiff's Wife Faces Discrimination and Retaliation</u>

17.   Plaintiff's wife, Purnima Pattanayak ("Purnima"), had also been employed by Defendant from approximately 2007 until November of 2016.

18.   In early 2015, Purnima was offered a new role as Vice President of Global Product Management in the same department as Plaintiff with the same Human Resources managers. The head of Purnima's group was Blake Rosenthal ("Rosenthal"). The new role required Purnima to transfer to Singapore, as well.

19.   However, when Purnima received the formal written offer for the new position and her relocation to Singapore, the proposed compensation was much lower than what was verbally promised.

20.   Purnima attempted, on multiple occasions, to resolve the compensation issue with her managers and Human Resources, but all refused to honor their previous offer.

21.   In August 2015, Purnima submitted a detailed complaint to Chief Human Resources Officer Ron Garrow ("Garrow"), who considered Purnima a high potential employee, outlining multiple and ongoing instances of discrimination.

4

22.   On August 20, 2015, Garrow acted on Purnima's complaints and directed his report Patricia Docherty ("Docherty"), SVP of Employee Relations and Human Resources, stating in an email: "Patty- I know we will catch up tomorrow on this but we do need to investigate this. I am also concerned on how we, HR, have handled this and I do think we may have some management/leadership issues here.  That said, I am sure Purnima owns some of this.  With my schedule, I think I will need you to meet with her."

23.   Thereafter, Purnima's compensation was revised to be in-line with what was initially promised to her.

24.   Subsequent to her complaint to Garrow, within a few weeks, Purnima faced retaliation. For example, Purnima was given new and extremely difficult projects.

25.   Purnima's managers requested Human Resources attend regular meetings wherein Purnima was involved, which had not previously been done and was not company policy or practice. Purnima also began receiving negative feedback, which was documented by Human Resources.

26.   In early 2016, Purnima requested a sabbatical due to the significant health issue of a parent. Purnima was informed that she would only be granted an unpaid sabbatical if she agreed to find a new job outside of Blake Rosenthal's group.

27.   In or around April of 2016, Purnima was put on a formal Performance Improvement Plan ("PIP") by her managers and Human

Resources. Purnima was given extremely difficult projects to accomplish in three (3) months and was constantly told she was not meeting expectations.

28. In or around August 2016, Purnima hired legal counsel to assist her with her potential claims against Defendant.

29. Purnima and Defendant thereafter negotiated a severance package in lieu of bringing a lawsuit against Defendant.

30. Plaintiff helped advise Purnima during her negotiations, as well as reviewed and signed as a witness Purnima's separation agreement. Defendant was aware of Plaintiff's assistance, from the time of the complaint to Garrow.

31. Purnima was then terminated in November 2016.

32. At the time of her termination, Plaintiff and his wife worked for the same division with the same senior leadership and Human Resources managers, Mary Sexton ("Sexton") and Meena Wadhera ("Wadhera").

## II.  Plaintiff is Subjected to Unlawful Conduct

33. For nearly three years, commencing in or around November 2015 (shortly after Purnima's retaliation began) through his unlawful termination in August 2018, Plaintiff suffered continuous discrimination, harassment, and retaliation by Defendant.

34. Plaintiff was told by Crum in November 2015 that department head Sachin Mehra ("Mehra"), and Crum's manager, believed that Plaintiff cannot do his job effectively from

Singapore, even though Plaintiff was relocated by the company to Singapore just two months prior.

35.   At the same time Purnima was subject to the PIP, Plaintiff's group became hostile towards him, in stark contrast to Plaintiff's prior three years in the same group, with the same manager.

36.   In March of 2016 at a group meeting in Defendant's New York office, David Peraino ("Peraino"), Plaintiff's superior, singled out Plaintiff, cursed at Plaintiff using extremely abusive and foul language, humiliated Plaintiff, and threatened him.

37.   The March 2016 group meeting included Plaintiff's manager, Crum, and the head of the department, Mehra, who was Peraino's and Crum's manager. Also present in the meeting were Jud Staniar and Illya Shell.

38.   Crum and Mehra did nothing to stop or prevent the behavior and stayed silent as Peraino carried on humiliating Plaintiff in front of the group.

39.   Peraino singled out Plaintiff despite the fact that he was working collaboratively on the project at issue in the meeting with Crum, Peraino, Shell, and Stanier. Mehra was also regularly updated on all key aspects of the project by Plaintiff and the group.

40.   Plaintiff was the only employee junior to Peraino that was of Indian national origin.

41.   After the meeting, Peraino, in his private office, cursed at Plaintiff and explicitly threatened him in a one-on-one session, stating, "*I am going to come after you*".

**III. <u>Plaintiff Submits His First Complaint of Unlawful Conduct</u>**

42.   In accordance with Defendant's employee handbook, Plaintiff complained to his manager, Crum, about Peraino's behavior during both the New York meeting in March 2016 and the one-on-one session.

43.   Specifically, Plaintiff informed Crum that he was subjected to threats, hostile behavior, discrimination and harassment by Peraino.

44.   Upon information and belief, the incident was not investigated in accordance with the Defendant's employee handbook procedure.

**IV. <u>Plaintiff's Job Duties and Responsibilities Change</u>**

45.   Shortly after submitting his complaint to Crum in May of 2016, Plaintiff was informed that his job responsibilities and 2016 performance objectives were being changed, mid-year, from "creating" and constructing new payment products to "selling" pre-built, conceptual products around the world to banks. Crum informed Plaintiff this role change was driven by department head Mehra.

46.   On May 31, 2016, Plaintiff submitted a written complaint to his manager, Crum, explaining his role and expertise was in developing and creating new products for the group, and not sales.

Plaintiff further explained that changing his role and objectives in the middle of the year was not reasonable and would not help him succeed, and in fact was setting him up to fail.

47.   Plaintiff, in the middle of the year, was now being asked to create, build, and sell pre-built products and he was told that his success for the year will be measured primarily by the number of "sales" of these new products. Plaintiff was not provided with any sales training as he requested.

