# PIRO ZINNA
## CIFELLI PARIS & GENITEMPO

JAMES M. PIRO
FRANK J. ZINNA
ANGELO CIFELLI, JR.
DAVID M. PARIS+†△
ALAN GENITEMPO *
RICHARD A. GRODECK†
DANIEL R. BEVERE †
TODD M. GALANTE*△
MICHELLE E. SMITH+

LIMITED LIABILITY COMPANY
─────
ATTORNEYS AT LAW

360 PASSAIC AVENUE
NUTLEY, NEW JERSEY  07110-2787
─────

(973) 661-0710
FAX: 973-661-5157
www.pirozinnalaw.com
e-mail: agenitempo@pirozinnalaw.com

KRISTEN JONES+
ALEX A. PASTORE
MICHAEL A. KORIBANICK
BRIAN M. FRANKOSKI*

∗  ALSO MEMBER OF NY BAR
+  ALSO MEMBER OF PA BAR
†  CERTIFIED BY THE SUPREME COURT
   OF NEW JERSEY  AS A CIVIL TRIAL ATTORNEY
△  RULE I:40 QUALIFIED MEDIATOR

April 18, 2022

**VIA ECF ONLY**
Honorable George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

> Re:   **Pattanayak v. MasterCard**
>       **Docket:  21-cv-02657-GBD**

Dear Judge Daniels:

This firm represents the Plaintiff, Sambit Pattanayak ("Plaintiff"), in connection with the above-referenced matter. Please accept this letter reply brief in response to Defendant Mastercard International Incorporated's ("Defendant") April 6, 2022 opposition to Plaintiff's application to file a Second Amended Complaint.

### I.   PLAINTIFF FILED HIS SECOND AMENDED COMPLAINT IN ACCORDANCE WITH THE COURT'S FEBRUARY 24, 2022 MEMORANDUM DECISION AND ORDER

The Court's February 24, 2022 Memorandum Decision and Order provides, "Plaintiff may seek leave to amend by letter application, attaching a proposed amended complaint on or before March 31, 2022, if such an amendment would not be futile." See, Dkt. No. 53 at p. 17. Plaintiff's Second Amended Complaint was filed by letter application, attached the proposed pleading, on or before March 31, 2022, with amendments that, as explained below, demonstrate the Second Amended Complaint is not futile. Accordingly, Plaintiff properly filed his Second Amended Complaint with the Court.

### II.   PLAINTIFF'S SECOND AMENDED COMPLAINT IS NOT FUTILE

Plaintiff's Second Amended Complaint addresses, revises, and supplements the factual allegations in which the Court determined contained deficiencies in its February 24, 2022 Memorandum Decision and Order. See, Dkt. No. 53 and Dkt. No. 54-1. Specifically, Plaintiff's Second Amended Complaint includes additional factual allegations within the 300-day period, as well as outside of the 300-day period, which state a plausible claim for relief under Title VII of the Civil Rights Act (Title VII") and the Americans with Disabilities Act ("ADA").

It is also important to note that, as argued by Plaintiff's counsel at the September 15, 2021 oral argument, one fact can support multiple causes of action. See, Dkt. No. 47 at 38:3-4.

> "A 'cause of action' may denote one of several separately stated claims in a pleading based on the same congeries of facts but related to different legal theories of recovery. A 'cause of action' may also denote a separately stated claim on the same congeries of facts, but for different legal relief. But even if there are variations in the facts alleged, or different relief is sought, the separately stated 'causes of action' may nevertheless be grounded on the same gravamen of the wrong upon which the action is brought."

Donovan v. Lewnowski, No. 03-CV-2985(DLI)(JO), 2005 WL 2095739, at *5 (E.D.N.Y. Aug. 30, 2005) (citing Schuylkill v. Fuel Corp. v. Nieberg Realty Corp., 250 N.Y. 304, 165 N.E. 456 (1929). Thus, Plaintiff's overlap of certain facts may appropriately be used, especially at the pleading stage, to support separate causes of action.

Plaintiff undoubtedly placed Defendant on notice of the discrimination, retaliation, harassment, and hostile work environment he faced, as he used those key words within his complaints. "The plaintiff must complain of discrimination in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII."); Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) ("the onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to his membership in a protected class"). Brantman v. Fortistar Capital, Inc., 15-CV-4774 (NSR), 2017 WL 3172864, at *7 (S.D.N.Y. July 22, 2017).