48.   This role of selling new products was the responsibility of Peraino and his team, as well as over a dozen sales and business development personnel at the division run by Mehra. Neither Crum, nor any other member of his team, were asked to do sales.

49.   In fact, no one else in the division run by Mehra, including the sales organization, had a sales target for the new product Plaintiff was helping create, except Plaintiff.

50.   Plaintiff's title official job description was Product Development, not Sales. Despite this, Plaintiff was suddenly asked to do the work of dozens of personnel in a compressed timeframe (by end of 2016). This decision was made by Mehra and his reports, Peraino and Crum.

51.   Over the ensuing six (6) months, Plaintiff was constantly pressured by management to demonstrate sales of pre-built products, an impossible task similar to those given to his wife, Purnima.

52. This was part of the ongoing hostile environment created by Defendant ensuring Plaintiff failed his objectives.

## V.  Plaintiff Submits Additional Complaints of Unlawful Conduct

53. Around the same time Plaintiff's wife was negotiating her severance package, Plaintiff was subjected to hostile behavior, role changes, and impossible to complete tasks created by his management team.

54. As a result, Plaintiff submitted several written complaints to Crum. Specifically, Plaintiff complained about the hostile work environment he was subjected to, as well as retaliation and harassment.

## VI.  Plaintiff Receives a Poor Year-End Performance Review

55. The Division's annual performance review calibration meeting took place at the end of 2016 and included Defendant managers such as Mehra, Crum, Peraino, Human Resources personnel such as Sexton and Wadhera, and International Regional Leads such as Jason Fryer from Singapore.

56. At this calibration meeting, Peraino and Mehra pushed for, and ensured, a poor year-end performance review for Plaintiff, just as he had threatened to do in the March 2016 incidents in New York.

57. This resulted in Plaintiff receiving a much poorer performance review compared to prior years in the same group.

58.   Plaintiff was specifically informed of Peraino's active role in pushing for a poor performance review for Plaintiff during the performance review meeting by Jason Fryer, a colleague in Singapore office who participated in the annual review meetings.

59.   In February of 2017, Crum provided Plaintiff his performance review, which was both written and verbal.

60.   While Plaintiff received "Meets Expectations" as his performance rating, many of his accomplishments were ignored, and the vague review was peppered with negative written feedback, with no concrete examples or proof of underperformance.

61.   The review had significantly curtailed Plaintiff's variable compensation of cash and stock compared to his peers by nearly $50,000.

62.   Plaintiff learned from Crum that he would not receive an annual equity grant, which he had previously received for multiple years, and was received by many of Plaintiff's peers that year.

63.   Plaintiff requested specific examples of performance issues from Crum, but Crum was unable to answer which objectives Plaintiff had not achieved, nor did he provide any examples of performance issues.

VII. **Plaintiff is Demanded to Seek Other Employment**

64.   Subsequent to Plaintiff submitting his complaints throughout 2016 and early 2017, Crum, during his one-on-one meetings with Plaintiff, requested Plaintiff seek other local

employment and leave the Global Product group. Plaintiff was told to make this "task" his "highest priority."

65.  Crum and Mehra also personally reached out to other MasterCard groups and Human Resource departments, including Wadhera in Singapore, to discuss transferring Plaintiff to remove him from the role that reported to New York.

66.  Plaintiff had difficulty seeking other employment as he did not have a career network in Singapore.

67.  Plaintiff offered to relocate himself back to the United States, at his own expense, to work at Defendant's New York office. However, Crum explicitly informed him that Mehra did not want him to relocate back to New York.

## VIII.    __Plaintiff Files Additional Complaints__

68.  In early 2017, Plaintiff filed a written complaint to Defendant's Human Resources Manager, Sexton, and the SVP of Employee Resources and HR, Docherty, who were based in New York.

69.  Docherty, who, per Garrow's direction, had worked directly with Purnima. Rather than respond to Plaintiff, Docherty handed off Plaintiff's complaints to her report, Lisa Rief ("Rief"), ostensibly to demonstrate Plaintiff's situation was not linked to retaliation from Purnima's case.

70.  Plaintiff specifically outlined he was facing retaliation from his superiors due to his complaints, as well as his wife's complaints and allegations.

71. Upon information and belief, Defendant did not investigate Plaintiff's complaints.

72. Plaintiff was told by Sexton to "move forward" and to do whatever he can to appease his group so he would not be subjected to hostile behavior.

73. In fact, when Plaintiff asked Defendant's Human Resources what they had done to ensure Peraino and others would not target him going forward, Sexton and Rief of Defendant's Human Resources department asked Plaintiff what *he* would do to rectify the situation, instead.

74. At that time, Plaintiff did not file a charge of discrimination or retaliation with the EEOC, as he was worried he would be terminated from his employment. Plaintiff was expecting a child and felt losing his job would create tremendous financial and logistical hardships for his family.

## IX.   **Plaintiff Finds New Employment**

75. Per Crum's and Mehra's directive to find new employment, Plaintiff found a new role with Defendant's Applied Predictive Technologies ("APT") division in Singapore and started the new role in April of 2017.

76. Plaintiff was hired by Anthony Bruce ("Bruce"), President of the APT division, who was based in Virginia.

77.   Plaintiff, in his new role, reported to Scott Setrakian ("Setrakian"), the individual who oversaw APT's Asia-Pacific region.

78.   A key part of Plaintiff's new role was to support the Defendant's overall Asia-Pacific region's sales initiatives led by Asia Pacific Co-President Ari Sarker ("Sarker") with differentiated APT solutions.

79.   Plaintiff then emailed Sexton and Rief, informed them that while he would be taking on a new role within the APT division, and that he was disappointed with how his previous complaints had been handled and went uninvestigated.

80.   Additionally, Plaintiff informed Sexton and Rief that although he was accepting a role in a new division, he would not be rescinding or waiving his previously filed complaints.

81.   Plaintiff commenced his role at APT on May 1, 2017.

82.   Plaintiff led the Southeast Asia office for APT out of Singapore, which covered fourteen (14) countries in the region, while Ed Lee ("Lee") led the North Asia office for APT out of Taiwan. Both Plaintiff and Lee reported to Setrakian.