Furthermore, the Second Amended Complaint includes additional factual allegations which support a continuing violation theory under the law. Finally, the Court may exercise supplemental jurisdiction over the Plaintiff's New York State Human Rights Law ("NYSHRL") Claims. Accordingly, Plaintiff's Second Amended Complaint is not futile, as it sets forth plausible claims under Title VII, the ADA, and NYSHRL.

### a) Plaintiff's Second Amended Complaint Has Set Forth a Claim for Race and National Origin Discrimination.

Despite Plaintiff's significant restructuring of the Second Amended Complaint, which includes numerous additional factual allegations that both fall within the 300-day look back period as well as factual allegations which support a continuing violation theory, Defendant misleadingly argues Plaintiff relies "almost exclusively" on allegations falling outside of the statute of limitations. See, Dkt. No. 55 at p. 3.

Similarly, during the September 15, 2021 oral argument, Defendant's counsel misleadingly argued, "The claims of race and national origin discrimination, again, seem almost entirely to be based on Mr. Peraino's purportedly abusive language and foul language during this March 2016 meeting in New York." See, Dkt. No. 47 at 12:16-19. While the factual allegations pled clearly evidence Plaintiff's discrimination claim is not "almost entirely" based upon this incident, the above referenced incident was one of the initial instances of the discrimination faced by Plaintiff, which remained constant through Plaintiff's unlawful termination.

Hon. George B. Daniels
April 18, 2022
Page 3

Title VII of the Civil Rights Act of 1964 provides, "It shall be an unlawful employment practice for an employer. . .to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

A plaintiff must demonstrate 1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, (citing Feingold v. New York, 366 F.3d 138, 152 (2d Cir.2004)). The Supreme Court ruled that, in the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show discriminatory motivation. See, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). "[O]vert acts of racism are not necessary to establish an inference of discrimination under Title VII. Davis v. Nat'l R.R. Passenger Corp., 733 F. Supp. 2d 474, 491 (D. Del. 2010)

Plaintiff's Second Amended Complaint sets forth allegations commencing in or around November 2015, continuing through his unlawful termination, that establish a prima facie case of race and national origin discrimination in violation of Title VII. See, Dkt. No. 54-1 at ¶34. The allegations set forth are part of a similar pattern of discriminatory conduct, rather than separate, discrete acts of discrimination.

Initially, an egregious instance of discrimination faced by Plaintiff occurred in March of 2016, arising out of a meeting with Plaintiff's superior, David Peraino ("Peraino"). See, Dkt. No. 54-1 at ¶¶36-41. In response, Plaintiff, per the Defendant's employee handbook guidelines, filed a complaint with his supervisor, Richard Crum ("Crum"), specifically noting he was subjected to discrimination. Id. at ¶43. No investigation was had. Id. at ¶44. Plaintiff, the only employee junior to Peraino of Indian national origin, was then given new job responsibilities in which he had no experience, given sales targets in which no other team member had, and asked to do the work of dozens of personnel. Dkt. No. 54-1 at ¶¶47-50. Comparatively, no other non-Indian employee received the same tasks or treatment.

In 2017, Plaintiff, the only employee junior to Peraino of Indian national origin, received a "meets expectations" year-end review, which was peppered with negative feedback without proof or concrete examples. Dkt. No. 54-1 at ¶60. Yet, despite meeting expectations, Plaintiff's compensation of cash and stock was curtailed, which upon information and belief, did not occur with any of his peers. Id. at ¶62.

Throughout mid to end 2017, after Plaintiff's transfer to the Applied Predictive Technologies ("APT") division, Plaintiff, the only individual within the region of Indian national origin, was not provided with any of the personnel or support staff provided to other regions within APT. Dkt. No. 54-1 at ¶¶81-85. Defendant decided to not grant an extension to Plaintiff's leave of absence beyond two months due to Plaintiff's health/personal condition. Id. at ¶¶95-96. Comparatively, Plaintiff's colleague, who was not of Indian national origin, was granted approximately one year off work. Id. at ¶97.

In 2018, Plaintiff, despite receiving a positive year-end review and accomplishing all his objectives for 2017, had his compensation lowered. Dkt. No. 54-1 at ¶¶112-117. Plaintiff, the only Regional Head within the APT division of Indian national origin was, upon information and belief, the only individual to have had his compensation lowered despite a positive 2017. Id. Even

Plaintiff's dotted line manager recognized the disparate treatment faced by Plaintiff and referred to Plaintiff as being treated by the APT division as the "red headed stepchild" of the division. Id. at ¶118.