83.   Lee's team employed over a dozen staff.

84.   Two other regional leads from Asia Pacific region, located in Japan and Australia, employed between six (6) to twelve (12) employees.

85.   Plaintiff was the sole employee of his region.

86.   Setrakian told Plaintiff that he would ensure Plaintiff receive a promotion from Vice President to Senior Vice President ("SVP"), which was on par with Lee and other APT regional leads, within a year if Plaintiff could help "win" one or two deals, which would validate the need for APT solutions in Southeast Asia.

87.   In May 2017, Setrakian informed Plaintiff that Plaintiff would be receiving personnel to grow the business in his region, including sales and consulting staff per the official job description and in line with other APT regional teams.

88.   Plaintiff was tasked with rebuilding APT's business, including sales, within the Southeast Asia region. APT had not achieved the level of success required in the Southeast Asia region prior to Plaintiff's hiring.

89.   Plaintiff worked with Sarker and his sales team and supported well over fifty (50) concurrent sales engagements within Southeast Asia.

90.   Plaintiff was informed by Setrakian that Sarker was very pleased by Plaintiff's performance.

**X.   Plaintiff Requires a Medical Leave of Absence**

91.   In or around August 2017, Plaintiff informed Setrakian, APT Human Resources Business Partner Jessica Gladden ("Gladden") and Head of APT Division Human Resources Cathy Baker ("Baker") that he had been diagnosed with dysthymia, a long-term form of chronic depression.

92. Plaintiff's dysthymia symptoms included severe exhaustion and lack of energy, severe sleep disturbances and inability to sleep, inability to concentrate and focus for more than short periods of time, difficulty interacting with others, and severe emotional distress and sadness. These symptoms were impacting Plaintiff at work and required tremendous effort by him to overcome and operate.

93. Plaintiff provided a doctor's note and requested a leave of absence pursuant to doctor recommendations and company policy. Plaintiff was granted a two-month medical leave from September of 2017 to the end of October of 2017.

94. Prior to his leave, Plaintiff again requested additional personnel resources to help mitigate his work-related stress. Setrakian informed Plaintiff he would look into staffing the Singapore office during Plaintiff's leave.

95. In accordance with Defendant's leave policy, Setrakian and Baker informed Plaintiff that employees were able to take up to two months paid leave and an additional four months of unpaid medical leave. However, Defendant decided to deny an extension beyond two months.

96. Upon information and belief, Plaintiff was treated much differently than a colleague in Defendant's Singapore office who requested leave due to a health/personal condition.

97.  Plaintiff was informed a colleague, who was not in Plaintiff's protected class, was given approximately one year off work to focus on her personal situation, while all of her benefits and accrued compensation were preserved.

**XI.  <u>Plaintiff's Accommodation Requests are Denied</u>**

98.  Upon Plaintiff's return to work, he again requested accommodations based upon his chronic medical condition, as well as the personnel resources he was told would be hired when he started his new job at APT division.

99.  Plaintiff was still the only employee in his region of the APT division. An individual who was hired to join Plaintiff's team was instead continuing to assist Lee in Taiwan.

100. Plaintiff continued to work fourteen (14) hour days, as well as weekends, to meet the demand of APT and Defendant MasterCard Asia without the promised resources.

101. During a conversation with Lee, SVP of APT North Asia Division, Lee stated that based upon his discussion with Setrakian, he was aware that the APT Division had decided to hold back moving allocated resources to Plaintiff given Plaintiff's "health issues" and potentially non-existent long-term career at the company.

102. Said holding back of designated resources further exacerbated Plaintiff's health situation.

103. Defendant not only denied Plaintiff's requests, but upon information and belief, provided less support than given to peers

not in Plaintiff's protected class with similar responsibilities, as well as to subordinates two levels below him.

104. Plaintiff's main request for accommodation and support was additional staff which would help Plaintiff balance his workload. Plaintiff was tasked with completing the work of several employees with weekly international travel and working extremely long hours and weekends, which exacerbated his medical condition, and concerned his medical doctor.

105. The six equivalent international regional teams were staffed with approximately six (6) to twelve (12) permanent resources consisting of consultants and salespeople.

106. The heads of these international teams had a similar mandate to the Plaintiff but held the title of SVP. Additionally, these international teams had administrative and clerical support.

107. Comparatively, Plaintiff was the only employee covering his region without administrative and clerical support even though he was supposed to have additional resources per his job description that was provided to him when he interviewed for and accepted the job.

108. All these resources, support and higher title had been promised by Setrakian at the start of Plaintiff's role at APT, but it was never fulfilled after his return from disability related leave.

109. Plaintiff regularly requested personnel support from Setrakian and Baker before his leave and multiple times after his return from medical leave. Yet, none was provided. Plaintiff was to lead the Southeast and South Asia region with staff in Singapore (per his written job description), but staffing was delayed and blocked, particularly after the disclosure of his medical condition.

110. After Plaintiff's return from medical leave, his manager Setrakian also moved away from the promise he made in May of 2017, wherein he stated making Plaintiff an SVP on par with his APT peers of similar responsibilities.

111. Furthermore, while APT had numerous employees of Indian origin at junior levels, there were none at an SVP level.

XII.     <u>Plaintiff's 2017 Year-End Performance Review</u>

112. In January 2018, Plaintiff received a positive year-end performance review from Setrakian.

113. Setrakian informed Plaintiff that the rating was based on feedback from Sarker, SVP Eric Schneider ("Schneider"), Plaintiff's dotted-line manager based in Singapore, along with many APT senior managers across the world Plaintiff worked with.

114. Plaintiff was able to accomplish all his objectives set out for the year 2017 despite the lack of resources. Plaintiff received a good performance review and his manager said that the Plaintiff's performance review could be characterized as "upbeat".

115. In February 2018, Plaintiff learned of his annual bonus and equity compensation details.

116. Setrakian and Baker determined compensation paid to Plaintiff would be only 88% of his target (meaning if $100 was allocated to Plaintiff, he would only receive $88).