In February 2018, Plaintiff, as part of his continuous requests after his return from medical leave, submitted numerous additional complaints regarding the disparate treatment he faced in relation to personnel resources. Dkt. No. 54-1 at ¶119. In March of 2018, Plaintiff again submitted a detailed complaint regarding the compensation issue revolving around his 2017 year-end review, as well as the severely inconsistent receipt of resources as compared to Plaintiff's peers. Dkt. No. 54-1 at ¶¶120-121. Plaintiff then took paternity leave in or around April 2018 and returned in May 2018. ¶131. At that point, Plaintiff again requested personnel assistance. See, Dkt. No. 54-1 at ¶¶136-137. Comparatively, non-Indian employees at lower levels were given support while Plaintiff was continuously denied. Id. at ¶138.

Plaintiff again complained in July of 2018 of the disparate treatment he faced, as he still did not receive personnel support comparable to those in similar positions. See, Dkt. No. 54-1 at ¶¶150-156. Setrakian then explicitly asked Plaintiff if he was an Indian citizen and if his home was in India. Id. at ¶158. Setrakian was disappointed to learn that Plaintiff was a U.S. citizen. Id. Thus, Plaintiff can, and has, identified numerous employees outside of the protected class who had received more favorable treatment than him throughout his employment.

Thereafter, Plaintiff was terminated, without cause, on August 26, 2018. See, Dkt. No. 54-1 at ¶168. This came despite the fact Plaintiff had met all his 2018 goals. Id. at ¶173. Undoubtedly, there was no justifiable reason to terminate Plaintiff. Defendant then offered three separate reasons for Plaintiff plaintiff's termination, all of which were undeniably pretextual.

While the allegations set forth above are numerous, they are in no way exhaustive. The allegations set forth in the Second Amended Complaint constitute a continuing violation. Nevertheless, if the Court determines the allegations prior to May 1, 2018 to be untimely, Plaintiff has set forth additional factual allegations of discrimination after May 1, 2018. Accordingly, with all inferences in Plaintiff's favor, Plaintiff has set forth a plausible claim for discrimination under Title VII.

    b) **Plaintiff's Second Amended Complaint Sets Forth a Plausible Claim for Retaliation.**

Throughout Plaintiff's employment, he repeatedly engaged in protected activity by filing several formal and informal complaints against his supervisors, human resource partners, and superiors. In response, Plaintiff suffered adverse employment actions such as having his job duties and responsibilities changed, Defendant failed and/or refused to provide Plaintiff training in his new role, Defendant decreased his pay, removed resources, and ultimately, terminated Plaintiff, among other adverse employment actions. See, Dkt. No. 54-1 at ¶¶45-52, ¶¶115-117, ¶47, ¶169. Moreover, Plaintiff was retaliated against in response to his participation in the Equal Employment Opportunity ("EEO") process regarding his wife's claims, as well as opposing the unlawful conduct his wife Purnima was subjected to.

To establish a prima facie case of retaliatory discharge, Plaintiff must show (1) he was engaged in protected activity; (2) defendants were aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the termination or suspension. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir.1998). To constitute an adverse action for a retaliation claim, the allegedly retaliatory action must be

"materially adverse," in other words, it must be the type of action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 77 (2006). "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Id. A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or ... (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir.2000); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.1993).

Defendant's opposition to Plaintiff's proposed Second Amended Complaint raises issue to Plaintiff's inclusion of his complaints and participation in protected activity regarding the discriminatory treatment his wife endured. See, Dkt. No. 55 at pp. 3-4. Specifically, Defendant cites the Court's statement during the September 15, 2021 oral argument wherein Your Honor took issue that Plaintiff himself never complained about discrimination or retaliation on behalf of his wife. See, Dkt. No. 55 at pp. 3; See, Dkt. No. 47 at 19:14-20:9.