117. Plaintiff's compensation was therefore lowered by approximately $20,000 due to a lower bonus and equity.

118. Around that same time in February 2018, Schneider, Plaintiff dotted-line manager based in Singapore, on several occasions, referred to Plaintiff as being treated by his division's leadership as the "red-headed stepchild" of the division, acknowledging Plaintiff was not treated like others at his level.

XIII.     **Plaintiff Submits Complaints in 2018**

119. In February 2018, Plaintiff, as part of his continuous requests, again inquired with Setrakian as to whether he would receive personnel resources, as his requests were constantly "delayed." At the same time, Plaintiff's peers were receiving resources much quicker.

120. In March 2018, Plaintiff submitted a detailed written complaint to Setrakian, Baker, and Gladden requesting an explanation about his lower bonus despite the positive 2017 performance review.

121. Plaintiff again complained in the written request that he was receiving significantly less personnel support than anyone

else of an equivalent role at APT, after nearly a year at the department, despite his significant on-going health issues.

122. Even though each individual Plaintiff complained to was aware of Plaintiff's health issues, Plaintiff's inquiries were not responded to.

123. On March 22, 2018, Plaintiff again complained to Baker. Plaintiff's complaint was based on the fact that he did not receive support from Setrakian after his prior complaint.

124. Plaintiff shared another written document with Baker and provided an update regarding his ongoing health issues. The document stated:

    a. Plaintiff, as a Vice President, was not on parity with other APT regional leads (even in Asia). These ones, who are Senior Vice Presidents, not only get higher compensation and title recognition, but are also given more resources to operate such as sales people and consultants to deliver client projects.

    b. Plaintiff did not have a voice in key areas such as hiring for his own sales geography and who to hire, like other regional leads did. Setrakian kept Plaintiff out of the loop and continued the customer project staffing discussions with Lee for Plaintiff's region[1].

---

[1]    When two temporary resources were placed in the region, just three (3) months before Plaintiff was terminated, they were decided without providing Plaintiff a chance to give input. This is not APT normal procedure nor policy.

125. At the March 22, 2018 meeting, Baker informed Plaintiff that she had looked into his employment history and issues at Defendant MasterCard.

126. Upon information and belief, Baker spoke with Mehra's department, including Human Resources, about Plaintiff's pre-APT employment issues. Ostensibly, this conversation factored into Setrakian and Baker's decision that Plaintiff would not have a long-term role with APT.

127. Subsequent to the March 22, 2018 meeting, Plaintiff was explicitly informed by Schneider that Baker was "very unhappy" with Plaintiff's complaints, particularly because they were in writing.

128. Schneider again reiterated that Plaintiff was the "red-headed stepchild" of the APT division.

129. In response to his complaint, Setrakian retaliated by severely limiting communications with Plaintiff, and began making decisions about Plaintiff's work and projects in his scope without consulting him.

130. Setrakian's retaliatory behavior became much more distant and uninterested in Plaintiff's achievements and career after his complaint. Plaintiff communicated this to Setrakian, but Setrakian's attitude did not change.

## XIV.  <u>Plaintiff takes Paternity Leave</u>

131. In April 2018, Plaintiff took paternity leave for the birth of his son pursuant to Defendant's company policy.

132. At that time, Setrakian immediately transferred two APT employees from other countries who joined the Singapore office immediately for two to six months after Plaintiff went on paternity leave. This was done to ensure the sales engagements Plaintiff managed were not dropped.

133. Thus, Defendant quickly moved sales and consulting resources to Plaintiff's APT division within two weeks to cover for Plaintiff but failed to do so when Plaintiff continuously requested an ADA accommodation and his repeated requests for personnel assistance for many months.

## XV.  <u>Plaintiff Returns from Paternity Leave</u>

134. Plaintiff returned from paternity leave in May of 2018.

135. By the end of July 2018, Plaintiff surpassed his revenue target for the year 2018. Plaintiff surpassed his total sales goal of $1.1 Million in 2018 by doing $3.6 Million in total sales.

136. However, Plaintiff's health continued to suffer. Plaintiff's medical condition was exacerbated due to the pressure and stress related to working fourteen (14) hour days without personnel support.

137. Plaintiff's psychiatrist continued to advise earnestly that Plaintiff manage his schedule to better his health. Accordingly, Plaintiff continued to request support.

138. Comparatively, lower-level individuals were given administrative assistance, while Plaintiff, a Vice President, was still not given the same even though he had continuously requested the same for over a year.

139. Plaintiff highlighted his achievements to Setrakian in writing, yet Setrakian did not respond. Rather, Setrakian asked Lee, a peer of Plaintiff's located in Taiwan, to communicate to Plaintiff that he would be measured by different criteria that were intended for a first year Vice President of APT, a significantly lower-level role than Plaintiff's role as Regional Lead.

140. Pursuant to Plaintiff's role and job description, it was clear Plaintiff was not a first year Vice President and therefore not responsible for providing consulting support in his role, as he had been hired to head the Southeast Asia office and secure deals.

141. Plaintiff also informed Lee that their discussions were inappropriate, as the information was out of Lee's purview, but Lee insisted. Therefore, Plaintiff did end up speaking to Lee, rather than Setrakian, and again raised the issue related to requiring resources.

142. Lee again informed Plaintiff that he was not given new resources directly as a result of Plaintiff's health condition and its impact on Plaintiff's long-term future in his role.

143. The three resources that were placed in the Singapore office during Plaintiff's paternity leave refused to acknowledge Plaintiff as the leader of the region and continued to seek direction from other leaders at MasterCard including Setrakian and Lee.

144. This created additional stress on Plaintiff, as it was clear plans were in motion to transfer Plaintiff's job duties and responsibilities to others, and ultimately terminate Plaintiff. It also created additional difficulties for Plaintiff in his day-to-day work.

145. Plaintiff, despite these hurdles, continued to win business in the Southeast Asia region, which required support from consulting resources to fulfill the projects.

146. Rather than transfer consulting resources to the Singapore office, Lee and Setrakian decided to fly in consulting resources from Taiwan.