Plaintiff's Second Amended Complaint addresses and clarifies this issue. See, Dkt. No. 54-1 at ¶¶17-33, ¶35, ¶¶53-54 ¶¶69-70, ¶206. Plaintiff indeed actively participated in the complaints made to Human Resources on behalf of his wife, Purnima, regarding the discrimination she endured. This was ultimately done in a detailed written complaint to the Chief Human Resources Officer ("CHRO") Ron Garrow ("Garrow") of Defendant in August of 2015, when both Plaintiff and Purnima were residents of New York, and before accepting the offers to relocate to Singapore. In fact, Plaintiff drafted the written complaint to Garrow, which was delivered by Purnima.

Furthermore, Plaintiff provided extensive information about his own confidential compensation and benefits of the Singapore job offer to Purnima and told Purnima to explicitly use his name and information as a direct and concrete example to strengthen her discrimination complaint. Defendant was well aware of Plaintiff's providing information to Purnima, as the information used during negotiations was only available to Plaintiff. In fact, in Purnima's complaint to CHRO Garrow in August 2015, Plaintiff's name was cited five times for comparison to show discrimination. Based on this email, CHRO Garrow acknowledged, in writing, potential discrimination by Purnima's managers and department Human Resources partners. See, Dkt. No. 54-1 at ¶21-22.

Defendant was also aware of Plaintiff's assistance to his wife regarding her separation agreement. See, Dkt. No. 54-1 at ¶30. Plaintiff was the individual who reviewed and signed the separation agreement. Id. Given that Purnima was instructed not to share the confidential within the separation agreement with anyone, Human Resources Partners Mary Sexton and Meena Wadhera ("Wadhera") proposed Purnima use Plaintiff as a witness to the agreement, as he was supporting her in her claims. After Purnima's complaint to CHRO Garrow in Aug 2015 using Plaintiff's detailed inputs to support her discrimination case throughout Purnima's termination, and then soon after Plaintiff's own forced departure from Mehra's division to the APT division, Plaintiff was subjected to retaliation, and submitted several complaints to his supervisor, specifically complaining to retaliation. See, Dkt. No. 54-1 at ¶¶33-67.

At the time of Purnima's separation from employment in November 2016, she and Plaintiff worked in the same division with the same senior leadership. See, Dkt. No. 54-1 at ¶32. When

Purnima was subject to a Performance Improvement Plan, after she had made complaints, Plaintiff's group became hostile towards him in retaliation. See, Dkt. No. 54-1 at ¶35.

Ultimately, when Plaintiff left the division, Wadhera had informed Plaintiff, in writing, that he should strictly deal with APT management and APT Human Resources going forward, as the APT department functioned independently. See, Dkt. No. 54-1 at ¶¶166-167.

The above-referenced factual allegations within the Second Amended Complaint demonstrates Defendant knew Plaintiff supported Purnima's claims and provided detailed information to support her claims. Soon after, Plaintiff was subject to retaliation from his managers and Human Resources. See, Dkt. No. 54-1 at ¶30, ¶33, ¶¶69-70. Subsequently, Plaintiff complained to Defendant's Human Resources regarding the retaliation he faced because of Purnima's situation. Id.

When Plaintiff submitted his first complaint alleging threats discrimination, and harassment in 2016, his job duties and responsibilities were completely changed. See, Dkt. No. 54-1 at ¶¶43-45. As a result, Plaintiff submitted a complaint. See, Dkt. No. 54-1 at ¶46. In 2017, Plaintiff filed additional complaints specifically detailing the retaliation he faces as a result of the complaints he filed to his supervisors. See, Dkt. No. 54-1 at ¶70. Plaintiff was merely told to "move forward." Id. at ¶72.

In early 2018, while at the APT division, despite achieving his goals and receiving a positive year-end review, Plaintiff was retaliated against as a result of submitting numerous complaints alleging discrimination and retaliation. Accordingly, Plaintiff had his compensation lowered. See, Dkt. No. 54-1 at ¶¶115-117. In March of 2018, while in the APT Division, Plaintiff was explicitly informed by dotted-line manager, Senior Vice President Schneider, that APT President and Chief Human Resources Officer Baker was "very unhappy" that Plaintiff submitted Complaints against Defendant in writing. See, Dkt. No. 54-1 at ¶127. Immediately subsequent to these complaints, Plaintiff's manager Setrakian and superiors severely limited communications with Plaintiff, made decisions about Plaintiff's work and projects in his scope without consulting Plaintiff, delayed personnel support to Plaintiff, transferred temporarily personnel to Plaintiff's region who did not report to Plaintiff or follow Plaintiff's directions, and tried to change Plaintiff's performance criteria to a new set of goals which aligned with a much junior role. See, Dkt. No. 54-1 at ¶¶129-130, ¶¶138-141, ¶¶143, ¶¶146.