147. Key junior consulting resources started to quit the organization and advised Plaintiff of their displeasure about Defendant's refusal to relocate them to Singapore.

148. Plaintiff had several conversations with Lee, Baker, Gladden and Setrakian about the issue.

149. Gladden informed Plaintiff that it was APT policy to move resources as needed, and the junior resources should have been relocated immediately. However, Setrakian and Lee prevented the transfer of these resources.

## XVI.        Plaintiff Complains in July 2018

150. In July 2018, Plaintiff again raised concerns to his dotted line manager, Schneider, and co-president of MasterCard Asia Pacific, Sarker. Both Sarker and Schneider closely worked with Plaintiff and were regularly updated on Plaintiff turning around the APT business in the Southeast Asia region. Both were also aware of Plaintiff's health conditions.

151. Plaintiff provided a detailed account to Sarker and Schneider about the impact from lack of provision of resources from Setrakian was having on his health condition after trying for more than a year.

152. Schneider informed Plaintiff that Sarker was happy with Plaintiff's work in Singapore.

153. Schneider also told Plaintiff he would try to move Plaintiff to his own group in Singapore, so he would have more supportive management.

154. Sarker even requested a copy of Plaintiff's resume so he could circulate it within Singapore's Human Resources department.

155. Plaintiff then spoke to Setrakian and informed him the stress related to his work situation had not lessened, as the group

continually failed to support him with resources, and Plaintiff did not receive any accommodation.

156. Plaintiff further informed Setrakian that his stress was worsening, and that he would like to change roles within Defendant MasterCard. Plaintiff mentioned to Setrakian that he was meeting with his psychiatrist monthly, who managed his medication, and suggested Plaintiff move to a new role where he could get an accommodation for his condition.

157. Finally, Plaintiff mentioned he had initial conversations with Sarker and Schneider regarding a role change.

158. At that time, Setrakian asked Plaintiff if he was an Indian citizen and if his home was based in India. Setrakian was outwardly disappointed to learn that Plaintiff was a United States citizen.

159. Setrakian then ended the call prematurely.

**XVII.    <u>Plaintiff is Unlawfully Terminated</u>**

160. From the end of Plaintiff's paternity leave in May 2018, through August of 2018, Setrakian had only spoken to Plaintiff for a total of approximately twenty (20) minutes.

161. Setrakian told Plaintiff Baker made him aware of the issues Plaintiff had raised to her in March 2018.

162. In August of 2018, Sarker and Schneider set up multiple interviews for Plaintiff to transfer departments and into their own groups where they had oversight.

27

163. They informed Plaintiff there were two or three roles of immediate need and which Plaintiff was a good fit.

164. However, on or around August 15, 2018, the meetings were postponed with no explanation.

165. On August 16, 2018, Setrakian and Defendant's Human Resources personnel, Wadhera, informed Plaintiff that Defendant would be terminating him without cause, and presented him with a grossly inadequate separation agreement, which included releasing Defendant of any liability.

166. Despite having left his previous group approximately a year and a half before his termination and having dealt with APT Human Resources Manager Jessica Gladden since that time, Plaintiff was terminated by Wadhera, Human Resources manager when Plaintiff was in Mehra's group.

167. When Plaintiff transferred to the APT division, Wadhera had informed Plaintiff, in writing, that he should strictly deal with APT management and APT Human Resources going forward, as the APT department functioned independently.

168. On August 24, 2018, Plaintiff informed Defendant's Human Resources that he had retained legal counsel and that he had claims against Defendant under U.S. Equal Employment Opportunity ("EEO") laws.

169. Two days later, on or around August 26, 2018, Plaintiff was officially terminated without cause.

170. Defendant communicated within the organization that Plaintiff's termination was due to "health" issues.

171. Yet, when Plaintiff received his termination letter, no reason for termination was provided.

172. Plaintiff was shocked at his unlawful termination, as Sarker and Schneider informed him that they were looking for a new role for him.

173. Plaintiff's unlawful termination occurred despite the fact that he had met all goals in 2018. Plaintiff was not offered a bonus or equity within his severance package.

174. Plaintiff was offered approximately $20,000 to relocate himself and his family back to the United States, an amount significantly lower than anyone else from the company relocating back to the United States.

175. The relocation assistance offered to Plaintiff to move back to the United States was a small fraction of the relocation assistance of approximately $325,000 Defendant provided to him when he was initially transferred from New York to Singapore, and significantly less than what other employees, who were not in Plaintiff's protected class, gained when repatriating back to their originating countries.

176. Furthermore, Plaintiff's family size and relocation needs had increased while in Singapore, which is a key consideration in Defendant's relocation assistance policy.

177. Further, Defendant included, as a condition of the proposed severance package, that jurisdiction for any claims lie in Singapore. Ostensibly, Defendant sought to take away Plaintiff's rights under the United States EEO laws, even though he was a United States citizen, working for a United States based company.

178. Defendant did not provide Plaintiff with any severance package, unemployment compensation, out-placement services, medical insurance, or his accrued annual bonus.

179. Defendant moved him to Singapore with his family where he did not have a strong professional or personal network as he did in his home country (United States) and subsequently left him there without adequate resources to fend for himself, while he was taking care of his family with young children and battling his chronic health condition of depression.

180. At the time of his unlawful termination, Plaintiff's annual compensation was USD $378,160.

181. As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## XVIII.    Plaintiff Files an EEO Complaint

182. On or around November 26, 2018, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

183. Plaintiff had a pre-filing intake interview with the EEOC approximately one week later in early December 2108.

184. Subsequently, Plaintiff did not hear back from the EEOC for approximately two months.

185. Due to the well-publicized government shutdown, which ended on or around January 26, 2019, Plaintiff's Complaint was delayed and not processed until February of 2019.

186. During the EEOC process, Plaintiff was informed his termination was due to "performance" which was inconsistent with the reasoning he was given at the time of his unlawful termination.

187. This was the third separate reason given by Defendant for as justification for Plaintiff's termination.

### COUNT ONE

### UNLAWFUL DISCRIMINATION BASED UPON RACE AND NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, U.S.C.A. § 2000(e) et seq.

188. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

189. Plaintiff was subject to unlawful discrimination based upon his race and national origin.

190. In both roles Plaintiff was employed in by Defendant, he was treated less favorably than those individuals not of Indian national origin.

191. At the March 2016 group meeting, Peraino singled out Plaintiff despite the fact that he was working collaboratively on the project at issue in the meeting with Crum, Peraino, Shell, and Stanier. Plaintiff was the only individual junior to Peraino of Indian national origin.

192. Plaintiff complained to Crum about Peraino's abusive behavior, threats, and humiliating treatment occurring on multiple occasions. Crum did not acknowledge Plaintiff's concerns.

193. In February 2017, Plaintiff reported multiple instances of harassment and discrimination, occurring since early 2016, related to race and national origin by his superior, Peraino, to Defendant MasterCard's Human Resources and Employee Relations groups, based in Defendant's headquarters in New York.

194. No legitimate investigation was conducted into Plaintiff's claims of discrimination.

195. Despite meeting his objectives, Plaintiff's bonus was severely reduced, and his annual and regular equity grant was eliminated. Upon information and belief, no other individual who performed to the level of Plaintiff received a reduced bonus or had their equity grant eliminated.

196. Defendant blocked Plaintiff from projects and work which pertained to his role and reduced Plaintiff's annual bonus.

197. APT division's management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian national origin at junior levels, there was not one employee of Indian national origin at an SVP level.

198. Plaintiff was not given personnel resources that were on par with other, non-Indian VP's. Moreover, Plaintiff was given less support than his peers that are regional leads and employees in divisions that were one to two levels below him in seniority, none of whom were of Indian national origin.

199. Schneider, Plaintiff's dotted-line manager based in Singapore, on several occasions referred to Plaintiff as being treated by APT as the "red-headed stepchild" of the APT organization, meaning Plaintiff was not treated on par with others at his level.

200. Despite Plaintiff exceeding 2018's full-year sales targets within just the first six months of 2018, he was unlawfully terminated by Defendant in August of 2018.

201. Accordingly, Plaintiff was subject to unlawful discrimination based on his race and national origin, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e
_et_ _seq_.

**WHEREFORE,** the Plaintiff demands judgment against the
Defendant for the following:

1)   compensatory damages;

2)   pre-judgment interest;

3)   punitive damages;

4)   counsel fees;

5)   cost of suit; and

6)   any other relief that the court deems to be just
and equitable.

### COUNT TWO

### UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A. § 2000e(3)(a)

202. Plaintiff repeats and reasserts each of the allegations
in the preceding paragraphs as if same were set forth at length
herein.

203. Plaintiff was subject to unlawful retaliation by
Defendant.

204. Shortly after submitting his complaint, in May of 2016,
Plaintiff was informed that his job responsibilities and
performance objectives were being changed, mid-year, from
"creating" and constructing new payment products to "selling" pre-
built products around the world to banks.

205. Approximately one month after Plaintiff reported multiple instances of harassment and discrimination to Defendant's Human Resources and Employee Relations group in February 2017, Plaintiff was told to "move forward" and subsequently expressed that Plaintiff should make it his highest priority to seek other employment.

206. Plaintiff's wife was terminated with a settlement agreement in 2016 following her own allegations. Upon information and belief, Plaintiff was retaliated against as a result of her grievances against the very same division and human resources personnel, Mary Sexton and Meena Wadhera.

207. Defendant retaliated against Plaintiff by lowering Plaintiff's bonus and removing some of his benefits. Defendant significantly docked Plaintiff's pay reducing his annual bonus and eliminating his annual equity grant by about $50,000, which Plaintiff has received in each of his prior years.

208. While in the APT division in Singapore, Defendant took retaliatory action against Plaintiff upon Plaintiff's request for a role change and potential relocation after experiencing workplace harassment on the basis of his race and national origin, and later his attempt to resolve issues with his division being understaffed and being locked out of his responsibilities.

209. Defendant ensured that Plaintiff's division was understaffed and created multiple hardships, ostensibly in an

effort to drive Plaintiff out of the company, with Plaintiff being the sole employee and other similarly situated divisions having approximately twelve employees.

210. A month after Plaintiff requested a role change due to the repeated harassment in Singapore, Plaintiff was terminated without cause.

211. Before his termination, Plaintiff attempted to resolve his grievances and claims with Human Resources directly with the help of his U.S. counsel.

212. When Plaintiff made a proposal to resolve the above issues, Human Resources told him that all proposals will be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States. This relocation assistance represented a small fraction of the relocation provided to Plaintiff when he was initially transferred from New York to Singapore, and significantly less than other employees repatriated back to their originating countries.

213. Defendant retaliated against Plaintiff's action of hiring legal counsel and discussing claims by rescinding the initial separation package (which was grossly inadequate to begin with and required Plaintiff agreeing to legal jurisdiction of Singapore giving up his US EEO rights). Plaintiff suffered great financial cost to himself and his family.

214. As a direct and proximate result of Defendant's unlawful and retaliatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

215. Defendant's unlawful and retaliatory conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1) compensatory damages;

2) pre-judgment interest;

3) punitive damages;

4) counsel fees;

5) cost of suit; and

6) any other relief that the court deems to be just and equitable.

## COUNT THREE

## UNLAWFUL CREATION OF A HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.A. § 2000e et seq.

216. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

217. Plaintiff faced an on-going environment for two and a half years in Mehra's group so severe or pervasive that a reasonable person would find hostile or abusive.

218. Defendant made a job offer for Plaintiff to move to Singapore and paid for the move. Then, within two months, told the Plaintiff that the Defendant did not believe that the Plaintiff could do his job effectively from Singapore, thereby creating immense pressure and stress for the Plaintiff as he was stuck in a difficult situation after having moved ten thousand miles away from his home base and having sold his home in the United States as part of the relocation. Comments of this nature were made on an on-going basis by Plaintiff's superiors.

219. Peraino threatened Plaintiff by stating, "I am going to come after you," and ultimately succeeded.

220. Plaintiff was told by his supervisors to seek new employment in Singapore and to make that his "highest priority," hoping Plaintiff would voluntarily leave Defendant MasterCard.