Also in 2018, Plaintiff informed Defendant's Human Resources that he had retained legal counsel and that he had claims against Defendant under U.S. Equal Employment Opportunity ("EEO") laws. See, Dkt. No. 54-1 at ¶168. Two days later, Plaintiff was terminated. Id. at ¶169.

Wadhera was the Human Resource Partner who terminated Plaintiff from the APT division even though she was part of Plaintiff's previous division, which Plaintiff had left about one and a half years earlier. See, Dkt. No. 54-1 at ¶166. Wadhera had explicitly informed Plaintiff in writing that she would not be dealing with Plaintiff's human resources matters after his departure from the previous division and move to the APT division. Id. at ¶167. During his employment at the APT division, Plaintiff was exclusively working with APT division human resources partners, not Wadhera.

While the allegations set forth above are numerous, they are in no way exhaustive. The allegations set forth in the Second Amended Complaint constitute a continuing violation. However, if the Court determines the claims prior to May 1, 2018 to be untimely, Plaintiff has set

forth factual additional allegations of retaliation after May 1, 2018. Accordingly, Plaintiff has set forth a plausible claim for retaliation under Title VII.

### c) Plaintiff's Second Amended Complaint Sets Forth a Plausible Claim for Hostile Work Environment.

As the Court set forth in its February 25, 2022 Memorandum Decision and Order, to state a claim for hostile work environment under Title VII, Plaintiff must demonstrate that the workplace exhibits "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and that the conduct is tied to the employee's race, gender, religion, or national origin. See, Dkt. No. 53 at p. 11 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. Harris, supra, 510 U.S. at 21. The incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997).Plaintiff's Second Amended Complaint sets forth numerous additional factual allegations which demonstrate the continuous and concerted effort on behalf of the Defendant, which deem its conduct pervasive.

Peraino did not merely threaten Plaintiff after the March of 2016 meeting, rather, Peraino carried out his explicit threat on various occasions. See, Dkt. No. 54-1 at ¶36, ¶41. Defendant did not merely block Plaintiff from projects at work, reduce his bonus, or cause Plaintiff to suffer from anxiety because he did not get a bonus. See, Dkt. No. 55 at p. 4. To minimize the severe and pervasive environment Plaintiff faced for approximately two years into those few instances is, to put it bluntly, offensive.

Plaintiff's Second Amended Complaint includes additional factual allegations, within the 300-day look-back period, which demonstrate Plaintiff is entitled to a continuing violation theory. For example, Plaintiff, while enduring significant health issues, was forced to work fourteen (14) hour days without support. See, Dkt. No. 54-1 at ¶136. At the same time, those of non-Indian national origin, and even those employed by Defendant at lower levels were liberally provided with personnel support while Defendant's were aware of Plaintiff's requests and the rapid deterioration of his health. Id. at 138. The Defendant's failure to aid Plaintiff, despite his countless requests, became so intolerable Plaintiff was forced to take a medical leave of absence. See, Dkt. No. 54-1 at ¶¶91-94.

Plaintiff was specifically directed to find alternative employment, despite his achievements and efforts for Defendant. See, Dkt. No. 54-1 at ¶¶64-67. Plaintiff was forced to do so in a country he was unfamiliar with, and did not have a career network. Without sales, consulting and clerical support provided to all other Regional Leads, Plaintiff was working fourteen (14) hour days. It was clear Defendant sought to make Plaintiff's work environment as difficult as possible in effort to force him to leave the company as a whole. See, Dkt. No. 54-1 at ¶¶100, ¶¶136. More importantly, Plaintiff was the only employee covering his region without personnel support, even though his job description provided he would be given said support. See, Dkt. No. 54-1 at ¶107

Plaintiff was explicitly told he did not have a long-term future with Defendant, which undoubtedly altered the conditions of Plaintiff's employment See, Dkt. No. 54-1 at ¶101. Plaintiff thereafter had his job duties and responsibilities usurped, Defendant continued to ignore his pleas

for help even with formal complaints filed, and ultimately, was forced to report to a peer, rather than his supervisors, which was against Defendant's policy. <u>See</u>, Dkt. No. 54-1 at ¶¶129-130, ¶139.