221. Plaintiff was given sales targets for pre-built products by Mehra, despite the fact that no one else in the division run by Mehra, including the sales organization, had a sales target for the new product Plaintiff was helping create, except the Plaintiff.

Plaintiff was continuously rebuked for not selling these pre-built products, which obviously cannot be sold.

222. Defendant's conduct as alleged above constitutes disparate treatment based on the Plaintiff's race where the Defendant subjected the Plaintiff to more strenuous workloads, as well as work outside his job description while workers of other race did less strenuous work within their job description.

223. After his transfer to APT Division, Plaintiff's division was grossly understaffed and overworked compared to similarly situated departments and Plaintiff was the sole employee in the Singapore division, while similar international regions with similar mandates typically had about a dozen employees. Plaintiff was the only person of Indian national origin with this type of role, and therefore was treated differently due to his race and national origin.

224. Plaintiff's manager severely limited communications with him and began making decisions about Plaintiff's work and projects in his scope without consulting him. Plaintiff was also locked out of some of his responsibilities.

225. February 2018, Plaintiff continuously inquired with Setrakian as to whether he would receive personnel resources, as his requests were constantly "delayed." At the same time, Plaintiff's peers were receiving resources much quicker.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1) compensatory damages;

2) pre-judgment interest;

3) punitive damages;

4) counsel fees;

5) cost of suit; and

6) any other relief that the court deems to be just and equitable.

### COUNT FOUR

### UNLAWFUL DISABILITY DISCRIMINATION AND THE UNLAWFUL CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C.A. § 12101 et seq.

226. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

227. Plaintiff was subject to unlawful discrimination due to his status as a disabled person.

228. Plaintiff's dysthymia symptoms were severe exhaustion and lack of energy, severe sleep disturbances and inability to sleep, inability to concentrate and focus for more than short periods of time, difficulty interacting with others, and severe emotional distress and sadness. These symptoms were impacting Plaintiff at work and required tremendous effort and strong on-going medications by him to operate.

40

229. Plaintiff was a member of a protected class, namely, a qualified individual with a disability that he had communicated to his superiors and Human Resources.

230. Defendant knowingly created a hostile atmosphere in that it failed to provide Plaintiff the same support systems and employees as similarly situated divisions at Defendant company, forcing Plaintiff to overwork to compensate for the lack of support, and having full knowledge of Plaintiff's disability.

231. These additional resources were also part of Plaintiff's job description that was provided to him when he interviewed for and accepted the job.

232. When Plaintiff returned from his medical leave in October 2017, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job at Defendant.

233. Defendant not only denied Plaintiff's requests but provided less support than provided to peers with similar responsibilities as well as to subordinates two levels below him. Plaintiff was the sole employee in his division while similarly situated departments employed approximately twelve (12) employees.

234. After Plaintiff's return from medical leave, his manager Scott Setrakian and APT management reneged from the promise made in May 2017 of making Plaintiff a Senior Vice President, which is on par with his APT peers of similar responsibilities. This was

despite Plaintiff achieving more than what Setrakian had asked him to do in order to be promoted to an SVP.

235. Defendant ensured that the employees that were transferred to work under the Plaintiff refused to cooperate with him, instead seeking direction from Setrakian and Lee, which was a continuation of the hostile environment being created.

236. The hostile environment created and fostered by Defendant exacerbated Plaintiff's medical condition and culminated in his termination less than one month after Plaintiff finally requested a transfer and role change to mitigate the toll the hostile environment took on his health.

237. Plaintiff complained to Setrakian in July of 2018 and informed him the stress related to his work situation had not lessened, as the group continually failed to support him with resources, and Plaintiff did not receive any accommodation.

238. Despite Plaintiff's numerous complaints commencing as early as 2017, through his termination in August of 2018, went uninvestigated by Defendant.

239. Plaintiff's numerous requests for an accommodation, commencing as early as 2017, through his unlawful termination in August of 2018, were either denied or Defendant failed to respond.

240. Defendant discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment in the form of

discrimination based on Plaintiff's disability which was severe and pervasive.

241. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1) compensatory damages;

2)   pre-judgment interest;

3)   punitive damages;

4)   counsel fees;

5)   cost of suit; and

6)   any other relief that the court deems to be just and equitable.

**COUNT FIVE**

**UNLAWFUL RACE AND NATIONAL ORIGIN DISCRIMINATION
IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW,
N.Y. EXECUIVE LAW § 290 et seq.**

242. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

243. Plaintiff was subject to unlawful discrimination based upon his race and national origin.

244. Plaintiff was repeatedly harassed by his managers and superiors, which partially occurred in front of other Defendant employees, including in front of his manager, Crum, and department head Sachin Mehra.

245. Plaintiff was the only employee junior to the harassers that was of Indian national origin.

246. Plaintiff complained to his manager, Crum, about Peraino's abusive behavior, threats, and humiliating treatment occurring on multiple occasions. Crum did not acknowledge Plaintiff's concerns.

247. Peraino explicitly pushed for and ensured a poor year-end performance review for Plaintiff (just as he had threatened to do in the March 2016 incident).

248. In February 2017, Plaintiff reported multiple instances of harassment and discrimination, occurring since early 2016, related to race and national origin by his superior, Peraino, to Defendant MasterCard's Human Resources and Employee Relations groups, based in Defendant's headquarters in New York.

249. In response to Plaintiff's harassment complaint, Defendant's Human Resources Department and Employee Relations Department told Plaintiff to "move forward" and asked Plaintiff what he could do himself to not be a target of such behavior by

his superiors, essentially laying blame on Plaintiff. No legitimate investigation was ever conducted.

250. Subsequently, Defendant blocked Plaintiff from projects and work which pertained to his role and reduced Plaintiff's annual bonus.

251. APT division's management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities. Furthermore, while APT had numerous employees of Indian national origin at junior levels, there was not one employee of Indian national origin at an SVP level.