Plaintiff's peer, in July of 2018, again advised Plaintiff he was not given resources requested directly as a result of Plaintiff's protected class, and its impact on his long-term future with Defendant. <u>See</u>, Dkt. No. 54-1 at ¶142. Plaintiff was intimidated as a result, due to the fact that he was facing termination, for no reason, at any point thereafter. Moreover, it created additional stress to Plaintiff, as it was clear plans were set to remove Plaintiff from his position, and therefore created impossibilities in Plaintiff's day-to-day employment. <u>See</u>, Dkt. No. 54-1 at ¶141. This peer also advised Plaintiff that he would now be measured on new criteria, which no other non-Indian employee faced. <u>See</u>, Dkt. No. 54-1 at ¶¶138-140.

Finally, despite Plaintiff being the only employee of his division, when he returned from paternity leave, the three employees placed in the Singapore office that handled Plaintiff's responsibilities when he was out refused to acknowledge Plaintiff as their superior within the region. <u>See</u>, Dkt. No. 54-1 at ¶143. Instead, these individuals took direction from other leaders at Defendant Mastercard. <u>Id</u>.

Defendant attempted to, and succeeded in, making the environment as objectively abusive as possible. These incidents were not merely "episodic" but rather a continuing pattern throughout Plaintiff's employment. Since plaintiff has sufficiently pled a hostile work environment claim, he can demonstrate a continuing violation if each "at the very least allege[s] that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 220 (2d Cir.2004). Accordingly, Plaintiff has set forth a plausible claim for hostile work environment under Title VII.

**d) Plaintiff's Second Amended Complaint Sets Forth a Plausible Claim for Disability Discrimination under the ADA.**

The Court's February 25, 2022 Memorandum Decision and Order specifically references Plaintiff failed to demonstrate his requests for staff were denied after May 1, 2018, and are therefore time-barred. <u>See</u>, Dkt. No. 53 at 15. Moreover, the Court notes that even if timely, temporal proximity, without more, is insufficient to support an inference of disability discrimination. <u>Id</u>.

Plaintiff's Second Amended Complaint clarifies and expands upon the disability discrimination faced by Plaintiff. First and foremost, Plaintiff was forced to take a medical leave of absence in August 2017 due to his diagnoses of dysthymia. <u>See</u>, Dkt. No. 54-1 at ¶91. Thus, Plaintiff disclosed his medical issue, and formally requested additional personnel resources to help mitigate his work-related stress **both before and after** his leave of absence. <u>Id</u>. at ¶94, ¶¶98-111. Plaintiff submitted multiple complaints regarding Defendant's failure to provide him an accommodation, and Defendant's failure to provide Plaintiff with resources as set forth in his job description. <u>Id</u>. at ¶87, ¶109 and ¶119. Defendant failed to engage in the interactive process, and seemingly intentionally, caused Plaintiff to suffer the consequences.

In fact, Plaintiff was explicitly told, in or around July 2018, the resources designated to Plaintiff were intentionally being withheld from him **as a result of Plaintiff's health condition**, and its impact on Plaintiff's long-term future with Defendant <u>Id</u>. at ¶142. Plaintiff's supervisors

were keenly aware of his disability and deteriorating condition. Id. at ¶¶150-151. Despite this, at no point did any employee of Defendant seek to assist Plaintiff. Id. at ¶148.

Subsequently, **Defendant explicitly noted Plaintiff's termination was due to his health issues**. Id. at ¶170. Thus, Plaintiff can both demonstrate temporal proximity to evidence a causal nexus, as well as demonstrate a continuing violation. Accordingly, Plaintiff has set forth a plausible claim for disability discrimination under the ADA.