252. Despite Plaintiff exceeding 2018's full-year sales targets within just the first six months of 2018, he was unlawfully terminated by Defendant in July of 2018.

253. Setrakian, and Defendant's Human Resources personnel, Wadhera, informed Plaintiff that Defendant was terminating him without cause, and presented for review a grossly inadequate separation agreement which included releasing Defendant of any liability.

254. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

255. Accordingly, Plaintiff was subject to unlawful discrimination based on his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

      1)   compensatory damages;

      2)   pre-judgment interest;

      3)   punitive damages;

      4)   counsel fees;

      5)   cost of suit; and

      6)   any other relief that the court deems to be just and equitable.

## COUNT SIX

### UNLAWFUL DISABILITY DISCRIMINATION AND THE CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUIVE LAW § 290 et seq.

256. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

257. Plaintiff was subject to unlawful discrimination due to his status as a disabled person.

258. Plaintiff was a member of a protected class, namely, a qualified individual with a disability.

259. Defendant's conduct as alleged at length herein constitutes that Defendant knowingly created a hostile atmosphere in that it failed to provide Plaintiff the same support systems and employees as similarly situated divisions at Defendant company and per the official job description, forcing Plaintiff to overwork to compensate for the lack of support, and having full knowledge of Plaintiff's disability.

260. When Plaintiff returned from his medical leave in October 2017, he requested accommodations based on his chronic medical condition and the resources he was told would be hired when he started the new job at Defendant. Defendant not only denied Plaintiff's requests but provided less support than provided to peers with similar responsibilities as well as to subordinates two levels below him. Plaintiff was the sole employee in his division while similarly situated departments employed approximately twelve (12) employees.

261. Human Resources' promises to Plaintiff, before his medical condition was disclosed, were held back, including relocating to Singapore. In addition, hiring plans were frozen as Plaintiff's long-term career in the APT division and company with his medical condition was questioned. This further exacerbated Plaintiff's medical condition.

262. After Plaintiff's return from medical leave, his manager Scott Setrakian and APT management moved away from the promise made in May 2017 of making Plaintiff an SVP which is on par with his APT peers of similar responsibilities.

263. Defendant ensured that the employees that were transferred to work under the Plaintiff refused to cooperate with him, instead seeking direction from Setrakian and Lee, which was a continuation of the hostile environment being created.

264. The hostile environment created and fostered by Defendant exacerbated Plaintiff's medical condition and culminated in his termination less than one month after Plaintiff finally requested a transfer and role change to mitigate the toll the hostile environment took on his health.

265. Defendant discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment in the form of discrimination based on Plaintiff's disability which was severe and pervasive.

266. As a direct and proximate result of this unlawful discriminatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1)   compensatory damages;

2)   pre-judgment interest;

3)   punitive damages;

4)   counsel fees;

5)   cost of suit; and

6)   any other relief that the court deems to be just and equitable.

### COUNT SEVEN

### UNLAWFUL RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, N.Y. EXECUIVE LAW § 290 et seq.

267. Plaintiff repeats and reasserts each of the allegations in the preceding paragraphs as if same were set forth at length herein.

268. Plaintiff was subject to unlawful retaliation by Defendant.

269. Approximately one month after Plaintiff reported multiple instances of harassment and discrimination to Defendant's Human Resources and Employee Relations group in February 2017, Plaintiff was told to "move forward" and subsequently expressed that Plaintiff should make it his highest priority to seek other employment.

270. Plaintiff's wife was terminated with settlement agreement in 2016 following her own allegations. Upon information and belief, Plaintiff was retaliated against as a result of her grievances against the very same division and human resources personnel, Mary Sexton and Meena Wadhera.

271. Defendant retaliated against Plaintiff by lowering Plaintiff's bonus, and removing some of his benefits.

272. Defendant significantly docked Plaintiff's pay reducing his annual bonus and totally eliminating his annual equity grant, which Plaintiff has received in each of his prior years.

273. While in the APT division in Singapore, Defendant took retaliatory action against Plaintiff upon Plaintiff's request for a role change and potential relocation after experiencing workplace harassment on the basis of his race and national origin, and later his attempt to resolve issues with his division being understaffed and being locked out of his responsibilities.

274. Defendant ensured that Plaintiff's division was understaffed, with Plaintiff being the sole employee and other similarly situated divisions having approximately twelve employees.

275. Schneider, Plaintiff's dotted-line manager based in Singapore on several occasions referred to Plaintiff as being treated by APT as the "red-headed stepchild" of the APT

organization, meaning Plaintiff was not treated on par with others at his level.

276. A month after Plaintiff requested a role change due to the repeated harassment in Singapore, Plaintiff was terminated without cause.

277. Before his termination, Plaintiff attempted to resolve his grievances and claims with Human Resources directly with the help of his U.S. counsel. When he made a proposal to resolve the above issues, Human Resources told him that all proposals will be rejected and that he was to be given only partial and insufficient relocation assistance within tight timeframes to repatriate back to the United States. This relocation assistance represented a small fraction of the relocation provided to Plaintiff when he was initially transferred from New York to Singapore, and significantly less than other employees repatriated back to their originating countries.

278. As a direct and proximate result of Defendant's unlawful and retaliatory conduct Plaintiff has suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

279. Defendant's unlawful and retaliatory conduct was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant for the following:

1) compensatory damages;

2) pre-judgment interest;

3) punitive damages;

4) counsel fees;

5) cost of suit; and

6) any other relief that the court deems to be just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury as to all matters herein.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates ALAN GENITEMPO, ESQ. as trial counsel for the within matter.

## CERTIFICATION

I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

**PIRO, ZINNA, CIFELLI,**
**PARIS & GENITEMPO, LLC**
Attorneys for Plaintiff,
Sambit Pattanayak

BY:**/s/Alan Genitempo, Esq.**
    ALAN GENITEMPO, ESQ.

**CARABBA LAW FIRM P.C.**
Attorneys for Plaintiff,
Sambit Pattanayak

BY:**/s/Anthony Carabba, Esq.**
    ANTHONY CARABBA, JR. ESQ.

Dated: March 31, 2022