### e) Plaintiff May Assert Claims Under the NYSHRL.

A nonresident plaintiff may invoke the protection of the NYSHRL by proving that the discriminatory act or acts took place within the jurisdiction in question. Pearce v. Manhattan Ensemble Theater, Inc., 528 F. Supp. 2d 175, 184 (S.D.N.Y. 2007). In order for a nonresident to invoke the protections of the NYSHRL, [he] must show that "the discriminatory act had an impact within the boundaries of the State." E.E.O.C. v. Bloomberg L.P., 967 F.Supp.2d 816, 865 (S.D.N.Y. 2013) (citing Hoffman v. Parade Publ'ns, 15 N.Y.3d 285, 907 N.Y.S.2d 145, 933 N.E.2d 744 (2010)). Even "[w]here the discriminatory conduct occurs outside the geographical bounds of New York City, courts have found that the impact requirement is satisfied if the plaintiff alleges that the conduct has affected the terms and conditions of plaintiff's employment within the city." Anderson v. HotelsAB, LLC, 15cv712-LTS-JLC, 2015 WL 5008771, at *2 (S.D.N.Y. Aug. 24, 2015).[1] Application of the "impact" requirement to State Human Rights Law claims permits those who work in the state to invoke its protections. Hoffman v. Parade Publications, 15 N.Y.3d 285, 291 (2010). "Whether New York courts have subject matter jurisdiction over a nonresident plaintiff's claims under the HRLs turns primarily on [his] physical location at the time of the alleged discriminatory acts" Wolf v. Imus, 96 N.Y.S.3d 54, 55 (2019).

The Court's February 25, 2022 Memorandum Decision and Order plainly noted it would not exercise supplemental jurisdiction as the remaining claims had been dismissed, and therefore dismissed Plaintiff's state law claims without prejudice. See, Dkt. No. 53 at p. 16. However, the Court, at the September 15, 2021 oral argument, did address Plaintiff's state law claims. Specifically, the Court queried,

> "For example, and tell me when he has one of these things. Does he have a car registered in New York? Does he have a New York driver's license? Does he reside in New York? Does he have a work address in New York? Does he have a voter registration in New York? Does he have a bank account in a New York bank? Does he get pay stubs that come out of New York? Does he pay taxes in New York? And is the location of the discriminatory acts that he is complaining about, did all of those acts or a majority of those acts happen while he was in New York?"

See, Dkt No. 47 at ¶57:19-58:3.

---

[1] Courts have traditionally read the City and State Human Rights Laws in parallel. See Dunson v. Tri–Maintenance & Contractors, Inc., 171 F.Supp.2d 103, 113–14 (E.D.N.Y.2001) (citing cases); Mohamed v. Marriott Int'l, Inc., 905 F.Supp. 141, 157 (S.D.N.Y. 1995) ("The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York ....").

Hon. George B. Daniels
April 18, 2022
Page 10

      Plaintiff was a New York resident when he and his wife, Purnima, complained to CHRO Garrow in August of 2015, relating to Purnima's discrimination. <u>See</u>, Dkt No. 54-1 at ¶21. Plaintiff actively participated (drafted the complaint, allowed use of his name, provided information, as an example). <u>See</u>, Dkt No. 54-1 at ¶¶29-31. Moreover, prior to his move to Singapore, Plaintiff resided in White Plains, New York while working for Defendant, held a New York driver's licenses, paid New York income taxes, and had a New York home address.

      Moreover, Plaintiff traveled round-trip approximately once a month in 2015 and 2016 from Singapore to New York. <u>See</u>, Dkt No. 54-1 at ¶9, ¶11, ¶36, ¶42, ¶65, ¶68, ¶193, ¶¶242-279. The evidence will further demonstrate Plaintiff spent at least one week, and occasionally longer, in the New York Offices on each occasion. Unlike nearly all other employees based in Singapore, Plaintiff's managers, superiors, and team members were based in New York until May 2017.

      Furthermore, unlike most other Singapore based employees, Plaintiff's compensation and other expenses were entirely funded by Defendant's New York Office, Plaintiff's objectives and performance were determined by his New York-based manager and superiors, and Plaintiff worked daily and primarily with his New York based team. Thus, the matter at hand is distinguishable from <u>Kingston v. Int'l Bus. Machines Corp</u>., 135 N.Y.S.3d 9, 10 (2020), wherein the Kingston <u>only</u> traveled to New York "three times a year, for two to three days each visit." <u>Kingston</u>, 135 N.Y.S.3d at 10.

      Thus, Plaintiff can establish Defendant's conduct made a significant "impact" within New York State, as his physical location at the time of the discriminatory conduct was Defendant's New York office. In addition, the impact on Plaintiff was caused by the actions of individuals working in the State of New York, those being Plaintiff's supervisors. Accordingly, Plaintiff may maintain his NYSHRL claim as a matter of law.

      Thank you for your consideration in this matter.

                                    Respectfully submitted,
                                    **/s/ALAN GENITEMPO, ESQ.**
                                    Alan Genitempo

AG/lc
cc:    Diane Windholz, Esq.